**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

**AZIBO AQUART, Movant,**

**#15750-014**
**USP Florence – High**
**US Penitentiary**
**PO Box 7000**
**Florence, CO 81226**

**v.** **Case No. 3:06-cr-160-SRU-3**

**UNITED STATES OF AMERICA,**
**Respondent.**

---

**AMENDED MOTION PURSUANT TO 28 U.S.C. § 2255**

**TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

---

Monica Foster
Counsel to Azibo Aquart
Executive Director
Indiana Federal Community Defenders
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
T: (317) 383-3520
F: (317) 383-3525
monica_foster@fd.org

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ........ xv

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 5

CLAIMS RELATED TO INEFFECTIVE ASSISTANCE OF COUNSEL ........ 5

I. Trial counsel were ineffective in failing to pursue an available motion to exclude the DNA evidence, failing to investigate serious reliability issues with the DNA evidence, and failing to pursue a new trial motion when the state laboratory that analyzed the DNA lost its accreditation shortly after trial ........ 8

A. Factual background ........ 13

1. DNA Analysis as of 2011 ........ 13

a. Fundamentals of DNA typing and testing ........ 13

b. Difficulties associated with DNA mixture interpretation as of 2011 ........ 16

c. Concerns about the reliability of certain DNA testing methods and samples as of 2011 ........ 20

2. DNA evidence relating to Azibo Aquart ........ 22

3. Trial counsel learned before trial that there were serious questions about the reliability of the DNA evidence against Mr. Aquart. ........ 27

a. Trial counsel knew that the DNA Examiner had failed to estimate how many people's DNA was present in the evidentiary samples ........ 28

b. Trial counsel were aware that Ms. Roy had looked at the "suspect" profiles to determine "dropout" rather than making the dropout determination first and independent of the suspect profiles and had failed to document judgment calls that affected her conclusions. .......... 29

c. Trial counsel knew that the probability calculations used by the State laboratory were highly problematic. .......... 32

d. Trial counsel knew that contamination in the State laboratory had contaminated the evidence here. .......... 35

e. Trial counsel knew the State laboratory had destroyed the samples in the testing process so the DNA evidence in this case could never be retested. .......... 37

4. There were additional significant red flags concerning the DNA evidence that counsel failed to investigate or sufficiently consult with defense experts about. .......... 38

a. Widespread lab contamination and testing issues .......... 38

b. Pervasive quality control issues in the Connecticut State lab .......... 41

c. Lack of sufficient laboratory protocols .......... 42

d. Missing validations .......... 45

e. Validation and protocol concerns regarding variable injection times .......... 46

5. The government's DNA evidence at trial .......... 48

6. The State lab lost its accreditation shortly after trial, based on two highly critical FBI audits. .................. 55

B. Trial counsel were deficient in their handling of the DNA evidence. .................. 63

1. Trial counsel's failure to move for a *Daubert* hearing or to exclude or limit the DNA evidence based on the significant reliability issues counsel were aware of prior to trial was objectively unreasonable. .................. 63

2. Defense counsel failed to reasonably investigate other significant issues undermining the reliability of the government's DNA evidence. .................. 72

3. Trial counsel's failure to move for a new trial when the State lab was de-accredited was unreasonable. .................. 75

C. Counsel's deficient performance prejudiced Mr. Aquart. .................. 76

1. Had trial counsel sought a *Daubert* hearing, the jury never would have heard much or all of the DNA evidence. .................. 77

a. Widespread contamination and insufficient protocols and validations would have led to complete exclusion of the DNA evidence. .................. 77

b. The lack of internal validation of injection times over 10 seconds would have led to the exclusion of DNA evidence as to four of the key evidentiary samples. .................. 79

2. Exclusion or limitation of the DNA evidence would have undermined confidence in the verdict. .................. 80

II. Trial counsel were ineffective in failing to investigate and challenge latent print evidence. .......... 84

A. Factual background .......... 84

B. A qualified expert following best practices in the field at the time of trial would not have identified 021-03-L1 to Mr. Aquart and would have helped counsel identify problems with Pleckaitis's testimony. .......... 96

C. Trial counsel's performance in failing to move to exclude or limit latent print evidence and in hiring an unqualified expert was deficient. .......... 99

D. Trial counsel's deficient performance prejudiced Mr. Aquart because it permitted the government to portray the latent print evidence as conclusively establishing his guilt. .......... 104

III. Trial counsel were ineffective for failing to adequately consult with and to present a crime scene investigation expert. .......... 107

A. Factual background .......... 109

B. The failure to adequately consult a crime scene expert and to use one at trial was deficient performance. .......... 116

1. Violation of crime scene investigation standards .......... 117

a. The crime scene investigation violated long- and well-established best practices. .......... 118

b. The flawed crime scene investigation affected the reliability of the evidence. .......... 121

c. The flawed crime scene investigation also meant important evidence was not preserved and tested. .......... 127

2. Inconsistencies between crime scene evidence and eyewitness testimony .................... 134

C. Trial counsel's deficient performance prejudiced Mr. Aquart .................... 137

IV. Trial counsel were ineffective for failing to investigate and present evidence to challenge the government's witnesses against Mr. Aquart. .................... 139

A. Trial counsel failed to investigate readily available evidence to impeach John Taylor, the government's star witness, around whom the government built its case that Mr. Aquart personally participated in the homicides. .................... 139

1. Trial counsel failed to investigate and impeach Mr. Taylor's credibility with the myriad inconsistencies between his testimony and that of other key witnesses, including Lashika Johnson, as well as the forensic and crime scene evidence. .................... 140

a. Summary of Taylor's testimony about the crime .................... 140

b. Trial counsel's failure to adequately investigate and present evidence to impeach Taylor's story about what occurred two days before the homicides .................... 145

c. Trial counsel's failure to impeach Taylor with inconsistencies .................... 146

2. Trial counsel failed to cross-examine John Taylor on his release expectations. .................... 151

B. Trial counsel were ineffective for failing to investigate readily available evidence to impeach Lashika Johnson, who provided the only other direct evidence of Mr. Aquart's involvement in the homicides, along with John Taylor. .................... 153

1. Trial counsel failed to impeach Lashika Johnson with evidence that she changed her story only after the government threatened to put her in shackles, lock her in jail, and take her kids away. ........................................... 155

2. Trial counsel were ineffective for failing to impeach Lashika Johnson with the many inconsistencies in her prior statements. ............ 159

C. Trial counsel were ineffective for failing to impeach the statements of Efrain Johnson, as recounted by Lashika Johnson, with his inconsistent statements. .... 161

D. Trial counsel failed to use readily available evidence to impeach Rodney Womble's testimony and to demonstrate the likelihood Womble—not Mr. Aquart—engaged in criminal activity leading to the victims' deaths. .................................................. 165

1. Trial counsel failed to marshal evidence demonstrating the lengths to which Womble would go to free himself. .................................... 166

2. Trial counsel failed to cross-examine Womble about his joint development with Randolph of an alibi for the night of the murders. .............. 167

3. Trial counsel failed to present evidence of the extent of Womble's own motive to kill Tina Johnson. ........................................................... 168

4. Trial counsel failed to Impeach Womble with his Calls to Kendall Willis on the night of the murders, with his recorded jail calls referencing his phone records, or with his post-arrest communication with Willis. .............. 170

5. Trial counsel failed to impeach Womble about his statements to other pretrial detainees about who was actually responsible for the murders or to call a witness on this subject. ...................................... 171

6. Trial counsel failed to impeach Womble or Randolph with their statements doubting Mr. Aquart's participation in the murders. ........ 173

E. Mr. Aquart was prejudiced by trial counsel's failure to adequately impeach John Taylor, Lashika Johnson, Efrain Johnson, and Rodney Womble. ........... 174

V. Trial counsel were ineffective for failing to investigate and litigate the government's *Massiah* violation with respect to Shamarr Myers. ........ 176

VI. Trial counsel were ineffective in failing to exclude Lashika Johnson's testimony about Efrain Johnson's alleged admissions in violation of the Sixth Amendment. .................. 179

A. Deficient performance – trial counsel sought to exclude Efrain Johnson's alleged statements to his sister but unreasonably failed to move to bar those statements under all applicable grounds...................... 181

1. Trial counsel only moved to exclude Efrain Johnson's statements as non-self-incriminating. ........ 181

2. Trial counsel did not move to exclude Efrain Johnson's hearsay statements on the basis that they lacked reliability even though the government itself had determined that Efrain Johnson was untrustworthy.................... 185

B. Prejudice ........ 197

VII. Trial counsel were ineffective in failing to investigate and present evidence of third-party guilt. ...................................... 197

A. Mr. Aquart's alleged drug operation had been the target of other robberies. ........ 198

B. Rodney Womble, Sherrell Randolph, and others—separately from Mr. Aquart's alleged drug operation—participated in other similar criminal activity, including robberies of other drug dealers,

and such activity may have resulted in the murders. .......... 199

C. Jose "Letho" Osorio, an associate of Womble, had committed similar home-invasion robberies of drug dealers. .......... 199

D. Other drug-related home invasions also took place in the area while Mr. Aquart was incarcerated.......... 200

E. A turf war was underway between rival drug organizations over the Charles Street apartments, leading these or other persons to attack the victims.......... 201

VIII. Trial counsel provided ineffective assistance of counsel in failing to seek a continuance when the government provided voluminous and critical discovery, including witnesses' statements and phone records, on the eve of, and continuing through, trial.......... 202

IX. Trial counsel were ineffective in failing io investigate and present phone-record evidence.......... 204

X. Trial counsel were ineffective in failing to investigate and present evidence to challenge the government's claim that Mr. Aquart's brother Azikiwe stole Tina Johnson's phone during the homicides and later used the phone to call him.......... 204

XI. Trial counsel were ineffective in failing to investigate and present evidence concerning the gloves and glove fragments found at the crime scene.......... 208

XII. Trial counsel's failure to challenge evidence of Mr. Aquart's purported motive was ineffective assistance of counsel.......... 209

A. Witness testimony about a threat to Tina Johnson was easily impeached.......... 210

B. Trial counsel should have interviewed potential defense witnesses regarding the relationship between Tina Johnson and Mr. Aquart. .......... 212

C. Trial counsel failed to complete impeachment and show the Jury the import of Jacqueline Bryant's evolving testimony about threats to Tina Johnson. ...... 213

XIII. The cumulative effect of counsel's ineffectiveness in Mr. Aquart's case warrants post-conviction relief. ......................... 215

CLAIMS RELATED TO *BRADY v. MARYLAND* ....................................... 216

XIV. The government failed to disclose that it provided substantial benefits, made threats, and provided other inducements to its witnesses for their testimony..................... 217

A. John Taylor ............................................................ 218

B. Jackie Bryant ........................................................... 219

C. Frank Hodges ........................................................... 219

D. Juanita Hopkins ........................................................ 220

E. Lashika Johnson ........................................................ 220

F. Shamarr Myers .......................................................... 221

G. Sherrell Randolph ...................................................... 222

H. Judith Rivera ........................................................... 222

I. Randi Washington ...................................................... 223

J. Shante Pettway ......................................................... 223

K. Rodney Womble ......................................................... 224

XV. The government failed to disclose that law enforcement had concluded Efrain Johnson was not a believable witness. ............................................................ 224

XVI. The government failed to disclose critical evidence that could have impeached John Taylor's testimony. ...................... 225

XVII. The government failed to disclose evidence and information that suggested persons other than Azibo Aquart were responsible for the homicides. ............................ 226

XVIII. The government failed to disclose evidence and information that could have been used to challenge the testimony of Shamarr Myers .................................................. 226

XIX. The government failed to disclose evidence and information that could have been used to challenge its DNA evidence. ................................................................ 227

XX. The government failed to disclose evidence and information that could have been used to challenge its fingerprint evidence. ............................................................. 228

XXI. The government's late discovery of critical evidence violated *Brady* ....................................................................... 228

XXII. The government failed to disclose phone and other records. ........................................................................... 229

XXIII. The cumulative effect of the ineffective assistance of counsel and *Brady* violations undermines confidence in the result of Mr. Aquart's trial. ............................................... 230

CLAIMS RELATED TO *NAPUE v. ILLINOIS* & *GIGLIO v. UNITED STATES* .................................................................................. 231

XXIV. The government's witnesses minimized, or failed to disclose inducements, including benefits and threats, obtained from the government in exchange for testimony. ..... 231

A. The government presented, and failed to correct, false testimony through John Taylor. ........................... 232

B. The government presented, and failed to correct, false testimony through Lashika Johnson. .................... 233

C. The government presented, and failed to correct, false testimony through Sherrell Randolph .................. 233

D. The government presented, and failed to correct, false testimony through Frank Hodges. ........................ 234

E. The government presented, and failed to correct, false testimony through Jacqueline Bryant .................. 234

F. The government suggested in closing argument that Rodney Womble had been cleared by DNA Analysis and failed to correct that falsehood................ 234

G. The government presented, and failed to correct, false testimony through Shamarr Myers...................... 236

H. The government presented, and failed to correct, false testimony through Christine Roy......................... 236

I. The government presented, and failed to correct, false testimony of John Pleckaitis................................ 238

J. The government presented, and failed to correct, evidence unconnected to the homicides that created a false and misleading impression of Mr. Aquart's involvement................................................................ 239

K. The government presented, and failed to correct, crime-scene evidence that created a false and misleading impression of Mr. Aquart's involvement..... 239

[redacted]

[redacted]

XXVIII. Mr. Aquart was denied his Sixth Amendment right to conflict-free counsel and his Fifth and Sixth Amendment rights to learned counsel. ........................................................ 259

A. Mr. Aquart was denied his right to conflict-free representation. ............................................................ 259

[redacted]

B. Mr. Aquart's Fifth and Sixth Amendment rights were violated when trial counsel failed to request and the Court failed to appoint him Learned Counsel until almost two years after Mr. Aquart was first charged. .......... 268

XXIX. The government violated Mr. Aquart's Sixth Amendment right by using jailhouse informant Shamarr Myers to deliberately elicit incriminating statements. .......... 269

A. The government elicited incriminating evidence from Mr. Aquart through jailhouse informant Myers. .......... 270

B. The government's conduct violated *Massiah*, and the testimony elicited by Myers at the government's direction prejudiced Mr. Aquart. .......... 276

XXX. Trial counsel provided ineffective assistance of counsel, in violation of Mr. Aquart's Sixth Amendment rights, in failing to raise meritorious challenges to the charges and evidence against him. .......... 278

A. Trial counsel provided ineffective assistance of counsel when they failed to challenge the VICAR counts of indictment .......... 278

B. Trial counsel provided ineffective assistance of counsel when they failed to challenge the drug-related murder counts of the indictment. .......... 280

C. Trial counsel provided ineffective assistance of counsel when they failed to raise a Sixth Amendment Speedy Trial Challenge to the over five-year pretrial delay. .......... 283

D. Trial counsel provided ineffective assistance of counsel when they failed to raise a Sixth Amendment Confrontation Clause Challenge to the testimony of Lashika Johnson. .......... 285

E. The government violated Mr. Aquart's due process rights when it relied on false information. .......... 286

F. Trial counsel provided ineffective assistance of counsel in failing to investigate and present evidence that would have shown Mr. Aquart's criminal history was wrongly calculated. ...................... 288

XXXI. The fundamental fairness of the entire trial was undermined by the introduction of scientific evidence that would not be admissible today, the introduction of testimony at odds with the DNA, and the government's failure to investigate other suspects. ....................................... 289

A. The DNA analyses admitted against Mr. Aquart would not be considered reliable science today. ............ 289

1. Changing understanding of the pervasive impact of contamination on the reliability of forensic testing .................................................... 291

2. Changing understanding of the inappropriateness of using the Combined Probability of Inclusion to interpret complex mixtures ............................................................. 296

3. Changing understanding of the foundational importance of documented validation studies and consistent interpretation procedures ........... 301

B. The presentation by the government of cooperating witness testimony that it knew squarely conflicted with the DNA evidence violated Due Process................ 306

C. Mr. Aquart's conviction violates due process because it is based on unreliable science regarding latent impression evidence. .......................................... 306

XXXII. Mr. Aquart's due process rights were violated by the government's failure to investigate other suspects. ................. 308

XXXIII. Mr. Aquart is factually and legally innocent of the charges. ........................................................................... 308

CONCLUSION.............................................................................................. 309

REQUEST FOR RELIEF ........................................................................... 310

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) .......... 78

*Barefoot v. Estelle*,
463 U.S. 880 (1983) .......... 83

*Barrett v. United States*,
607 U.S. 128 (2026) .......... 281, 284

*Bibbins v. Dalsheim,*
21 F.3d 13 (2d Cir. 1994) .......... 257, 258

*Bobby v. Van Hook*,
558 U.S. 4 (2009) .......... 5

*Bryant v. Thomas*,
274 F.Supp.3d 166 (S.D.N.Y. 2017) .......... 75, 83

*Bullcoming v. New Mexico*,
564 U.S. 647 (2011) .......... 92

*Chapman v. California*,
386 U.S. 18 (1967) .......... 277

*Chessman v. Teets*,
354 U.S. 156 (1957) .......... 1

*Crane v. Kentucky*,
476 U.S. 683 (1986) .......... 198

*Cuyler v. Sullivan*,
466 U.S. 335 (1980) .......... 259

*Crawford v. Washington*,
541 U.S. 36 (2004) .......... 264

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .......... *passim*

*Davis v. Velez*,
797 F.3d 192 (2d Cir. 2015)........................................................................183

*Dugas v. Coplan*,
428 F.3d 317 (1st Cir. 2005)........................................................................230

*Duncan v. Ornoski*,
528 F.3d 1222 (9th Cir. 2008)........................................................................72

*Dyer v. Calderon,*
151 F.3d 970 (9th Cir.1998)........................................................................242

*Elmore v. Ozmint*,
661 F.3d 783 (4th Cir. 2011), *as amended* (Dec. 12, 2012)..................................72

*Engle v. Isaac*,
456 U.S. 107, 126 (1982)........................................................................309

*Feather v. United States*,
18 F.4th 982 (8th Cir. 2021)........................................................................290

*Fernandez v. United States*,
146 S. Ct. 1292 (2026)........................................................................309

*Fischer v. Smith*,
780 F.3d 556 (2d Cir. 2015)........................................................................178

*Florida v. Nixon*,
543 U.S.175 (2004)........................................................................7

*Gersten v. Senkowski*,
426 F.3d 588 (2d Cir. 2005)..................................................71, 72, 77, 100

*Giglio v. United States*,
405 U.S. 150 (1972) ........................................................................*passim*

*Gimenez v. Ochoa*,
821 F.3d 1136 (9th Cir. 2016)........................................................................290

*Glossip v. Oklahoma*,
604 U.S. 226 (2025)........................................................................287

*Gonzales v. McKune*,
247 F.3d 1066 (10th Cir. 2001)........................................................................230

*Han Tak Lee v. Houtzdale SCI*,
798 F.3d 159 (3d Cir. 2015) ........ 290

*Hemphill v. New York*,
595 U.S. 140 (2022) ........ 286

*Holmes v. South Carolina*,
547 U.S. 319 (2006) ........ 198

*Irvin v. Dowd*,
366 U.S. 717 (1961) ........ 256

*Johnson v. United States*,
860 F.Supp.2d 663 (N.D. Iowa 2012) ........ 216

*Kimmelman v. Morrison*,
477 U.S. 365 (1986) ........ 74, 179

*Kubat v. Thieret,*
867 F.2d 351 (7th Cir. 1989) ........ 230

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ........ 10

*Lindstadt v. Keane*, 239 F.3d 191
(2d Cir. 2001) ........ *passim*

*Mammone v. Jenkins*, 49 F.4th 1026
(6th Cir. 2022) ........ 102

*Massiah v. United States*,
377 U.S. 201 (1964) ........ *passim*

*Massillon v. Conway*,
574 F. Supp. 2d 381 (S.D.N.Y. 2008) ........ 80

*Mayo v. Henderson*,
13 F.3d 528 (2d Cir. 1994) ........ 63, 77, 99

*McDonough Power Equipment, Inc. v. Greenwood*,
464 U.S. 548 (1984) ........ 241, 242

*Melendez-Diaz v. Massachusetts*,
557 U.S. 305 (2009) ........ 91

*Mickens v. Taylor*,
535 U.S. 162 (2002) .......... 264, 265

*Moeller v. Weber*,
649 F.3d 839 (8th Cir. 2011) .......... 81

*Napue v. Illinois*,
360 U.S. 264 (1959) .......... *passim*

*Osborne v. Terry*,
466 F.3d 1298 (11th Cir. 2006) .......... 137

*United States ex rel. Owen v. McMann,*
435 F.2d 813 (2d Cir.1970) .......... 256, 257

*Padilla v. Kentucky*,
559 U.S. 356 (2010) .......... 5

*Pavel v. Hollins*,
261 F.3d 210 (2d Cir. 2001) .......... 77

*Phillips v. Woodford*,
267 F.3d 966 (9th Cir. 2001) .......... 230

*Porter v. McCollum*,
558 U.S. 30 (2009) .......... 5, 6

*Purcell v. United States*,
158 F.4th 441 (2d Cir. 2025) .......... 63, 70, 99, 100

*Remmer v. United States,*
347 U.S. 227(1954) .......... 256, 257

*Richards v. Quarterman*,
566 F.3d 553 (5th Cir. 2007) .......... 230

*Richey v. Bradshaw*,
498 F.3d 344 (6th Cir. 2007) .......... 101

*Rivas v. Fischer*,
780 F.3d 529 (2d Cir. 2015) .......... 71, 75, 83, 103

*Rompilla v. Beard*,
545 U.S. 374 (2005) .......... 5, 7

*Selsor v. Kaiser*,
81 F.3d 1492 (10th Cir. 1996) ........ 263

*Smith v. United States*,
360 U.S. 1 (1959) ........ 282

*Strickler v. Greene*,
527 U.S. 263 (1999) ........ 216

*Strickland v. Washington*,
466 U.S. 687 (1984) ........ *passim*

*Sullivan v. Louisiana*,
508 U.S. 275 (1993) ........ 282

*Townsend v. Burke*,
334 U.S. 740 (1948) ........ 287

*United States v. Aquart*,
912 F.3d 1 (2d Cir. 2018) ........ 2, 4, 152

*United States v. Aquart,*
92 F.4th 77 (2d Cir. 2024) ........ 4, 280, 284, 285

*United States v. Black*,
918 F.3d 243 (2d Cir. 2019) ........ 285

*United States v. Blau,*
159 F.3d 68 (2d Cir.1998) ........ 260

*United States v. Bonds,*
12 F.3d 540 (6th Cir. 1993) ........ 68

*United States v. Boney*,
977 F.2d 624 (D.C. Cir. 1992) ........ 249

*United States v. Colombo*,
869 F.2d 149 (2d Cir. 1989)) ........ 245, 249

*United States v. Coronado-Cervantes,*
912 F. Supp. 497 (D.N.M. 1996) ........ 68

*United States v. Cromitie*,
727 F.3d 194 (2d Cir. 2013) ........ 309

*United States v. Cruz*,
785 F.2d 399 (2d Cir. 1986)........................................................ 178, 276

*United States v. Curcio,*
680 F.2d 881 (2d Cir. 1982)........................................................ 259, 260

*United States v. Ebbers*,
458 F.3d 110 (2d Cir. 2006)........................................................ 163

*United States v. Farhane,*
634 F.3d 127 (2d Cir. 2011)........................................................ 256

*United States v. Gladden*,
394 F. Supp. 3d 465 (S.D.N.Y. 2019)........................................ 75, 81

*United States v. Greer*,
285 F.3d 158 (2d Cir. 2002)........................................................ 243

*United States v. Hebshie,*
754 F. Supp. 2d 89 (D. Mass. 2010)................................ 69, 71, 100, 101, 102

*United States v. Henry*,
447 U.S. 264 (1980)..................................................................... 278

*United States v. Hines,*
55 F. Supp. 2d 62 (D. Mass. 1999)................................................ 71

*United States v. Iorizzo*,
786 F.2d 52 (2d Cir. 1986)........................................................... 260

*United States v. Johnston*,
No. 23-cr-13, 2025 WL 964073 (E.D.N.Y. Mar. 30, 2025)................ 46, 80

*United States v. Katsougrakis,*
715 F.2d 769 (2d Cir. 1983)........................................................ 190, 197

*United States v. Lemke*,
No. 22-156, 2023 WL 192493 (2d Cir. Jan. 17, 2023) ........................ 261

*United States v. Lieberman*,
637 F.2d 95 (2d Cir. 1980)........................................................... 190

*United States v. Malcolm*,
432 F.2d 809 (2d Cir. 1970)........................................................ 288

*United States v. Matthews*,
20 F.3d 538 (2d Cir. 1994)........................................................................ 190

*United States v. Matos*,
905 F.2d 30 (2d Cir. 1990)........................................................................ 180

*United States v. McKinney*,
429 F.2d 1019 (5th Cir. 1970) .................................................................. 257

*United States v. Miller*,
954 F.3d 551 (2d Cir. 2020)...................................................................... 184

*United States v. Monteleone*,
257 F.3d 210 (2d Cir. 2001)...................................................................... 308

*United States v. Nieves*,
58 F.4th 623 (2d Cir. 2023) ...................................................................... 248

*United States v. Ortiz*,
736 F.Supp.3d 895 (S.D. Cal. 2024)......................................................... 305

*United States v. Pelton*,
578 F.2d 701 (8th Cir. 1978) .................................................................... 184

*United States v. Pennick*,
713 F. App'x 33 (2d Cir. 2017) ................................................................. 285

*United States v. Sanchez*,
969 F.2d 1409 (2d Cir. 1992).................................................................... 134

*United States v. Sasso,*
59 F.3d 341 (2d Cir.1995) ........................................................................ 183

*United States v. Schwarz,*
283 F.3d 76 (2d Cir.2002) ........................................................................ 258

*United States v. Smith*,
869 F.2d 348 (7th Cir. 1989) ...................................................................... 69

*United States v. Stewart*,
433 F.3d 273 (2d Cir. 2006)............................................................ 245, 308

*United States v. Stewart*,
907 F.3d 677 (2d Cir. 2018)............................................................ 164, 165

*United States v. Tigano*,
880 F.3d 602 (2d Cir. 2018)........................................................................ 285

*United States v. Torres*,
128 F.3d 38 (2d Cir. 1997)........................................................................ 243

*United States v. Trala*,
162 F. Supp. 2d 336 (D. Del. 2001)............................................................ 79

*United States v. Trzaska*,
111 F.3d 1019 (2d Cir. 1997)...................................................................... 164

*United States v. Tuzman*,
No. 15-cr-536, 2017 WL 6527261 (S.D.N.Y. Dec. 18, 2017).......................... 79

*United States v. Wexler*,
522 F.3d 194 (2d Cir. 2008)............................................................... 183, 187

*United States v. Wiley*,
846 F.2d 150 (2d Cir. 1988)........................................................................ 257

*United States v. Williams*,
927 F.2d 95 (2d Cir. 1991).......................................................................... 184

*United States v. Wooden*,
595 U.S. 360 (2022)..................................................................... 281, 284

*United States v. Wrensford*,
No. 2013-0003, 2014 WL 1224657 (D.V.I. Mar. 25, 2014)............................ 79

*Usher v. Ercole*,
710 F. Supp. 2d 287 (E.D.N.Y. 2010)...................................................... 73, 81

*Walker v. City of New York*,
No. 14-cv-680, 2024 WL 4198451 (E.D.N.Y. Sept. 16, 2024).......................... 83

*Wiggins v. Smith*,
539 U.S. 510 (2003)...................................................................................... 5, 6

*Williams v. Taylor*,
529 U.S. 362 (2000)...................................................................................... 249

*Williamson v. United States*,
512 U.S. 594 (1994)...................................................................................... 185

*Wood v. Georgia*,
450 U.S. 261 (1981) ........................................................................ 260, 264

*United States ex rel. Zembowski v. DeRobertis,*
771 F.2d 1057 (7th Cir. 1985) ........................................................... 264

**State Cases**

*Burgos v. Comm'r of Correction*,
No. CV17-4008805-S, 2023 WL 2495405, *aff'd*, 229 Conn. App. 818 (2024),
*cert. denied*, 351 Conn. 912 (2025)........................................................ 76

*E.I. du Pont de Nemours & Co., Inc. v. Robinson*,
923 S.W.2d 549 (Tex. 1995) ................................................................. 70

*People v. Collins*,
15 N.Y.S.3d 564 (N.Y. Sup. Ct. 2015)................................................... 306

*People v. Hillary*, Ind.
No. 2015-15 (St. Lawrence Cty. Ct., N.Y., Aug. 26, 2016)...................... 305

*People v. Venegas*,
18 Cal.4th 47 (1998) ........................................................................... 68

*People v. Williams*,
35 N.Y.3d 24 (N.Y. 2020) .................................................................... 83

*People v. Wright*,
25 N.Y.3d 769 (N.Y. 2015) .................................................................. 83

*State v. Bennett*,
324 Conn. 744 (Conn. 2017)................................................................. 76

*United States v. Porter*,
618 A.2d 629 (D.C. 1992) .................................................................... 15

**Statutes**

18 U.S.C. § 924........................................................................................ 280

18 U.S.C. § 1959(a) ............................................................................. 2, 279

21 U.S.C. § 841........................................................................................ 282

21 U.S.C. § 848................................................................................. 2, 281, 282

21 U.S.C. § 851 .......... 275

CONN. GEN. STAT. §§ 53–54 .......... 279

Fair Sentencing Act of 2010,
Pub. L. No. 111–220, 124 Stat. 2372 (2010) .......... 282

Science, State, Justice, Commerce, and Related Agencies Appropriations Act of 2006,
Pub. L. No. 109-108, 119 Stat. 2290 (2005) .......... 20

**Rules**

FED. R. CRIM. P. 44(c) .......... 260

FED. R. EVID. 403 .......... 10, 11

FED. R. EVID. 608 .......... 168

FED. R. EVID. 613 .......... 215

FED. R. EVID. 702 .......... *passim*

FED. R. EVID. 804 .......... *passim*

FED. R. EVID. 806 .......... 164, 165, 168

**Constitutional Provisions**

U.S. CONST. amend. V .......... *passim*

U.S. CONST. amend. VI .......... *passim*

U.S. CONST. amend. VIII .......... 245

**Other Authorities**

ANSI National Accreditation Board General Requirement for the Competence of Testing Laboratories ISO 17025 .......... 294

Bert Black et al., *Science and the Law in the Wake of* Daubert*: A New Search for Scientific Knowledge*, 72 TEX. L. REV. 715, 789 (1994) .......... 69

Brenner, C.H. *The mythical "exclusion" method for analyzing DNA mixtures – does it make any sense at all?*, PROCEEDINGS OF THE AMERICAN ACADEMY OF FORENSIC SCIENCES, Feb 2011, Volume 17, .......... 35

FED. R. EVID. 804, Notes of Advisory Committee (2011) .......... 182

GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, 31 Hofstra L.R. 913 (A.B.A. 2003) .......... *passim*

John Butler, ADVANCED TOPICS IN FORENSIC DNA TYPING: INTERPRETATION (2014) .......... *passim*

John Butler, FUNDAMENTALS OF FORENSIC DNA TYPING (1st ed. 2010) .......... *passim*

Butler, et al., DNA MIXTURE INTERPRETATION: A NIST SCIENTIFIC FOUNDATION REVIEW (2024) .......... 302

John M. Butler, *History of DNA Mixture Interpretation: Supplemental Document to DNA Mixture Interpretation: A NIST Scientific Foundation Review* (2024) .......... 303

Michael Coble, *Interpretation Errors Detected in a NIST Interlaboratory Study on DNA Mixture Interpretation in the U.S.*, International Forensics Symposium on Error Management (July 22, 2015) .......... 298

MODEL RULES OF PRO. CONDUCT (A.B.A. 2023) .......... 259

James M. Curran & John Buckleton, *Inclusion Probabilities and Dropout*, J. FORENSIC SCI. 55 (2010) .......... 65, 66, 297

Heidi Eldridge, *The Shifting Landscape of Latent Print Testimony: An American Perspective*, J. OF FORENSIC SCIENCE & MEDICINE, Apr.-June 2017 .......... 105

Robert Epstein, *Fingerprints Meet Daubert: The Myth of Fingerprint "Science" is Revealed*, 75 S. CAL. L.R. 605 (2002) .......... 88

FBI, *External DNA Audit Report on Compliance with the FBI Director's Quality Assurance Standards for Forensic DNA Testing Laboratories,* Audit of the Connecticut Department of Public Safety Forensic Science Laboratory, July 11-13, 2011 .......... *passim*

FBI, *External DNA Audit Report on Compliance with the FBI Director's Quality Assurance Standards for DNA Databasing Laboratories*, Audit of the Connecticut Department of Public Safety Forensic Science Laboratory, July 11-13, 2011 .......... *passim*

FBI Quality Assurance Standards (2009) .......... *passim*

FBI Quality Assurance Standards (2025)................................................................294

Lyn Haber & Ralph Norman Haber, *Scientific validation of fingerprint evidence under Daubert, Law Probability and Risk,* 7(2), 87-109 (2008) .............87

Vincent P. Iannece, *Breaking Bad Science: Due Process as a Vehicle for Postconviction Relief When Convictions Are Based on Unreliable Scientific Evidence*, 89 St. John's L. Rev. 195 (2015)..............................................................69

Carll Ladd et al., *Interpretation of Complex Forensic DNA Mixtures*, 42(3) Croatian Med. J.244 (2001) ..............................................................28, 65

Nick Lentz, *DNA analysis at Hennepin County forensic lab stopped after finding contamination*, CBS News (Oct. 15, 2024) ......................................293, 294

William Leo, *Comment*, The Print, July/Aug./Sept. 2009 ..........................................90

Robert P. Mosteller, et al., 1 McCormick on Evidence § 34 (7th ed.) ......................164

*The Evaluation of Forensic DNA Evidence*, 94(11) Proc. Nat'l Acad. Sci. U.S.A. 5498(May 27, 1997) ......................................................................................33

National Institute of Standards and Technology Interlaboratory Mixture Interpretation Study 2013......................................................298, 302, 303

Committee on Identifying the Needs of the Forensic Sciences Community; Committee on Applied and Theoretical Statistics, National Research Council, *Strengthening Forensic Science in the United States*: *A Path Forward* (2009)................................................................................... *passim*

National Research Council, *The Evaluation of Forensic DNA Evidence, Committee on DNA Forensic Science: An Update* (1996)........................................16

National Research Council, *DNA Technology in Forensic Science* (1992)..........16, 50

NYC OCME, *Root Cause Analysis Report*, RCA #2024-01 (Nov. 4, 2024)...............293

Paoletti et al., *Empirical Analysis of the STR Profiles Resulting from Conceptual Mixtures*, 50(6) J Forensic Sci. 1361 (2005)........................................19

President's Council of Advisors on Science and Technology, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (Sept. 20, 2016).................................................8, 17, 300, 304

Professional Review Board, *Announcements*, 58(3) J. of Forensic Identification 281 (2008) .......... 90

Professional Review Board, *Announcements*, Identification News, Dec./Jan. 2010 .......... 90

M. Regan, *State police crime lab loses accreditation*, Connecticut Mirror (Aug. 17, 2011) .......... 55

Andrea Roth, *Chapter 13: Admissibility of DNA Evidence in Court*, in *Silent Witness: Applying Forensic DNA Evidence in Criminal Investigations and Humanitarian Disasters* (Henry Erlich, et. al, ed. 2020) .......... 15, 16

Scherczinger et al., *Allele Frequencies for the CODIS Core STR Loci, Connecticut population*, J. Forensic Sci. 938-40 (1999) .......... 32, 33

Scientific Working Group on DNA Analysis Methods (SWGDAM), 2010 SWGDAM *Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories* .......... 28, 29

"Shooter," *Urban Dictionary,* https://www.urbandictionary.com/define.php?term=Shooter .......... 172

Melissa Smrz, et al., *Review of Latent Print Unit Processes and Recommendations to Improve Practices and Quality*, J. 56 Forensic Identification 3 (2006) .......... 89

Staff Writer, *Forensic board suspends former FBI analysts for error in '01 Monroe murder case*, Pocono Record, June 29, 2009 .......... 90

Staff Writer, *Minutes of the 2009 Mid-Year Board of Directors Meeting,* IDentification News, June/July 2009 .......... 90

Scientific Working Group on Friction Ridge Analysis, Study and Technology, Quality Assurance Guidelines for Latent Print Examiners ver. 2.3, 56 J. Forensic Identification 1 (2006) .......... 89

Def.'s Amended Motion in Limine Re: Proposed Testimony Relating to DNA Testing, *State v. Moreno-Hernandez*, No. NNH-CR09-0251887-T, 2011 WL 070732 (Conn. Super. Ct. 2011) .......... 75

Texas Forensic Science Commission, *Final Audit Report for Austin Police Department Forensic Services Division DNA Section* (2016) .......... 293, 296, 299

Texas Forensic Science Commission, *Fifth Annual Report* (2016) .......... 299

William C. Thompson, *Evaluating the Admissibility of New Genetic Identification Tests: Lessons From the 'DNA War,'* 84 J.Crim. L. & Criminology 22, 84-86 (1993) ........ 68

William C. Thompson, *Painting the target around the matching profile: the Texas sharpshooter fallacy in forensic DNA interpretation*, 8 L., Prob. & Risk 257 (2009) ........ 21

U.S. Department of Justice, Office Of the Inspector General, *A Review of the FBI's Handling of the Brandon Mayfield Case* (2006) ........ 88

U.S. Department of Justice, Technical Working Group on Crime Scene Investigation (TWGCSI), *Crime Scene Investigation: A Guide for Law Enforcement* (2000) 117

## PRELIMINARY STATEMENT

Azibo Aquart's convictions for the most serious crimes—the 2005 murders of three persons, Tina Johnson, James Reid, and Basil Williams, in Bridgeport, Connecticut—cannot stand. [1] As the pages that follow explain, there were simply too many scientific, factual, and legal problems with the government's evidence and his trial. Especially in cases of harrowing crimes that wrack families and communities, like this one, constitutional protections must hold. *Chessman v. Teets*, 354 U.S. 156, 165 (1957) ("Due Process … must be respected, no matter how heinous the crime.").

According to the government, Mr. Aquart ran a drug-selling operation out of 215 Charles Street, and Ms. Johnson, who lived in the building, sometimes bought drugs from his organization. Its theory of the case, under which the jury convicted Mr. Aquart, was that Ms. Johnson began selling in the building too and that, to put an end to the competition, Mr. Aquart, together with his brother Azikiwe, John Taylor, and Efrain Johnson (all members of Mr. Aquart's drug-selling operation), broke into the apartment early one morning and beat all three occupants to death.[2]

Mr. Aquart was tried in 2011 and sentenced to death. His death sentences were overturned on appeal to the Second Circuit in 2018, due to government

[1] References to "Mr. Aquart" are to the movant Azibo Aquart. Mr. Aquart's brother and co-defendant, Azikiwe, is referred to by his first name or his full name. References to the trial transcript are noted as "TT." References to the district court docket are noted as "Doc."

[2] This theory was questionable on its face, since there was no evidence of such violence in the building before the murders and since—to no one's surprise—a triple homicide in the building swiftly led to arrests and an end to all drug operations there.

misconduct in the sentencing proceedings that undermined the reliability of the jury's death verdict. *United States v. Aquart,* 912 F.3d 1, 34, 42 (2d Cir. 2018) ("*Aquart* (I)"). As the appeal progressed, Mr. Aquart spent a nearly a decade in solitary conditions of confinement on the federal death row at USP Terre Haute, where he was a model prisoner. On remand from the Second Circuit, the government declined to seek the death penalty again, and Mr. Aquart was sentenced on the now non-capital case, including to a mandatory life sentence on the VICAR-related homicide counts.[3]

Given the grave nature of the crimes and punishments at stake, the government's evidence ought to have been correspondingly substantial. That evidence fell into two categories. First, a parade of drug sellers and customers, most of whom testified pursuant to agreements providing substantial benefits for their cooperation. Indeed, the government's principal witness, John Taylor, the sole purported eyewitness to testify, ultimately received only 9 years' incarceration for admitting to participating in the triple homicide. And second, to bolster Taylor and the other cooperating witnesses, the government introduced forensic evidence collected from the crime scene, including, particularly, DNA and fingerprint evidence, which given the patina of science, surely seized the jurors' attention and gave them comfort in relying otherwise on the testimony of cooperators. Indeed, the

[3] Mr. Aquart was convicted of three counts of VICAR-related murder, under 28 U.S.C. § 1959, and three counts of drug-related murder under 21 U.S.C. § 848. On the § 848 counts, Judge Arterton departed downward to sentence Mr. Aquart to 40 years.

forensic evidence has caused courts to mistakenly characterize the evidence against Mr. Aquart as abundant or overwhelming.

As set out below, however, further investigation has shown the evidence on which the government built its case—including the forensic evidence—does not bear the weight required of it—not for a capital case, nor a life case, nor any case.

As set out in Claim I, the DNA evidence was deeply flawed and should never have been admitted. The State lab that analyzed it lost its accreditation shortly after trial, and its work on the evidence in this case shows why: the evidence was contaminated, improperly analyzed, and ultimately—a defense expert later found—not inculpatory of Mr. Aquart, but actually "uninterpretable."

As set out in Claim II, the fingerprint evidence, which the government portrayed as conclusive, was also unreliable. The latent print examiner did not follow accepted best practices designed to prevent misidentification and substantially overstated both the strength of his comparison and the ability of any latent print analysis to definitively identify a subject. Far from a "match," the latent print used to place Mr. Aquart at the crime scene was at best "inconclusive."

And Taylor's purported eyewitness account, as set out in Claims III and IV and elsewhere throughout, cannot be reconciled, in important, material ways, with the forensic evidence, other aspects of the crime scene, and the testimony of other witnesses. Indeed, the Second Circuit vacated Mr. Aquart's death sentences because of errors concerning conflicts between Taylor's and Efrain Johnson's accounts, errors which impaired Mr. Aquart's ability to question the government's central

narrative of the crime. *Aquart* (I), 912 F.3d at 42-43. And as set out in Claims IX, XI, XII, XVI, XXII, additional evidence that the government failed to disclose and trial counsel failed to uncover, would have further impeached Taylor's account and shown that, contrary to the government's theory, Ms. Johnson sold drugs with Mr. Aquart's knowledge and approval, vitiating the claimed motive for the homicides.

Mr. Aquart's convictions are also marred by serious legal problems, including: juror errors,[4] and challenges to the indictment, including a substantial categorical-approach challenge to the VICAR counts (Claim XXX.A); an Indictment Clause and related challenges to the drug counts (Claim XXX.B); and denial of a speedy-trial claim (Claim XXX.C), all of which were left open by the Second Circuit for resolution now. *United States v. Aquart*, 92 F.4th 77 (2d Cir. 2024) ("*Aquart* (II)").

As this motion demonstrates, the pillars on which the government built its case against Mr. Aquart crumble under scrutiny. The crimes are serious, and the loss suffered by the victims and families immeasurable. Mr. Aquart has acknowledged the losses suffered and has accepted responsibility for his past criminal activity. But he is innocent of the murders charged against him. And, for the reasons set forth in this motion, his convictions and sentences must be set aside.

---

4 [redacted]

## ARGUMENT

## CLAIMS RELATED TO INEFFECTIVE ASSISTANCE OF COUNSEL

"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *see Porter v. McCollum*, 558 U.S. 30, 38–39 (2009) (per curiam). Counsel's performance was deficient if it fell below "an objective standard of reasonableness" and the defendant was prejudiced by counsel's deficiency if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 687, 694 (1984).

Trial counsel performs in an unconstitutionally deficient manner when the performance falls below "an objective standard of reasonableness," as defined by "prevailing professional norms" at the time of the petitioner's trial. *Strickland*, 466 U.S. at 688; *see also Bobby v. Van Hook*, 558 U.S. 4, 7–9 (2009) (per curiam) (holding reasonableness is determined through evidence of "what reasonably diligent attorneys would do" at the time of petitioner's trial); *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). The Supreme Court has repeatedly assessed the reasonableness of counsel's performance by looking to "[p]revailing norms of practice as reflected in [the] American Bar Association standards." *Strickland*, 466 U.S. at 688; *see also Padilla v. Kentucky*, 559 U.S. 356, 367 (2010) (noting that the *ABA Standards* "may be valuable measures of the prevailing professional norms of effective representation"); *Rompilla*, 545 U.S. at 387 ("[W]e long have referred [to

the *ABA Standards for Criminal Justice*] as "guides to determining what is reasonable."' (quoting *Wiggins*, 539 U.S. at 524)).

The mainstay of effective assistance of counsel is a reasonable investigation. *See Strickland*, 466 U.S. at 690–91 (1984); *Wiggins*, 539 U.S. at 534–35 (failure to investigate family and social history). Trial counsel must independently investigate anything that would negate or minimize their client's culpability. In *Strickland*, the Court explained that "choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690–91. Counsel may not "ignore[] pertinent avenues for investigation of which he should have been aware." *Porter*, 558 U.S. at 40. The *ABA Standards for Criminal Justice* emphasize that a culpability investigation "should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt." American Bar Association, *ABA Standards for Criminal Justice*, Guideline 10.7(A)(1). In addition to "finding, interviewing, and scrutinizing the backgrounds of potential prosecution witnesses," counsel also has an obligation to "search[] for any other potential witnesses who might challenge the prosecution's version of events, and subject[] all forensic evidence to rigorous independent scrutiny." *ABA Standards for Criminal Justice*, Guideline 1.1 cmt.

In a capital case, such as this was, where a client is facing the death penalty, counsel is held to a higher standard and specific ABA standards for counsel's performance in death penalty cases provide the applicable measure of

reasonableness. American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L.R. 913 (2003) ("*ABA Death Penalty Guidelines*"). *See also Rompilla*, 545 U.S. at 386-87 (2005) (citing *ABA Death Penalty Guidelines* with approval regarding defense counsel's duty to investigate); *Florida v. Nixon*, 543 U.S.175, 191 (2004) (citing *ABA Death Penalty Guidelines* with approval regarding counsel's obligations as to plea negotiations). "Because the death penalty differs from other criminal penalties, defense counsel in a capital case should make extraordinary efforts on behalf of the accused and, more specifically, review and comply with the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases." ABA Crim. Justice Standard 4-1.2(g).

Under the *ABA Death Penalty Guidelines*, counsel has a heightened responsibility not only to investigate, but also to challenge evidence through motion practice and present, where possible, affirmative evidence. "Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case. . . . Counsel should object to anything that appears unfair or unjust even if it involves challenging well-accepted practices." 31 Hofstra L.R. at 1032 (Commentary to Guideline 10.8). For that reason, more so than in any other type of case, capital counsel has a duty to assert legal claims even where to successfully do so would require a change to existing law. *Id.*, Guideline 10.8 ("The Duty to Assert Legal Claims").

**I. Trial counsel were ineffective in failing to pursue an available motion to exclude the DNA evidence, failing to investigate serious reliability issues with the DNA evidence, and failing to pursue a new trial motion when the state laboratory that analyzed the DNA lost its accreditation shortly after trial.**

The DNA analysis presented by the government at trial was very damaging to Mr. Aquart. It appeared to squarely contradict his defense that he had not participated in the homicides and to prop up the government's main cooperator, who had significant credibility problems. It was also misleading and unreliable. It rested on a method that, by 2016, leading scientists would recognize as "clearly not foundationally valid." President's Council of Advisors on Science and Technology ("PCAST"), *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods*, 78 (Sept. 20, 2016) ("PCAST Report"). And even in 2011, when the government presented its DNA evidence at Mr. Aquart's trial, the Connecticut Department of Public Safety Forensic Science Laboratory ("State lab")'s use of that faulty method was itself deeply flawed in ways that magnified its risks and that were not considered reliable, particularly when applied to complex, low-level mixtures such as the DNA samples here. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 27 ("the problem is not merely that the laboratory used CPI rather than probabilistic genotyping, or even that the laboratory did so in an inherently unreliable manner even in 2011; it is that these profiles exceed the reliable interpretative limits of forensic DNA analysis, then and today.").

The State lab had not appropriately validated its DNA mixture-interpretation method. It therefore lacked the two things methodological validation is designed to provide: (1) empirical evidence that the method reliably works on

casework-similar samples and (2) scientifically grounded protocols for critical interpretative steps. The DNA analyst in this case, instead of assessing mixture characteristics—such as dropout and number of contributors—prospectively and independent of any suspect, employed the Combined Probability of Inclusion ("CPI") in a suspect-driven manner, inferring dropout only after comparison to Mr. Aquart's known profile. That approach violated core assumptions of CPI, departed from the scientific method, and reflected interpretive practices that were already the subject of sustained concern within the forensic DNA community. Compounding those errors, the laboratory she worked in had no documented protocols for determining contributor number, interpreting peak heights or discerning major and minor contributors, and lacked an adequate quality control program to detect, prevent, and address documented contamination that was neither systematically investigated nor bounded. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D. Trial counsel were aware of some of these issues and failed to investigate others despite obvious red flags. *See* Ex. I-B, Declaration of Edward J. Ungvarsky ("Ungvarsky Decl."), at ¶ 32 ("Counsel's file materials lack any indication that they investigated sufficiently the other areas that are standard inquiries when faced with DNA evidence, including validations of laboratory equipment and methodology, the laboratory's history of quality control and staffing issues, and the sufficiency of the laboratory's internal protocols and quality standards.").

Despite these issues, trial counsel made no pretrial motion for a *Daubert* hearing or to exclude the evidence under Federal Rules of Evidence 702 or 403,

instead allowing the jury to be told by the prosecution that the DNA evidence was consistent with Mr. Aquart having committed the murders, and then trying to cross-examine the DNA analyst on highly technical issues. Nor did trial counsel have its own expert present during the testimony of the government's DNA analyst to advise on cross-examination, nor call its own expert to testify and affirmatively explain the unreliability of the DNA evidence to the jury.

Trial counsel's failure to move to exclude the evidence was unreasonable. Undersigned counsel consulted with Edward J. Ungvarsky, a criminal defense lawyer with extensive experience in both forensic evidence and capital cases, as to the prevailing practices among capital defense counsel in the period of Mr. Aquart's trial. Ex. I-C, Curriculum Vitae of Edward J. Ungvarsky. Mr. Ungvarsky opined that by 2011 "prevailing standards of practice in serious criminal cases required counsel to carefully investigate, consult appropriate experts, and, where warranted, challenge forensic evidence before trial" to attempt to exclude or limit the admissibility of technical or scientific forensic evidence. Ex. I-B, Ungvarsky Decl., at ¶ 5. *Daubert* challenges to the reliability of the scientific method, as well as motions *in limine* to exclude the evidence or to limit its admissibility based on discovery, expert notice violations, relevance, or unfair prejudice arguments were all means then available to defense counsel and commonly utilized. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (extending *Daubert* beyond scientific expert testimony); Fed. R. Evid. 702; Fed. R. Evid. 403. This was especially true in capital cases, such as Mr.

Aquart's. Ex. I-B, Ungvarsky Decl., at ¶¶ 21-22. By 2011, it was well-established that capital counsel preparing for a trial that centered forensic evidence had a duty to demand that heightened reliability was ensured through scrutiny of the evidence, consultation with experts, pre-trial admissibility litigation, and the use of a defense expert at trial. *Id.*

But a challenge to the government's DNA evidence should have been filed not merely to comply with the minimal standards of effective representation. The DNA analysis here was an unscientific mess, and trial counsel knew it – they had consulted with leading DNA experts and been informed of many of the reliability issues with the DNA analyses long before trial. Trial counsel had an obligation to bring the rampant reliability issues to the Court's attention so the Court could exercise its gatekeeping function under Federal Rule of Evidence 702. Had counsel sought a *Daubert* hearing or moved to exclude under Rule 702, it would have been apparent to the Court that the government's DNA analyst had fundamentally misapplied the DNA interpretation method she purported to use.

As DNA expert Dr. Keith Inman concluded after reviewing the State lab's case file and the raw data from the testing of the six samples introduced against Mr. Aquart, the samples were actually uninterpretable:

> Given their complexity, each of these six samples sit[s] right at or beyond the boundary of the limits of reliability. This results from the combined effects of the laboratory's choice of longer injection times, the high number of contributors present in each sample, and the laboratory's misuses of CPI to interpret these mixtures.
> ...
> Five of these samples under current standards using modern methods would be deemed uninterpretable. This should also have been the

> conclusion under prevailing standards in 2011. The remaining sample may provide limited information relevant to contributor identity, but it would not answer the separate activity level question of how or when the DNA was deposited. It would, therefore, be of limited utility to a judge or jury in deciding a criminal case.

Ex. I-A at 20-21, 1.

In addition to their pre-trial failures, trial counsel also unreasonably failed to file a new trial motion when, just two months after Mr. Aquart's trial, the FBI audited the lab, found longstanding issues that bear directly on the DNA analyses here, and revoked the lab's access to the FBI's national DNA database (CODIS), resulting, as a practical matter, in the lab no longer being able to compare DNA to any profiles. Shortly, thereafter, the lab's accrediting body, the American Society of Crime Lab Directors, refused to extend its accreditation, an extraordinary rebuke to the lab's scientific integrity. The FBI's audit findings squarely contradicted portions of the sworn testimony given by the government's DNA witness at Mr. Aquart's trial. However, counsel inexplicably failed to move for a new trial or to raise these *Napue* issues.

Those failures violated Mr. Aquart's Sixth Amendment right to effective assistance of counsel and prejudiced Mr. Aquart. The government relied heavily on the DNA evidence throughout trial, including in its opening and closing arguments to the jury. The government urged the DNA evidence as independent proof that Mr. Aquart was in the apartment and committed the murders (TT at 4226-27, 4257-59,4260, 4263, 4329), repeatedly vouching for the reliability of the DNA evidence. *See, e.g.,* TT at 4227 ("Christine Roy testifies to findings, not beliefs, to conclusions,

not expectations, could she have butchered her analysis? The evidence tells you of course not."). And, critically, the government argued that the DNA evidence corroborated the testimony of cooperating witness John Taylor (TT at 4235-39, 4259, 4335), the only witness from inside the apartment that night, whose stories constantly shifted over time and whose incentive to lie was obvious. The DNA evidence was the linchpin used to "corroborate" Taylor's version of events; without it, the government's case against Mr. Aquart was profoundly weakened. Absent the unreliable DNA, the government's case rested on shaky cooperators and a single fingerprint which not only had its own significant reliability issues (*see* Claim II, below), but could have been left at various other times. That is enough to undermine confidence in the verdict.

## A. Factual background

### 1. DNA Analysis as of 2011

#### a. Fundamentals of DNA typing and testing

Deoxyribonucleic acid, or DNA, is found in all cells possessing a nucleus. John Butler, FUNDAMENTALS OF FORENSIC DNA TYPING 19 (2010) ("*Fundamentals*"). Forensic DNA typing examines certain locations (loci) on the DNA strand. The DNA typing technique used in this case was short tandem repeat ("STR"). STR typing measures how many times a short piece of DNA repeats at each of the tested loci; the number of repeats is known as an allele or "genetic marker." *Fundamentals* at 148. An individual's genetic type, or profile, is the compilation of his or her alleles at each locus tested. At each locus, an individual possesses two alleles: one allele inherited from each biological parent. *Id* at 25.

Thus, an individual's DNA profile is simply a list of two numbers—known as a *genotype*—per locus examined.

The DNA testing process proceeds via a set series of steps: sampling, extraction, quantitation, amplification, capillary electrophoresis, electronic data analysis, and interpretation. It is a known feature of DNA testing that during amplification, some of the targeted DNA at some locations may not amplify, meaning it will fail to copy. When targeted DNA does not amplify, that genetic information is lost in downstream steps; this loss of genetic information is known as *allelic dropout*. *Fundamentals* at 222.

Each post-amplification sample consists of large numbers of only the copied alleles, which can then be separated on an instrument called a genetic analyzer so that each allele can be distinguished and then recorded. *Fundamentals* at 175. The result is a series of peaks on a graph, called an electropherogram. *Id*. at 194.

The next critical step in the process is interpretation. In the period leading to Mr. Aquart's trial, interpretation was undertaken manually by an analyst; shortly after Mr. Aquart's trial, most laboratories began incorporating probabilistic genotyping software into interpretation. When conducting strictly manual interpretation, as here, however, the analyst would review the data on the electropherogram and make judgment calls about which peaks represented true DNA alleles— "real" DNA—and which were mere artifacts of the testing process. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 1.

Each peak that the analyst judged to be "real" would be inferred to correspond to an allele actually present in the sample, and the height of each peak roughly to correspond to how much of that allele is present. When testing a single source evidence sample, two peaks of roughly equivalent height should be observed at each locus where the contributing individual is a heterozygote. At loci where the contributor is a homozygote, one relatively high peak should be observed, because the two alleles "stack" on top of one another.

When DNA analysis was first introduced in criminal courts, analysts were only interpreting single-source samples or simple two-person mixtures. When faced with samples of this type, once they had determined what peaks were real, the analyst could then compare the DNA profile of any reference sample(s) to the evidence profile. If the analyst determined that one of the reference profiles "matched" or "could not be excluded from" the evidence profile, the analyst would calculate a rarity statistic to contextualize the significance of the match or inclusion. Statistical calculations are an essential part of the interpretation methodology, giving the trier of fact a means of assessing the possibility that the inclusion is "merely a coincidence and that the two samples did not actually come from the same person." *United States v. Porter*, 618 A.2d 629, 632 (D.C. 1992).

Without these probability statistics, evidence of a DNA inclusion is generally not admissible in court. *See, e.g., id.* at 640; Andrea Roth, *Chapter 13: Admissibility of DNA Evidence in Court,* in *Silent Witness: Applying Forensic DNA Evidence in Criminal Investigations and Humanitarian Disasters* 291, 296 (Henry Erlich, et. al,

ed. 2020) ("In general, evidence of a DNA match is inadmissible without a corresponding match statistic expressing the statistical significance of the match to the factfinder."). This is because "it would not be scientifically justifiable to speak of a match as proof of identity in the absence of underlying data that permit some reasonable estimate of how rare the matching characteristics actually are." National Research Council, *The Evaluation of Forensic DNA Evidence, Committee on DNA Forensic Science: An Update* 192 (1996); *see also* National Research Council, *DNA Technology in Forensic Science* (1992) at 74 ("To say that two patterns match, without providing any scientifically valid estimate (or at least, an upper bound) of the frequency with which such matches might occur by chance, is meaningless").

Interpreting the evidence profile and the calculation of any significance statistic becomes much more complicated, however, when an analyst faces a DNA mixture, because probability calculations are only appropriate where reliable determinations can be made about which alleles are present in the mixture. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 13-14.

**b. Difficulties associated with DNA mixture interpretation as of 2011**

Forensic DNA samples found at crime scenes often contain DNA from more than one individual, as with the samples in this case. Such a DNA profile representing two or more contributors is a DNA mixture. *Fundamentals*, at 320. An analyst knows that they are dealing with a DNA mixture if they observe more than two alleles at two or more loci, or if loci with only two alleles display significant

peak height imbalance. John Butler, *Advanced Topics in Forensic DNA Typing: Interpretation* ("Interpretation"), 129 (2014).

Unlike the straightforward analysis involved in interpreting a high-quality, single-source DNA profile, or even a simple two-person mixture, mixtures of three or more persons are often ambiguous. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 1-2. As PCAST would later explain, "It is often impossible to tell with certainty which alleles are present in the mixture or how many separate individuals contributed to the mixture, let alone accurately to infer the DNA profile of each individual." PCAST Report at 8. Thus, interpreting complex mixtures may be highly subjective. *Id.*

Subjectivity is introduced at the first step of manual interpretation when the analyst evaluates whether electropherogram peaks represent true allelic signal or, instead, testing artifact and considers whether the genetic information at a tested locus is complete or has suffered dropout. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 1-2, 12.

Specifically to constrain subjectivity at this interpretation stage, the FBI issued Quality Assurance Standards effective in 2010 that required laboratories to establish and document empirically derived analytical and stochastic thresholds through internal validation studies. *See* Ex. I-D, FBI Quality Assurance Standards ("QAS") (2009). The analytical threshold sets a minimum signal level below which peaks are presumed to be unreliable and are not interpreted as alleles, while the stochastic threshold defines the signal level below which allelic dropout cannot be

reliably ruled out. Together, these thresholds were intended to ensure that interpretative decisions were made *prospectively*, based on validated laboratory performance, rather than retrospectively or through analyst discretion after comparison to known profiles. *Id.*

Instead of proceeding directly from analysis of which peaks in the electropherogram are real allelic material to sample comparison, the analyst first must complete several further analytical steps when interpreting a mixture. First, she must consider how many individuals contributed to the sample. *See* Ex. I-A Expert Report of Keith Inman, Ph.D. at 21. Next, using her number of contributor determination as the denominator, she must calculate a ratio of contributors to the sample, determining the relative amounts of DNA contributed by each source. *See id.* at 14, 18.

Once this calculation is complete, the analyst can judge whether the mixture is deducible into its component contributors or not. Some mixtures may be resolved by an analyst into individual sources based on the relative amounts of DNA contributed by each source; generally, if a single individual contributes more than three quarters of the DNA in the mixture that person is deemed the "major contributor," and their DNA profile may be isolated and compared to reference samples. The profile of the low-level contributor(s) cannot be isolated in this way. *Id.*

Some mixtures, however, are not resolvable. *See* Ex. I-A Expert Report of Keith Inman, Ph.D., at 21. This occurs, for example, with balanced mixtures where

each contributor has contributed roughly similar amounts of DNA. In these situations, the relative ratio of contributors does not permit the analyst to deduce or isolate a major contributor.

One of the biggest complicating factors in the interpretation of complex mixture data is the potential for allele sharing. *Interpretation* at 153. When an individual has two of the same allele at a locus, that person's alleles "stack" on top of one another and present as a single peak on the electropherogram. Similarly, when multiple contributors to a DNA mixture possess the same allele at a locus, those alleles also "stack" and present as a single peak. This is known as allele stacking or allele sharing.

There are two important consequences of allele sharing. One consequence is that "allele sharing makes accurately deducing the number of contributors to a mixture challenging – and the challenge only grows with each additional contributor to a DNA mixture." *Interpretation* at 169.[5] If an analyst cannot accurately determine how many contributors there may be in a mixture, the analyst cannot accurately interpret the mixture. Inaccurate interpretation of the mixture impacts not only decisions to include or exclude individuals as potential

[5] For example, studies have shown that, because of allelic stacking, more than 75% of known four-person mixtures would be misclassified as two- or three- person mixtures based on the maximum number of alleles detected at any given locus. Paoletti et al., *Empirical Analysis of the STR Profiles Resulting from Conceptual Mixtures*, 50(6) J. Forensic Sci. 1361 (2005).

contributors to the mixture, but also the associated statistical probability analysis. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 22.

**c. Concerns about the reliability of certain DNA testing methods and samples as of 2011**

In late 2005, just as the DNA analysis in this case began, Congress passed legislation calling for a review of forensic sciences because of growing concerns about unreliability and bias in scientific evidence used in criminal cases. Science, State, Justice, Commerce, and Related Agencies Appropriations Act of 2006, P.L. No. 109-108, 119 Stat. 2290 (2005). The National Academy of Sciences undertook a comprehensive review, and, in February 2009, issued a thorough critique of the state of forensic science, including DNA analysis. Ex. I-E, Committee on Identifying the Needs of the Forensic Sciences Community; Committee on Applied and Theoretical Statistics, National Research Council, *Strengthening Forensic Science in the United States*: *A Path Forward* (2009) ("NAS Report"). The Committee specifically expressed concern about the criminal legal system's reliance on forensic evidence:

> The law's greatest dilemma in its heavy reliance on forensic evidence, however, concerns the question of whether—and to what extent—there is science in any given forensic science discipline. Two very important questions should underlie the law's admission of and reliance upon forensic evidence in criminal trials: (1) the extent to which a particular forensic discipline is founded on a reliable scientific methodology that gives it the capacity to accurately analyze evidence and report findings and (2) the extent to which practitioners in a particular forensic discipline rely on human interpretation that could be tainted by error, the threat of bias, or the absence of sound operational procedures and robust performance standards. These questions are significant. Thus, it matters a great deal whether an expert is qualified to testify about forensic evidence and whether the evidence is sufficiently reliable to merit a fact finder's reliance on the truth that it purports to support.

> Unfortunately, these important questions do not always produce satisfactory answers in judicial decisions pertaining to the admissibility of forensic science evidence proffered in criminal trials.

Ex. I-E, NAS Report, Executive Summary, S7.

Specific concerns surrounding the lack of reproducible methods for complex mixture interpretation and the widespread use of improper interpretation methods began well before the DNA evidence in this matter was presented against Mr. Aquart. Shortly after the National Academies published *Strengthening Forensic Science* in 2009, Dr. William C. Thompson published a landmark critique of complex DNA mixture interpretation that captured growing concerns within the forensic DNA community. Dr. Thompson's *Texas Sharpshooter Fallacy'*s central critique rested on the observation that, "[a]t this point in the history of DNA testing, . . . there are no standards for distinguishing 'inclusions' and 'exclusions.'" William C. Thompson, *Painting the target around the matching profile: the Texas sharpshooter fallacy in forensic DNA interpretation*, 8 L., Prob. & Risk 257, 268 (2009). Specifically, the forensic community lacked a standard approach to handling the problem of dropout. *Id.* The lack of standards thus permitted and even encouraged DNA analysts to engage in the Texas sharpshooter fallacy: interpreting complex mixture data using the profile of the suspect and then overstating the meaning of circling the bullseye around the target. *Id.* Dr. Thompson argued that the problem was endemic and was becoming worse, causing an unacceptable risk of overstating the value of the DNA results. *Id.*

That same year, the FBI, which administers the national DNA database (CODIS), released its new Quality Assurance Standards for DNA Databasing

Laboratories, such as the Connecticut State lab, which sought to address this problem. *See* Ex. I-D, 2009 QAS. A major focus of the new QAS was standardizing mixture interpretation through more robust internal validation studies and documented interpretation procedures. The Standards now required that internal validation studies include mixture studies and that those studies drive interpretation guidelines, including "a documented procedure for mixture interpretation that addresses major and minor contributors, inclusions and exclusions, and policies for reporting of results and statistics." *Id.* at 8.3.1, 8.3.2, and 9.6.4.

**2. DNA evidence relating to Azibo Aquart**

In the days after the homicide scene was discovered, numerous evidentiary items were collected by the Bridgeport Police from the apartment where the victims were found. These items were submitted by the police and by the medical examiner to the State lab for analysis. TT at 3075. This was a complex crime scene, with three decedents, at least four suspects, and lots of traffic in and out. *See* Claims II, III. At least two people entered the crime scene before EMT arrived (*see* Claim III); EMT went into the apartment without wearing protective gear, followed by police (*id.*); only then did police secure the scene. *Id.* Blood spatter from the walls, gloves and parts of gloves found on the floor and under a couch cushion, duct tape from the victims' wrists, plastic bags, and a nylon stocking were among the items swabbed for DNA. TT at 2995-97, 3022-35, 3063-64, GX 148.

The Forensic Science Examiner from the State lab assigned to this case, Christine Roy, conducted the DNA analysis process over the course of five years,

from 2005 to 2010, issuing numerous reports and then revised reports, running the DNA from certain samples multiple times, and analyzing new reference samples. *See* Ex. I-F, DNA Report (Nov. 29, 2005) ("Nov. 29, 2005 DNA Report"); Ex. I-G, Supp. DNA Report (Jan. 4, 2006) ("Jan. 4. 2006 Supp. DNA Report"); Ex. I-H, Supp. II DNA Report (March 9, 2006) ("March 9, 2006 Supp. II DNA Report); Ex. I-I, Amended Supp. II DNA Report (Nov. 20, 2006) ("Nov. 20, 2006 Amended Supp. II DNA Report); Ex. I-J, Supp. III DNA Report (Nov. 20, 2006 ) ("Nov. 20, 2006 Supp. III DNA Report); Ex. I-K, Supp. IV DNA Report (May 1, 2008) ("May 1, 2008 Supp. IV DNA Report), Ex. I-L, Supp. V DNA Report (May 2, 2008) ("May 2, 2008 Supp. V DNA Report); Ex. I-M, Supp. VI DNA Report (May 2, 2008) ("May 2, 2008 Supp. VI DNA Report); Ex. I-N, Amended Supp. VI DNA Report (dated April 15, 2009) ("April 15, 2009 Amended Supp. VI DNA Report"); Ex. I-O, Supplemental VII DNA Report (dated May 18, 2010) ("May 18, 2010 Supp. VII Report")

Each evidentiary item was swabbed, some in multiple places, by a trace examiner in the laboratory, then those swabs were provided to the DNA section for analysis. TT at 3073. For each swab, Ms. Roy extracted the DNA, quantified it using a kit called Aluquant, amplified it with a kit (Identifiler for some of the samples and a combination of Identifiler and Cofiler for others), and then visualized it on an electropherogram. Ms. Roy concluded that the three victims and the four identified suspects, in various combinations, as well as DNA from unknown males, were either included as potential contributors or could not be said to be excluded as potential contributors to various evidentiary samples.

As to Mr. Aquart, the lab reports that trial counsel received in discovery indicated that for six total swabs of five of the approximately 70 items from the crime scene submitted for DNA analysis, Ms. Roy concluded that Mr. Aquart's profile either could not be eliminated or was "included" as a contributor. Each of these six samples was a complex mixture with multiple contributors. All six samples were interpreted to include Mr. Aquart's biological brother, Azikiwe. Ms. Roy analyzed these samples several times, using varying "injection times" into the capillary electrophoresis machine in an attempt to increase the visualized data. Generating multiple divergent electropherograms for each sample, Ms. Roy selected the tests that displayed alleles consistent with her suspect-centric analysis theory. She followed no protocols and documented no consideration for the risks that come with varying injection times, including the increased likelihood of introducing stochastic effects and visualizing low level contamination.

After completing the steps to generate electropherograms for the samples, Ms. Roy did not produce an independent interpretation of which alleles were true signal and which were artifacts, how many contributors had contributed to the samples, or what the ratio of contributors might be. She also did not determine what the possible genotypes were that might have contributed to the mixtures. Instead, she moved directly to comparing the "suspect" profiles, including the profile for Mr. Aquart, who had been identified, explicitly and before the analysis, to the lab as a suspect, to the DNA profile of each evidentiary sample. TT at 3121. After determining which alleles from each sample "matched" alleles in Mr. Aquart's

profile, Ms. Roy used the CPI method to interpret the mixtures and calculate a statistical probability of how many people in certain population groups also could not be excluded. TT at 3138-3140. The CPI provides an estimate of people in the population with the combination of alleles observed in the mixture profile. Against the guidance of the FBI's and Scientific Working Group on DNA Analysis Methods' protocols, Ms. Roy engaged in suspect-centered analysis of each mixture and generated different CPI statistics for each comparator.

Ms. Roy concluded that Mr. Aquart's DNA profile was "included" as a contributor to two DNA swabs (#14-1-Z1 and #14-1-Z-2) of just one item from the apartment, item # 14, a double glove found in the bedroom of victim Tina Johnson. Ex. I-F, Nov. 29, 2005 DNA Report. For one of the swabs of item 14, #14-1-Z1, Ms. Roy concluded that James Reid, Basil Williams, Azikiwe Aquart and Mr. Aquart were "included" as contributors, and Tina Johnson could not be excluded. *Id.*; Ex. I-G, Jan. 4, 2006 Supp. DNA Report; Ex. I-J, Nov. 20, 2006 Supp. III DNA Report; Ex. I-K, May 1, 2008 Supp. IV DNA Report. Ms. Roy calculated that the genetic markers that led her to include Mr. Aquart as a contributor to that swab would be shared by 1 out of every 400 African Americans. *Id.* She calculated a different Combined Probability of Inclusion for Ms. Johnson, as she excluded two loci from the calculation due to the possibility of dropout for this analysis. *Id.* When those loci were omitted, the CPI dropped to 1 in 60 in the African American population. *Id.* For the other swab of the double glove, #14-2-Z1, Ms. Roy's report stated that Basil Williams, Mr. Aquart and Azikiwe Aquart were "included" as contributors, and

James Reid and Efrain Johnson could not be eliminated as minor contributors. Ex. I-L, May 2, 2008 Supp. V DNA Report. Ms. Roy calculated the statistical probability of the genetic markers that led her to include Mr. Aquart as a contributor would be shared by 1 in every 390 African Americans. *Id.* However, when determining that Mr. Reid and Efrain Johnson could not be eliminated, Ms. Roy invoked dropout at three loci for Mr. Reid, reporting that 1 in 100 African Americans would not be eliminated, and four loci for Mr. Johnson, reporting that 1 in 10 African Americans would not be eliminated. *Id.* Ultimately, across the analyses, Ms. Roy decided that dropout had occurred at five separate locations. *See* Ex. I-P, State of Conn., Dep't of Public Safety, Div. of Sci. Services, Forensic Sci. Lab., Case No. 05-019367, Bench Notes and Worksheets ("Bench Notes").

As to the swabs of four other pieces of evidence, Ms. Roy's reports concluded that Mr. Aquart "could not be eliminated" as a contributor to the DNA profiles found on them: item 9 (fragments of a vinyl glove found stuck to duct tape that bound decedent Tina Johnson's hands); item 15 (a nylon stocking found in the bedroom with decedents Tina Johnson and James Reid); item 16 (a glove found on a bedside table in Tina Johnson's bedroom); and item 19 (the cuff of a latex glove found under a couch cushion in the living room). Ex. I-L, May 2, 2008 Supp. V DNA Report; Ex. I-M, May 2, 2008 Supp. VI DNA Report. Each of these DNA samples was a complex mixture with at least four contributors. *Id.* In order to conclude that Mr. Aquart could not be eliminated as a contributor, Ms. Roy assumed "dropout" at between two to four loci on each sample, *i.e.,* Mr. Aquart's alleles were not present

at locations on each sample. *Id.*; *see also* Ex. I-P, Bench Notes. For swabs of three of the items (items 9, 15, 16), Ms. Roy calculated a statistical probability that was quite high: between 1 in 140 and 1 in 220 African-Americans also could not be excluded as contributors to these DNA samples. *Id.* As to the swab of the fourth item, item 19 (the cuff of a latex glove found in the living room couch cushions), which was the only item not located in the rooms where the victims appear to have been killed and which appeared significantly older and of different material than the other evidentiary items, Ms. Roy calculated a low statistical probability of 1 in 79 million African-Americans who could not be excluded. *Id.*

In April 2009, trial counsel were informed by the government that Ms. Roy had revised her conclusion as to the swabs of one of the evidentiary items, item 16, the glove found on the bedside table, to "inconclusive," because a State laboratory staff member's profile had been found in the DNA sample. Ex. I-N, April 15, 2009 Amended Report; *see also* Ex. I-Q, April 15, 2009 Letter from C. Roy to AUSAs.

#### 3. Trial counsel learned before trial that there were serious questions about the reliability of the DNA evidence against Mr. Aquart.

Beginning nearly three years before trial, counsel consulted with at least three leading DNA experts, as well as reviewing numerous important articles on DNA analysis (including ones directly on point written by the State lab's supervising DNA analyst, Carll Ladd), consulting with lawyers experienced in challenging DNA evidence, attending trainings on DNA evidence, and analyzing the State lab's DNA reports themselves. The expert reports, counsel's notes and emails of discussions with experts, and counsel's case file show that counsel knew of at

least five significant issues undermining the reliability of the DNA evidence against Mr. Aquart.

**a. Trial counsel knew that the DNA Examiner had failed to estimate how many people's DNA was present in the evidentiary samples.**

Trial counsel knew that Ms. Roy's conclusions inculpating Mr. Aquart were not based on identification of the number of contributors to any of the evidentiary samples she concluded Mr. Aquart's profile either was included in or could not be eliminated from. Counsel knew all were complex mixtures. Counsel's case file shows that they were aware that the leading scientific working group on DNA had stressed the importance of determining the number of contributors to a mixture in rendering an accurate DNA analysis. *See* Scientific Working Group on DNA Analysis Methods (SWGDAM), 2010 SWGDAM *Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories,* at 3.4.1 ("For DNA mixtures, the laboratory should establish guidelines for determination of the minimum number of contributors to a sample. ... An actual number of contributors, not a minimum number, is needed, as a different number of contributors for the same DNA mixture will result in more or less allele dropout to explain the observed profile."). By failing to determine the number of contributors, the analyst makes it impossible to decide what the matching pairs of alleles (genotype combinations) are and thus cannot determine to whom they belong. *See* Carll Ladd et al., *Interpretation of Complex Forensic DNA Mixtures*, 42(3) Croatian Med. J. 244 (2001).

As trial counsel noted in their file, Ms. Roy's bench notes show no effort to document all the possible genotype combinations, calculate peak height ratios, evaluate the potential for artifacts such as allelic stutter, drop-in, or dropout, or consider the estimated frequencies of certain alleles within the relevant population. Ex. I-R, Balakrishnan DNA Memos/Chart; *see also* TT at 3535. Months before trial, lead counsel wrote to his co-counsel, co-defendant's counsel, and a lawyer with whom they were consulting on DNA: "the more I look at this stuff, the less it l[oo]ks like science and the less objective it appears." Ex. I-S, Jan. 10, 2011 email.

Trial counsel raised this problem in cross-examination, eliciting from Ms. Roy that the number of contributors to the samples she sought to connect to Mr. Aquart was unknown and ranged anywhere from 3 to 36 people. TT at 3577-78. Trial counsel tried to cross-examine Ms. Roy on her failure to follow the 2010 SWGDAM guidelines, but, when she responded that these were only recommendations and the State lab's protocols were what governed her analysis, trial counsel backed off and failed to elicit the scientific rationales behind the SWGDAM guideline or the insufficiency of the State lab protocols.

**b. Trial counsel were aware that Ms. Roy had looked at the "suspect" profiles to determine "dropout" rather than making the dropout determination first and independent of the suspect profiles and had failed to document judgment calls that affected her conclusions.**

Trial counsel knew that several of the evidentiary samples being analyzed consisted of low quantities of DNA, which made them susceptible to errors in the amplification process, and increased the potential impact of variable capillary-

electrophoresis injection times. Trial counsel were also aware that Ms. Roy's reports and bench notes contained little to no documentation of how she had determined for each allele at each locus in each profile which alleles were "real" and what the allele pairs were for each locus in each profile, contrary to accepted scientific method. TT at 3242-43. Trial counsel also knew that Ms. Roy's reports and bench notes contained no documentation of how she had reconciled the differing results of the injections of the same sample or how she had chosen which injection run to use.

Trial counsel were explicitly warned by DNA expert William Shields over a year before trial that for several of the key samples, if Ms. Roy had not found dropout at several loci, Mr. Aquart would have been excluded as a contributor. Trial counsel's notes indicate that they knew that Ms. Roy had made these determinations by looking at Mr. Aquart's profile. *See* Ex. I-R. Balakrishnan DNA Memos/Chart, at 50 (dated Apr. 6, 2010) ("In our case, what the lab did was to look specifically at Azibo and Azikiwe's profiles and then where their profiles did NOT evidence alleles at the lab's specified threshold (75 or more RFU's), the lab ASSUMED that there was allelic dropout at those loci"). For example, for the swab of item 15, the nylon stocking, Mr. Aquart's alleles were not seen at three loci, so Ms. Roy decided there must be dropout at those loci. Ex. I-L, May 2 2008, Supp. V DNA Report. Absent this assumption, Mr. Aquart would have been excluded as a contributor. Likewise for a swab of the glove found on the bedside table, item 16. Ms. Roy's report notes that Mr. Aquart's alleles were not observed at four

separate loci; she invoked dropout so that Mr. Aquart would not be excluded. *Id.* But for this same sample, Ms. Roy excluded John Taylor, even though his alleles were only missing at three loci. *Id.*; *see also* Ex. I-P, Bench Notes. For the swab of the latex glove cuff found in the living room, item 13 – the item for which Ms. Roy calculated the lowest rarity statistic, of 1 in 70 million African Americans not being able to be eliminated as contributing to the DNA profile – Mr. Aquart's alleles were not present at two of the loci, CSF and D2, so Ms. Roy decided these loci must be exhibiting dropout. *Id.* Trial counsel were warned by DNA expert Shields that many of these dropout determinations were arguable, at best, and provided weak evidentiary support for Ms. Roy's conclusions about Mr. Aquart. Ex. I-T, Shields, "Work Product Draft of Discussion of Probative versus Prejudicial Value of DNA evidence in the Aquart Cases" (July 5, 2010).

Mr. Shields flagged that not only did Ms. Roy assume allelic dropout by looking at Mr. Aquart's profile and comparing it to the specific samples, but for some of the samples, Ms. Roy made *different* dropout assumptions for different potential contributors. For one of the swabs of item 9, in order to conclude that Mr. Aquart could not be eliminated as a contributor from this swab, for Mr. Aquart and his brother only and not the other contributors, Ms. Roy assumed dropout of alleles at three loci, D21S11, D2S1338, and FGA. Ex. I-L, May 2, 2008 Supp. V DNA Report. Had she not invoked dropout at these loci, Ms. Roy would have been forced to exclude Mr. Aquart as a contributor

to this sample. As to two other potential contributors, Ms. Roy assumed dropout at different loci so that they too "could not be eliminated." *Id.* Similarly for a swab of item 14, Ms. Roy invoked dropout at different loci for each person she concluded could not be eliminated. *See* Ex. I-P, Bench Notes. Trial counsel made no motion to preclude the DNA evidence based on these clear reliability issues.

**c. Trial counsel knew that the probability calculations used by the State laboratory were highly problematic.**

Trial counsel knew before trial that the probability calculations used by the State lab were flawed. Their files contain articles about issues with the CPI method used by the State lab and they consulted with various DNA experts before trial about specific issues with the probability calculations in Ms. Roy's reports.

The most obvious problem with the State lab's use of CPI, which trial counsel were aware of (and tried to bring out, unsuccessfully, through cross-examination), was that the State lab relied on allele frequency statistics drawn from less than 600 people's DNA profiles: 182 African-Americans, 179 Caucasians, and 187 Hispanic people. *See* Scherczinger et al., *Allele Frequencies for the CODIS Core STR Loci, Connecticut population*, J. Forensic Sci. 938-40 (1999); TT at 3330. In 1998, these 557 people provided their DNA profiles for analysis and then extrapolations were performed to try to use this very small number of profiles as the basis for predicting how frequently alleles at each locus would be found throughout Connecticut. TT at 3324-25. The National Research Council had issued a report in 1992 emphasizing that such statistics had a range of error of a factor of ten: "Although reasonable

approximations for most populations, are not exact… we believe that it is safe to assume that the uncertainty of a profile frequency calculated by our procedures from adequate databases, at least several hundred persons, is less than a factor of about ten in either direction." *The Evaluation of Forensic DNA Evidence*, 94(11) Proc. Nat'l Acad. Sci. U.S.A. 5498 (May 27, 1997), at 5498-5500. Trial counsel did not challenge the reliability of such massive extrapolation before trial.

But this was not just a problem with statistical extrapolation. It was also a problem with the specific method Ms. Roy used here of calculating CPI, the reliability of which was under serious challenge in the scientific community at the time of Mr. Aquart's trial. Ms. Roy based her statistical computations only on loci where Mr. Aquart's alleles were detected in the evidence, ignoring (for statistical purposes) any locus where Mr. Aquart's alleles were not observed. This approach allows labs to ignore potentially exculpatory results (the loci where the suspect's alleles are not observed) while counting against him those where he does match.

The experts consulted by trial counsel pointed out specific problems with this in the allegedly inculpatory samples the government intended to use at trial. DNA experts Simon Ford and William Shields raised serious concerns about Ms. Roy only considering a locus to be "dropout" for a particular person, not for all potential contributors to the profile. *See, e.g.,* Ex. I-U, Nov. 3, 2010 email ("In talking to Simon [Ford], he agreed with me about the problems inherent in the lab's procedures whereby they only assign 1's to those loci where they suspect dropout for a particular individual, while also

using the combined probability frequencies for other loci where they suspect dropout for other individuals. For example, in 9-Z-1, they assign 1's to D21, D2S and FGA for Azibo and Azikiwe's profiles, whereas they also use 1's at D13 and D18 for computing the frequency associated with Efrain Johnson, and they further use 1's at D7 for computing the frequencies associated with John Taylor."). As an example, for item 14, the double glove found in Tina Johnson's bedroom, Ms. Roy calculated that the genetic markers that led her to include Mr. Aquart as a contributor would be shared by 1 out of every 400 African Americans. Ex. I-L, May 2, 2008 Supp. V DNA Report. She calculated a different Combined Probability of Inclusion for Ms. Johnson, as she excluded two loci from the calculation due to the possibility of dropout for this analysis. *Id.* When those loci were omitted, the CPI dropped to 1 in 60 in the African American population. *Id.*

Counsel had in their files a 2010 study about the approach Ms. Roy employed here; that study observed that such an approach essentially asks: "What is the chance that a randomly chosen individual from a given population would match the defendant if we focus only on evidence consistent with a match and ignore evidence to the contrary?" James M. Curran & John Buckleton, *Inclusion Probabilities and Dropout*, J. Forensic Sci. 55 (2010). *See also* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 13-14 (explaining issues with suspect-centric use of CPI).

As concerns about the interpretation of complex DNA mixtures intensified, the FBI's Scientific Working Group on DNA Analysis Methods released guidelines

specifically addressing the use of CPI in mixture interpretation. Those guidelines reflected growing recognition that CPI was being applied to data that exceeded its scientific limitations. SWGDAM explained that for the CPI statistic to be accurate, each allele of every contributor to the mixture must be detected. In other words, the CPI statistic can only be reliably applied if there is no allelic dropout. SWGDAM Interpretation Guideline 4.6.3 (2010) ("the potential for allelic dropout raises the possibility of contributors having genotypes not encompassed by the interpreted alleles," which are not accounted for in the CPI calculation). *See also* Brenner, C.H., The mythical "exclusion" method for analyzing DNA mixtures – does it make any sense at all? *Proceedings of the American Academy of Forensic Sciences*, Feb 2011, Volume 17, p. 79 (concluding that CPI is guesswork at best).

To say it plainly, the DNA opinions used against Mr. Aquart at his trial were known, or should have been known, by everyone involved to be unreliable.

**d. Trial counsel knew that contamination in the State laboratory had contaminated the evidence here.**

The government disclosed to the defense on April 21, 2009 (over a year before trial) that a State lab staff member's DNA profile had been identified on one of the swabs of DNA in this case (16-Z-1), leading the lab to revise its conclusion for that swab to "inconclusive." *See* Ex. I-Q, April 15, 2009, letter from C. Roy to AUSA Reynolds. Trial counsel initially sought discovery on how the contamination occurred and moved to preclude the DNA evidence if such discovery were not produced, noting that two other relevant swabs (14-2-Z1 and 15-Z-2) had been processed at the lab at the same time, but soon, for no apparent reason, narrowed

their focus to obtaining the identity and DNA profile of the staff member so that they could determine whether that staff profile was detectable in any of the other samples. *See* Doc. 428 (filed July 7, 2010); Doc. 433 (filed July 28, 2010). In response, the government provided an affidavit from Carll Ladd, the secondary DNA reviewer in this case and the supervisor of the DNA section of the State lab, stating that the staff member's profile was not included in any other sample, but providing no information about any laboratory investigation into or protocols for preventing contamination. *See* Ex. I-V, Affidavit of Carll Ladd (dated July 15, 2010). Once the Court ordered disclosure of the staff member's DNA profile (Tr., Aug. 7, 2010, Status Conference), trial counsel met informally with the DNA examiners and learned that the staff member was the trace examiner, Maria Warner, and that the DNA examiners' theory – developed without any apparent investigation – was that Ms. Warner had coughed on a single piece of evidence during the swabbing process (#16-Z-1). *See* Ex. I-W, Sep. 30, 2010 email.

Trial counsel did not pursue disclosure of formal information about how the contamination occurred or what investigation had been done into contamination in the laboratory more broadly. There is no indication that trial counsel reviewed the lab's internal operating procedures to understand what, if any, procedures were required when contamination occurred. Nor did trial counsel look to the FBI Quality Assurance Standards for guidance. Moreover, there is no indication that trial counsel sent the contamination information disclosed about #16-Z-1 to the DNA

experts at Forensic Bioinformatics, whom they already had been consulting about issues with the State lab's analysis of the samples.

The lack of a documented investigation into the contamination event and the failure to follow the governing FBI Quality Assurance Standards would have formed a strong basis for a motion to exclude the DNA evidence because, "[i]n a forensic DNA laboratory, the quality assurance and quality control program is not an administrative formality; it is the mechanism by which the laboratory ensures that its methods are scientifically reliable, its analysts are properly trained and monitored, its protocols remain current, and errors, contamination, and nonconformities are detected, documented, corrected and prevented from recurring." Ex. I-A, Expert Report of Keith Inman, Ph.D., at 5.

**e. Trial counsel knew the State laboratory had destroyed the samples in the testing process so the DNA evidence in this case could never be retested.**

Trial counsel knew that the DNA process used here consumed the evidentiary samples, preventing any re-testing by the defense. *See* Ex. I-L, May 2, 2008 Supp. V DNA Report. In February 2010, a lawyer with substantial experience challenging DNA evidence, with whom trial counsel repeatedly consulted about DNA issues before trial, advised the trial team that they should move to preclude the DNA analyses here because the DNA analysis process Ms. Roy used had destroyed each of the evidentiary swabs. *See* Ex. I-X. Feb. 11, 2010 email. The lawyer also sent the team sample motions to preclude the DNA evidence based on the samples having been consumed. *Id.* Nevertheless, trial counsel filed no motions about the consumption of the samples.

### 4. There were additional significant red flags concerning the DNA evidence that counsel failed to investigate or sufficiently consult with defense experts about.

Undersigned counsel consulted with DNA expert Keith Inman, Ph.D., regarding the reliability of Ms. Roy's analysis of those evidentiary samples that the government sought to connect to Mr. Aquart and regarding the expert advice trial counsel had received before trial. Ex. I-A, Expert Report of Keith Inman, Ph.D. Dr. Inman has over fifty years of experience in the field of forensic DNA analysis, including working as a criminalist for Sheriff's Departments, Medical Examiners and the Department of Justice, as well as co-authoring numerous peer reviewed articles and treatises on DNA typing and criminalistics and being qualified as an expert in DNA analysis in numerous federal, state and military courts. Ex. I-Y, Curriculum Vitae of Keith Inman, Ph.D. Dr. Inman confirmed that not only did the issues above, which trial counsel had discussed with its consulting experts, significantly impair the reliability of the DNA evidence, but there were at least five other important grounds to challenge the reliability of the State Lab's DNA analyses that counsel failed to fully investigate. Ex. I-A, Expert Report of Keith Inman, Ph.D.

#### a. Widespread lab contamination and testing issues

One of the DNA experts that trial counsel consulted with, Forensic Bioinformatics, warned trial counsel of widespread contamination in the DNA samples in this case. In November 2008 – two and one-half years before trial – Forensic Bioinformatics issued a 56-page report containing the results of its reanalysis of Ms. Roy's DNA testing. *See* Ex. I-Z, Forensic Bioinformatics,

Genophiler Analysis Report (dated Nov. 12, 2008) ("Forensic Bioinformatics Report"). The report explicitly flagged serious reliability issues with the DNA analysis, beginning on the very first page of the report with the reference sample for Mr. Aquart, *i.e.*, the DNA that Ms. Roy was using to compare to every evidentiary sample:

- The reference sample of the defendant, **"Azibo Aquart (12-21)"**,
  - Displays peak height imbalance at the locus D8. The difference in the peak heights of the 13 and 14 alleles for the D8 locus (511 and 335, respectively) could be the result of a technical artifact (such as primer binding site mutations), or be evidence of more than one contributor to that sample.

*Id.* at 2. No DNA reference sample, let alone the reference sample of one's client, who is facing the death penalty based on evidence obtained by use of that reference sample, should contain evidence of an additional contributor. Trial counsel knew exactly how the sample of Mr. Aquart's DNA had been obtained: a registered nurse drew Mr. Aquart's blood on December 13, 2005 pursuant to a warrant and the blood sample was delivered to the State lab for analysis by Ms. Roy. TT at 3127-3128. So the contamination had to have come from the lab.

Mr. Aquart's was not the only reference sample contaminated by someone else's DNA. Forensic Bioinformatics flagged the same issue for the reference sample for suspect Efrain Johnson. Ex. I-Z, Forensic Bioinformatics Report, at 3 (concluding that "[a] mixture in a reference sample could indicate that contamination has occurred). Trial counsel knew that the reference sample for Efrain Johnson also had been drawn by a registered nurse and delivered by law enforcement to the State lab, so no one else's DNA should have been present. Contamination was also flagged in the reference samples from all three victims. *Id.* at 2-4. These issues alone, brought

to trial counsel's attention almost three years before trial, should have led counsel to follow up and investigate further through discovery motions and follow-up discussions with experts.

But it wasn't just the reference samples. The State lab's negative, positive and neutral control samples also showed signs of contamination. The negative control samples, the whole purpose of which is to flag for the examiner contamination introduced during the testing process -- because the negative control samples contain no DNA -- showed what appeared to be DNA, *i.e.,* were contaminated:

- The control sample **"Neg Control (2-1)"**
  - Contains 1 peak. Negative or Blank Controls are used to calibrate the genetic analysis machine and contain no DNA profile. The presence of peaks is a possible indication of contamination or other problem during analysis. Review the GenoTyper electropherograms or the Genophiler Spreadsheet to see how many peaks are present and their relative peak heights. If the peaks are low (below 150 RFU's), it is possible that the peaks are simply artifacts or noise. The highest on-ladder peak found is 50 RFU's.

- The control sample **"Neg Control (2-21_163)"**
  - Contains 1 peak. Negative or Blank Controls are used to calibrate the genetic analysis machine and contain no DNA profile. The presence of peaks is a possible indication of contamination or other problem during analysis. Review the GenoTyper electropherograms or the Genophiler Spreadsheet to see how many peaks are present and their relative peak heights. If the peaks are low (below 150 RFU's), it is possible that the peaks are simply artifacts or noise. The highest on-ladder peak found is 67 RFU's.

Ex. I-Z, Forensic Bioinformatics Report, at 22. Twelve of the 16 positive control samples also showed issues of either contamination, missing genotypes or pull-ups, *i.e.*, were not accurate control samples. *Id.* at 22-24. All 17 of the neutral control samples were similarly problematic and showed either contamination, degradation or issues with the testing methods, particularly amplification. *Id.* at 24-28.

Trial counsel should have pursued questions of widespread contamination and testing issues in the lab immediately upon receiving this report. But they

apparently did nothing to pursue this information further, even in 2010 when they learned of the acknowledged contamination of one of the evidentiary samples by a staff member. After reviewing the case file, including the audits, the Forensic Bioinformatics report, and the sample contamination issues, Dr. Keith Inman concluded that "broader systemic (undetected) contamination" in the State lab at this time "should be seriously considered" and "the level of reliability of any of the work of the lab is uncertain." Ex. I-A, Expert Report of Keith Inman, Ph.D. at 8.

**b. Pervasive quality control issues in the Connecticut State lab**

Had trial counsel raised questions about the handling of DNA samples in the State lab based on the explicit flags in the Forensic Bioinformatics report, they would have learned how longstanding and pervasive these problems were. It was publicly known at the time of trial that the State lab was severely underfunded and understaffed. A Connecticut Office of Legislative Research report issued in 2010 flagged the lengthy turnaround time – among the longest in the nation – by the State lab of DNA analyses. The Governor of Connecticut publicly spoke in 2011 about the past "decade of neglect" of the State lab. Two of the lab's leaders, including Carll Ladd, who did the second review of the DNA analysis here, were being investigated for spending weeks at a time out of the lab on private cases, rather than supervising the DNA analyses. Ladd told the *Hartford Courant* in November 2011 that he and his fellow supervisor had a "five-year memo trail" documenting staffing issues, outdated equipment, overtaxed managers and other problems in the lab. Ex. I-AA, "State DNA Chiefs' Side Jobs Face Scrutiny,"

*Hartford Courant* (Nov. 12, 2011). But trial counsel appear to have done no investigation into the State laboratory.

**c. Lack of sufficient laboratory protocols**

As soon as they received the Forensic Bioinformatics report, trial counsel also should have looked at the Standard Operating Procedures for the State lab, which they had received and had in their files. *See* Ex. I-AB, State of Conn., Dep't of Public Safety, Div. of Sci. Services, Forensic Sci. Lab., Standard Operating Procedures (Revised 7-17-07) ("Standard Operating Procedures"). Trial counsel knew that the State lab's Standard Operating Procedures were required to meet the FBI's Quality Assurance Standards. Trial counsel had those Quality Assurance Standards in their files, but do not appear to have recognized that the State lab's Standard Operating Procedures were facially insufficient on exactly the issues flagged by Forensic Bioinformatics, despite the fact that by the time of trial, well-publicized problems in other large crime laboratories had uncovered systematic deficiencies in quality control, including poor documentation, serious analytical and interpretive errors, the absence of quality assurance programs, inadequately trained personnel, erroneous reporting, and the use of inaccurate and misleading statistics. The report issued by the National Academy of Sciences in 2009, discussed above, had documented such issues extensively and gave specific recommendations for ensuring quality going forward. *See* Ex. I-E, NAS Report.

The Connecticut State lab's Statement of Operating Procedures during the period of the DNA analyses in this case fell far short of both the NAS recommendations and the FBI requirements. Most blatantly, the State lab had no

procedure for how to identify or investigate a contamination incident, contrary to the FBI's Quality Assurance Standards, which emphasized contamination monitoring and required internal validation studies to include a contamination assessment that demonstrated that contamination could be identified, minimized and contained. *See* Ex. I-AB, Standard Operating Procedures. The State lab had no procedure for reviewing the lab's reagent blanks, negative controls, and positive controls for the presence of contamination. *Id.* While it appears -- from the identification of the trace examiner's DNA profile in one of the key evidentiary samples here -- that at some point in time the lab instituted a contamination database (collecting samples of lab personnel), the lab's procedures do not identify a protocol for checking samples against that database. *Id.* All of this should have been apparent and concerning. "By 2011, the Connecticut DPS Laboratory's quality system lacked both a defined mechanism for detecting contamination and a functioning mechanism for responding to it." Ex. I-A, Expert Report of Keith Inman, Ph.D. at 6.

Another red flag for quality control that trial counsel failed to pursue was the handling -- by the same trace examiner who had contaminated evidentiary sample #16-Z-1 and around the same time as that contamination apparently occurred -- of the sole item that Ms. Roy subsequently concluded Mr. Aquart's DNA profile was "included" in: the double glove, evidentiary item 14. Trial counsel knew that the DNA collection from this piece of evidence was flawed and careless. Trace Examiner Maria Warner testified that she used the same swab to swab the inside of the gloves

(to identify the wearer) and the outside of the gloves (collecting everything it may have come in contact with). TT at 3084-85. Trial counsel brought out on cross-examination the use of a single swab for the inside and outside of each glove, but failed to connect this swabbing issue to the identification of a complex mixture, contamination or transfer, and failed to ask any questions about how such a process was contrary to the FBI Quality Assurance Protocols. Dr. Keith Inman notes the significance of the staff profile of Ms. Warner also appearing in a swab from item 14 at all but two loci, a fact that trial counsel themselves were aware of but did not pursue. Ex. I-A, Expert Report of Keith Inman, Ph.D. at 6; Ex. I-W, Sep. 30, 2010 email.

The lab's procedures also gave no guidance on interpreting mixtures. While the laboratory had a section on the "Interpretation of Results," no procedures specifically addressed how to determine the number of contributors, decide what is dropout and what is not, discern major or minor contributors, determine inclusions and exclusions, or report results and applicable statistics. *See* Ex. I-AB, Standard Operating Procedures; Ex. I-A, Expert Report of Keith Inman, Ph.D., at 13.

There was also no policy about the destruction of samples during testing. The 2009 FBI Quality Assurance Standards (Standard 7.2) explicitly state: "Where possible, the laboratory shall retain or return a portion of the evidence sample or extract." Ex. I-D, 2009 QAS.

Finally, the lab's procedures were hurriedly updated in April 2011 in anticipation of the July 2011 FBI audits, a fact that trial counsel would have

learned if they had investigated the sufficiency of the lab's procedures. Indeed, trial counsel would have learned that the lab's April 2011 revised guidelines were quite different than the guidelines Ms. Roy worked under when analyzing the evidence here and could have questioned Ms. Roy far more effectively about the lab's lack of guidelines for mixture interpretation and other key issues affecting reliability.

**d. Missing validations**

A validation study establishes the reliability of a method (repeatability, reproducibility, and accuracy) and the parameters (*e.g.*, amount of DNA, quality of DNA, number of DNA contributors) within which the method functions reliably.

> In determining whether a challenged use of DNA evidence is sufficiently valid and reliable, a court must not only look to the general reliability of DNA analysis or statistical tool that gives meaning to any potential inclusion a known individual in a mixture…. It is just as critical to ask whether the specific application of the methodology, software, or protocol in the case at bar has been subjected to appropriate validation by the analyst and her laboratory. This inquiry is not just a fundamental tenet of DNA science. It is directly linked to *Daubert's* requirement that courts assess not only whether a given form of scientific evidence is sound, but whether, in a particular case, the "[p]roposed testimony [is] supported by appropriate validation."

*United States v. Johnston*, 23 Cr. 13 (NRM), 2025 WL 964073, at *21 (E.D.N.Y. Mar. 30, 2025) (quoting *Daubert*, 509 U.S. at 590). *See also* Ex. I-D, 2009 QAS, STANDARD 8.1 ("The laboratory shall use validated methodologies for DNA analyses.").

If that general principle was not enough to alert trial counsel of the importance of obtaining all the State lab's internal validation studies before trial, a lawyer with whom trial counsel consulted on DNA issues expressly advised trial counsel to obtain these validations in February 2009, as trial counsel's own file

memos show. *See* Ex. I-R, Balakrishnan DNA Memos/Chart. Trial counsel requested these validations from the lab at least three times in 2010 and 2011,[6] but when the laboratory failed to produce them, counsel did not move to compel production of them or to adjourn trial to receive them.

The validation studies were finally received by Freedom of Information Act request in the middle of jury selection, but trial counsel apparently did not have time to review them, and failed to request the necessary time to do so. Accordingly, they did not realize that the validation studies omitted important checks on reliability, including the contamination assessments required by the FBI Quality Assurance Standards. Without the required internal validations, the prosecution could not have met its burden of showing the analyses were sufficiently reliable to be admitted.

**e. Validation and protocol concerns regarding variable injection times**

Trial counsel documented in their file the injection times used on each of the allegedly inculpatory samples and specifically noted that several of the evidentiary samples were injected multiple times for varying lengths of time and the differing injection times yielded different results at certain loci. *See* Ex. I-R, Balakrishnan DNA Memos/Chart; Ex. I-AC, June 24, 2010 email. For example, as to the single

[6] Trial counsel's files show that they requested the validation studies from the laboratory in writing on Oct. 8, 2010; Nov. 15, 2010; Jan. 11, 2011. On Nov. 4, 2010, defense counsel reviewed some of the requested materials in person and were told by Dr. Ladd that the lab was still looking for the rest. Dr. Ladd promised to send copies of the validation studies, but did not do so.

swab that Ms. Roy concluded Mr. Aquart's DNA was "included in" – one of the swabs of item 14, the double glove – trial counsel flagged that to reach her inclusionary result, Ms. Roy injected the swab twice, a week apart, the first time for 10 seconds, and the second time for 20 seconds, and then relied on the results from the longer injection time to conclude that multiple additional low-level peaks were alleles that included Mr. Aquart as a contributor. *See id.*; Ex. I-L, May 2, 2008 Supp. V DNA Report. "Injection time affects the amount of DNA product introduced into the capillary electrophoresis instrument and can therefore affect peak height, peak balance, the detection of low-level alleles, and the appearance of artifacts." Ex. I-A, Expert Report of Keith Inman, Ph.D., at 11.

This issue of varying injection times had been flagged for trial counsel in the November 2008 report from Forensic Bioinformatics. Ex. I-Z, Forensic Bioinformatics Report, at 23. However, trial counsel made no effort to investigate whether the lab had a validated protocol for injection times.

Then, on December 23, 2010, the State lab disclosed that some of the Identifiler amplification kits used in this case "may have been substandard or potentially compromised." Ex. I-AD, Dec. 23, 2010 Letter of C. Roy to AUSAs. This disclosure apparently prompted no investigation by trial counsel into how such issues may have affected the DNA analyses the prosecution was offering against Mr. Aquart.

Had trial counsel done the warranted investigation – including the basic step of reading the lab's Standard Operating Procedures –, they would have found out

that the State lab had no protocol for when to use increased capillary-electrophoresis injection times nor had it internally validated the kits for the longer injection times it was using. This was an important finding against the lab made by the FBI in its July 2011 audit, discussed below. When trial counsel finally received the lab's internal validations by Freedom of Information request, there is no indication they sent these validations to any of the DNA experts they were consulting with to see if they raised issues important to pursue at trial. Trial counsel failed, as with the other validations, to ensure before the evidence was admitted at trial that the lab had an internal validation for the injection methods used. The lab did not. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 12 ("First, the laboratory failed to validate the injection times analysts were using in casework, and the laboratory did not have defined protocols for determining which injection time to use and when. Second, even if the method had been validated and properly defined, longer injection times in low-level mixtures may affect which peaks are observed above threshold and may therefore affect number of contributors, inclusion, non-exclusion, stutter, and dropout decisions.").

#### 5. The government's DNA evidence at trial

The government opened on the DNA evidence, telling the jury confidently: "You are going to hear from a forensic DNA examiner who will tell you that DNA was recovered from the scene of the murders and that it was consistent with the defendant having left it there." TT at 45.

The only limiting motion about the DNA evidence that trial counsel filed was a request to preclude the government from eliciting that a second DNA examiner had reviewed Ms. Roy's analyses. Doc. 788 (filed May 9, 2011).

The first government witness to testify about the DNA evidence was trace examiner Maria Warner, who swabbed most of the samples that were submitted for DNA analysis. Trial counsel knew Ms. Warner's profile had been found in sample #16-Z-1, *i.e.,* that she was the source of the contamination. Trial counsel's cross of Ms. Warner on the contamination was sparse and failed to bring out the larger issues of the lack of an investigation into how the contamination occurred, the lack of laboratory protocols for contamination, and the lack of any clean-up of the laboratory or retesting of other evidentiary samples after the contamination was discovered. These failures were notable in the face of Ms. Warner stating that she was never asked to review what led to the contamination and no supervisor ever spoke to her about the incident. TT at 3090-93. It was as though trial counsel did not perceive the larger issues with contamination that impacted the general reliability of the laboratory and all of its analyses.

DNA examiner Christine Roy testified over four days. Trial counsel did not question her qualifications to testify nor did they conduct any voir dire on the reliability of the protocols she had followed. TT at 3108-40. The government repeatedly elicited from Ms. Roy that Mr. Aquart's profile was "included as contributor" or "could not be eliminated as a contributor" to certain evidentiary items in the apartment. Defense counsel did not object to these bald statements,

made without statistical probability qualification. *See, e.g.,* TT at 3156, 3186. Even in 2011, the field of DNA analysis heavily criticized such assertions, which wrongly indicate that the examiner actually knows who contributed the DNA as opposed to the scientifically accurate statement that Mr. Aquart's profile was potentially included as (or could not be eliminated from being) a contributor with an accompanying probability statistic. *See, e.g.,* National Research Council, *DNA Technology in Forensic Science* (1992) at 74 ("To say that two patterns match, without providing any scientifically valid estimate (or at least, an upper bound) of the frequency with which such matches might occur by chance, is meaningless").

Ms. Roy testified that Mr. Aquart's profile was "included" on the double glove found in Tina Johnson's bedroom (14-1-Z1 and 14-2-Z1) (TT at 3186-87), and could not be eliminated from a latex glove cuff found underneath a cushion on the living room couch (TT at 3174-85 (13-Z-1), one of the swabs of latex material found on tape that had been used to bind Tina Johnson's hands (9-Z-1) (TT at 3155-64), and a piece of nylon stocking found in Tina Johnson's bedroom (15-Z-2) (TT at 3197-3201). Regarding the evidentiary sample contaminated by the trace examiner, #16-Z-1, despite the analysis having been deemed inconclusive because of the contamination, the government was permitted by the Court to elicit that, before the contamination, Ms. Roy had concluded that Mr. Aquart could not be eliminated from that sample (TT at 3207-08) and that the trace examiner's profile was eliminated from all other samples. *Id.*

Ms. Roy testified on direct that she had used controls, negative controls, and positive controls during the analysis of the swabs here to ensure that the amplification process was working correctly, and that the negative control shows no DNA and the positive control shows only the DNA it is supposed to. TT at 3234. She assured the jury that all required protocols had been followed and all the controls checked. *Id.*

Trial counsel tried to ask about some of the key issues, such as peak heights under the analytical threshold being used in the interpretation and Ms. Roy's lack of documentation of her judgment calls, but the point of such questions got lost in counsel's unclear phrasing and lengthy shuffling through documents. TT XIV-XV. The Court repeatedly asked trial counsel how much longer the cross would continue and if the Court could assist in moving it along.

There were also numerous missed opportunities during the cross-examination. For example, trial counsel were asking Ms. Roy about distinguishing single-source samples from mixtures and Ms. Roy testified that she knew one of the victims' profiles was single-source because she was told it came from the victim, rather than from looking at the peak heights and alleles at each locus. TT at 3310. That volunteered testimony would have been a good opportunity to pursue Ms. Roy's failure to follow the scientific method, the indicia of contamination in the victims' reference profiles that had been pointed out in the Forensic Bioinformatics report, and even the importance of the number of contributors' estimates that Ms. Roy failed to make. Similarly, trial counsel took Ms. Roy through the wide range of

possible contributors by asking how many allele pairs were possible, but failed to ask why she did not estimate a number of contributors for any of the relevant evidentiary samples. TT at 3439-43. Trial counsel began to explore the issue of transfer, but never asked the key question to show that Ms. Roy had no way to tell how any DNA profile she was looking at got on the evidentiary sample. TT at 3347. Likewise, trial counsel brought out that Ms. Roy had used three different injection times on a single sample and based her conclusions on only one run that had a 25 second injection time, TT at 3459-60, 3472, but failed to bring out the differences in results among the runs, the increased pull-up and stochastic effect, the lack of validation for any injection time over 10 seconds, or the lack of documentation of why she chose to use a particular run. Ms. Roy agreed that all the samples had been consumed in the testing process, but then trial counsel failed to bring out what that meant -- that the evidence could never be retested.

Issues with the combined probability of inclusion statistics were one of trial counsel's focuses, returned to multiple times during the cross, but unfortunately counsel could not squarely elicit the uncertainty of the probability calculation, *see, e.g.,* TT at 3318, 3334, 3343, and spent a great deal of time on the less probative issue of the different calculations for three racial groups. TT at 3318, 3330, 3342. Trial counsel focused on another key issue – Roy's use of loci with dropout in the combined probability of inclusion statistics, TT at 3481 – but the questions were muddy and he could not bring out the actual reliability issues. Ms. Roy repeatedly cut-off the cross-examination by saying she was following the lab's protocol. Had

trial counsel recognized the problems with the lab's protocols, they could have more effectively challenged the reliability of Ms. Roy's CPI calculation. TT at 3493.

It was not until the third day of cross that trial counsel even asked Ms. Roy about the evidentiary samples she had connected to Mr. Aquart. This part of the cross-examination finally focused on the numerous unaccounted-for alleles in these samples and then moved to the crucial issue of Mr. Aquart's alleles not being present at multiple loci on five of six evidentiary samples. TT at 3475-76. But, when Ms. Roy balked at confirming that she could not be sure it was dropout, trial counsel failed to keep pushing her, and the point was lost. *Id.* at 3476-77.

There were a number of important issues that trial counsel never asked Ms. Roy about at all: wider problems in the lab, the insufficiency of the lab protocols, broader contamination issues, internal validations, the possibility of persistence (the DNA having been left on an item at a different, earlier time than the night of the crime). On the specific contamination issue with #16-Z-1, trial counsel asked no questions about the lab's procedures for dealing with contamination, or about what investigation was done to make sure the contamination was limited, instead focusing on the fact that Ms. Roy did not have elimination profiles for people who collected the evidence. TT at 3360.

Trial counsel called no defense experts on DNA, not because they did not think they would be helpful but out of a concern that if an expert were only called on DNA it would make the defense position on other issues look weaker:

> After much thought, we have decided not to rely on a DNA defense expert and are putting our DNA eggs in the cross-examination basket.

> Had it been solely or even principally a DNA case, our posture quite likely would have been different. As it is, however, to call in a defense expert on this one item of evidence would in our opinion weaken our credibility over all.

Ex. I-AE, March 7, 2011 email. This makes no strategic sense, particularly since the key forensic evidence introduced by the government was the DNA.

In its closing argument, the government asserted that the cooperating witnesses' testimony wasn't even necessary because of the strength of the scientific evidence, asserting without caveat that Mr. Aquart's DNA was "found at the murder scene." TT at 4237. Trial counsel did not object to this inaccurate assertion. *Id.* The government also repeatedly vouched for the credibility of Ms. Roy and the DNA evidence. TT at 4236-4240. The government told the jury that Ms. Roy was "cross-examined for three days and the only error she was found to have made was a typo she noted on one of her many reports." TT at 4258-59. Again, emphatically, the government claimed that Mr. Aquart's "DNA profile is there" on the cuff of a latex glove found on the couch, "just as John Taylor said he was." TT at 4259. Trial counsel did not object despite the government misstating the testimony of Ms. Roy misleadingly. What Ms. Roy concluded was far weaker: that Mr. Aquart's profile could not be eliminated as a contributor to the swab of the cuff, not that it was there.

Trial counsel tried to pull the strands together at closing, arguing that as to the glove cuff found under the pillow of the living room couch --because there were additional genetic markers on it that did not belong to Mr. Aquart -- the markers that did match his profile could actually have come from a different person with

shared alleles. TT at 4275. Counsel also tried to argue that assumptions colored Ms. Roy's analysis, but unfortunately did not have concrete information from the testimony to anchor that argument. There was no argument made that contamination in the lab was more widespread and affected reliability of all the testing. TT at 4278-80.

The government in rebuttal asserted that the DNA completely corroborated its cooperating witnesses. TT at 4335.

**6. The State lab lost its accreditation shortly after trial, based on two highly critical FBI audits.**

In August 2011, prior to Mr. Aquart's sentencing, Connecticut state officials publicly announced that the American Society of Crime Laboratory Directors had refused to re-accredit the DNA sections of the State lab following two highly critical FBI Quality Assurance audits, one of the DNA databasing section of the lab and one of the DNA casework section of the lab. *See* Ex. I-AF, M. Regan, *State police crime lab loses accreditation*, Connecticut Mirror (Aug. 17, 2011); Ex. I-AG, *External DNA Audit Report on Compliance with the FBI Director's Quality Assurance Standards for Forensic DNA Testing Laboratories,* Audit of the Connecticut Department of Public Safety Forensic Science Laboratory, July 11-13, 2011 ("July 2011 FBI Quality Assurance Casework Audit"); Ex. I-AH, *External DNA Audit Report on Compliance with the FBI Director's Quality Assurance Standards for DNA Databasing Laboratories*, Audit of the Connecticut Department of Public Safety Forensic Science Laboratory, July 11-13, 2011 ("July 2011 FBI Quality Assurance Database Audit").

The audit findings were shocking The FBI found that the lab failed to meet over 40 of the mandated Quality Assurance Standards, including numerous ones directly relevant to the analyses introduced at trial. Ex. I-AG, July 2011 FBI Quality Assurance Casework Audit. *See also* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 2 ("The judgements made by the CT laboratory analysts occurred in precisely those areas identified as deficient in the audit: low-level mixtures, possible dropout, minor peaks, and contamination assessment.").

For example,

**Standard 7.3** The laboratory does not have a documented policy on sample consumption.

**Standard 8.1** The laboratory does not use validated methods for DNA analyses.

**Standard 8. Validation**

| | | Yes | No | N/A |
|---|---|---|---|---|
| 8.1 | Does the laboratory use validated methods for DNA analyses? | ☐ | ☑ | ☐ |

Click Here For Discussion

**Comment**

Standard 8.1 - See Findings Section

**Standard 8.6** The laboratory has not evaluated each additional or modified critical instrument by conducting a performance check prior to its use in casework.

Regarding Standard 8.6, the FBI specifically found that the State lab had not conducted an internal validation for injection times greater than 10 seconds for the Identifiler amplification kit (the same kit used on most of the evidentiary samples here). *Id.*

**Standard 9.1.1** The laboratory does not have a documented standard operating procedure for each analytical method used.

**Standard 9. Analytical Procedures**

| | | Yes | No | N/A |
|---|---|---|---|---|
| 9.1 | Does the laboratory have and follow written analytical procedures approved by the technical leader? | ☐ | ☑ | ☐ |
| | a. Are the laboratory's standard operating procedures reviewed annually by the technical leader, and is this review documented? | ☐ | ☑ | ☐ |
| 9.1.1 | Does the laboratory have a documented standard operating procedure for each analytical method used? | ☐ | ☑ | ☐ |
| | a. Do the analytical procedures specify reagents, sample preparation, extraction methods, equipment, and controls that are standard for DNA analysis and data interpretation? | ☐ | ☑ | ☐ |

Click Here For Discussion

| | | Yes | No | N/A |
|---|---|---|---|---|
| 9.7 | Does the laboratory have and follow a documented policy for detecting and controlling contamination? | ☐ | ☑ | ☐ |

**Standard 9.6** The laboratory does not have and follow written guidelines for the interpretation of data.

Regarding Standard 9.6, the FBI specifically found that the laboratory's manual "gives no guidance regarding the inclusion/exclusion of loci depending upon allelic activity under the reporting threshold. Numerous reports were reviewed where loci with alleles below the reporting threshold were used for statistical purposes to support an inclusion." *Id.* Dr. Inman concludes in his expert report that "the auditors' findings" as to "the laboratory's interpretation protocols" are "devastating" to the DNA evidence against Mr. Aquart. Ex. I-A, Expert Report of Keith Inman, Ph.D., at 12.

**Standard 9.6.4** The laboratory does not have and follow documented procedures for mixture interpretation to include the following:

**Standard 9.6.4.a** Major and minor contributors

**Standard 9.6.4.b** Inclusions and exclusions

**Standard 9.6.4.c** Policies for reporting results and statistics

Nor, the FBI found, did the State lab have a policy for identifying and remediating contamination:

**Standard 9.7** The laboratory does not have and follow a documented policy for detecting and controlling contamination

Very significantly, the FBI found that the lab had skipped its mandated bi-annual external audit that was necessary to maintain access to the FBI CODIS database: *Id.*

**Standard 15** The laboratory has not been reviewed by an external auditor a minimum of once every two years. The FBI found that the laboratory had no external audit in 2009 or 2010.

Trial counsel's files and emails show that they learned of the audit findings while they were working on a new trial motion for Mr. Aquart.

Trial counsel considered making a new trial motion based on the audit findings but did not, apparently because they viewed the audit findings extremely narrowly as bearing only on the validation of certain machines. *See* Ex. I-AI, Oct. 18, 2011 email ("In our case, the verification results provided to us on the eve of trial indicate that the 3130x1,- 1 and 2 machines used to test our samples were validated only at 10 second injection times. Given Ladd's anticipated testimony that the extrapolation method was appropriate, and further that the machines had since

been tested and found to be accurate at the longer injection times, my opinion is that without an expert to testify to the contrary, we have nothing on this issue.").

A memo in trial counsel's files titled "Discussion with our expert – Analysis of External DNA Audits," dated August 31, 2011, attached as Ex. I-AJ, contains notes of a conversation between trial counsel and an unidentified DNA expert about the audit issues. Those notes show that the expert flagged far broader issues than just instrument validation:

> **MAJOR ISSUE**: Insufficient performance check on newly purchased Applied Biosystems' 3130xl Genetic Analyzer.
>
> Lab performed performance checks on instruments, but only tested at 5 and 10 second injection times. However, analysts also used instrument with up to 40 second injections. Injection time has a direct impact on the sensitivity and ability to detect
> ....
>
> Fundamentally, lab didn't establish that the instruments are performing as they should be, according to the lab validations.
>
> ....
>
> **MAJOR:** The lab's interpretation of results SOP does not contain guidelines / procedure for interpreting mixtures. (e.g., major/minor contributors and also inclusions and exclusions decisions) Standard 9.6.4
>
> - Old practice was more like "through my training and experience" I can tell you … but no documentation with written guidelines.
>     - SWGDAM Jan 2010 puts an end to this. SOP must spell out the interpretation guidelines. Lab not compliant with this new requirement.
> - Here's the problem: let's say you have a mixture with some weak alleles (e.g. asterisks) in the 50 to 75 RFU range. The lab will only include in CPI stat if above 75 RFU. But, what if there are potentially

4 alleles at a certain locus, where two are slightly above the threshold and two slightly below. These could pair up in any combination, but the lab just considers the two above for stat purposes. BUT, maybe the lab is simply not using this certain locus from stat purposes. The SOP doesn't spell this out.

....

**MAJOR**: The lab does not have guidelines for interpreting / assessing when a peak just above and/or just below the lab's threshold is potential contamination. Standard 9.7

- Example: audit team found numerous case files where negative controls and/or reagent blanks showed allelic activity both above and/or below the threshold. (is it contamination or real DNA)

- If contamination, there is nothing in the SOP as to how to handle this. (e.g. re-run the samples, try to ascertain the source of contamination, etc.)

....

**SOMEWHAT SIGNIFICANT:** The lab is conducting multiple tests on certain evidentiary items, yet is not reporting on all results, just those lab feels significant / relevant. Standard 12.2.6

- Reports don't always address each item tested or its probative fraction.

- Requirement is as follows: Any stain, sample, or item on which an attempt is made to isolate DNA, regardless of the outcome or result, must be addressed in the final report.

- There may be some evidentiary value for defense (depending on theory) in unreported testing.

That is, trial counsel appears to have in fact consulted an expert who could have testified to the significant issues revealed in the audits that bore directly on the reliability of the DNA analyses here. Yet, trial counsel failed to raise the audits in their new trial motion.

Just as with the pre-trial issues, there were also issues related to the audits that trial counsel unreasonably failed to investigate. Trial counsel does not appear to have recognized – or even gone back and read the trial transcripts to check – that Ms. Roy had testified contrary to the audit findings at several points, in a way that was misleading to the jury.

*First,* the FBI found that the state lab had entirely missed its mandated bi-annual audit in 2010 – while analysis of the DNA samples in this case was still ongoing. *See* Ex. I-AG, July 2011 FBI Quality Assurance Casework Audit. Ms. Roy testified under oath on direct exam:

> Q. Okay. In addition to the accreditation process, is the lab also audited?
>
> A. Yes. As part of our accreditation process the laboratory has to be audited once a year. This audit can be from an outside agency or we can do an internal audit. But for DNA it has to be outside agency audit at least every other year.
>
> Q. And are you aware of whether the DNA section has passed all of its audits?
>
> A. Yes.
>
> Q. Yes, it has?
>
> A. Yes, it has.

TT at 3314.

*Second,* the FBI found that there were no protocols for detecting contamination and that the "audit team found numerous case files where negative controls and/or reagent blanks showed allelic activity both above and/or below the threshold." Ex. I-AG, July 2011 FBI Quality Assurance Casework Audit, Standard 9.7. But, Ms. Roy had testified on direct examination that she had used controls, negative controls, and positive controls during the analysis of the swabs to ensure

that the amplification process was working correctly, and that the negative control shows no DNA and the positive control shows only the DNA it is supposed to. TT at 3234. She assured the jury that all required protocols had been followed and all the controls checked. *Id.*

*Third,* the FBI found that the lab did not have all of its internal validations, including for certain injection times used in the amplification process. Ex. I-AG, July 2011 FBI Quality Assurance Casework Audit. On cross-examination, when Ms. Roy was asked about injection times, she testified:

> A. That is correct. And our instruments are validated up to a certain amount of time for injection.
>
> Q. And if it's -- for example, if you think it's going to be a large amount of DNA you know that, perhaps from your yield gel, or whatever, you might only inject it for five seconds.
>
> A. Standardly I always start at five second, see what I get, and then if I need to I reinject longer.
>
> Q. Okay. And the maximum amount of time that you inject is 30 seconds?
>
> A. It depends on the instrument. There are some instruments that the maximum amount of time is 20 seconds.

TT at 3459.

It is hard to imagine that in May 2011, when she testified, Ms. Roy did not know that the FBI was scheduled to audit the lab in July and that there were issues her supervisor, Carll Ladd, who was the second reviewer on this case, was scrambling to address. The lab's Standard Operating Procedures were revised (by Ladd) in April 2011, just as the trial was occurring, to try to bring them into compliance with the FBI Quality Assurance Standards, including, specifically, as to validations and protocols for contamination. Ms. Roy certainly would have known

there were new and significantly revised lab procedures. There is no indication that Ms. Roy or the lab ever disclosed to trial counsel that the lab's procedures had been revised. Had trial counsel known that there was a revision, it might well have alerted them to the deficiencies in the procedures in place during the analyses of the evidence used against Mr. Aquart.

### B. Trial counsel were deficient in their handling of the DNA evidence.

In failing to request a *Daubert* hearing or move *in limine* to exclude the DNA evidence based on the significant reliability issues counsel were aware of, in failing to adequately investigate the contamination issues and broader quality control issues with the lab, and in failing to move for a new trial based on the FBI audit findings and the de-accreditation of the State lab, trial counsel's actions did not comport with the "prevailing professional norms" at the time of Mr. Aquart's trial. Ex. I-B, Ungvarsky Decl.; *see also Purcell v. United States*, 158 F.4th 441, 450 (2d Cir. 2025) (quotation omitted). Their actions thus "fell below an objective standard of reasonableness" and were, consequently, constitutionally deficient. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting *Strickland*, 466 U.S. at 688).

#### 1. Trial counsel's failure to move for a *Daubert* hearing or to exclude or limit the DNA evidence based on the significant reliability issues counsel were aware of prior to trial was objectively unreasonable.

Long before trial ever began, trial counsel knew that the DNA analysis by the State lab had not been conducted in accordance with established scientific methods. As prevailing practices expert Ungvarsky opined based on his review of the trial

record and counsel's case file, trial counsel failed to act in the face of unusually strong advice from their own experts:

> The multiple, compounding issues forcefully raised by the defense experts are of a degree and type I have not encountered in a single case in my many years of practice. The defense experts uniformly advised trial counsel that the laboratory in this case had not employed a neutral, reliable, and consistently applied interpretative method. Counsel solicited that advice and then, having received it, disregarded it.

Ex. I-B, Ungvarsky Decl., at ¶ 75.

*First*, trial counsel knew, both from consulting experts and from their own investigation, that although each of the relevant DNA samples contained a complex mixture of DNA, the State lab's DNA examiner had not determined how many people's DNA was in the evidence samples she claimed inculpated Mr. Aquart. This was contrary to the then-current guidance of the leading scientific working group. *See* 2010 SWGDAM *Interpretation Guidelines for Autosomal STR Typing by Forensic DNA Testing Laboratories*, at 3.4.1. Without a determination of how many contributors there were to a particular sample, the examiner's consideration of which genotypes were potentially present in the mixture was entirely unconstrained and susceptible to known risks of cognitive bias and suspect-centered analysis. Counsel knew that exactly this problem had been identified by the State lab's own supervisor in a leading scholarly article. Ladd et al., "Interpretation of Complex Forensic DNA Mixtures," *Croatian Medical Journal* 42(3):244-246, 2001.

*Second,* trial counsel knew that the examiner's inclusionary opinions rested on a series of undocumented, subjective judgment calls made only *after* she

compared the evidentiary samples to Mr. Aquart's known profile as law enforcement's lead suspect. Precisely the kind of analysis the DNA examiner engaged in had already been rejected as unscientific and dangerous by the relevant scientific community. *Fundamentals,* at 325, Fig. 14.5. Its false positive error rate had been suggested to be as high as 87 percent.[7] Rather than first assessing the allele pairs for each evidentiary sample, Ms. Roy had engaged in a classic technique of painting the bullseye around her target. She *first* compared the reference profiles from Mr. Aquart and the other suspects to the evidentiary profiles *before* determining which alleles were "missing" or had "dropped out" versus "not present."

By the time of Mr. Aquart's trial, it was established in the scientific community that evidence samples must be fully interpreted before the analyst learns the DNA profiling results, or "genotype," of the reference samples (*i.e.,* samples from known contributors, such as defendant and victim). Ex. I-A, Expert Report of Keith Inman, Ph.D., at 19. Otherwise, knowledge of the genotypes from known contributors can bias the analyst's interpretation of DNA types from the evidence. *Id.* The 2010 SWGDAM Guidelines – which counsel were well aware of -- unambiguously recommended that "[t]he laboratory must establish guidelines to ensure that, to the extent possible, DNA typing results from evidentiary samples are interpreted before comparison with any known samples." SWGDAM Interpretation Guideline 3.6.1. By 2011, there was consensus in the forensic DNA

---

[7] James Curran and John Buckleton, *Inclusion Probabilities and Dropout*, 55 J. Forensic Sci. 1171, 1172 (2010), https://doi.org/10.1111/j.1556-4029.2010.01446.x ("In 87% of simulated cases, evidence was produced that had some tendency to inculpate the random third profile that was in fact not in any way a contributor to the mixture.").

community that the kind of suspect-centric analysis performed by Ms. Roy in this case was unreliable. *See* Curran & Buckleton, *Inclusion Probabilities and Dropout*. And the defense's own consulting expert had told them just that.

> The suspect-centric interpretation at issue in this case was not even difficult to discern; the analyst in this case had specifically calculated different combined probabilities of inclusion for each person of interest compared to those samples. Nor would challenging that defect have required substantial additional effort. Counsel already possessed what was needed to litigate the issue: qualified experts who had identified the problem, explained why it mattered, and could have supported a motion. In that sense, the challenge was unusually available and unusually clear.

Ex. I-B, Ungvarsky Decl., at ¶ 79.

*Third,* trial counsel also knew that an evidentiary sample that had been contaminated by a lab staff member had been tested at the same time, in the same place, by the same lab staff, and according to the same laboratory protocols as other evidentiary samples and that the lab had not done an investigation to fully characterize the nature and extent of contamination. Counsel also knew – from its own consulting experts – that there was affirmative evidence that other evidentiary samples were potentially contaminated. DNA evidence from other labs with similar contamination episodes had been challenged successfully. But counsel failed to challenge the admissibility of the DNA evidence based on potential contamination, or even to seek full discovery regarding the protocols for contamination in the State laboratory. Their reliance on cross-examination was counter to prevailing practice:

> A functioning quality system was known to be a basic prerequisite to reliable DNA analysis, not a collateral administrative matter. By 2011, therefore, competent capital counsel could not reasonably treat breakdowns in quality assurance and quality control as mere fodder for impeachment. Where the laboratory's quality systems were deficient, the reliability of the resulting scientific conclusions was in question, and prevailing practice required counsel to present that issue to the court through pretrial motions practice.

Ex. I-B, Ungvarsky Decl., at ¶ 88.

*Fourth*, trial counsel knew that the statistical method used by the lab —the Combined Probability of Inclusion—was a flawed approach to complex mixture interpretation that was already being sharply questioned by numerous experts in the field, including the defense's own consulting experts. It was the prevailing norm at the time of Mr. Aquart's trial for lawyers confronted with DNA evidence based on this CPI method to challenge the statistics through a *Daubert* challenge. *See, e.g., United States v. Bonds,* 12 F.3d 540, 565 (6th Cir. 1993) (subjecting "the underlying principles and methodology used by the FBI to declare matches and make statistical probabilities" to *Daubert* review); *United States v. Coronado-Cervantes,* 912 F. Supp. 497, 500-01 (D.N.M. 1996) (observing that compliance with standard protocols in applying RFLP technique and statistical calculations of the frequency of alleles in a population go to admissibility rather than weight of the evidence); *People v. Venegas*, 18 Cal.4th 47 (1998) (FBI DNA test inadmissible due to failure of lab to follow correct statistical method); W. Thompson, *Evaluating the Admissibility of New Genetic Identification Tests: Lessons From the 'DNA War,'* 84 J. Crim. L. & Criminology 22, 84-86 (1993). Trial counsel failed to do so here even though they

knew that this wasn't just an application of CPI, it was a suspect-centered use of CPI. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 21.

*Fifth,* trial counsel knew that the State lab had destroyed the evidentiary samples in this case in the testing process, so no retesting would ever be possible. Trial counsel were specifically advised to move to exclude the DNA evidence on this basis. They did not do so.

Courts have deemed the failure to challenge the admissibility of unreliable scientific evidence to be ineffective assistance of counsel even in the non-capital context. For example, in *United States v. Hebshie*, decided the year before Mr. Aquart's trial, the court concluded that counsel's failure to move for a *Daubert* hearing constituted ineffective assistance, finding notable the fact that, by the time the trial took place, "a number of articles in legal journals and cases cast a critical eye on the scientific reliability of arson evidence, methodologies, and techniques," and observing that, faced with this "drumbeat of concern about arson prosecutions," "[o]rdinarily competent counsel would have . . . taken appropriate steps to litigate the issues using all the tools available." 754 F. Supp. 2d 89, 92 (D. Mass. 2010).

It was objectively unreasonable for trial counsel here not to seek a *Daubert* hearing in order to prevent the admission of misleading, unreliable evidence cloaked as "scientific" and "expert." The inherent persuasiveness of expert testimony owes in part to a perceived "infallibility" of forensic evidence among lay audiences. *See, e.g., United States v. Smith*, 869 F.2d 348, 352 (7th Cir. 1989) ("The

tendency of testimony on scientific techniques to mislead the jury relates to the fact that, because of the apparent objectivity of opinions with a scientific basis, the jury may cloak such evidence in an aura of mystic infallibility." (internal quotation and citation omitted); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 553 (Tex. 1995) (explaining that "a jury more readily accepts the opinion of an expert witness as true simply because of his or her designation as an expert" and that this "potentially prejudicial influence" is exacerbated by the "difficulty inherent in evaluating scientific evidence" such that "'ostensibly scientific testimony may sway a jury even when as science it is palpably wrong'") (quoting Bert Black et al., *Science and the Law in the Wake of* Daubert*: A New Search for Scientific Knowledge*, 72 Tex. L. Rev. 715, 789 (1994)); *see also* Vincent P. Iannece, *Breaking Bad Science: Due Process as a Vehicle for Postconviction Relief When Convictions Are Based on Unreliable Scientific Evidence*, 89 St. John's L. Rev. 195, 199-200 (2015) (discussing the "Reverse CSI Effect," whereby jurors expect damning forensic proof of guilt, hear expert testimony on the subject, and then "place too much weight on the forensic evidence" that is produced, even if it would not properly be considered strong enough to result in a conviction).

Prevailing practices expert Ungvarsky calls "[t]he deficiencies in counsel's handling of the government's DNA evidence … profound":

> By the time of trial, counsel had been advised by multiple qualified experts that the laboratory's analysis was fundamentally unreliable. Counsel had been advised by the laboratory itself that contamination had occurred and by their own experts that contamination was more widespread than the lab had disclosed. Counsel was aware that the lab lacked clear protocols governing fundamental issues of interpretation.

> Yet, counsel filed *no* pretrial challenge to the admissibility of that evidence. In a capital case—where forensic proof will carry enormous weight and the law demands heightened reliability—prevailing professional practices required counsel to bring these issues to the court before the jury ever heard them.

Ex. I-B, Ungvarsky Decl., at ¶ 67.

It was not reasonable strategy to forego the threshold question of admissibility in favor of cross-examination. "Cross-examination addresses the weight a jury should give admissible evidence. By contrast, Rule 702 and related admissibility procedures exist to permit the court to determine, before the jury hears the evidence, whether the testimony is reliable enough to be admitted at all." Ex. I-B, Ungvarsky Decl., at ¶ 91. *See also United States v. Hines,* 55 F. Supp. 2d 62, 67 (D. Mass. 1999) ("[T]he court must be the gatekeeper, and must assure the reliability and relevance of testimony with respect to all expert testimony included in Fed. R. Evid. 702.").

Mr. Aquart's trial counsel's failure to request a *Daubert* hearing or move to exclude under Rule 702 prevented the Court from exercising its gatekeeper function and lifted the burden of proving admissibility from the government. Counsel's failure to move to exclude the DNA evidence "cannot be justified as a result of some kind of plausible . . . strategy." *Purcell*, 158 F.4th at 450. Here, "there was simply no downside to requesting a *Daubert* hearing." *Hebshie*, 754 F. Supp. 2d at 121; *see also Gersten v. Senkowski*, 426 F.3d 588, 608 (2d Cir. 2005) ("[N]o facts known to defense counsel at the time that he adopted a trial strategy that involved conceding the medical evidence could justify that concession.").

> The ABA Guidelines describe themselves as reflecting well-established national norms and minimum requirements for the defense effort in capital cases. Those norms do not contemplate retaining multiple highly qualified experts, receiving a uniform warning that the State's scientific evidence is fundamentally unreliable, and then filing nothing.

Ex. I-B, Ungvarsky Decl., at ¶ 74.

Cross-examination cannot remedy a failure to move for exclusion where, as here, such cross-examination cannot or does not draw out the particular issues that would have been a basis for the evidence's exclusion. *See, e.g.*, *Rivas v. Fischer*, 780 F.3d 529, 550 (2d Cir. 2015) (counsel ineffective for failing to adequately challenge medical examiner testimony, where counsel's cross-examination only "scratched the surface" of the medical examiner's findings); *Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir. 2001) (determining that counsel was ineffective for failing to properly challenge physical evidence despite fact that he cross-examined expert witness, reasoning that counsel did not *specifically* cross-examine expert witness on the report on which expert testimony rested). As prevailing practices expert Ungvarsky explains as to the suspect-centric use of CPI by Ms. Roy, "this issue was also poorly suited to attack through cross-examination. This was not simply "shaky but admissible" evidence to be weakened through cross-examination; it was evidence that lacked reliability because the analyst's interpretative approach changed from one known-person to the next. That is precisely the kind of defect that should be presented first to the district court in a pretrial reliability challenge." Ex. I-B, Ungvarsky Decl., at ¶ 80.

#### 2. Defense counsel failed to reasonably investigate other significant issues undermining the reliability of the government's DNA evidence.

Additional significant issues affecting the reliability of the DNA evidence would have been known to trial counsel had they undertaken a reasonable investigation. Under the prevailing norms of capital defense practice, competent trial counsel "must independently investigate the circumstances of the crime and all evidence—whether testimonial, forensic, or otherwise—purporting to inculpate the client" and must "subject[] all forensic evidence to rigorous independent scrutiny." Commentary to Guideline 1.1 of the *ABA Death Penalty Guidelines*, 31 Hofstra Law Rev. at 926. As part of this general duty to investigate, counsel has a duty to sufficiently consult with experts when dealing with technical matters. *See Gersten*, 426 F.3d at 608 (counsel was deficient in failing to consult with medical expert); *Usher v. Ercole*, 710 F. Supp. 2d 287, 303 (E.D.N.Y. 2010) (same); *Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008) (counsel was deficient in failing to consult with serology expert); *Elmore v. Ozmint*, 661 F.3d 783, 859 (4th Cir. 2011) (failure to independently assess and consult experts regarding various forms of forensic evidence was deficient), *as amended* (Dec. 12, 2012).

Here, trial counsel had qualified DNA experts with whom they were consulting on some issues and simply failed to consult those experts on other significant issues.

*First,* there is no indication that counsel sought to investigate the most basic question: were the analyses of this State lab, writ large, reliable? In 2011, the Connecticut Department of Public Safety Forensic Science Laboratory was

notoriously underfunded, understaffed, had the longest backlog of DNA samples in the nation, and it had been publicly reported that its leaders, one of whom was the head of the DNA section and the reviewing analyst on Mr. Aquart's case, were spending weeks out of the lab working on private DNA cases, rather than supervising the laboratory. This information had been widely reported in the Connecticut press.

*Second,* multiple analyses conducted in this matter exhibited contamination, with alleles detected in reagent blanks and negative controls and drop-in alleles detected in positive controls. Trial counsel's own consulting DNA experts at Forensic Bioinformatics told them, in a report provided almost three years before trial, of this contamination, not just of the control samples, but of the reference sample for Mr. Aquart, but trial counsel did no further investigation of this widespread contamination in the lab. Even after the lab reported identifying a clearly contaminated sample in this case and issued an amended report, counsel still failed to explore the systemic nature of the contamination in the lab.

*Third,* the lab's operating procedures were facially insufficient under governing FBI Quality Assurance standards, as the FBI would soon formally conclude in its audits of the lab. Yet, counsel failed to fully investigate the broader quality-system failures those deficiencies revealed—including skipped audits, missing required documentation, and overall lack of compliance with the FBI's standards.

*Fourth*, the lab had not conducted appropriate internal validation studies for its methods. Even after counsel learned the validation studies might be flawed, they failed to litigate the lab's noncompliance with their discovery and information requests, leaving a critical scientific-validity issue unresolved and undeveloped. "Prevailing professional norms applicable at the time of Mr. Aquart's trial in 2011 specifically required trial counsel to make thorough and detailed requests for laboratory files and to file motions to compel such disclosure or to preclude scientific evidence if the laboratory failed to provide full disclosures." Ex. I-B, Ungvarsky Decl., at ¶ 14.

*Fifth,* when the defense was specifically informed of a reliability issue with the amplification kits being used by the lab, despite knowing both that the lab had failed to produce validation information about the kits used in the analyses here and also that the lab had done multiple injections for different lengths of time and chosen the particular injection results that best met its theories of culpability, the defense conducted no further investigation, not even consulting with their retained experts on this issue. Without a bona fide internal validation and protocols for injection times, the analyses were unreliable and thus inadmissible. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 11.

The Supreme Court has recognized that failing to investigate constitutes deficient performance, *see Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986), and courts consistently find ineffective assistance where trial counsel fails to investigate and independently assess evidence. In *Rivas*, the Second Circuit held

that trial counsel's failure to adequately investigate the basis of a medical examiner's revised time-of-death estimate, which investigation would have exposed flaws in the medical examiner's methodology and the medical examiner's pending investigation for misconduct, was deficient performance. 780 F.3d at 550-51; *see also Bryant v. Thomas*, 274 F.Supp.3d 166, 189-91 (S.D.N.Y. 2017) (trial counsel's failure to adequately "learn about and analyze the serological evidence being put forward by the prosecution" was deficient), *aff'd*, 725 Fed. App'x 72 (2d Cir. 2018); *Lindstadt*, 239 F.3d at 201-02 (trial counsel erred in failing to obtain and independently analyze study underlying expert's testimony); *United States v. Gladden*, 394 F. Supp. 3d 465, 479-80 (S.D.N.Y. 2019) (trial counsel's failure to adequately investigate circumstances of seizure, which would have revealed a basis for moving to suppress items seized, was deficient).

**3. Trial counsel's failure to move for a new trial when the State lab was de-accredited was unreasonable.**

The lab that analyzed the key forensic evidence against Mr. Aquart was effectively shut down by the FBI shortly after trial. Trial counsel knew this, considered it, talked to an expert about it, learned that other defendants in Connecticut were litigating it as a significant reliability issue,[8] and then did not

---

[8] *See, e.g.*, *State v. Bennett*, 324 Conn. 744, 775-77 (Conn. 2017) (denying on procedural grounds trial counsel's motion for a new trial based on 2011 report); Def.'s Amended Motion in Limine Re: Proposed Testimony Relating to DNA Testing, *State v. Moreno-Hernandez*, No. NNH-CR09-0251887-T, 2011 WL 070732 (Conn. Super. Ct. 2011) (moving to exclude DNA evidence based on lab's accreditation issues); *Burgos v. Comm'r of Correction*, No. CV17-4008805-S, 2023 WL 2495405, at *1 n.1 (Conn. Super. Ct. Mar. 3, 2023) (noting that habeas petitioner initially raised an ineffective assistance claim based on counsel's failure to challenge the admissibility of DNA evidence because of the

raise it with the Court. Revocation of CODIS access by the FBI and of accreditation by the American Society of Crime Lab Directors are both extremely rare events. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 5. In the ordinary course, accreditation audits result in corrective-action findings, not the laboratory's exclusion from the basic accreditation and database systems required for all forensic DNA work. *Id.* When a lab loses accreditation or CODIS access, it signals not a technical lapse, but a systemic failure of scientific reliability. *Id.*

"Once the trial had ended and counsel learned that the FBI had revoked the laboratory's CODIS access for quality failures similar to those present in this case and uncovered in an outside audit, counsel's failure to raise the admissibility issues surrounding the DNA analysis through post-verdict motion practice became an even more serious departure from prevailing professional norms." Ex. I-B, Ungvarsky Decl., at ¶ 68. "Reasonably competent capital counsel would have recognized that evidence of a failed FBI Quality Assurance Standards audit, on grounds directly related to the reliability of the forensic evidence presented at trial, bore directly on confidence in the verdict and required judicial review." *Id.* at ¶ 102.

### C. Counsel's deficient performance prejudiced Mr. Aquart.

Trial counsel's failure to adequately investigate the serious deficiencies related to the DNA evidence and failure to move to exclude the DNA evidence prejudiced Mr. Aquart because there is a "reasonable probability" that, but for these failures, the outcome at trial would have been different. *Mayo*, 13

---

lab's loss of accreditation), *aff'd*, 229 Conn. App. 818 (2024), *cert. denied*, 351 Conn. 912 (2025).

F.3d at 533 (quoting *Strickland*, 466 U.S. at 694); *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.") (internal quotation omitted)). Had trial counsel sought a *Daubert* hearing, the Court would have held one. There is a reasonable probability that the outcome of such a hearing would have been exclusion or significant limitation of the DNA evidence, a result that would have "undermine[d] confidence" in the verdicts as to the conspiracy to murder count, the murder in aid of racketeering counts and the drug-related murder counts.

"In evaluating prejudice, [courts] look to the cumulative effect of all of counsel's unprofessional errors." *Gersten*, 426 F.3d at 611 (citing *Lindstadt*, 239 F.3d at 202).

**1. Had trial counsel sought a *Daubert* hearing, the jury never would have heard much or all of the DNA evidence.**

There are multiple independent grounds on which the trial court likely would have excluded this DNA evidence. To highlight just a few:

**a. Widespread contamination and insufficient protocols and validations would have led to complete exclusion of the DNA evidence.**

"[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). At an evidentiary hearing, the trial court would have learned of the rampant contamination of reference samples and control samples flagged explicitly in the Forensic Bioinformatics

Report, the lack of a formal investigation by the lab into the contamination of evidentiary sample #16-Z-1 or any remediation steps after that contamination, the lack of a laboratory protocol for how to detect and control contamination, the lack of contamination assessments in the internal validation studies, and the failure of the lab to undergo the bi-annual external audit mandated by the FBI. These issues are not matters of differences of expert opinion. They are not gray areas. They make any analysis coming out of the specific laboratory insufficiently unreliable to be admitted, particularly where, as here, there was no way for the samples to be retested since the lab had consumed them all in the testing process. *See United States v. Tuzman*, No. 15 CR. 536 (PGG), 2017 WL 6527261, at *15-16 (S.D.N.Y. Dec. 18, 2017) (concluding that expert's testimony was unreliable under Rule 702 where expert "fail[ed] to use basic quality control protocols" to prevent contamination and "fail[ed] to maintain written records of his standard operating procedure and internal validation"); *see also Daubert*, 509 U.S. at 594 (factor of reliability includes "the existence and maintenance of standards controlling the technique's operation"); *cf. United States v. Wrensford*, No. CR 2013-0003, 2014 WL 1224657, at *10-11 (D.V.I. Mar. 25, 2014) (denying *Daubert* challenge to DNA evidence where there were "strict" and "extensive" quality control standards); *United States v. Trala*, 162 F. Supp. 2d 336, 349 (D. Del. 2001) (denying *Daubert* challenge to DNA evidence where FBI "established that it ha[d] protocols and quality assurance controls in place to assure that its methods [were] sufficiently reliable").

**b. The lack of internal validation of injection times over 10 seconds would have led to the exclusion of DNA evidence as to four of the key evidentiary samples.**

Even if the overarching contamination and lack of protocol issues had not led to a full exclusion, a *Daubert* hearing also would have forced the lab to disclose the internal validations that trial counsel repeatedly had requested and would have revealed the lack of an internal validation for injection times over 10 seconds. Ms. Roy's conclusions for four of the samples concerning the inclusion of Mr. Aquart as a potential contributor or someone who could not be eliminated as a potential contributor relied on results from injection times over 10 seconds: 14-2-Z1 (one of the double gloves); 9-Z-1 (fragment of glove in duct tape wrapped around Tina Johnson's hands); 15-Z-2 (nylon stocking); and 13-Z-1 (cuff of a latex glove). Without the proper validation of this method, her conclusions as to these four samples were inadmissible. *See Johnston*, 2025 WL 964073, at *21 (E.D.N.Y. Mar. 30, 2025) (excluding DNA evidence produced without an appropriate validation); Ex. I-D, 2009 QAS, Standard 8.1 ("The laboratory shall use validated methodologies for DNA analyses.").

This would have left just two pieces of "inculpatory" DNA evidence. One, the swab of a glove found on a bedside table, was contaminated by the trace examiner and deemed by the lab inconclusive. For the reasons set forth above regarding the lack of a contamination protocol and the lack of any formal investigation or remediation efforts, this contaminated evidence likely would not have survived a *Daubert* hearing. The remaining piece of evidence, a swab of the outer glove of a double glove, #14-1-Z1, might have survived a *Daubert* challenge, though the

handling of it by the same trace examiner who contaminated the glove found on the bedside table would have raised serious reliability concerns: Trace Examiner Warner testified that she used a single swab to swab both the outside of the glove (which would have touched other surfaces) and the inside of the glove (which presumably would only have touched the hand of the wearer). TT at 3084-85. This swabbing method resulted in a DNA sample that contained a complex mixture of at least four contributors, to which Ms. Roy concluded not only Mr. Aquart, but also James Reid, Basil Williams and Azikiwe Aquart were included as potential contributors, and Tina Johnson could not be excluded. *See* Ex. I-F, Nov. 29, 2005 DNA Report; Ex. I-G. Jan. 4, 2006 Supp. DNA Report; Ex. I-J, Nov. 20, 2006 Supp. III DNA Report; Ex. I-K, May 1, 2008 Supp. IV DNA Report. Ms. Roy concluded that one out of every 400 African-Americans in Connecticut would have been included as potential contributors to this DNA sample. *Id.*

**2. Exclusion or limitation of the DNA evidence would have undermined confidence in the verdict.**

There is a reasonable probability that, had the DNA evidence been excluded entirely, or limited to testimony about the analysis of the outer glove of the doubled glove (14-1-Z1), the outcome at trial on the murder-related counts would have been different, because the prosecution's remaining forensic evidence was weak and their cooperators were shaky, a factor that weighs heavily in the prejudice analysis. *See Massillon v. Conway*, 574 F. Supp. 2d 381, 399 (S.D.N.Y. 2008) (finding prejudice where, without evidence that should have been suppressed, "the prosecution's case would have contained little evidence of any real probative value"); *Usher*, 710 F.

Supp. 2d at 312-13 (finding prejudice where trial counsel could have undermined prosecution's corroborative physical evidence, and the rest of the prosecution's case was "relatively weak"); *Gladden*, 394 F. Supp. 3d at 483-85 (finding prejudice where there was reasonable probability that suppression motion would have succeeded and other evidence linking petitioner to crime was testimony of cooperating co-conspirator whose credibility was questionable); *cf. Moeller v. Weber*, 649 F.3d 839, 846 (8th Cir. 2011) (determining that there was not a reasonable probability that, upon exclusion of certain DNA evidence, outcome at trial would be different because other, *non-challenged* DNA evidence showed high probability of match).

Ms. Roy's DNA analysis was central to the government's case during the guilt/innocence proceedings. The government urged the DNA evidence as independent proof that the Aquarts, Taylor, and Johnson were in the apartment the night of the homicides. TT at 4257-59, 4260, 4263, 4329. And, critically, the government argued that the DNA evidence corroborated the testimony of John Taylor (TT at 4235-39, 4259, 4335), whose changing stories to law enforcement and his incentive to implicate Mr. Aquart had impaired his credibility. The only other forensic evidence linking Mr. Aquart to the victims' apartment was a single fingerprint on a piece of duct tape connecting two plastic bags, which had its own reliability issues, as discussed in Claim II, below, and, in any event, could have been explained by the drug traffic between the apartments in the building. TT at 4269. It was the DNA evidence that allowed the government to argue to the jury (albeit inaccurately) that "Mr. Aquart… was there." TT at 4259.

The government's rebuttal summation emphasized item 13, the latex glove cuff found under the couch pillow in the living room, because, even though Mr. Aquart's profile was not "included" as a contributor, the probability statistic for that piece of evidence sounded dramatic: Ms. Roy testified that only one in 79 million African-Americans would not have been able to be eliminated as a potential contributor. TT at 3179. By contrast, the double glove, which Mr. Aquart's profile was included as a contributor to, carried a far higher likelihood of inclusion, with one in every 400 African-Americans being a potential contributor, even under Ms. Roy's skewed statistical estimate. *See* Ex. I-K, May 1, 2008 Supp. IV DNA Report. Had the DNA evidence been limited to the double glove, or excluded entirely, the defense could persuasively have argued that Mr. Aquart was not in the apartment that night.

The DNA evidence undoubtedly had serious weight in Mr. Aquart's conviction. DNA evidence is touted as the "gold standard" of forensic science, *Walker v. City of New York*, No. 14-CV-680 (NRM) (PK), 2024 WL 4198451, at *7 (E.D.N.Y. Sept. 16, 2024) (quoting *People v. Williams*, 35 N.Y.3d 24, 29 (N.Y. 2020)), and has been noted to carry "a mystical aura of definitiveness" that "jurors may overvalue." *People v. Wright*, 25 N.Y.3d 769, 780 (N.Y. 2015) (collecting authorities) (finding ineffective counsel's failure to object to prosecutor's misrepresentations regarding DNA evidence). It is exceedingly likely that the absence of such uniquely powerful evidence would have changed the outcome of Mr. Aquart's trial. *See Barefoot v. Estelle*, 463 U.S. 880, 916 (1983) ("In a

capital case, the specious testimony of [an expert], colored in the eyes of an impressionable jury by the inevitable untouchability of a . . . specialist's words, equates with death itself.") (Blackmun., J. dissenting).

But even if the evidence had not been excluded or significantly limited, there is still a reasonable probability that, had counsel fully investigated and uncovered the issues with the DNA evidence and the State lab, they could have used such information to undermine the government's evidence at trial through cross-examination not on the highly technical issues of dropout and probability calculations but on the far more comprehensible issues of contamination, lack of mandated protocols, lack of validated methods, and failure to be audited as required by the FBI and for accreditation.

The Second Circuit in *Rivas* found prejudice in similar circumstances, observing that a reasonable juror would have discredited a medical examiner's testimony "upon learning that he had been subject to numerous investigations for misconduct and official malfeasance and was under investigation for potentially criminal misconduct at the very moment that he was providing testimony in the criminal trial." 780 F.3d at 551; *see also Bryant*, 274 F.Supp.3d 166 at 190 (finding prejudice where attorney failed to get petitioner's blood tested for trial, petitioner had different blood type than that found in victim's underwear, and that "such a fact would have severely undermined the prosecution's case").

Because of the serious failures by trial counsel regarding this important evidence, Mr. Aquart's convictions should be vacated.

## II. Trial counsel were ineffective in failing to investigate and challenge latent print evidence.

The government gave notice pretrial that a latent print examiner would testify that Mr. Aquart's fingerprint was found inside a fold of duct tape connecting two plastic bags recovered in the same room as Mr. Williams's body. At the time of trial, the limitations of latent print evidence were well understood. However, trial counsel failed to effectively investigate and challenge this evidence. They relied on an unqualified expert selected by Mr. Aquart's co-defendant's counsel, failed to make *Daubert* or other legal challenges, and conducted an insufficient cross-examination of the government's expert. This allowed the government to portray the latent print evidence as conclusive, contrary to science. In fact, the print assigned to Mr. Aquart should have been excluded—or the testimony significantly qualified—because the government expert's identification was unreliable. As it was, Mr. Aquart was seriously prejudiced by the latent print evidence, which the government argued conclusively established he was involved in the murders.

### A. Factual background

In 2009, the government provided discovery to trial counsel regarding the findings of John Pleckaitis, latent print examiner, Connecticut State Forensic Science Laboratory.[9] Pleckaitis had over thirty years' experience as a latent print examiner, was certified by professional organizations, and previously had qualified

[9] The government had previously provided notice to counsel regarding Pleckaitis's findings in a related firearms investigation. That evidence is not the focus here, although the same problems with Pleckaitis's testimony about that evidence—and trial counsel's failure to challenge it—apply.

as an expert in federal and state court. *See* TT at 2721-24. According to the discovery, Pleckaitis developed the following latent print evidence from evidence collected at the scene of the homicides:

- From two plastic bags connected by duct tape (evidence item 21), eight impressions on a Walgreens bag, four of which were suitable for identification, and five impressions on a blue/green bag, four of which were suitable for identification.
- From two plastic bags connected by duct tape (evidence item 21), three impressions on the duct tape, one of which was suitable for identification.
- From a piece of broken sheetrock wallboard (evidence item 24), four impressions, three of which were suitable for identification.
- From a piece of broken sheetrock wallboard (evidence item 25), one impression that was suitable for identification. Ex. II-A, Lab Report (Feb. 6, 2006) at 2.
- From a latent lift of black powder developed impressions on a Sirchie brand transparent hinge lifter (evidence item 22), two impressions that were suitable for identification. Ex. II-B, Lab Report (Dec. 16, 2005) at 1.

From the latent print evidence, Mr. Pleckaitis made the following findings regarding Mr. Aquart:

> The impression of latent #021-03-L-1 and the fingerprint impression of Azibo Aquart's left middle finger were identified as having been made by one and same person. Latent #021-03-L-1 was developed on the non-adhesive side of a piece of gray duct tape attached to the plastic Walgreen bag.

Ex. II-A, Lab Report (Feb. 6, 2006), at 3.[10]

[10] Mr. Pleckaitis made additional findings regarding Azikiwe Aquart. Ex. II-A, Lab Report (Feb. 6, 2006) at 3; Ex. II-C, Lab Report (Sept. 22, 2006), at 2.

Pleckaitis also identified one of the impressions from evidence item 24 as having been made by James Platt, Ex. II-A, Lab Report (Feb. 6, 2006), at 3, a person not charged in the drug conspiracy or in connection with the homicides, but who was known to frequent the apartment where the victims were killed. Nine impressions remained unidentified, although they were compared to known prints of the victims, some of the suspects, and others known to have visited the victims' apartment.[11] Ex. II-C, Lab Report (Sept. 22, 2006), at 2; Ex. II-D, Lab Report (April 20, 2006), at 2.

Also in 2009—still two years before Mr. Aquart's trial—a committee of the National Academy of Sciences' National Research Council issued a report, "Strengthening Forensic Science in the United States: A Path Forward." *See* Ex. I-E. The report examined three premises underlying latent print analysis: (1) uniqueness, (2) individualization, and (3) infallibility. Although it acknowledged some support for the presumption of uniqueness, Ex. I-E (NAS Report) at 143-44, it rejected the notion that latent print individualization necessarily follows, *id.* at 144.[12]

In its discussion of "friction ridge analysis" (fingerprints, palm prints, and sole prints), the Committee described both the process for data collection and

---

[11] In addition to the victims' prints, the impressions were compared to known prints of Mr. Aquart, Azikiwe Aquart, Rodney Womble, Efrain Johnson, Nathaniel Grant, James Rucker, and James Platt. The impressions were not compared to the prints of John Taylor or Jose Osorio. *See* Claim VII.

[12] The Committee concluded that only nuclear DNA testing can support a finding of individualization. *Id.* at 87.

comparison, including the "ACE-V" method used in most cases (including this one), TT at 2731, *see* Ex. I-E (NAS Report) at 137-42, and the flaws with that process, *id.* at 142-45.[13] It concluded that the ACE-V method "is not specific enough to qualify as a validated method:"

> ACE-V does not guard against bias; is too broad to ensure repeatability and transparency; and does not guarantee that two analysts following it will obtain the same results. For these reasons, merely following the steps of ACE-V does not imply that one is proceeding in a scientific manner or producing reliable results.

*Id.* at 142.

Among its concerns, the NAS noted the subjectivity of latent print analysis and risk of cognitive bias and other human error, *id.* at 141, 122-25; the lack of a scientifically-validated method, *id.* at 142-43; the unavailability of an error rate, *id.* at 143-44; and the lack of research into friction ridge distribution and variability, *id.* at 144-45. The Committee concluded, "[u]niqueness and persistence are necessary conditions for friction ridge identification to be feasible, but those conditions do not imply that anyone can reliably discern whether or not two friction ridge impressions were made by the same person." As a result, the Committee found, "[t]here is a critical need … to raise the standards for reporting and testifying about the results of investigations." *Id.* at 185. Among other things, it recommended that standard

---

[13] The NAS Report referenced "a more complete description of the steps of ACE-V [analysis, comparison, evaluation – verification] and an analysis of its limitations [] provided in a paper by Haber and Haber." *Id.* at 139 (citing Lyn Haber & Ralph Norman Haber, *Scientific validation of fingerprint evidence under Daubert, Law Probability and Risk*, 7(2), 87-109 (2008)).

terminology be established for more fairly reporting results. *Id.* at 189.[14] Specifically, it criticized the practice of calling impressions a "match." *See id.* at 141-42 ("Claims of 'absolute' and 'positive' identification should be replaced by more modest claims about the meaning and significance of a 'match.'") (internal citation omitted).

Although the NAS Report was the most authoritative statement to date on the problems with latent print analysis, its critiques were not new. Indeed, the Report cited scientific literature and legal challenges questioning the validity of fingerprint evidence. *See generally id.* at 136-144. Trial counsel were aware of these critiques. Counsel's files contained a 2002 law review article debunking the "science" of fingerprint evidence. *See* Robert Epstein, *Fingerprints Meet Daubert: The Myth of Fingerprint "Science" is Revealed*, 75 S. Cal. L.R. 605 (2002).[15] They also contained the Inspector General's report on the most famous fingerprint misidentification of all time, which was widely reported in mass media. *See* Ex. II-E, U.S. Dep't of Justice, Office of Inspector General, *A Review of the FBI's Handling of the Brandon Mayfield Case* (2006). And they contained a sample *Daubert* motion challenging fingerprint evidence in a high-profile federal homicide case from

---

[14] It also called for better documentation by latent print examiners and further research on both ridge flow and crease patterns and the rarity and discriminating value of patterns of ridge formations. *Id.* at 142-44. It also called for research on the many factors that can affect latent print image quality. *Id.* at 145. *See also id.* at 188-191 (describing general recommendations for all forensic sciences).

[15] From 2010 to 2013, Epstein served as a member of the subcommittee on Forensic Science, National Science and Technology Council in the Executive Office of the President. He has also been a member of the American Academy of Forensic Science Friction Ridge Consensus Body.

another jurisdiction. *See* Ex. II-F, *Daubert* motion. This motion noted that other federal courts had excluded latent print evidence under *Daubert*. *Id.* at 142-48.

Following the Mayfield misidentification, the FBI reviewed its latent print processes, implementing improved practices and procedures and publishing recommendations for the field. *See* Melissa Smrz, et al., *Review of Latent Print Unit Processes and Recommendations to Improve Practices and Quality*, J. 56 Forensic Identification 3 (2006). The Scientific Working Group on Friction Ridge Analysis, Study, and Technology (SWGFAST) also published draft updates to its standards for case-note documentation. *See* SWGFAST, *Quality Assurance Guidelines for Latent Print Examiners ver. 2.3*, 56 J. Forensic Identification 1 (2006). "These standards were circulated throughout the latent print community, discussed at conferences, and were in use during the period during which the work in Mr. Aquart's case was done." *See* Ex. II-J at 4.

In April 2009, counsel for co-defendant Azikiwe Aquart retained a "fingerprint technology consultant and instructor," Ivan Futrell, a retired FBI latent fingerprint supervisor, to examine the latent print evidence. Doc. 253. Although Azikiwe's counsel sought approval for Mr. Futrell's services, Futrell evaluated the evidence for both brothers, and trial counsel appeared to treat him as a defense expert for Mr. Aquart. Trial counsel did not obtain a report from Mr. Futrell; however, according to email correspondence between the lawyers, Futrell agreed with Pleckaitis's findings. *See* Ex. II-G, Dec. 8, 2009 email. Trial counsel do not

appear to have considered whether Futrell's findings may have been the result of bias or other problems noted in the NAS and Mayfield reports.

Trial counsel also appear not to have been aware that Futrell had been censured by a Professional Review Board of the International Association for Identification—which certifies latent print examiners—in July 2007. *See* Professional Review Board, *Announcements*," 58(3) J. of Forensic Identification 281, 393 (2008).[16] Nor does it appear they were aware that Mr. Futrell was then suspended by the International Association for Identification in January 2009, shortly before he was retained in this case. *See* Staff Writer, *Minutes of the 2009 Mid-Year Board of Directors Meeting*, IDentification News, June/July 2009, at 13 & 22. The suspension was affirmed by the Professional Review Board in August 2009. *See* Professional Review Board, *Announcements*, IDentification News, Dec./Jan. 2010 at 26.[17]

Regardless of Futrell's findings, trial counsel recognized that it was still possible "to challenge the science" of latent print analysis. In the same email exchange with Azikiwe's counsel, trial counsel expressed the concern that, "while

---

[16] The censure was related to Futrell's testimony in a sexual assault case that a print had been fabricated. The IAI found Futrell's analysis to be incorrect. *See* William Leo, *Comment*, The Print, July/Aug./Sept. 2009, at 6, *available at* https://scafoca.org/wp-content/uploads/2024/03/3rd-Qtr-2009.pdf, last visited (Jan. 10, 2026).

[17] The suspension was related to "a technical error in misidentifying a fingerprint on a gun in a [Pennsylvania] murder case." *See* Staff Writer, "Forensic board suspends former FBI analysts for error in '01 Monroe murder case," Pocono Record, June 29, 2009, *available at* https://www.poconorecord.com/story/news/crime/2009/06/29/forensic-board-suspends-former-fbi/51937065007/, last visited (Jan. 10, 2026).

this [challenging the science] may make some sense for Azibo, with only one ID at issue, it does not make sense for Azikiwe with at least 5 identifications." Ex. II-G, Dec. 8, 2009 Email. As discussed below, counsel were incorrect about this; no matter how many identifications the accused faces, ensuring the reliability of the scientific method and its presentation at trial is equally important. Still, even after Azikiwe's case was severed during jury selection, rendering moot any of his trial strategy concerns, trial counsel failed to file a *Daubert* motion regarding latent print evidence or to seek limits on how Pleckaitis presented his testimony.

Nor did trial counsel seek to assure the unidentified latent impressions were run through state and national databases to identify alternative suspects, despite the lapse of years between when Mr. Pleckaitis first did this in 2005 and 2006 and the conclusion of trial proceedings in 2012.

And while counsel objected *in limine* to allowing the DNA analyst to testify that her results and report were reviewed by a second examiner who concurred in her conclusions, Doc. 788, trial counsel did not file a similar challenge—nor make a contemporaneous objection at trial—to identical testimony by the government's latent print examiner, TT at 2719, 2737, even though the Supreme Court had by then made clear the Confrontation Clause implications of such testimony. *See Bullcoming v. New Mexico*, 564 U.S. 647, 652, 665 (2011); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311, 329 (2009).

At trial, the government proffered Pleckaitis as an expert in latent print examination. Trial counsel did not object to his qualifications or to the nature of his

testimony. TT at 2724. Pleckaitis explained what fingerprints are, how they are left, and that they are "unique" and permanent. TT at 2726-30. He used the term "unique," or a variant of that word, eight times in his testimony. Pleckaitis also described the ACE-V method for comparison of latent and known prints—the same method criticized in the NAS Report—noting that examiners look at three levels of detail: (1) overall pattern flow of ridge characteristics; (2) nature of the ridge characteristics (including ending, bifurcation, dot); and (3) poroscopy, if visible (the pattern of pores on the skin), and open fields. TT at 2732-33. The quality and quantity of information dictate the suitability for comparison, although Pleckaitis did not define thresholds nor did he address the new, heightened FBI and SWGFAST standards. TT at 3234.

In conducting a comparison, Pleckaitis said he would use focal points of the latent impression as guidance, i.e., to "know what part of the hand to look at … to see which characteristics are in that impression." TT at 2735. In other words, he would search in the known prints for characteristics he has identified in the latent prints. When he found them, he would make an identification; if the prints were dissimilar, he would make an exclusion. In the case of insufficient information—for example, where there is some, but not complete, similarity—he would say the comparison was inconclusive. TT at 2736. After his comparison, another examiner would go through the same process to verify his findings. TT at 2737. Examiners ask for "major case prints" from law enforcement to assure the known prints are of

high quality. They can also make comparisons to prints in state and national databases. TT at 2638-39.

Pleckaitis reviewed his process and findings regarding evidence item 21—the plastic bags said to be connected by duct tape on which he testified he found one latent print he attributed to Mr. Aquart. TT 2740-68. He led the jury through a PowerPoint presentation that showed the points of comparison he used between the latent print and the known print. TT 2759-2781; GX 409. He identified latent impression 21-03-L1 as the impression on the non-adhesive side of the duct tape and compared it to the left middle finger of Mr. Aquart, illustrating points of similarity. TT 2761-68. He concluded, "I was able to identify that the latent impression developed on the non-adhesive side of the tape as having been made by the left middle finger of Azibo Aquart." TT at 2758. *See also* TT at 2768, 2792.

Pleckaitis also identified two latent impressions on each of the bags as being "made by" Azikiwe Aquart. TT at 2794-96.

Finally, Pleckaitis testified about the other items he examined.[18] He described items on which he did not locate suitable prints, items on which he found suitable prints but could not make identifications, and his identification of James Platt as the contributor of a latent print on the wallboard. TT at 2786-91.

---

[18] This included detailed testimony about a latent print found on a gun manual and operating instructions that Pleckaitis attributed to Mr. Aquart. TT at 2271-83. He also identified a latent print on the box containing these materials as having been made by Randi Washington. TT at 2784.

On cross-examination, trial counsel pointed out that there is no way to date a latent print; that is, to tell when the impression was left. TT at 2800 ("someone at some point in time touched an item"). Pleckaitis conceded that "it could be weeks or months before it was collected by police." TT at 2801.[19] Trial counsel also established that it is impossible to know where the item was located when the impression was left, i.e., whether it was in the victims' apartment or another location. TT at 2801. Or, indeed, regarding the duct tape, whether the impression was left before or after the tape was attached to the bags. *Id.* Trial counsel noted that the impression on the duct tape was found inside a fold, "so initially when [Pleckaitis] received the tape [he] didn't see the print." TT at 2802.

Trial counsel also pointed out the impressions that did not "match" (in trial counsel's words) Azikiwe or Azibo Aquart: the two impressions on the hinge lifter, the sheet rock, or the duct tape taken from the victims. TT at 2804-07.

Trial counsel did not cross-examine on the limitations of the ACE-V method, inquire about Pleckaitis's threshold for identification, interrogate his process, challenge his presentation of the comparisons in such absolute terms, point out the

---

[19] Although trial counsel did not elicit this, Juanita Hopkins told law enforcement that there was a Walgreens near the building where deliveries of drugs or money would be made. Ex. II-H (Hopkins 302 (Sept. 28, 2005)). This could have explained why Azikiwe's fingerprints were on the bags (one of which was a Walmart bag). Indeed, prosecutors apparently accepted as explanation for latent impressions tied to James Platt recovered from damaged sections of the wall in the victims' apartment that he visited the apartment to buy drugs. Numerous plastic bags were located in the apartment, but apparently not considered by police to be of evidentiary significance. *See, e.g.,* Crime Scene Photos 97, 100, 102, 129, 171, 242, 261.

history of dramatic errors in fingerprint identification, nor inquire about the FBI and SWGFAST standards. A memo in trial counsel's file, however, suggested they had identified these issues for "follow up." *See* Ex. II-I Jan. 13, 2009 Memo.

In closing argument, the government emphasized the latent print evidence in ways trial counsel could have undermined had they effectively investigated and challenged the science. "Could the fingerprint identifications be mistaken?" the prosecutor argued. "Could this be the first case ever where two people have the same fingerprints?" TT at 4227. Despite knowing there were cases where latent print identifications have been mistaken—and that government counsel must have been aware *at least* of the Mayfield case, which DOJ had investigated—trial counsel did not object. The government continued, "Thirty years as a latent print examiner. He told you *fingerprints are unique to each individual*," TT at 4259 (emphasis added), something the NAS and Mayfield reports undercut. Homing in on the evidence and capitalizing on the errant testimony about uniqueness, the prosecutor stressed, "Exhibit 123, bears the fingerprint of the defendant, and it is surrounded on both sides by a blue plastic bag and a Walgreens bag, both of which bear the prints of his brother, his co-conspirator." TT at 4260. Then in one line, the prosecutor derided trial counsel's ineffective cross-examination, "Movement does not cause a print to be left; touching, handling, being present does." TT at 4260.

In rebuttal closing argument, the government was even more forceful, arguing "the fact that Pleckaitis found both the defendant [Mr. Aquart's] and his brother's fingerprints on the bloody bag next to Basil's crushed skull is no one's

fault but their own. Obviously they weren't careful enough with their latex gloves." TT at 4323.[20]

### B. A qualified expert following best practices in the field at the time of trial would not have identified 021-03-L1 to Mr. Aquart and would have helped counsel identify problems with Pleckaitis's testimony.

Undersigned counsel retained Heidi Eldridge, Ph.D., to review Pleckaitis's conclusions and offer an opinion regarding latent print 021-03-L1. Dr. Eldridge is a research forensic scientist and professor of forensic science with an extensive background in latent print examination. *See* Ex. II-J, Declaration of Heidi Eldridge, Ph.D. ("Eldridge Decl."), at Ex. A (curriculum vitae). She has served as the Chair of standard-setting organizations and is widely published in the field of latent print examination. *Id.* She has been qualified as an expert in state courts and the District of Columbia. Ex. II-J, Eldridge Decl. at 1.

"After careful review," Dr. Eldridge concluded that Pleckaitis's work "was not in conformance with contemporaneous standards" and that "there was not sufficient support for a decision of Individualization." Ex. II-J, Eldridge Decl. at 10. "Declaring this comparison to be an *Identification*," she found, "is not warranted, overstates the strength of the evidence, and could be misleading to a jury." *Id.* at 11 (emphasis in original). Dr. Eldridge determined that "[t]he correct analysis and comparison under either the applicable standards in place at the time of trial or today, would have limited the conclusion on this comparison to Inconclusive." *Id.* at 6.

[20] As discussed below, the bag was neither bloody, nor "next to Basil's crushed skull," when investigators first encountered it. *See* Claim III (describing investigators' manipulation of the evidence at the crime scene).

Dr. Eldridge observed three main problems with Pleckaitis's comparison process. First, he did not account for the relative quality of the points of comparison he relied on. He noted nine features relevant to his comparison. Five of these minutiae, on the left side of the impression, "are reasonably clear." Ex. II-J, Eldridge Decl. at 6. Four, however, "are in a visually degraded area." *Id.* Dr. Eldridge therefore designed the impression "complex," which requires additional documentation, blind verification, or multiple verification—none of which Pleckaitis did here. *Id.*

Second, Pleckaitis does not appear to have made contemporaneous bench notes, including annotated images of the compared impressions that "show[] the features relied upon to support the conclusion." *Id.* at 7. Pleckaitis only provided notes in connection with his testimony, *see* TT at 2758; Ex. II-K, GX 409A, "suggesting that these annotations were made later to prepare for trial," i.e., they are "a reconstruction of what the examiner believes he *would* have used" to support his conclusion, not what he actually used. Ex. II-J, Eldridge Decl. at 7. "This practice is subject to confirmation bias due to knowledge of the expected result driving the examiner to find data post hoc to support the desired result," and "can lead to erroneous identifications." *Id.* at 7-8

Third, Pleckaitis provided no supporting documentation of the verification process. "Verification is the last step of the ACE-V process, in which a second qualified examiner conducts the same process as the initial examiner to see whether they reach the same conclusion and to ensure that there is sufficient observable

data present to support that conclusion. Ex. II-J, Eldridge Decl. at 8. This step should have been documented, especially given the complexity of the marks. *See id.* at 8. "Without documentation of how the Verification process was completed," what Pleckaitis described at trial "sounds dangerously like a 'rubber stamp'…."' *Id.* at 8. *See* TT at 2719 ("all our findings a second examiner goes through the same process and agrees with whatever findings"); TT at 2737 ("another competent examiner will go through the same process and has to come to the same conclusions and findings as the initial examiner").

Dr. Eldridge also identified problems with several aspects of Pleckaitis's testimony—foremost, his claim that fingerprints are unique. As noted, the 2009 NAS report "questioned whether [the uniqueness] premise had been sufficiently supported by research." Ex. II-J, Eldridge Decl. at 9. And the Mayfield debacle demonstrated the possibility of close non-matches. *Id.* at 6-7. Today, the field considers the uniqueness terminology to be "problematic" and has "disavowed" it. *Id.* Pleckaitis also overstated the usefulness and reliability of pore detail. *Id.* at (citing TT at 2733). In fact, pore detail was "a contributing cause to the well-known Mayfield case of 2006 in which a high-profile erroneous identification was made by the FBI…." *Id.* Likewise, Pleckaitis overvalued edgeoscopy, which has "poor reproducibility and should not be a main contributor to the decision-making process." *Id.* at 10 (citing TT at 2733).

### C. Trial counsel's performance in failing to move to exclude or limit latent print evidence and in hiring an unqualified expert was deficient.

Trial counsel's failure to adequately investigate latent print evidence, to request a *Daubert* hearing regarding its admission, to move *in limine* to limit Pleckaitis's testimony, to object based on significant reliability issues about which trial counsel knew or should have known, and to hire a competent expert did not comport with the "prevailing professional norms" at the time of Mr. Aquart's trial and was deficient performance. *Purcell*, 158 F.4th at 450 (quotation omitted). *See also* Ex. I-B, Ungvarsky Decl., ¶¶ 8-23. Mr. Aquart incorporates by reference here the law on failure to investigate and failure to move to exclude or limit evidence discussed in Claim I. *See Hebshie*, 754 F. Supp. 2d at 92 ("[o]rdinarily competent counsel would have . . . taken appropriate steps to litigate the issues using all the tools available."). For analogous reasons, trial counsel's actions here "fell below an objective standard of reasonableness" and were, consequently, constitutionally deficient. *Mayo*, 13 F.3d at 533 (quoting *Strickland*, 466 U.S. at 688). *See also* Ex. I-B, Ungvarsky Decl. at ¶ 25 (noting "systemic failure to investigate, understand, and litigate the forensic evidence at the center of the prosecution's case").

The failure to request a *Daubert* hearing prevented the Court from exercising its gatekeeper function and lifted the burden of proving admissibility of the latent print evidence from the government at a time when the so-called "science" was

under scrutiny.[21] There is no conceivable reason why competent counsel would waive a *Daubert* hearing and grant that advantage to the government. At minimum, as discussed below, such a motion was likely to result in limitations on Pleckaitis's testimony that would have minimized the impact of the latent print evidence.

Nor can counsel's failure to move to exclude latent print evidence "be justified as a result of some kind of plausible . . . strategy." *Purcell.*, 158 F.4th at 450. Here, "there was simply no downside to requesting a *Daubert* hearing." *Hebshie*, 754 F. Supp. 2d at 121; *see also Gersten*, 426 F.3d at 608 ("[N]o facts known to defense counsel at the time that he adopted a trial strategy that involved conceding the medical evidence could justify that concession."). As with the DNA evidence, the issues raised by the latent print evidence were recognized in the forensic and legal communities, so there was no advantage to "surprise." But—in contrast to the DNA evidence—Mr. Aquart's counsel didn't even attempt to present the critiques of latent print evidence before the jury, although they were simpler and well-known, including to counsel.

Thanks to the NAS Report and the DOJ's Inspector General's report on the FBI's failures in the Mayfield case, "[c]ounsel … had in hand a nationally known

[21] The science remains under scrutiny today. Indeed, recently, the New Jersey Supreme Court ordered a special review to evaluate the reliability of latent print evidence in criminal trials. *See State v. Lee*, -- A.2d --, 2026 WL 1857378 (N.J. June 29, 2026).

example, and a DOJ-endorsed explanation, of why the very methodology used here was vulnerable to error," Ex. I-B, Ungvarsky Decl. at ¶ 119:

> The examiner proceeded from complex and compromised latent impressions to conclusive identification opinions without adequate documentation showing that the relevant features had been identified independently in the questioned impressions before comparison.

*Id.* at 118. "Yet counsel failed to use that knowledge to challenge the admissibility of the … latent-print evidence, to seek limitation of the identification testimony, or to expose the risk of cognitive bias to the court and the jury." *Id.*

Futrell's opinion agreeing with Pleckaitis was no excuse. Counsel did not interrogate the basis for Futrell's opinion any more than they interrogated the basis for Pleckaitis's. And the same issues with latent print examination identified in the NAS and Mayfield reports applied equally to the defense expert's review. "Having simply been served up with [Futrell's] flat agreement with [the government], and not having known either what [Futrell] did to arrive at his conclusion or why he came out where he did, [trial counsel] was in no position [to evaluate the expert's opinion]." *Richey v. Bradshaw*, 498 F.3d 344, 363 (6th Cir. 2007), *abrogated on other grounds by Debruyn v. Douglas*, 168 F.4th 913, 926 (6th Cir. 2026). *See also* Ex. I-B Ungvarsky Decl. at ¶ 121 ("Effectively, trial counsel gave up on a direct challenge to the latent print identifications on the word of a decertified former FBI examiner.").

Even accepting, however, that Futrell had correctly affirmed Pleckaitis's identifications, this was more—not less—of a reason for counsel to pursue all legal tools to exclude or limit the latent print evidence. *Cf. Hebshie*, 754 F. Supp. 2d at 92. Mr. Aquart's counsel recognized the availability of such challenges, to "the

science," *see* Ex. II-G, and even had model motions available, *see* Ex. II-F. Inexplicably, however, they made no legal challenges.

As discussed, though, Futrell was *not* a qualified expert—having been censured and suspended by the preeminent certifying body in the field—so it was deficient performance to give any weight to his opinion. *Cf. Mammone v. Jenkins*, 49 F.4th 1026, 1052 (6th Cir. 2022) ("Mammone does not suggest that [the expert] was unqualified or unqualified, so counsel reasonably relied on his opinions.") (citing cases). Trial counsel were deficient in failing to investigate his qualifications prior to hiring him. *See* Ex. I-B, Ungvarsky Decl. at ¶¶ 10, 16, 17, 21. Competent counsel would have learned of his censure and selected a qualified examiner. Alternatively, upon learning of Futrell's suspension, which competent counsel would have discovered, trial counsel should have retained a new examiner and sought review of his opinion. *See id.* at ¶¶ 113-14 (noting publicly available announcements and reporting on Futrell's discipline).

Had counsel sought a qualified expert, like Dr. Eldridge, they would have been armed with affirmative evidence—about latent print analysis generally and print 021-03-L1 in particular—to help undermine the government's case and challenge its expert. *See generally* Ex. II-J, Eldridge Decl).

Cross-examination of Pleckaitis does not absolve trial counsel of their deficient performance. Exclusion of, or limits on, the evidence would have been preferable. *See Smith*, 389 A.2d at 1359 ("the authoritative quality which surrounds expert opinion ... might be given undue deference by jurors."). And, in any event, as

noted in Claim I, cross-examination can only cure a failure to move for exclusion where that cross-examination highlights the relevant evidentiary defects. *See, e.g., Rivas*, 780 F.3d at 550 (counsel ineffective for failing to adequately challenge medical examiner testimony, where counsel's cross-examination only "scratched the surface" of the medical examiner's findings); *Lindstadt*, 239 F.3d at 202 (2d Cir. 2001) (determining that counsel was ineffective for failing to properly challenge physical evidence despite fact that he cross-examined expert witness, reasoning that counsel did not specifically cross-examine expert witness on the report on which expert testimony rested). The cross-examination of Pleckaitis, handled by Mr. Aquart's junior trial counsel, who—on information and belief had limited or no experience with scientific evidence and handling experts[22]—failed to address the critiques of latent print evidence *at all*. *See* Ex. I-B, Ungvarsky Decl. at ¶ 124 ("Counsel never put the questions of validated methodology, cognitive bias, or error rates before the jury.").

Trial counsel also failed to object to patently incorrect statements by Pleckaitis—especially about the uniqueness of fingerprints—in his testimony and by government counsel during closing argument:

> By 2011, individualization conclusions had been significantly criticized in scientific and legal scholarship. Counsel never raised with the court the issue of the government examiner's overstated identification conclusions, permitting the examiner to testify that he had identified Mr. Aquart's latent print on duct tape from the crime scene. Counsel never challenged the unscientific certainty embedded in that testimony

[22] It appears learned counsel did all the work pretrial on latent prints. It was deficient performance for junior counsel, even less versed in the issues, to be tasked with the cross examination.

> and never introduced the inherent doubt that latent print examination could establish the discernable uniqueness required to reach identification, instead of mere consistency.

Ex. I-B, Ungvarsky Decl. at ¶ 125. Trial counsel knew or should have known the statements were objectionable; the research supporting the objections was in counsel's files.

Worst of all, during cross-examination and closing argument, counsel implied that the latent print *was* Mr. Aquart's, adopting the errors warned of in the NAS report, made in Mayfield, and repeated by Pleckaitis and Futrell, and undermining Mr. Aquart's defense. *See* Ex. I-B, Ungvarsky Decl. at ¶130.

### D. Trial counsel's deficient performance prejudiced Mr. Aquart because it permitted the government to portray the latent print evidence as conclusively establishing his guilt.

Trial counsel's deficient performance prejudiced Mr. Aquart because it permitted the government to portray the latent print evidence as conclusively establishing his guilt. Even if the evidence was not excluded, had science-based limits on Pleckaitis's testimony been enforced—and if trial counsel had retained and presented a qualified expert—there is a reasonable probability the jury would have evaluated the evidence differently.

*Limits on expert testimony.* Pleckaitis's testimony should have been limited in at least three important ways that were known, or could have been known, by trial counsel at the time of Mr. Aquart's trial and that would have considerably changed the impact of the latent print evidence: (1) He should not have been permitted to call fingerprints "unique"; (2) he should not have been permitted to describe his comparisons as "matches"; and (3) he should have been required to acknowledge the

possibility of error. All these limits follow from the NAS and Mayfield reports and are utilized by courts and experts to "allow[] the trier of fact to assess the weight of the evidence in an appropriate context." *See, e.g.*, Heidi Eldridge, *The Shifting Landscape of Latent Print Testimony: An American Perspective,* J. of Forensic Science & Medicine, Apr.-June 2017 at 80. *See also id.* at 79.

The prejudice from trial counsel's failure to insist on these limits—or to make appropriate objections—was profound. As the NAS and Mayfield reports made clear, it was simply not true for Pleckaitis to testify and for the government to argue, "[t]hirty years as a latent print examiner. He told you fingerprints are unique to each individual," TT at 4259. Or, worse, "[c]ould the fingerprint identifications be mistaken? Could this be the first case ever where two people have the same fingerprints?" TT at 4227. *See* Ex. II-J, Eldridge Decl. at 9. But due to counsel's failures, the jury was left to believe it was Mr. Aquart's fingerprint on the duct tape, placing him *conclusively* at the scene of the murders, when it was beyond the science to say so.

*Unqualified expert.* A good cross-examination on the science might have highlighted aspects of the limitations of latent print evidence for the jury, but a qualified expert could have provided a detailed explanation. This would both have undercut the government expert's credibility—because he was ignoring the NAS and Mayfield reports and had failed to follow the recommendations that flowed from them—and given the jury appropriate context for considering the evidence. *See* Ex. II-J, Eldridge Decl. at 3-11.

More importantly, a qualified expert would have undermined Pleckaitis's comparisons themselves, especially the comparison of Mr. Aquart's known print to the latent impression on the duct tape, providing grounds to exclude it altogether or at least seriously curtailing the impact of the government's purported identification. *Id.* at 5-8. A qualified expert would have testified that at least four of the comparison points noted by Pleckaitis were either not reliable or deserved much less weight than he gave them. *Id.* at 6. As a result, the comparison was inconclusive and no identification should have been made. *Id.* at 6, 10. A qualified examiner would have indicated there were, *at best*, some similarities between the latent print and Mr. Aquart's known print. *Id.* at 6. A conclusion of identification under these circumstances "overstates the strength of the evidence and fails to account for the significant possibility that others may share the observed features…." *Id.*

An inconclusive finding would have been a far cry from the finding by Pleckaitis that Mr. Aquart "made" the print on the duct tape or that his known print "matched" it. As discussed, the government emphatically argued in both opening and rebuttal closing argument that the latent print evidence conclusively established Mr. Aquart's guilt: "His fingerprints are on duct tape inches from the fractured skull of the viciously murdered skinny man, Basil Williams." TT at 4263. *See also* TT at 4260, 4323.[23] The failure to retain a qualified expert cost Mr. Aquart

[23] This argument also was erroneous because the evidence showed the white bag was moved to the location next to Mr. Williams head, and because it is unclear how the duct tape came to be attached to the bag(s). *See* Claim III.

the opportunity to mitigate that argument. Since DNA and latent print evidence were the only physical evidence tying Mr. Aquart to the crime scene, the prejudice is plain.

A qualified expert could also have explained that it would be unusual for latent prints suitable for comparison to be left through latex gloves, supporting the defense argument regarding inability to date prints from the scene (and/or calling into further question the veracity of the government's witnesses). Ex. II-J, Eldridge Decl. at 10.

And a qualified expert could have helped counsel explain the significance of unidentified latent impressions to a reasonable doubt or third-party guilt defense. *Id.* Without any explanation, counsel's arguments in this regard appeared to be, as the government argued, "speculation" and "conjecture." TT at 4263.

Trial counsel's deficient performance regarding the latent print evidence therefore requires a new trial.

## III. Trial counsel were ineffective for failing to adequately consult with and to present a crime scene investigation expert.

Mr. Aquart's defense at trial was that, although the jury might find that he participated in drug activity, he was not guilty of the murders. TT at 4268. Trial counsel sought to portray the physical evidence connecting him to the murders as circumstantial and attacked the witnesses as unreliable and self-interested. Central to the defense was attempting to demonstrate areas where the crime scene evidence conflicted with witness testimony and trying to show how the crime scene evidence had been mishandled and/or misinterpreted by police and the government.

But trial counsel could not effectively present the significant issues with the crime scene because they failed to adequately consult with a crime scene investigation expert to advise on these issues and to help present them to the jury. As a result, trial counsel's efforts were, at best, hit-and-miss, leaving the jury with the impression that the defense case was—as the government put it—mere "conjecture and speculation." TT at 4240. A trained expert in the field, could have presented the problems with the government's evidence using scientific method and technique, casting doubt on the government's experts against Mr. Aquart, whose "diligence and professionalism" the government emphasized. TT at 4251.

Trial counsel had no strategic reason for failing to consult fully with and present such an expert. Indeed, counsel engaged experts on forensic issues in Mr. Aquart's case, like DNA and latent impressions, who had expertise in crime scene investigation, but apparently never explored crime scene issues with them. They also engaged a crime scene investigation expert, but that expert did the equivalent of only about two days of work on the case before counsel stopped working with him—almost a year before trial—and apparently without obtaining advice or opinions on key issues. *See* Ex. III-A, CJA Voucher. For the reasons detailed below, there is a reasonable probability that a crime scene expert would have identified serious lapses in crime-scene processing and discrepancies between the physical evidence and cooperator testimony that would have changed the outcome of the trial if explained by a qualified expert.

### A. Factual background

On the morning of August 24, 2005, Leroy Whittingham went to see his mother, Tina Johnson, at 215 Charles Street, Apartment 101, where she had been staying with her boyfriend, James Reid, and another man, Basil Williams. TT at 79-80, 88. When no one answered the door, Whittingham went around the side of the building and looked through an open window into the apartment. TT at 88-89. He saw his mother and Mr. Reid on the floor, tied up with duct tape, and noticed blood on the ceiling and walls. TT at 89. He jumped through the window and went to his mother, moving pillows off her, holding her, and saying, "Get up, mom." *Id.* He then checked the other rooms of the apartment. *Id.* at 90. Although he claimed not to remember this at trial, TT 96-99, Whittingham testified under oath before the grand jury that he also opened the front door of the apartment and checked the hallway. TT at 99.

Q When you approached the front door, was the top lock still locked?
A Yes.
Q What did you do at that point?
A I unlocked it, went out the front door scoping in the hallway, like, Nobody didn't hear nothing? heard nothing? Then I ran back in the building inside the apartment. I locked the door and jumped out the window.

DX B (excerpt from March 8, 2006, Grand Jury Testimony). He then went back into the apartment, locked the door from the inside, and went out the same bedroom window. *Id.*

After leaving the apartment through the window, Whittingham called 911. TT at 90. His call was received at 10:14 a.m. GX 100. The 911 recording showed Whittingham was with another man who spoke to him familiarly. *Id*. This man was not identified at trial, nor did detectives investigate whether he was present with Whittingham inside the apartment, i.e., at the crime scene.

Whittingham waited for emergency responders to arrive. First to arrive on the scene—within five minutes of the 911 call—were EMT Karen O'Donnell and paramedic Rosanna Mendoza. TT at 108-09, 111. Although protocol dictated they should wait for police, they entered 215 Charles St. immediately, out of concern that Whittingham or the crowd that was forming might "turn on us." TT at 113-14. Whittingham "took off" into the building "in front of" O'Donnell and Mendoza, who lost sight of him. TT at 115-16, 117. As they entered the building, they noted the security door was "wide open." TT at 174.

They proceeded into the building and heard "a loud noise like a crash." TT at 118. O'Donnell believed the noise was Whittingham forcing open the front door to apartment 101, *id.*, which Whittingham confirmed, TT at 90-91("I kicked the door"), 99 ("Q. And it was at that point that you kicked it in? A. Yes."). When O'Donnell arrived at the front door, she saw the moulding around it was damaged. TT at 121-22.

O'Donnell and Mendoza claimed to have done their best not to disrupt the crime scene. TT at 125. They were not, however, wearing any protective gear. TT at 142. (Nor, of course, was Whittingham.) They did not see Whittingham when they

first entered the apartment. TT at 123. O'Donnell could hear him, however, and he sounded "very upset." TT at 126. She "assume[d] he would be down by his mom." TT at 176. A woman was also in the apartment. O'Donnell didn't know who she was or "where she came from"—"she could have come from the sky. I have no idea." TT at 127, 177. Mendoza asked the woman to assist in removing Whittingham. TT at 127. The woman was not identified at trial, nor did detectives investigate her presence at the crime scene or relationship to Whittingham.

O'Donnell and Mendoza "shimm[ied]" past a large floral couch "in order to get down the hall" to the bedrooms where the victims were. TT at 128. O'Donnell could not see the victims until she got to the doorways to the bedrooms: "Anybody would have to get all the way to the doorways" to see the victims. TT at 179.

Mendoza entered the room with two victims inside—a male and a female (Whittingham's mother, Tina Johnson). TT at 146. Although Mendoza "thought there were signs of life from the female [victim]"—bubbles coming from her nose, TT at 149, 180—O'Donnell claimed Mendoza did not touch the duct tape that was "cutting into [the victim's] face." TT at 148-49. Instead, Mendoza checked for a carotid pulse and attempted chest compressions, which revealed rigor mortis. TT at 149, 180. Mendoza and O'Donnell agreed that the second victim's injuries were "inconsistent with life." TT at 152.

After determining neither victim in the first room could be revived, TT at 152, O'Donnell proceeded to the second room, TT at 159. By then, police had arrived, although they waited for O'Donnell and Mendoza to finish before beginning

their investigation. *Id.* O'Donnell checked for breathing and a pulse and determined the third victim was also "expired." TT at 162.

Both O'Donnell and Mendoza had put on gloves to examine the victims, and they removed these when they left the apartment. TT at 168. Police asked them to retain their gloves and the boots they were wearing, but the police never retrieved these items. TT at 182. O'Donnell disposed of hers two years later—four years before trial. *Id.*

When police first arrived at the apartment, they searched for victims and suspects. *See* DG01905 (search warrant affidavit). Following this search, a first police responder stood at the front door of the apartment to secure the scene. TT at 213. More than twenty other police officers were also present. TT at 618. Crime scene detectives arrived at around 11:00, after most of the other officers. TT at 612. At least four detectives walked through the apartment again to assess it. TT at 211-12.[24] They requested that teams from the State Forensic Lab and the Medical Examiner's office respond, and only then put on protective gear[25] and began documenting the scene. TT at 214-15, 217-18. One detective (Devan) took notes,[26] one (Vargas) took video and photographs, and another (Ortiz) collected evidence. TT

---

[24] Detective Devan testified to this. Detective Ortiz denied it. TT at 1079.

[25] The protective suits were donned in the crime scene van. TT 1080. So once suited up, the detectives had to walk from the parking area, through the building, to Apartment 101.

[26] Detective Devan was a newly-minted crime scene detective, with only about a year of experience and ten investigations under her belt.

at 215-16. Once evidence was collected from the three victims' bodies, the Medical Examiner's office removed their bodies from the scene. TT at 279.

Scene processing continued for three days. TT at 283, 318. Police also returned on August 30, 2005, for "additional note taking." Ex. III-B, Crime Scene Report - Narrative at 10. Despite the lengthy investigation, detectives made only limited measurements. TT 189-90, 4060.[27] They did, however, take a video of the scene before processing began, and they took photographs at multiple points during processing. TT at 222. The photos were not time-stamped, but their rough sequence is discernable from the narrative of the crime scene report and from the activity at the crime scene reflected in them, e.g., removal of the victims' bodies. *See* TT at 4058-59; Ex. III-B, Crime Scene Report - Narrative. At trial, detectives acknowledged that the photos show they moved evidence later used to implicate Mr. Aquart (two plastic bags, said to be connected by duct tape, and which included latent impressions) into closer proximity with one of the victims, staining it with his blood. TT at 647-53, 1085-87, 1089-90, 4051-42.[28]

Detectives did not process the outside of the building until the third day, TT at 1070, 1073, 4060-61, Ex. III-B, Crime Scene Report - Narrative at 9, even though Whittingham had entered and exited through the first-floor window of the bedroom

[27] The FBI returned to the apartment in 2009—four years after the crime scene investigation—to take measurements of the apartment. TT at 188-89.

[28] Detective Vargas was led by the prosecutor to assert the bags were moved only "within arm's reach" to get the right angle for photographs. TT at 4062-63. The issues with the collection of this evidence, and detectives' reporting about it, are discussed below.

where two victims' bodies were found. Detective Ortiz testified that the window Whittingham used to enter and exit still remained open on the third day of the investigation. TT at 1073. Although an officer was posted at the front door on the interior of the building throughout the crime scene processing, TT at 1065, no one guarded that window at the rear of the apartment on the exterior of the building. The risk someone might enter and contaminate the crime scene was not theoretical. On August 27, 2005, Police recorded a report of subjects "inside apt where 10-48 incident occurred this week." Ex. III-C, CAD report.

Trial counsel retained an expert, Peter R. De Forest, to review the evidence and provide opinions regarding how the crime scene was processed and how the crime may have taken place. *See* Ex. III-D, curriculum vitae of Peter R. De Forest; Exs. III-E and III-F, trial counsel notes. Trial counsel billed the court for 16.4 hours of work by De Forest, Ex. III-A, CJA voucher, but the file contains no record of any opinions provided by De Forest.

At trial, the government presented the testimony of lay witnesses present at the crime scene, emergency responders, crime scene detectives, medical examiners, and an FBI visual information specialist. Trial counsel attempted to cross-examine these witnesses on matters related to the integrity of the crime scene investigation. *See, e.g.*, TT at 97, 176-77, 181-82, 617-20 (contamination of scene); TT at 644-53, 1083-87, 1089-90 (movement of evidence); 615, 640 (failure to collect evidence); 179, 1079-80 (ability to observe). In Mr. Aquart's case, they presented further evidence through one of the crime scene detectives, Vargas, whom the government had not

called. *See* TT at 4045 (contamination of scene); 4051-52 (movement of evidence); 4056 (failure to collect evidence). This questioning was brief, however, and the government's witnesses resisted the points defense counsel was attempting to make. *See, e.g.*, TT at 544-53 (Det. Devan cross-examination). Moreover, trial counsel failed to conduct fulsome questioning about crime scene investigation protocols and procedures that would have given meaning to the facts they managed to elicit.

Trial counsel also briefly cross-examined the government's only alleged eyewitness, John Taylor, about crime-scene-related issues. TT at 2468-73. As discussed in Claim IV.A., although Taylor's most impactful testimony about the crime hinged on his ability to observe what was happening in the bedrooms where the victims' bodies were found, trial counsel did not cross-examine him on this issue.

In closing, trial counsel argued a reasonable doubt defense. TT at 4287, 4312-15. Those facts suggesting issues with the integrity of the crime scene, the physical evidence, and Taylor's account that trial counsel had been able to point out without a crime scene investigation expert's assistance featured heavily. TT at 4270-72, 4279-80, 4275-76, 4286-87, 4309-10. As discussed below, however, without an expert's help, trial counsel could not fully identify and explain the most critical issues for the jury. Also, without a crime scene investigation expert to lend credulity to these points, the government was able to criticize the defense arguments as mere "conjecture and speculation." TT at 4240.

### B. The failure to adequately consult a crime scene expert and to use one at trial was deficient performance.

Because the trial defense depended on challenging the reliability of the crime scene investigation (including evidence collection), the physical interpretation of the scene, and the eyewitness testimony, "prevailing professional practice [at the time of Mr. Aquart's trial] required counsel to obtain and use expert crime scene assistance at trial." Ex. I-B, Ungvarsky Decl., at ¶ 145. Topics like crime scene processing, scene preservation, documentation protocols, evidence collection, chain of custody, contamination risks, and sight-line analysis "are specialized subjects," requiring expert assistance for both counsel and jurors to understand. *Id.* at ¶¶ 137, 138. "These are not merely technical concerns. They affect whether the physical evidence can reliably support the conclusions urged by the prosecution." *Id.* at ¶142.

Undersigned counsel's consultation with forensic scientist Kenton S. Wong, B.S., M.A., D-ABC, a crime scene investigation expert with over twenty years' experience in the field,[29] demonstrates the difference such an expert could have made in Mr. Aquart's trial, by providing scientific support for issues raised by counsel and by identifying other issues that supported Mr. Aquart's defense but were never raised by trial counsel.

After reviewing the crime scene investigation and evidence, Mr. Wong concluded, "the Government's handling of the crime scene departed from accepted best practices in 2005 and introduced a substantial risk of error":

---

[29] Mr. Wong's qualifications are elaborated in his declaration at pages 1-2 and in his curriculum vitae, which is attached to the declaration as Ex. A.

> The scene and the evidence were not properly maintained: access to the scene was not properly restricted, the scene was not properly documented, and evidence was moved without appropriate evidence-control procedures or documentation. In addition, relevant evidence, including potentially exculpatory evidence, was not properly documented or collected.

Ex. III-G, Declaration of Kenton S. Wong, at 1. Mr. Wong also concluded that "the crime scene information that was collected, together with the medical and forensic testing results, materially conflicted with the Government's theory of the case at trial and with the testimony of John Taylor." *Id.* at 1.

**1. Violation of crime scene investigation standards**

"Accepted crime-scene-processing practice requires investigators to secure and control the scene, restrict and document access, document the scene before it is altered and throughout processing, and maintain reliable evidence-control procedures from discovery through collection, transfer, and storage." Ex. III-G, Wong Decl. at 3. Mr. Wong explains that, "[m]easured against long-established and widely accepted standards of crime scene investigation, law enforcement's handling of the Charles Street crime scene was deficient in ways that materially compromised the integrity of the investigation." Ex. III-G, Wong Decl. at 2.[30] Nor were these "minor departures from preferred practice." Rather, "they created real and foreseeable risks that evidence would be contaminated, fabricated, misrepresented, or lost." *Id.* For that reason, Mr. Wong observes, "these

[30] "The best practices for crime scene investigation have been settled and stable for more than thirty years and require securing, controlling and documenting the scene." Ex. III-G, Wong Decl. at 3. *See also id.* at 3-4 (citing Technical Working Group on Crime Scene Investigation (TWGCSI), *Crime Scene Investigation: A Guide for Law Enforcement* (2000)).

deficiencies"—both those trial counsel identified but failed to explain and those they missed—"bear directly on the reliability of the crime scene evidence…." *Id.*

It was deficient performance for trial counsel to fail to present this information to jurors evaluating the crime scene evidence.

**a. The crime scene investigation violated long- and well-established best practices.**

*Failure to adequately secure and control the scene.* "Scene management mitigates obvious and well-recognized risks: when access is uncontrolled or undocumented, the risk of contamination increases, the opportunity for fabrication or planting of evidence cannot be meaningfully excluded, and later disputes about who entered the scene and what they did become harder to resolve." Ex. III-G, Wong Decl. at 3. Crime scene boundaries should be set broadly, "to include potential entry and exit paths, as well as places where evidence may have been moved." *Id.* (citing TWGCSI at 15-16). Investigators should document everyone who enters and exits the scene throughout the investigation. *Id.* (citing TWGCSI at 15-16, 23)).

Mr. Wong's declaration marshals and explains the evidence of failure to secure and control the scene. *See* Ex. III-G, Wong Decl. at 4-7 (discussing testimony of Whittingham and O'Donnell, Devan's Crime Scene Narrative, a CAD report, and photographs of the crime scene). Regarding Whittingham's discovery of the crime scene, movement of evidence (including his mother's body and possibly the others victims' bodies), and interaction with the window and the front door, Mr. Wong explains, "[a]lthough these disturbances occurred before law enforcement arrived, accepted forensic methodology requires investigators to thoroughly document all

known pre-arrival activity that may have altered the scene so that its effects can be evaluated." *Id.* at 4. Similarly, best practices would require the presence and activities of the unknown individuals, the emergency responders, and all police personnel to enter the scene to have been documented, but they were not. *Id.* at 5-6.

Finally, Mr. Wong notes, it is unclear whether police even conducted a complete search. "There were multiple closets … whose contents were not mentioned in Detective Joette Devan's scene notes or narrative report and that are never photographed opened. Similarly, the kitchen and bathroom are cursorily photographed, but there is no documentation reflecting that the cabinets in either room were searched." *Id.* at 6. Mr. Wong also explains how delays in processing some areas, including the building exterior, "left potential evidence exposed to the elements and to unauthorized access," contrary to best practice. *Id.* at 6.

*Failure to Adequately Document the Investigation.* Proper scene documentation seeks to "preserve an objective record of the scene before conditions change" and "document[] what investigators did." Ex. III-G, Wong Decl. at 4. This is accomplished by photographs, video, sketches, measurements, and notes aimed at "providing a basis from which a report or scene reconstruction cold be created … and allowing later reviewers to determine whether opinions offered about the scene are grounded in what was observed and recorded, rather than in memory, inference or post hoc characterization." *Id.* (internal quotation omitted).

Here, Mr. Wong notes that "despite the availability of appropriate equipment and the daytime hours available, both the video and photographs were poorly lit

and of poor quality." *Id.* at 7. Nor were contemporaneous room or scene measurements made: the model and diagram of the scene used at trial "were created well after the scene investigation." *Id.* Mr. Wong observes that these failures in crime scene documentation created unnecessary difficulty resolving questions about lines of sight in the apartment, the condition of the victims' bodies, the location of critical evidence, and the chronology of the crime. *Id.* at 8-9.

*Failure to properly collect and control evidence.* "Proper evidence control procedures are equally essential … to mitigate the risk that evidence will be contaminated, mixed, misplaced, altered, falsely attributed, or lost altogether …." Ex. III-G, Wong Decl. at 4. This requires documentation that establishes "a particular item can reliably be treated as the same item allegedly recovered from a particular location at the crime scene." *Id.* It also requires careful attention to the scene to assure that all evidence is identified and preserved. *Id.* Despite visiting 215 Charles Street on four separate days—and Apartment 101 on three of those days—detectives collected only thirty-seven items of evidence from the scene. "Numerous potentially probative items of evidence were not properly documented or collected." *Id.* at 11. These included items that could have been processed for DNA and/or fingerprints and that might have helped resolve disputed matters in the trial. *Id.* at 11.

"More egregiously," some evidence collected was moved while the scene was being processed, including items being moved directly into biological material. *Id.* at 10. "Moving evidence and items around a crime scene without documenting its

original location and condition, and particularly moving evidence into areas with blood and biological material, is an especially troubling deviation from best practice and calls into question the integrity of a crime scene and its evidence." *Id.*

Mr. Aquart's jury never heard these standards nor a full accounting of how the government's investigators failed to meet them.

**b. The flawed crime scene investigation affected the reliability of the evidence.**

After reviewing the testimony, reports, notes, photographs, and video in Mr. Aquart's case, and comparing the crime scene investigation to best practices, Mr. Wong concluded that "all four risks" of deviation from best crime scene investigation practices—evidence contamination, evidence fabrication, evidence misrepresentation, and evidence loss—"were at play in the investigation of the Charles Street crime scene." Ex. III-G, Wong Decl. at 12. Examples are provided throughout Mr. Wong's declaration and incorporated by reference here. We elaborate several below.

*Government Exhibit 123 (blue and white plastic bags said to be adhered by duct tape).* At trial, the government introduced two plastic bags—one blue and one white—said to be connected by a piece of duct tape and smeared with blood, which crime scene investigators said were recovered near the head of victim Basil Williams. TT at 1029-32; GX123. The government's latent print examiner said that fingerprints on the bags matched Azikiwe Aquart, and a fingerprint inside a fold on the duct tape matched Mr. Aquart. TT at 2754-57, 2794-96, 2757-68. The

government introduced photographs showing the white bag bloodied and in proximity to Mr. Williams's head. GX120-3, 120-4.

Detective Ortiz admitted, however, that investigators had moved the evidence. TT at 1086-87, 1090. Ortiz did not volunteer this; he was confronted with "photographs that," according to Mr. Wong, "establish clearly that the plastic bags were moved while the scene was being processed, and that the white bag was moved into a pool of blood and biological material near Mr. Williams's head." Ex. III-G, Wong Decl. at 10 (citing photos 125-134, 138-139, 141-44).[31] At one point, "the evidence marker (Yellow Placard #1) for the duct tape around Mr. Williams's head was placed on top of the white plastic bag, pushing it further into the bloodstain on the carpet." *Id.* (citing photos 143-44).

Neither the photos nor the crime scene video establish the original location of the bags nor whether they were attached by the duct tape from the start. *Id. See* Ex. III-H, Crime Scene Video at 5:40, 5:56, 6:06, 6:27.[32] In some photos, neither bag is visible. In others, only one bag is visible. *Compare* photos 125-26, DX F (no bags visible) with photos 127-30, 134 (only blue bag visible). In still other photos, the bags appear to be separated from each other. *Compare* GX120-2 and 120-7 (showing

[31] Neither the blue bag nor the duct tape is visible in the photos showing the white bag in the blood stain by Mr. Williams's head. *See* GX120-3, 120-4; photos 143-44.

[32] The video is not continuous; it is a series of vignettes. This is not the proper method for documenting a crime scene.

bags separated).[33] In GX120-2, if the bags are not separated, the duct tape must be attaching the bags in a different location than in GX123: in GX120-2, the only possible point of connection is under Yellow Placard #1—at the handles, but in GX123, the duct tape is not attached at the handles.

The bags, collectively, were eventually marked Lab Item (Yellow Placard) # 21 and, ultimately, Government Exhibit 123. By the time they were marked Lab Item 21, they were no longer near the couch, nor near Williams's head; instead, they were closer to the window, next to the air conditioning unit. And they were attached by duct tape. Ex. III-G, Wong Decl. at 10; GX123; photos 156-57.

The following visual timeline illustrates a likely sequence:[34]

[33] Detective Devan noted of the white material in 120-7, "[t]he blue to me looks like plastic. The white does not look like plastic to me. You know, that looks like material." TT at 653.

[34] None of the photos are time-stamped, so it is unclear in what order they are taken (except that detectives explained those with evidence markers were taken second, TT at 222).

<u>Visual timeline of blue and white plastic bags found at the crime scene</u>

[redacted]

Blue bag near the couch and air conditioner (within red circle).

Bag is the pillow's length from Mr. Williams' head (depicted with red line).

[redacted]

After the pillow is removed, Picture 139 shows bag crumpled near the couch and distant from Mr. Williams' face and the blood stain on the carpet (distance shown with red line).

Picture 143 shows the white bag has been moved closer to Mr. Williams' head (distance shown with red line), flatted out onto the bloodstain, and marked with an evidence placard.

[redacted]

After Mr. Williams's body is removed from the scene, the bags are moved to their final position, where they are marked with a different placard.

The white bag is no longer lying flat in Mr. Williams's blood but is scrunched up, close to the air conditioner, and now attached to the blue bag by duct tape.

This was not the only example of police manipulation of the evidence. Detective Ortiz made similar—grudging—admissions about other evidence. *See* Ex. III-G, Wong Decl.) at 10 (citing Lab Items #13, 14 and Crime Scene Photos 127-28, 153-54).

Without the assistance of a crime scene investigation expert, however, trial counsel were unable to explain all this to jurors; they were forced to rely on whatever admissions they could squeeze out of the government's witnesses. For example, regarding the critical bags and duct tape, detectives admitted only that

the photos depicted the items in different locations. They defended this as incidental. TT at 649-653, 664-65; 1083-87, 4051-52.

*Appearance of the victims' bodies.* Whittingham admitted touching, moving, and altering evidence at the scene, including moving pillows off the bodies of his mother and potentially Mr. Reid. His account of the position of Mr. Williams's body differed from the account of emergency personnel's, suggesting that Whittingham or others moved Mr. Williams's body, as well. *See* Ex. III-G, Wong Decl. at 5.[35] Detectives failed to document and investigate multiple aspects of this scene alteration. *Id.* at 8 (citing issues relating to bloodstains, brain matter, and victims' clothing).

Of particular significance, the government asserted that Mr. Aquart "left Tina's eyes uncovered, perhaps to make her watch" the murder of Mr. Reid. TT at 4340. This was mere speculation, to which no witness testified. A crime scene expert could have explained that, because Whittingham threw the pillows off Tina and held her, crying for her to get up, TT 89, 97, "questions also exist about whether Mr. Whittingham removed or repositioned any duct tape from his mother's face." Ex. III-G, Wong Decl. at 8. Such an expert could also have explained that, for EMTs, preserving evidence never takes precedence over patient care, so it is likely that, confronted with "bubbling around the nose," TT 130, first responders would have endeavored to clear any tape from Ms. Johnson's face, either to clear an airway or to

[35] The government also had information that individuals were in the apartment between the homicides and Whittingham's arrival and, as noted above, that Whittingham was accompanied by another person when he made the 911 call.

check her reflexes. As Mr. Wong observes, "[w]hile EMT O'Donnell denied in her trial testimony that she or her partner manipulated the duct tape around Ms. Johnson's head, she stated it had been their intention to do so after observing potential signs of breath and it would have been entirely consistent with typical emergency medical response to have done so." Ex. III-G, Wong Decl. at 12.

**c. The flawed crime scene investigation also meant important evidence was not preserved and tested.**

*Gloves.* At least three distinct types of gloves were recovered from the crime scene: clear gloves, opaque gloves, and fragments of yellowed gloves. The government's only eyewitness, John Taylor, however, testified that he remembered wearing *blue* gloves. TT at 2450-51. The FBI documented Taylor's recollection that everyone present was wearing them. Ex. III-I, Taylor 302 (Dec. 2, 2009) (referring to "blue rubber gloves")). Although the government allowed him to hedge on that at trial—"I don't remember, but I remember what gloves I was wearing," TT at 2463—Taylor had hand-written a guilty-plea allocution about everyone wearing blue gloves:


(31) I declare that I offer my plea of "GUILTY" freely and
Everyone had masks and Blue ~~Red~~ rubber gloves.
Azibo Kicked in

*United States v. Taylor,* U.S. Dist. Ct. No. 10-cr-00061-JBA, Doc. 35 (D. Conn. 2010). No blue gloves or fragments of blue gloves were ever located in or around the crime scene, and no evidence was presented that Mr. Aquart ever purchased such gloves.

The distinct types of gloves collected at the scene were inconsistent with Taylor's recounting and supported the defense theory that any biological evidence suggesting Mr. Aquart was in the apartment was the result of drug trafficking, not because he participated in the murders. While crime scene investigators refused to admit this, TT at 643-44, a crime scene expert could have testified that latex gloves are part of the tools of the drug trade. Ex. III-G, Wong Decl. at 18 ("I could have provided important context, as well, about items commonly associated with the drug trade, including plastic bags, duct tape, and latex gloves.").

Even more importantly, a crime scene expert could have helped explain why the torn glove cuff found in the living room couch that the state DNA analyst claimed Mr. Aquart could not be eliminated as a contributor to, *see* Claim I above, was unlikely to have been involved in the crime: "it was clearly older, more damaged, and of a different type than other gloves recovered from the scene and tested for forensic evidence." Ex. III-G, Wong Decl. at 17.



While trial counsel argued this in closing, TT 4274-75, they did not support that argument with evidence. But according to the lab description, the cuff was "worn, discoloring, [and] soiled," whereas the gloves found in proximity to the victims' bodies appeared newer. A photographic comparison conducted by an expert in polymer science and engineering in 2016 demonstrated the difference.



*A. Former vinyl doubled-glove found under bed*



*B. Fragment found in tape around victim's wrist*



*C. Gloves found in Walgreens bag located under bed*



*D. Cuff found in living room*

Although all the items had been seized, preserved, and stored under the same conditions, the torn cuff was significantly more deteriorated than the other items collected.

*Door and screws.* The government argued that Mr. Aquart "forced his way into [the victims'] home," breaking the door down, and then later "entomb[ing]" them in the apartment after killing them by drilling the door shut, "ensuring that nobody could save them." TT at 4223, 4341. This was supported by John Taylor's claim that Mr. Aquart kicked the front door off the hinges, with the chain still attached,[36] Lashika Johnson's questionable testimony that Mr. Aquart asked her to dispose of a drill, TT at 2884-85,[37] and—the government alleged—by screws in the door frame, TT at 305-06. As chronicled above, however, when Whittingham first arrived at the scene, the front door was functioning—he opened it to "scope" the front hall and locked it before leaving out the window to call for help. TT at 99. Whittingham then kicked in the locked front door when he returned with first responders. TT at 90-91, 99. EMT O'Donnell noted, however, that although clearly forced open, the door was still on its hinges. TT at 122.[38]

---

[36] Perhaps because crime scene photos depicted no chain, prosecutors did not elicit this account at trial, but it appears in Taylor's pretrial statements.

[37] Nobody saw Lashika Johnson with the drill, TT at 2286, and she had not mentioned it in multiple prior statements to law enforcement, TT at 2943, 2944-47. She mentioned it for the first time at a proffer session where prosecutors yelled at her and threatened her with incarceration and loss of her children. *See* Doc. 1102. No other witness references the drill or "entombing."

[38] First responder O'Donnell heard a "loud noise" consistent with this version. TT at 118.

Although crime scene investigators took photos of and swabbed the door, they did not take it into evidence. Nor did they recover screws left behind in the apartment, which could have been tested for trace evidence. *See* TT at 548, 1004. A crime scene expert could have explained the feasibility and importance of collecting and testing these items, which formed the foundation for the government's inflammatory claims. *See* Ex. III-G, Wong Decl. at 9, 11. Mr. Wong notes that the limited documentation they made, i.e., scene photographs, was "partial and unclear"—a poor substitute. *Id.* at 9.

Moreover, Mr. Wong notes, the absence of the supposedly missing drill may actually reflect "a failure to conduct a full search of the apartment," especially the closets and cabinets, "and/or to control the crime scene, which increased the risk that items—like the drill—may have been removed by outsiders before they could be documented by investigators." *Id.* at 7.

Mr. Wong explains that detectives' failures respecting this aspect of the investigation "either reflect sloppy scene investigation or indicate that detectives believed"—consistent with the defense—that "the frame screws and damage were unrelated to the murders." Ex. III-G, Wong Decl. at 13.

*Hair*. Investigators worked the crime scene for three days. TT at 318. During this period, they removed every item from the apartment, including all the furniture, so they could examine the walls and carpet for evidence, as shown below:

[redacted]

Despite this lengthy investigation, no hair or fiber evidence was recovered to connect Mr. Aquart to the scene. Investigators recovered only one small, hair-like fiber from a damaged area of the wall, which proved not to be of evidentiary value. TT at 655.

According to cooperating witness John Taylor, however, the offense was frenzied: “Dreddy was standing over the victim’s body bashing her like … he was at a meat market, beating them. His brother was over there doing the same thing.” TT at 2503. And both Aquart brothers were known to wear their hair in long locks—a custody photo of Mr. Aquart shows his locks at waist length.



*Custody photo of Azibo Aquart*

Under the circumstances (including the nature of the attack, the use of duct tape, and the extensive search), and given witnesses did not testify anyone had taken precautions to prevent leaving hair at the scene, it strains credulity that investigators found no hair from either brother—if indeed either had been there for

the murders. *Cf. United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) ("Where testimony is patently incredibly or defies physical realities, it may be rejected by the court, despite the jury's evaluation."). A crime scene expert could have explained to jurors the techniques available to investigators to recover hair and fiber evidence and the unlikelihood that none would have been recovered from this scene.

*Other evidence, including drug paraphernalia.* Detective Devan admitted that crime scene investigators failed to collect certain evidence, including possible drug paraphernalia and items that might have contained DNA or latent print evidence. TT at 636 (flashlight), 639-40 (possible crack pipe), 640 (cigarette pack), 640 (scissors). According to Mr. Wong, the failure to collect this evidence conflicted with proper crime scene processing procedures and compromised the investigation. Ex. III-G, Wong Decl. at 11-12.

*Spoliation of Evidence.* Law enforcement permitted important evidence to be lost, including but not limited to: physical evidence such as the door, discussed above; phone records, discussed in Claim IX; digital forensics, discussed in Claim V; protective gear worn by first responders on the scene, TT at 182; and suspected narcotics and related field tests, TT at 912. A crime scene expert could have described protocols for evidence preservation and how the spoliation of evidence compromises an investigation. *See* Ex. III-G, Wong Decl. at 4, 11-12, 14-15.

### 2. Inconsistencies between crime scene evidence and eyewitness testimony.

A crime scene expert could have explained how the evidence that was collected—when properly evaluated—was inconsistent in important ways with the testimony of government witnesses and the government's theory of the case. This was especially important in a case that relied heavily on the testimony of one cooperating eyewitness. It was deficient performance for trial counsel to fail to seek assistance in evaluating and challenging several critical factual issues raised by the eyewitness and other testimony. Ex. I-B, Ungvarsky Decl. at ¶¶ 135-139, 143-45.

When asked to consider the crime scene evidence's relationship to Taylor's allegations, Mr. Wong found "key elements of the crime scene were inconsistent with Taylor's account." Ex. III-G, Wong Decl. at 16.

> **First,** Taylor testified that he was supposed to serve as a lookout from the living room window of Apartment 101. He also claimed to have observed the attacks by moving up and down the hallway of the apartment. Considering the documented layout of the scene, the witness testimony, the subsequently prepared computer rendering of the apartment, and the positioning of furniture and other items within the apartment, Taylor's ability to maneuver and line of sight into either bedroom would have been more limited than described in his testimony.
>
> **Second,** A floral loveseat was found overturned in the narrow hallway leading to the bedrooms. Taylor did not recall that loveseat being present. Given its position, however—lying on its back and obstructing the hallway between where Taylor was serving as a lookout and the bedrooms where the victims were killed—it would have been significant to Taylor's vantage point and should have featured in his testimony.
>
> **Third,** Taylor testified that, when the attacks began, both Mr. Azibo and Azikiwe Aquart stood side by side over Ms. Johnson and Mr. Reid and repeatedly swung baseball bats downward at them. That account is contradicted by the physical evidence. Based on the documented layout of Ms. Johnson and Mr. Reid's bedroom, the placement of furniture and other items within the room, and the

positions of the decedents, there was not sufficient space for Mr. Azibo and Mr. Azikiwe Aquart to stand and strike in the manner Taylor described.

That conclusion is reinforced by the bloodstain pattern evidence. Trial Testimony of Thomas Martin, 4552-53 (May 31, 2011). The spatter patterns and DNA results associated with blood deposits on the walls and ceiling of Ms. Johnson and Mr. Reid's bedroom, together with the placement of Mr. Reid's body, indicate that Mr. Reid's assailant struck him while positioned parallel to the closet. Ms. Johnson, however, was lying perpendicular to Mr. Reid. In that confined space, those positions would not have permitted two assailants to stand side by side and deliver simultaneous blows as Taylor claimed.

**Fourth,** Taylor's account is inconsistent with the defensive injuries observed on Ms. Johnson. Taylor testified that Ms. Johnson and Mr. Reid were almost immediately bound with duct tape at gunpoint. The physical evidence, however, indicates that Ms. Johnson engaged in a substantial struggle before her death, in which her arms were free. She sustained a broken wrist and scratched her assailant with her fingernails. DNA recovered from Ms. Williams's fingernails excluded Mr. Azibo and Mr. Azikiwe Aquart and, to date, has not been identified. Those findings are inconsistent with Taylor's account that Ms. Johnson was immediately restrained and instead indicate a struggle that his version of events does not explain.

**Fifth,** Taylor's account described the bludgeoning of Mr. Reid and Ms. Johnson as a frenzied "meat market" with repeated overhead blows. However, the medical and blood spatter evidence does not support this. The government's expert testified that most of the blood spatter was from Mr. Reid's killing and that there was limited blood spatter from Ms. Johnson's killing. Martin, 4549-64; GSX-1 (J-P). A medical examiner testified that Mr. Reid suffered approximately 3-5 blows. Testimony of Malka Shah, M.D., 431-41 (Mar. 21, 2011).

**Sixth,** Taylor's testimony was inconsistent with the forensic evidence. According to Taylor, it was Mr. Azibo Aquart who killed Ms. Johnson. However, it was Mr. Efrain Johnson's DNA that was found on the latex glove fragment from the duct tape that bound Ms. Johnson. DNA was also recovered from Ms. Johnson's fingernails, but that profile excluded Mr. Aquart, along with everyone else who was compared to it. In fact, none of the forensic evidence connected Mr. Aquart to the bludgeoning of Ms. Johnson. . . .

**Finally,** the presence of unidentified DNA on multiple items highlights the incompleteness of the evidentiary picture and complicates efforts to correlate physical findings with witness accounts. There were unidentified DNA profiles found on the duct tape recovered from the victims. There was an unidentified DNA

> profile on the bloodstain located on the front door. And there was an unidentified DNA profile found under the nails of both of Ms. Johnson's hands.

Ex. III-G, Wong Decl. at 16-17.[39] Mr. Wong concludes that, "[t]aken together, these inconsistencies with the objective crime scene evidence raise significant questions about the reliability of Mr. Taylor's version of events." *Id.* at 17.[40]

Taylor's testimony about the floral couch is illustrative. Taylor denied that the floral couch had been in the hallway to the bedrooms, where it would have obstructed both his view of the crimes and his ability to move easily between his lookout spot in the living area and the bedrooms. But the crime scene photographs demonstrated it must have been: images of the hallway before and after investigators removed the couch show the carpet looks markedly different where the couch had been standing—a difference that would not have developed during the period of the crime scene investigation.







[39] By the time of Efrain Johnson's state trial, Taylor had changed his tune, now testifying that Mr. Aquart hit Tina Johnson only one or two times.

[40] Given this, it was also deficient performance that prejudiced Mr. Aquart for trial counsel to fail to insist the blood spatter testimony be offered during the guilt-innocence phase of the trial, when it could be used to impeach Taylor's testimony.

Trial counsel would have benefitted from a crime scene investigation expert's assistance exposing and explaining the multiple "physical impossibilities" in Taylor's account. *Cf.* Ex. I-B, Ungvarsky Decl. at ¶ 148.

Mr. Aquart's counsel had a duty to make reasonable investigation into how a crime scene expert could have assisted in the presentation of Mr. Aquart's defense. Ex. I-B, Ungvarsky Decl. at ¶¶ 9, 19-20, 22-23. Although trial counsel had a crime scene expert available, there is no evidence they sought appropriate advice or made reasonably informed decisions regarding the crime scene evidence or how to counter the government's presentation. *Id.* at ¶¶ 136-40. Presentation of a crime scene expert would not have been inconsistent with the evidence and cross-examination trial counsel presented; rather, expert testimony would have bolstered the points trial counsel were trying to convey. *Cf. Osborne v. Terry*, 466 F.3d 1298, 1310 (11th Cir. 2006) (rejecting ineffective assistance claim where expert testimony would not have supported client's defense).

"This type of assistance was available and commonly accessed by criminal defense attorneys at the time of Mr. Aquart's trial in 2011." Ex. III-G, Wong Decl. at 18.

**C. Trial counsel's deficient performance prejudiced Mr. Aquart.**

Trial counsel's failure to adequately consult with and present a crime scene investigation expert was prejudicial, because it "deprived the jury of evidence and explanation that could have undermined eyewitness reliability, exposed weaknesses in the investigation, challenged the integrity of the physical evidence, and exposed

reasonable doubt." Ex I-B, Ungvarsky Decl. at ¶ 146. Although counsel attempted to cross-examine on these issues, "[a]n expert could have translated [them] into clear, concrete testimony showing why the Government's evidence was less reliable than it appeared." *Id.* at ¶ 144.

As it was, the government ridiculed trial counsel's attacks on the crime scene investigation. In addition to the "conjecture and speculation" comment, the government derided counsel's attempt to hold detectives accountable to investigation standards and protocols: "Look, this is a crime scene, not a cleaning service, things aren't tidy and neat." TT at 4333-34. The government also claimed that detectives' movement of the evidence did not matter. TT at 4260.

But far from conjecture and speculation that was of no moment, a crime scene investigation expert could have explained that the flaws in the government's evidence were pervasive, readily provable, and problematic. These flaws undermined the government's case in foundational ways—affecting the validity of its forensic evidence, demonstrating the lack of "diligence and professionalism" by government investigators, TT at 4251, and damaging the credibility of key witnesses, including the only eyewitness. Trial counsel's failure to adequately consult a crime scene expert prevented them from understanding the crime scene, countering the government's evidence, and marshalling information in support of Mr. Aquart's defense. Ex. I-B, Ungvarsky Decl. at ¶ 145; Ex. III-G, Wong Decl. at 17-18.

"The failure to adequately consult with and, where supported by the expert's findings, present a crime scene investigation expert prejudiced the defense by leaving the prosecution's version of the scene largely unrebutted by qualified expert testimony." Ex. I-B, Ungvarsky Decl. at ¶ 146-47. An expert rebuttal would have convincingly made a case for Mr. Aquart's legal innocence, since no jury could reasonably have found him guilty beyond a reasonable doubt given the questions raised about the evidence by a crime scene investigation expert.

## IV. Trial counsel were ineffective for failing to investigate and present evidence to challenge the government's witnesses against Mr. Aquart.

Trial counsel failed to conduct a reasonable pretrial investigation into the government's most important guilt-phase witnesses against Mr. Aquart, and they failed to adequately prepare to cross-examine critical government witnesses on the significant inconsistencies between their testimony and other evidence in the case. There was no objective reason not to impeach these witnesses and marshal the evidence to challenge their credibility; instead, counsel was simply unprepared. Trial counsel's performance fell below an objective standard of reasonableness and their multiple failures prejudiced Mr. Aquart. *Strickland*, 466 U.S. 687.

### A. Trial counsel failed to investigate readily available evidence to impeach John Taylor, the government's star witness, around whom the government built its case that Mr. Aquart personally participated in the homicides.

John Taylor was the lynchpin of the government's case against Mr. Aquart: an alleged co-conspirator, eyewitness and accomplice to the murders with purportedly direct evidence of Mr. Aquart's guilt. He was arrested years after the

Aquart brothers, when the government needed a witness to directly implicate Mr. Aquart.

Taylor was also a deeply problematic witness. Not only did he tell countless lies in his prior statements, his trial testimony was inconsistent with the testimony of other key witnesses and the physical evidence. At trial, Taylor insisted he was telling the truth out of remorse, and while he hoped for a lesser sentence, he didn't believe he was ever coming home. Although trial counsel established that Taylor had lied repeatedly to police—something the government acknowledged and incorporated into its narrative that he had decided to finally tell the truth out of remorse—trial counsel failed to adequately impeach Taylor with crucial inconsistencies in his testimony and his expectations for release. Ultimately trial counsel failed to marshal the significant evidence undermining Taylor's credibility.

1. **Trial counsel failed to investigate and impeach Mr. Taylor's credibility with the myriad inconsistencies between his testimony and that of other key witnesses, including Lashika Johnson, as well as the forensic and crime scene evidence.**

**a. Summary of Taylor's testimony about the crime**

John Taylor testified that soon after returning from a road trip down South, Mr. Aquart had asked him to come to Bridgeport. Mr. Aquart's brother, Azikiwe, picked Taylor up at the train station and they eventually met up with Mr. Aquart. As the three of them drove around, Mr. Aquart and his brother started talking. Mr. Aquart "said something about duct tape," and they rode around to some stores. TT at 2282-83. They eventually went to a Walgreens. Taylor testified that Mr. Aquart went inside and came back out with "[d]uct tape and a Walgreen bag." TT at 2284.

Taylor knew it was duct tape because "that's the only thing he was looking for." *Id.* They went to a diner next to the Charles Street building, where Mr. Aquart told Taylor he would set him up to sell drugs.[41] TT at 2285. Behind the diner, they then met Efrain Johnson (described by Taylor as a chubby light-skinned guy with cornrows and known to him as Big Boy). TT at 2285. The four of them talked about how Mr. Aquart "wanted to move some people out" of the Charles Street building because "they was into his money business." TT at 2291. Taylor testified that the four of them then entered the Charles Street building, with Azikiwe and Efrain carrying bats. TT at 2293. "The big guy" brought the bats with him when they met at the diner. TT at 2296. Taylor was wearing black but he couldn't remember what anyone else was wearing. Azikiwe gave them masks with holes for the eyes and nose and blue latex gloves. TT at 2296-97. They lined up in the hallway on the second floor and "then there was a girl knocking on the door." TT at 2295. She was light-skinned, maybe Hispanic. TT at 2298. Nobody answered and they left and went to a third-floor apartment, where he saw the woman who had knocked on the door and another man. TT at 2297-98. Mr. Aquart told him this was the apartment where he would set Taylor up to sell drugs. TT at 2299. Taylor identified a picture of Judith Rivera as the woman who knocked on the door, agreeing that he had seen pictures of her before and recognized her. TT at 2300-01.

[41] Although, upon information and belief, the diner was equipped with numerous surveillance cameras, the government presented no video evidence of the meeting John Taylor described.

Taylor testified that a couple of days later, Mr. Aquart called him up and asked him to come back, saying "the big guy got a couple girls at the diner." When Taylor got to Bridgeport, Azikiwe and Azibo drove him back to the building. The "big guy" eventually joined them and again brought bats.[42] Azikiwe again gave them masks and blue gloves. Taylor claimed that Mr. Aquart said, "I know she's there now" and told Taylor to help "handle" her son because he's a big guy. TT at 2307.

Taylor testified he entered the apartment with no weapon. In contrast, he claimed, Azikiwe and Efrain had bats, and Azibo had a gun. TT at 2311-12. Taylor claimed that Mr. Aquart kicked the door in and all four went into the apartment. TT at 2312-13. Mr. Aquart told people to get on the ground. Taylor claimed he saw Mr. Aquart and his brother enter a bedroom on the left, where there was a man and a woman. Efrain went into the bedroom on the right, with an older skinny man. TT at 2315. All three people in the apartment got on the ground. Taylor claimed to be able to see into both bedrooms from where he was standing, toward the right bedroom. At some point, Taylor said, Mr. Aquart came out of the room and he and Taylor pushed an off-white couch from the living room against the door because the door had come off its hinges when they entered. TT at 2316-17.

According to Taylor, Mr. Aquart instructed him to stand near the window and look out. TT at 2319. While Taylor stood at the window, he said Mr. Aquart "went

---

[42] "I know that it wasn't no bats with us when we got there. When he got there, that's when I seen the bats again." TT 2307.

back" and "the only thing I'm hearing is duct tape." TT at 2320. When the prosecutor asked Taylor if he went back to look, he said he went back to look a couple of times and saw Mr. Aquart and his brother duct taping the man and woman in the left bedroom. The skinny man was laying on the floor and Efrain "was still standing there." Taylor claimed not to see Efrain duct taping anyone. TT at 2321. Eventually Taylor stopped hearing the duct tape. Then, he heard someone say "Yeow." He went back and looked and, he claimed, saw Mr. Aquart standing over Tina and beating her with a bat, while his brother was standing on the other side doing the same thing to the man. Taylor claims he said "Yo, what are you doing?" In response, Mr. Aquart allegedly said "Yo, come and get you some." TT at 2322-23. At that point, Taylor claimed he left. "I'm out of here." TT at 2323. He testified he saw Mr. Aquart hand a gun to Azikiwe.

Taylor claimed that Mr. Aquart took a cell phone and some money from the room where the man and woman were located. TT at 2326. Taylor said that when he left, Azikiwe followed him out, taking the cell phone and money. TT at 2326-27. Taylor testified the two of them drove to an apartment where Azikiwe changed his clothes, and then they drove to a second apartment building. There, they entered a third-floor apartment, where he saw a girl coming in and out of the apartment. TT at 2329. They smoked weed and chilled, and then, Taylor said, he left. Taylor testified he never saw Mr. Aquart or Efrain at the second apartment. TT at 2331-33.

Trial counsel spent most of their cross-examination questioning Taylor on the plethora of lies he told during his first interview with investigators when he was

arrested on December 2, 2009. Taylor admitted that he was telling lie after lie, "saying anything," in hopes the investigators would leave. TT. 2396, 2408. Taylor admitted to numerous lies during that first interview. He admitted blaming others for the murders, thinking he would avoid liability. He was "surprised" when he was arrested after his first interview. TT at 2465-66.

> Well, I thought if I lied to them they'd not arrest me. I thought maybe I told enough good little lies to squiggle my way out of it, but I end up putting myself in -- the more I lied -- the more I lied, the more I put myself into it. I couldn't come out of it now.

TT at 2466.

Trial counsel also crossed Taylor on his prior convictions, his quick decision to proffer information to the government, and his knowledge of the murder from other sources like television. Taylor was not crossed on the contradictions between his trial testimony and the other evidence about the crime itself and the events after the homicides.

In closing arguments, trial counsel focused on only three inconsistencies in John Taylor's testimony: his claim that they wore blue rubber gloves in Tina's apartment (no evidence of blue rubber gloves existed);[43] his in-court identification of Judith Rivera as the woman who knocked on the door during the "dry-run" even

---

[43] Taylor admitted to telling numerous lies during his initial interview. But he acknowledged some truths as well. TT at 2452. One detail that he remained consistent on—and that did not match up with the evidence—was the use of blue gloves. He maintained that it was true, as he had stated during his January 14, 2010, proffer session, that a box of blue hospital gloves was in the car they drove to Charles Street and that the gloves he wore in Tina's apartment were blue. TT at 2450-2451; Ex. IV-A (John Taylor, FBI 302, at Jan. 15, 2010).

though he said he did not recognize her when shown a photograph during prior interviews; and his prior identification of the floral couch as having been propped against the door (when the floral couch is pictured in the hallway).

**b. Trial counsel's failure to adequately investigate and present evidence to impeach Taylor's story about what occurred two days before the homicides**

Taylor testified that, a couple days before the homicides, he, Mr. Aquart, and Mr. Aquart's brother went to a Walgreens, where Mr. Aquart purchased duct tape; drove to a diner next to the Charles Street Building; and then met with Efrain Johnson, whom Taylor identified as a fourth participant in the homicides, in the parking area between the diner and the Charles Street Apartment building. TT at 2284, 2285. Trial counsel performed deficiently in failing to investigate and present evidence to impeach Taylor's account. An effective investigation would have revealed:

Each of these locations, the Walgreens, the diner next to the Charles Street apartment building, the parking area in between the diner and the apartment building, and the apartment building itself employed numerous surveillance cameras. Surveillance video would have disproved Mr. Taylor's account. Trial counsel performed deficiently in failing to seek and obtain surveillance video from these locations.

On information and belief, Walgreens did not sell the duct tape or latex gloves that Taylor described and/or were recovered from the bodies at the crime scene. Sales receipts and inventory records from Walgreens would have disproved

Taylor's account. Trial counsel performed deficiently in failing to seek and obtain sales receipts, inventory records, and other evidence from these locations.

Cell-phone data and records, including cell site location information, could have been used to establish the location of the cell phones of each of the four persons Taylor identified as participants and to disprove his account of the events. Trial counsel performed deficiently in failing to seek and obtain cell-phone data and other records, including cell site location information.

**c. Trial counsel's failure to impeach Taylor with inconsistencies**

Taylor's testimony was inconsistent in important ways with both the testimony of the government's other witnesses and the forensic evidence. One example is the contradictions with Lashika Johnson's testimony. Lashika—an employee of the Aquart drug business with whom Mr. Aquart was sometimes intimate—was the only other witness who testified regarding certain aspects of the early morning hours of August 24, 2005. During his January 15, 2010, proffer session, John Taylor stated that after the homicides, both Mr. Aquart and Efrain joined him and Azikiwe at Azikiwe's apartment. Taylor specifically proffered that Mr. Aquart changed his clothes at Azikiwe's apartment, and only after they changed clothes did the four of them drive to another apartment that investigators believed belonged to Lashika Johnson.[44]

44 [redacted]

At trial, when Taylor was questioned about having said that Mr. Aquart and Efrain had joined them at Azikwe's apartment, he said he didn't remember making that statement. But he did confirm that he and Azikiwe had gone to one apartment first, where at least Azikiwe changed his clothes, before going to a second apartment where they "met a dark-skinned female." TT at 2451-53.

Trial counsel never questioned Taylor about his conflicting assertions that he both did and did not see Mr. Aquart or Efrain after leaving the Charles Street apartment. Nor was he cross-examined regarding his claim that after the homicide he and Azikiwe went to a second apartment where they met a "dark-skinned" woman. TT at 2453. The government contended that the dark-skinned woman was Lashika Johnson. But it could not have been, as no one would describe Lashika as "dark-skinned." Such cross-examination would have injected further holes into Taylor's story.

Taylor's testimony about changing clothes before arriving at the second apartment, which the government alleged was Lashika's apartment, directly contradicts Lashika's testimony that Azikiwe and Azibo were in their underwear in her living room when she awoke to find them there.

> Q. And were they -- was there anything unusual that you observed?
>
> A. Well, when I came out to the living room they didn't have on clothes. They just had on like boxers and T-shirts.

---

[redacted]

Q. Who is they?

A. Dreddy and his brother.

TT at 2880.

Taylor's testimony about the alleged "dry run" before the homicides also suffered contradictions that trial counsel failed to point out. For example, John Taylor's testimony that a Hispanic woman assisted with the "dry run" a few nights before the homicide is contradicted by two other government witnesses, Frank Hodges and Juanita Hopkins. Hodges testified that he was in the third-floor apartment a few nights before the homicides when Mr. Aquart asked him to knock on Tina Johnson's door and get out of the way when it opened, TT at 778-86; Juanita Hopkins was in the third-floor apartment and Hodges told her what happened when he came back. TT at 780-86, 865-69. Although Taylor identified Hopkins as the woman who came to the third-floor apartment to buy crack from Mr. Aquart after the dry run, TT at 2301, Hopkins never mentioned seeing Taylor or Mr. Aquart that night. TT at 2584-2585.

Jackie Bryant also claimed to have been present during the dry run and Taylor never mentioned seeing her. Bryant testified that a few nights before the homicides she cut through the diner-side area of the Charles Street building to buy drugs and saw three men dressed in black in the parking lot. TT at 1163-1164. "I noticed them and they noticed me." TT at 1164. She lingered pretending to talk on her phone, "trying to be nosy." TT at 1166. She later saw them coming down the first-floor hallway and warned Frank Hodges that they were about to get robbed.

TT at 1164-1166. Although Bryant said the men "noticed" her, Taylor said nothing about seeing Bryant that night.

Trial counsel failed to question Taylor about these myriad inconsistencies, impeaching him only with his in-court identification of Judith Rivera as the woman who knocked on Tina's door when he had failed to identify the same photo in statements to the police.

Finally, John Taylor's account of the crime is also inconsistent in other important ways with the crime scene and medical evidence—which counsel failed to investigate and challenge. *See* Claims I, III and Ex. III-G, Declaration of Kenton S. Wong. For example:

- DNA evidence was inconsistent with Taylor's account.

Contrary to the implications of Taylor's testimony that neither he nor Efrain did anything at the crime scene, DNA evidence established that Efrain's DNA was found on the duct tape binding Tina Johnson's hands – this was consistent with Efrain's statements to police that he and John Taylor bound Ms. Johnson. [45]

- The blood spatter and autopsy evidence was inconsistent with Taylor's graphic account of the way Mr. Aquart allegedly beat Tina.

Taylor claimed that Mr. Aquart used repeated overhead motions to strike Tina with a bat, "bashing" her as if he was "at a meat market," and that Azikiwe did

---

[45] Mr. Aquart does not concede the reliability of the DNA evidence presented at trial, *see* Claim I; but at the very least, counsel should have raised questions about the reliability of Mr. Taylor's testimony, which contradicted the government's DNA case.

the same to Reid. TT at 2322, 2502-03. The government introduced blood spatter evidence during the penalty phase. The heavy cast-off splatter in the room was on the wall near Reid's feet (denominated Wall A) and on the 9 1/3-foot ceiling above him (Wall D). The government's expert stated that that spatter was made by an overhead striking motion, with the object casting up to the ceiling and back toward Wall A. TT at 4552-53. There was also a lot of blood spatter on the closet wall parallel to Reid's body (Wall B), including high up. DNA samples from Walls A, B and D were consistent with Reid alone; Tina's DNA was eliminated. The blood spatter evidence was thus inconsistent with Taylor's graphic account of the way Mr. Aquart beat Tina. *See also* Claim III, incorporated herein.

- From where he stood, and paced back and forth, it would have been impossible for Taylor to have seen the area of the bedrooms where the assaults took place.

Taylor claimed to have witnessed the beatings of Tina Johnson and Reid, testifying in prejudicial detail about what he saw—specifically what he claimed Mr. Aquart did. Trial counsel failed to question Taylor about his ability to see what he claimed to have seen from his vantage point. The crime scene photographs, for one thing, demonstrated that the floor where the victims lay was not visible from where Taylor was standing; all Taylor would have seen was a dresser (if he could have seen into the darkened doorway at all). *See* Claim III, incorporated herein by reference.

**2. Trial counsel failed to cross-examine John Taylor on his release expectations.**

Taylor was arrested for murder at the end of 2009, in North Carolina. TT at 2356-68. In October 2010, he entered into a cooperation agreement and pleaded guilty to three counts of murder in aid of racketeering (although at trial he testified he was pleading guilty to a different crime, felony murder). TT at 2369-72. He faced three mandatory life sentences, but his cooperation agreement left open the possibility of a lesser, non-mandatory sentence in exchange for his assistance in the prosecution of another.

In 2011, Taylor testified against Mr. Aquart. After eliciting that the death penalty would not be sought against Taylor, the prosecutor asked why he was testifying. When he replied, "[t]o tell the truth," she pressed: "Why?" Because, Taylor said, "[p]eople got killed for no reason. . . . it never should have gone to the point it went to." TT at 2372. Shortly thereafter, the prosecutor showed Taylor a photo of the victims' bodies and asked why he had not called 911 when he left the apartment; he replied that he was "[s]cared" of getting "lock[ed] . . . up the way I am now"; he had not called them later because he "didn't know what to do" TT at 2373.

Toward the end of his testimony at trial, the prosecution questioned Mr. Taylor about his expectations, having cooperated in the case:

Prosecution: What are you hoping happens to you?
Taylor: Lesser sentence.
Prosecution: Do you think you are going to go home tomorrow?
Taylor: No.
Prosecution: When do you think you are going to go home?
Taylor: I don't think I'm never going home.

TT at 2374. Mr. Taylor claimed he was testifying against Azibo Aquart not out of self-interest, but because it was the right thing to do: the victims did not have to die.

Taylor was ultimately sentenced to just nine years for his role in the murders. Facing three mandatory life sentences, he would instead become eligible for release just six years after Mr. Aquart's trial.

Trial counsel did not question Mr. Taylor about his expectations for release. But as the Second Circuit noted in its opinion on direct appeal, Taylor's hope for something less than a life sentence combined with his professed expectation of never getting out gave rise to a basis for cross-examination:

> [M]oments before Taylor stated that he did not think he was ever going home, he admitted that he was "hoping" for a "lesser sentence." This, by itself, provided a basis for cross-examination to insinuate that Taylor's hope belied his professed expectation.

*Aquart* (I), 912 F.3d at 24. But trial counsel "fail[ed] to avail himself of this opportunity." *Id*. There was no legal impediment to charging Taylor with the death penalty. The scale of difference between the death penalty or a life sentence and nine years certainly suggests Taylor had reason to curry favor with the government.

As a result of counsel's failure to probe Mr. Taylor's expectations, the jury's assessment of his credibility was based on the misleading testimony that he never expected to get out of prison and was instead testifying out of remorse and a sense of obligation to come forward.

**B. Trial counsel were ineffective for failing to investigate readily available evidence to impeach Lashika Johnson, who provided the only other direct evidence of Mr. Aquart's involvement in the homicides, along with John Taylor.**

Lashika Johnson (Efrain Johnson's sister and one of Mr. Aquart's employees with whom he was sometimes intimate) testified as a government cooperator at Mr. Aquart's trial. Through Lashika, the government introduced damning statements that Efrain had purportedly made to her. Efrain allegedly told Lashika that "he helped tie the people up and rough them up a little bit, but . . . when he left those people were still alive." TT at 2907-08. He said he left Mr. Aquart alone in the apartment, and that "everything that they had or used was disposed of before they came to me" – "Bats and gloves and maybe masks." TT at 2909. Lashika thus provided secondhand eyewitness and accomplice testimony implicating Mr. Aquart in the crime—and corroborating John Taylor's testimony in important ways.

Critically, Lashika also provided a firsthand incriminating account of the early morning hours of August 24, 2005, supposedly after the homicides had occurred. After a night out at a club and a Denny's, Lashika said she came back to her apartment with her friend Tasha and went to sleep. She testified that sometime later she awoke to men talking in her living room. She heard the voices of Mr. Aquart and her brother and assumed a third voice that she heard was Mr. Aquart's brother because they sound alike. TT at 2878. She could have sworn she heard a fourth, deeper voice. When she walked out into the living room, she saw her brother Efrain, Azikiwe and Mr. Aquart. TT at 2879. Mr. Aquart and his brother "didn't have on clothes," they wore boxers and t-shirts. TT at 2880. Her brother had on a t-

shirt and jeans. She testified there were two or three kitchen garbage bags by her door that Mr. Aquart asked her to take to a dumpster a couple of blocks away from her apartment. TT at 2882. She claimed she didn't look inside the bags but she knew they contained clothes. TT at 2883. According to Lashika, Mr. Aquart also asked her to take a black drill to the dumpster. TT at 2884. Lashika also testified that Mr. Aquart asked her to drive his car to his house and bring him some clothes, which she did. TT at 2887.

Lashika's testimony was critical to the government's case against Mr. Aquart. It was also wholly unreliable. She provided crucial statements about Efrain's purported admissions only after the prosecutor threatened to put her in shackles and take her children away. And her damning testimony about what transpired in her apartment the night of the homicides was filled with inconsistencies.

Trial counsel knew Lashika's hearsay testimony would be highly prejudicial and they tried to keep it out, albeit ineffectively. *See* Claim VI. However, they don't appear to have conducted a reasonable investigation into this critical government witness. Upon information and belief, the defense fact investigator at trial—who split their time between fact and mitigation investigation—did not conduct a reasonable investigation into Lashika Johnson, despite her critical role in the government's case. Counsel were thus unable to impeach her with the government's threats and failed to adequately cross-examine her on the inconsistencies.

1. **Trial counsel failed to impeach Lashika Johnson with evidence that she changed her story only after the government threatened to put her in shackles, lock her in jail, and take her kids away.**

Lashika Johnson was interviewed by law enforcement numerous times and provided at least six different proffers over the course of two years. Her first proffer session was on September 18, 2008. On that date, Lashika signed a proffer agreement. Lashika testified to her understanding of the terms of that initial proffer: if she told the truth she would not be "punished for what [she] did." TT at 2915. After her initial proffer session, Lashika provided five additional proffers, on 9/24/08; 10/14/08; 10/22/08; 1/20/10; and 12/13/10. Several federal prosecutors and FBI Agent Christopher Munger were present for each proffer. It wasn't until her third proffer session on October 14, 2008, after the prosecutors told her they didn't believe her and she started to cry, that Lashika provided the critical information about what Efrain purportedly told her and when he told her: [redacted] he told her that [redacted] and [redacted] Ex. IV-B, Lashika Johnson FBI 302, Oct. 14, 2008, at 2.

On cross-examination, trial counsel briefly attempted to establish that Lashika Johnson provided information about what Efrain admitted to her only after being "threatened." TT at 2946. But Lashika flatly denied this characterization. Trial counsel first established what was apparent from the text of the FBI 302: that after the prosecutors confronted her, saying they didn't believe her, she began to cry and then told them that her brother admitted tying people up. Trial counsel then

suggested that she made this statement "because you were being threatened, right?"

> A. Not because I was threatened.
>
> Q. You were being threatened, were you not?
>
> A. I don't think it was a threat. It was just more so like they were telling me what was right and what I had to do.
>
> Q. And you understood that if you didn't do what they said, you were in big trouble.
>
> A. I understood that if I didn't do what was right then I would be in trouble.

TT at 2946.

All that was established on cross was that Lashika started to cry when she was told that the prosecutor did not believe her. She agreed with counsel that she "understood" that their lack of belief could result in the loss of her proffer agreement. TT at 2945. But she never disclosed that anyone at the meeting mentioned any consequences for sticking to her story, much less warned her of the potential for prosecution.

Had trial counsel conducted an adequate investigation into this critical government witness, they would have learned that prosecutors had threatened Lashika during her third proffer session.

On February 21, 2012, eight months after the jury's verdict but before Mr. Aquart was formally sentenced, Lashika testified at Efrain's federal trial. There, she stated that she had been threatened at an early proffer session and provided a vivid description. Lashika testified that during the October 14 proffer session, federal prosecutor Tracy Dayton stood up and "yelled" at her. She said Ms. Dayton

"threatened to put [her] in shackles," threatened that she'd "be going to jail," and threatened that she would "lose [her] children." Ex. IV-C (2/21/12 Tr. at 2081-2083, *United States. v. Efrain Johnson*, 6-CR-160 (D. Conn.), D.E. 1084). This interaction "scared" Lashika, and necessitated a break so she would have time to "gather [her]self." Lashika felt that if she "didn't start saying different things . . . [she] could be going to jail" and "could lose [her] kids." *Id.* at 2083). Lashika said that even though her attorney was present, the prosecutor "didn't seem to have any hesitation to yell at [her] and say that if [she] d[id]n't do this we're going to send [her] to jail and take away [her] kids in front of everybody in that whole room"; the prosecutor "made clear she was going to have those agents who were present take [her] out of that room *right then* and take [her] to jail." *Id.* at 2094).

Lashika also testified as a cooperating witness at Efrain's subsequent state trial in December 2013, where she gave the same details and agreed with defense counsel's characterization of AUSA Dayton's conduct as a threat. She admitted that AUSA Dayton had threatened her because they were "not really happy with what you were saying to the government." Ex. IV-D, 12/16/13 Tr. at 121-122, *Connecticut v. Efrain Johson*, No. FBT-CR11-0259461-T.

Lashika has three children who mean "everything" to her. Ex. IV-C, 2/21/12 Tr. at 2070; Ex. IV-D, 12/16/13 Tr. at 130. When the prosecutor said "she's going to put you in shackles and take you out of there," Lashika then broke down crying. When the prosecutor made those threats, it meant that "everything that I loved was going to be taken away." Ex. IV-D, 12/16/13 Tr. at 130. She acknowledged that at

that point, her choice was her children or her brother. Ex. IV-D, 12/16/13 Tr. at 131. After taking some time, she came back and started telling the government what it wanted to hear about what Efrain allegedly told her—"about bats and roughing up." *Id*.

The difference in her testimony is stark. At Mr. Aquart's trial Lashika claimed she changed her account because it was the "right" thing to do. At Efrain's trial, she said she believed the prosecutor's threats would be immediately carried out if she "didn't start saying different things" – apparently regardless of their truth. Ex. IV-C, 2/21/12 Tr. at 2083. The jury should have had this information in assessing Lashika's credibility.

Because counsel had failed to investigate Lashika Johnson and the circumstances of her proffer sessions, they could do no more than attempt to get Lashika to agree with their conclusory characterization that she'd been threatened. The specific threats that were made to Lashika during the October 14 proffer—yelling at Lashika that she would be taken away in shackles, put in jail, and would lose her kids—were available to trial counsel had they conducted a reasonable investigation into this witness.[46] Trial counsel took no steps to investigate.

---

[46] Even if counsel couldn't interview Lashika Johnson while she was represented, government disclosures in counsel's possession detailed other avenues of investigation that could have uncovered this information. For example, in her October 14 proffer, Lashika stated that [redacted] x. IV-B (Lashika Johnson FBI 302, Oct. 14, 2008, at 1). These are witnesses that Lashika confided in, witnesses that could have told counsel the extreme and detailed nature of the government's pressure.

**2. Trial counsel were ineffective for failing to impeach Lashika Johnson with the many inconsistencies in her prior statements.**

Trial counsel's cross-examination of Lashika Johnson focused on her prior larceny convictions and the resolution of those cases; the timing of various law enforcement interviews and discussions with her brother (TT at 2939-2940); and pointing out a few new details that Lashika added at later proffer sessions.[47] Trial counsel failed to point out the many consistent aspects of Lashika's earlier statements—before she was threatened—that were ultimately inconsistent with her testimony at trial.

Before she was threatened during the October 14 proffer, Lashika had consistently said that she had not discussed the murders with Efrain before he went to jail; and that it was only since he'd been arrested – when he had a motive to lie – that he allegedly made incriminating statements about himself and Mr. Aquart. Ex. IV-E (Lashika Johnson FBI 302, Sept. 18, 2008, at 5); Ex. IV-F (Lashika Johnson FBI 302, Sept. 24, 2008, at 2-3). After she was threatened, she claimed Efrain had made the relevant statements to her *before his arrest*—and added details about tying people up, and ultimately about using bats, gloves and masks. When she later

[47] Lashika admitted she added a "new detail" during her October 14 proffer session about going to Philadelphia with Azikiwe and Efrain, TT at 2944; during the October 22, 2008, proffer session she added a story about taking the drill to the dumpster and a phone call Mr. Aquart had about his brother being at the Charles Street building after the murders, TT at 2948; and finally, she added a new detail during her January 20, 2010, proffer about seeing Mr. Aquart outside her apartment in a red Cadillac. When questioned about this detail, added years after her first interview, Lashika stated, "Everything was coming to me not all at once" and she "couldn't remember everything all at first." TT at 2950.

testified at Efrain's two trials, Lashika denied that Efrain ever told her who was with him that night. Ex. IV-D (12/16/13 Tr. at 104); Ex. IV-C (2/21/12 Tr. at 2059-60).

This was a crucial difference—as the government sought to show that Efrain admitted the details of the crime before he or Lashika would have known he was a suspect, and before either of them had spoken to police.

Before she was threatened by the prosecution, Lashika also consistently said that she woke up to laughter in her apartment and that she saw Mr. Aquart, his brother and Efrain in her living room, laughing, drinking and watching television. Ex. IV-E (Lashika Johnson FBI 302, Sept. 18, 2008, at 7); Ex. IV-F (Lashika Johnson FBI 302, Sept. 24, 2008, at 1). At trial, Lashika testified that she "just heard talking," and when she came into the living room to find her brother and the Aquarts, the television was off. TT at 2879-2880.

> Q. When you heard the voices, what kind of noise was being made? Was it loud? Or what did you hear?
>
> A. I just heard talking.

TT at 2879. When asked what they were doing, Lashika testified "they could have possibly been smoking and just talking." TT at 2880.

> Q. Was there a TV in that room?
>
> A. Yes.
>
> Q. Was it on, off?
>
> A. It was off.

TT at 2880.

Trial counsel also failed to cross-examine Lashika on new details she added at trial—details which were not included in any of her many pretrial statements to investigators. For example, she testified that she used gloves to dispose of the garbage bags to ensure that she left no prints because she was worried. TT at 2911. She claimed Mr. Aquart told her to wear them. *Id*. This detail was not in any of her prior statements. When asked about this detail at Efrain Johnson's state trial, she said nobody told her to put on gloves. Ex. IV-D (12/16/13 Tr. at 88, 91, *Connecticut v. Efrain Johnson*, No. FBT-CR11-0259461-T) ("Q. Who told you to put the gloves on? A. Nobody.").

### C. Trial counsel were ineffective for failing to impeach the statements of Efrain Johnson, as recounted by Lashika Johnson, with his inconsistent statements.

During his March 7, 2007, proffer session at the US Attorney's Office, Efrain stated that he, Mr. Aquart, Azikiwe and John Taylor, whom he knew as "Big Man," approached the Charles Street apartment and Efrain knocked on the door pretending to be a customer. When Tina Johnson opened the door, Efrain said they all "bum rushed" the door. Efrain and John Taylor took Tina Johnson into the living room while Mr. Aquart and his brother took a man and pushed him into the back bedroom. While Efrain was taping Tina Johnson's hands, the big man "pulled a long metal pipe from his pants and smacked" Tina Johnson in the head. At that point, Efrain stated that he ran out of the apartment. He later met up with the Azibo and the other two men. Ex. IV-G (Efrain Johnson FBI 302, March 7, 2007); *see also* Ex. IV-H (Efrain Johnson FBI 302, March 6, 2007). During a February 8, 2010, proffer

session, Efrain denied seeing any bats. Ex. IV-I (Efrain Johnson FBI 302, Feb. 8, 2010.)

Efrain's statements during his proffer sessions are inconsistent in at least two ways with the statements his sister Lashika claimed he made to her. First, Efrain allegedly told Lashika that they used baseball bats, that he both hit one of the victims with a bat and saw a victim being hit with a bat. Ex. IV-J (Lashika Johnson FBI 302, Jan. 20, 2010); *see also* TT at 2909 (Lashika testifying that Efrain said they used bats and he helped rough them up). To the government, Efrain denied seeing any bats and instead claimed that John Taylor hit Tina Johnson with a metal pipe.

The second inconsistency relates to Efrain's departure from the scene. He allegedly told Lashika that he left Azibo "by himself in the apartment." TT at 2909; *see also* Ex. IV-F (Lashika Johnson FBI 302, Sept. 24, 2008) (Efrain left Azibo [redacted]); Ex. IV-B (Lashika Johnson FBI 302, Oct. 14, 2008) ("[redacted]."). At a later proffer session, Lashika said that Efrain had told her he and Azikiwe left out the front door together. Ex. IV-J (Lashika Johnson FBI 302, Jan. 20, 2010). In contrast, Efrain told the government that he left the apartment after seeing John Taylor hit Tina Johnson and that he later met up with the others.

"A hearsay declarant may be impeached by showing that the declarant made inconsistent statements, based upon the theory that such a declarant is in effect a witness and therefore his credibility should in fairness be subject to impeachment

as though he had in fact testified." *United States v. Stewart*, 907 F.3d 677, 687 (2d Cir. 2018) (quoting *United States v. Trzaska*, 111 F.3d 1019, 1024 (2d Cir. 1997) and Fed. R. Evid. 806 advisory committee' notes) (internal quotation marks and alterations omitted). Further, it does not matter when the inconsistent statement was made. "Under Fed. R. Evid. 806, a hearsay declarant may be impeached by an inconsistent statement that was made prior to or subsequent to the hearsay declaration." *Trzaska*, 111 F.3d at 1024 n.1.

To determine whether a hearsay declarant's different statements are inconsistent, the Second Circuit "appl[ies] two tests . . ., asking whether there is any variance between the impeachment material and the hearsay statement that has a reasonable bearing on credibility or whether a jury could reasonably find that a witness who believed the truth of the facts asserted in the hearsay statement would have been unlikely to make a statement of the impeachment material's tenor." *Stewart*, 907 F.3d at 687 (quoting *United States v. Ebbers*, 458 F.3d 110, 123 (2d Cir. 2006) and *Trzaska*, 111 F.3d at 1024-25) (internal quotation marks omitted).

Efrain's alleged statement to Lashika about using bats is clearly inconsistent with his statements to law enforcement denying the presence of bats (and instead describing the use of a metal pipe).[48] Efrain's statement to the government that he left the apartment after seeing John Taylor hit the victim is also inconsistent with

---

[48] Lashika mentioned what Efrain allegedly told her about bats for the first time in a proffer session that occurred years later, days after the government had obtained information about bats from John Taylor. *See* Ex. IV-A, John Taylor FBI 302, Jan. 15, 2010; Ex. IV-J, Lashika Johnson FBI 302, Jan. 20, 2010.

his statement to Lashika that he left Mr. Aquart in the apartment by himself. His statements to the government imply that he left the apartment on his own, leaving John Taylor and the Aquart brothers still inside; his statements to Lashika on the other hand suggest that he had firsthand knowledge of Mr. Aquart being in the apartment alone, while he and the others left.

The inconsistencies in Efrain's account to the government have "a reasonable bearing on the credibility of" Efrain's statements to Lashika about Mr. Aquart's involvement. "Regardless of which version of [Efrain's statements] was correct, if either, 'the fact of the inconsistency gives the jury an insight into the witness's state of mind; the inconsistency shows that the witness is either uncertain or untruthful. In either event, the inconsistency calls into question the witness's believability.'" *Stewart*, 907 F.3d at 688 (quoting Robert P. Mosteller, et al., 1 McCormick on Evidence § 34 (7th ed.))

Trial counsel did not attempt to invoke Rule 806 to impeach the statements Lashika recounted with Efrain Johnson's own inconsistent statements. Although the defense theory at trial was that neither Mr. Aquart nor John Taylor were involved in the homicides, Efrain's statements implicating Mr. Aquart were coming in through Lashika Johnson. It was imperative to impeach Efrain's credibility.

Mr. Aquart was prejudiced by trial counsel's failure to impeach Efrain Johnson's inconsistent statements. The government's case heavily relied on the testimony of alleged co-conspirators who could provide eyewitness accounts of the crime. Had Efrain been impeached with his inconsistent statements, it would have

raised questions about the reliability and truthfulness of both his and John Taylor's accounts. On their own, the limited statements Efrain allegedly made to Lashika corroborated Taylor's testimony and provided an additional assertion that Mr. Aquart was involved. But Efrain's statements to the government directly contradict Taylor's account. According to Efrain, Taylor took on a greater role than he let on: he assaulted the victims and took control of the duct taping. The inconsistencies in Efrain's statements create uncertainties about the government's case against Mr. Aquart, and a reasonable probability exists that the outcome of trial would have been different had counsel revealed them.

### D. Trial counsel failed to use readily available evidence to impeach Rodney Womble's testimony and to demonstrate the likelihood Womble—not Mr. Aquart—engaged in criminal activity leading to the victims' deaths.

Rodney Womble was an important government witness, both because he claimed to be Mr. Aquart's "lieutenant" in charge of 215 Charles Street, TT at 1430, and because he offered evidence supporting the alleged motive for the crime: that Mr. Aquart sought to eliminate Tina Johnson's competition, TT at 1488, 1492. Trial counsel sought to demonstrate that Womble had a motive to lie, both to obtain favorable treatment in his own criminal case, in which he was facing a life sentence, and to cover up his involvement—and the involvement of his friends and relatives—in the murders. But they failed to use readily available evidence to do so, substantively prejudicing Mr. Aquart's case, and making it look like the government was correct that the defense was mere "conjecture and speculation." TT at 4240.

### 1. Trial counsel failed to marshal evidence demonstrating the lengths to which Womble would go to free himself.

Trial counsel cross-examined Womble about his sentencing exposure and desire to avoid prison, TT at 1522-25, 1531-1533, 1535-39. But Womble wasn't totally forthcoming. He denied, for example, having ever said that five years in prison would be too much:

> Q. Even 20 years is too much.
> A. Yeah.
> Q. Even ten.
> A. Yeah.
> Q. At the time you even felt that five was the most you could do.
> A. No, I wouldn't say that.

TT at 1533. In fact, trial counsel knew that Womble said exactly that in a recorded telephone call from jail with his girlfriend, Sherrell Randolph. Ex. IV-K (Womble Calls), 9/16/2005, 19:51:22 at 7:00. According to the calls, prosecutors promised Womble he would face no more than 3-5 years' incarceration. Ex. IV-K (Womble Calls), Sept. 22, 2005, 20:52:20. *See also id.* ("[redacted]"). Womble swore to Randolph that he would not cooperate with investigators unless he knew what benefit he would receive. *Id.*, Sept. 19, 2005, 19:47:55 at 5:40 ("[redacted]."). Trial counsel told the Court that they intended to impeach Womble with recorded calls. TT at 1520-21, 1534. Inexplicably, however, they never did so.[49]

---

[49] The failure to use the recordings of Womble's jail calls was a problem throughout his cross-examination. Some examples are illustrated in this section.

Trial counsel also failed to impeach Womble with a letter he wrote to Randolph about his willingness to do everything possible to get out of jail to be with her. *See* Ex. IV-L (Womble Letter to Randolph). He wrote:

- "[redacted] Ex. IV-L (Letter) at DG03227.
- "[redacted] Ex. IV-L (Letter) at DG03229
- "[redacted] *Id.*

Trial counsel's notes indicate he planned to cross-examine Womble about these letters. Ex. IV-M (Womble Cross-Examination Notes).[50] No strategic reason appears in the record for the failure to do so.

**2. Trial counsel failed to cross-examine Womble about his joint development with Randolph of an alibi for the night of the murders.**

Womble understood immediately that the government "really wanted" Mr. Aquart. TT at 1530. Because of this, he testified that he had distanced himself from Mr. Aquart in the weeks prior to the murders. TT at 1479-82. Trial counsel cross-examined Womble about how that story evolved in the course of his cooperation with the government, with Womble first saying he ended the relationship because he was messing up his drug packages and later saying it was because he lost a gun. TT at 1575-78.[51] Even as he was meeting with the government, however, and

[50] Trial counsel could also have sought to admit the calls under Federal Rule of Evidence 608, 804, or 806.

[51] *Compare* Ex. IV-O (Womble 302, 9/8/2005 at 2, 4) and Ex. IV-N (Womble 302, 9/20/2005 at 10-11). Randolph stated the real reason for the fallout was money, not

discussing this purported "distancing," the recorded jail calls show that Womble and Randolph were discussing his alibi for the night of the murders: how, "[redacted]" Womble was waiting for Troop[52] all night and until 3:00 in the morning. Ex. IV-K (Womble Calls), Sept. 20, 2005, 19:51:40 at 5:38, 5:54. Trial counsel did not cross-examine Womble about—or otherwise demonstrate—this. Nor did trial counsel point out that the government had not yet asked Womble for an alibi when he and Randolph were concocting one. *See* Exs. IV-N, IV-O (Sept. 2005 Womble 302s).[53]

### 3. Trial counsel failed to present evidence of the extent of Womble's own motive to kill Tina Johnson.

Womble admitted at trial that he had argued with Tina Johnson about selling drugs in the building. According to Womble, Mr. Aquart was aware of this argument between the two. TT at 1488. There was a second argument, however, during which Womble cursed at Ms. Johnson and threatened her with a table leg, in front of multiple witnesses. TT at 1489-91, 1600-03. Ms. Johnson responded by threatening to shut down the building to all drug dealing: "Ain't nobody selling, if I can't sell." TT at 1491.

This threat must have concerned Womble, for whom this was just the most recent in a string of mistakes—from messing up Aquart's money, to losing his gun,

---

the gun. Ex. IV-P (Randolph Feb. 11, 2010, 302) [redacted]).

[52] Womble claimed Troop was one of the dealers from whom he purchased drugs.

[53] The alibi Randolph presented at trial—that she and Womble were together all night, "trying to get high," TT at 1891-94—conflicts with the FBI interview of James Rucker, who died before he could testify. According to Rucker, [redacted] Ex. IV-Q, Rucker Sept. 26, 2005, 302.

to becoming a drug user himself, TT at 1577-78. Left unprobed by trial counsel: Womble was at 215 Charles Street the day he threatened Ms. Johnson with members of the Terrace Crew, who were not part of Mr. Aquart's operation, helping them deliver heroin to a third-floor apartment, from which it would be sold. *See* Ex. IV-N, Womble Sept. 20, 2005, 302 at 15. One of those Terrace Crew members explained to Womble that [redacted] *Id.* at 16.

Trial counsel elicited that the police might come for an argument like that. TT at 1603. But they did not explain how the argument likely created issues for Womble not just with Mr. Aquart,[54] but with the Terrace Crew, who also would look unkindly on police attention, creating a motive—even beyond his own financial predicament—for Womble (or the Terrace Crew) to retaliate against Tina Johnson. Even if Womble had been unwilling to admit as much, trial counsel could have cross-examined other witnesses to establish the necessary facts, like Hodges, who threw Womble the table leg. Alternatively, trial counsel could have called the agents present during Womble's proffer sessions. *See* Ex. IV-N (Womble Sept. 20, 2005, 302) at 16 (identifying the Terrace Crew member by booking photo number and date of birth).

Trial counsel further failed to impeach Womble with his relationship with Efrain Johnson, whom Randolph told investigators was practically family to the

---

[54] According to Womble's 302, "[redacted] *See* Ex. IV-O (Womble Sept. 8, 2005, 302) at 3.

couple and who left his DNA in duct tape at the crime scene—one of the few defensible DNA results in the case.

**4. Trial counsel failed to Impeach Womble with his Calls to Kendall Willis on the night of the murders, with his recorded jail calls referencing his phone records, or with his post-arrest communication with Willis.**

The government emphasized Mr. Aquart's phone records on the night the victims were killed. *See, e.g.*, TT at 4248-49. Agents also obtained Womble's phone records and questioned him about them. Womble first lied, denying using his phone after noon on the day of the murders. Ex. IV-N (Womble Sept. 20, 2005, 302) at 11. There was no reason for Womble to make this false denial unless there was something to hide in his phone records. That turned out to be Womble's calls to his nephew, Kendall Willis. Womble later admitted calling his nephew, Kendall Willis, multiple times on the night of the murders. *Id.*[55] But not before trying to blame *Randolph's children* for any calls that might appear in his phone records. *Id.* And then pivoting to explaining the calls as "[redacted]" *Id.*

Womble's recorded jail calls undermine his efforts to explain away the Willis calls. As discussed above, they show that the drug use story was a recently constructed alibi.[56] In fact, the recorded jail calls show Willis was—on the night of

[55] In addition to Willis, Womble's phone showed calls to Eugene LNU, AKA "Troop." Ex. IV-N (Womble Sept. 20, 2005, 302) at 11.

[56] *See* Ex. IV-K (Womble Calls), Sept. 20, 2005, 19:51:40 at 5:47, 5:54 ("[redacted]").

the murders and still—a primary concern for Womble: that he was in regular communication with Willis, who remained on the street.

Among Womble's earliest and most persistent interests in those recorded calls is Willis. Womble advises his mother that Willis should [redacted] because [redacted] and [redacted] Ex. IV-K (Womble Calls), Sept. 13, 2005, 12:59:37 at 9:35. Willis passes the message back through Randolph that Womble should, [redacted] *Id.*, Sept. 28, 2005, 20:19:21, at 6:47. At least once, Randolph three-ways Willis in, so Womble can tell Willis directly, [redacted] *Id.*, Sept. 30, 2005, 19:55:32 at 5:58. Womble also tells his mother to warn Willis to [redacted] because agents plan to talk with all the people Womble spoke with during the last month before his arrest. *Id.*, Mar. 18, 2006, 13:52:14 at 8:24. In addition, it is obvious from the calls that Womble anticipates financial support from Willis during his incarceration. *See, e.g., id.*, Sept. 30, 2005, 19:55:32 at 3:14 (Willis will get Womble out if granted bond); Oct. 14, 2005, 19:07:46 at 13:30 (Womble: [redacted] Willis: [redacted]); Oct. 15, 2005, 21:09:35 at 1:34 ([redacted]).[57]

### 5. Trial counsel failed to impeach Womble about his statements to other pretrial detainees about who was actually responsible for the murders or to call a witness on this subject.

Womble told the FBI that he had been talking with other pretrial detainees about his pending charges. Ex. IV-N (Womble Sept. 20, 2005, 302) at 16. He said

---

[57] See also Oct. 1, 2005, 22:17:57 at 5:36; Oct. 15, 2005, 13:22:43 at 9:50; Oct. 17, 2005, 21:56:03 at 2:44; Dec. 25, 2005, 09:37:17 at 2:05; Feb. 4, 2006, 18:58 at 00:38.

these detainees were Marlon Spaulding and Kinsely Dufus. *Id.* On information and belief, the FBI were—at the same time—discussing Womble with Marlon Spaulding, who was arrested on or about August 19, 2005, *see United States v. Spaulding*, No. 3:05-cr-00239-SRU-1 (D. Conn.), although no interview report for Spaulding was prepared until November 2005, *see* Ex. IV-S (Spaulding Nov. 17, 2005 302). According to Spaulding, he spoke with Womble every day. *Id.* He prepared detailed notes of these conversations, which he provided to the FBI. Ex. IV-R (Spaulding Notes).

Womble told his mother about this during a recorded jail call. He said the FBI said that someone "[redacted]" and "[redacted]." *See* Womble Calls, Sept. 12, 2005, 13:37:03 at 4:25. On information and belief, that paperwork was Spaulding's notes. Those notes, and the FBI's report recounting Spaulding's interview, state that "[redacted]" Ex. IV-S (Spaulding 302) at 2. A "shooter" is "[a] designated person whom you can rely on to rob or kill somebody; an individual who often carries firearms and is down to catch a body at any given time." *See* "Shooter," *Urban Dictionary,* https://www.urbandictionary.com/define.php?term=Shooter. Spaulding said "[redacted]" *Id.*

Although Womble did not tell Spaulding the name of the shooter, the government knew that Mr. Aquart was incarcerated at the time and Kendall Willis was not. The government also knew or learned—as discussed above—that Womble

had been sending messages to Willis to lay low, stay below the radar, and keep his mouth shut. Womble did tell Spaulding that the shooter had a friend in the jail named "P-nut." Later, P-nut told Spaulding that the shooter asked him to tell Womble to keep his mouth shut because the shooter was family. The government knew or learned that Womble and Willis were related.

Trial counsel failed to cross-examine Womble about his confessions to Spaulding. Trial counsel also failed to call an FBI agent or Spaulding as a witness. Whether presented through cross examination of Womble, the recording, or another witness, this evidence would have both undermined Womble's testimony and tended to suggest Mr. Aquart's innocence.

**6. Trial counsel failed to impeach Womble or Randolph with their statements doubting Mr. Aquart's participation in the murders.**

The government's evidence showed Mr. Aquart may have occasionally enforced the rules of his drug operation by assaultive conduct. In contrast to other drug cases brought in the District of Connecticut during this period, however, *see, e.g., United States v. Luke Jones*, No. 3:00-cr-264-VAB (D. Conn.), Mr. Aquart's operation was not known for acts of murder and similar extreme violence. Despite this, the government—with Womble's assistance, attempted to portray Mr. Aquart as a cold-blooded criminal. TT at 1468-77. Womble knew, though, that murder would be out of character for Mr. Aquart. He and Randolph discussed this on a recorded jail call:

Womble: [redacted].

Randolph: [redacted]

Womble: [redacted]

Ex. IV-K, Womble Calls, Sept. 26, 2005, 22:19:37 at 6:34 (emphasis added). Despite this, Womble freely implicated Mr. Aquart in the killings, in exchange for a lesser sentence.

The call between Randolph and Womble was consistent with trial counsel's defense theory and effectively undercut Womble's testimony for the government. No strategic reason appears in the record for counsel's failure to use it to impeach Womble's (and/or Randolph's) testimony. Indeed, as noted, trial counsel forecast the intention to use the recordings in cross-examining Womble, TT at 1520-21, 1534, but never did. This was deficient performance, and it prejudiced Mr. Aquart, because it left the jury with the impression Mr. Aquart's alleged lieutenant believed he committed the murders.

These additional attacks on Womble's credibility and the government's theory, individually and cumulatively, would have measurably improved the defense case. The failure to make them was deficient performance and prejudiced Mr. Aquart.

### E. Mr. Aquart was prejudiced by trial counsel's failure to adequately impeach John Taylor, Lashika Johnson, Efrain Johnson, and Rodney Womble.

The prosecution built their case against Mr. Aquart around the statements of two of the alleged participants in the crime: John Taylor and Efrain Johnson (through Lashika Johnson), and Mr. Aquart's supposed right-hand-man at 215

Charles Street, Rodney Womble. Taylor and Johnson did not give incriminating statements until years after the crimes. And their testimony was both internally inconsistent and inconsistent with other significant aspects of the evidence. Although Womble's statements came earlier, they raise key questions never pursued by the government about whether people other than Mr. Aquart – including Womble himself – may have committed this crime.

The government alleged Mr. Aquart oversaw the drug operation at Charles Street, and was known to have physically disciplined employees before, but with non-severe injuries. But assigning him blame for this crime didn't make sense—why would Mr. Aquart put himself out of business to retaliate against Tina Johnson's short-term, negligible sales? It took years for investigators to develop the evidence they thought they needed to arrest Mr. Aquart for the murders. More than four years after the crime, on January 15, 2010, John Taylor finally signed his proffer agreement and provided the eyewitness allegations the government thought it needed to secure a homicide conviction against Mr. Aquart. Around that same time—on January 20, 2010— Lashika gave her first detailed account of what Efrain allegedly told her. She made this statement nearly three years after first meeting with investigators—and after providing at least five different prior statements. It was at this last significant proffer session, years after the crime but days after Taylor's proffer, that Lashika allegedly added the specific details that happened to line up with John Taylor. The alignment of these two key witnesses so long after these tragic homicides raises red flags about the government's investigation.

Trial counsel knew this even if they hadn't conducted the investigation to prove it, arguing in closing that "The police developed a suspect and then they developed the evidence." TT at 4268. But their failure to adequately investigate the witnesses against Mr. Aquart, impeach them with inconsistencies, and marshal all the evidence to cast doubt on their accounts, constituted deficient performance, prejudiced Mr. Aquart, and requires relief.

### V. Trial counsel were ineffective for failing to investigate and litigate the government's *Massiah* violation with respect to Shamarr Myers.

Trial counsel failed to investigate and litigate the government's use of a jailhouse informant, Shamarr Myers, in violation of the Sixth Amendment to the United States Constitution. *See also* Claim XXIX. Myers testified at trial that, during their incarceration together at the Wyatt Detention Center, Mr. Aquart told him that the victims "had to go" and "had to die," TT at 3643, and also sought Myers's help in what the government alleged was a scheme to present false testimony, TT at 3652, 3658-59, GX506. Although Mr. Aquart was represented by counsel at all times he interacted with Myers, his trial lawyers failed to investigate whether Myers deliberately elicited these statements and what role the government played in that. Nor did trial counsel seek a hearing under *Massiah v. United States*, 377 U.S. 201 (1964), so the Court could determine the admissibility of Myers's testimony. Had they done so, they would have discovered evidence tending to support a *Massiah* violation, which should have led to exclusion of Myers's testimony. Myers's testimony was foundational to the government's case and was emphasized in closing argument. Trial counsel's performance therefore was both

deficient and prejudicial, requiring a new trial. Claim XXIX, which details the factual basis of the *Massiah* violation, is incorporated herein by reference.

By their own admission, trial counsel learned well before trial of the written instructions Myers alleged Mr. Aquart provided him. *See* Doc. 803 at 1 (describing that evidence as "relatively old news."). They did not, however, investigate the provenance of Myers's allegation, nor file a motion to suppress. Although trial counsel filed a discovery motion regarding the eve-of-trial disclosure of the "had to go" and "had to die" statements (Doc. 803), they inexplicably withdrew that motion, again without reference to *Massiah*. Failure to lodge a *Massiah* objection—or even to request a continuance to complete an adequate investigation of the issue—was deficient performance. Counsel knew or could have discovered the following facts supporting a *Massiah* claim before or during Myers's testimony:

- Mr. Aquart was moved to Myers's unit in the Wyatt Detention Center in Spring 2010.
- Myers claimed to have received unsolicited outreach from the FBI in that same time period. (This information was new during trial. It was deficient performance to fail to object under *Massiah*, to fail to seek discovery and to investigate Myers's newest claim, and to fail to seek a continuance to complete that work. Among other things, counsel should have sought a forensic examination of the Wyatt Detention Center computer on which Myers claimed to receive the "pop-up" from the FBI. TT at 3645-46.)
- Myers met with the government during that same time period. TT at 3653-64.
- Myers claimed at least one meeting with the government occurred on a day that Scott Timmons was in court. Scott Timmons had public court proceedings in that same time period. *See United States v. Timmons*, No. 3:10-cr-00036-AVC-1 (D. Conn.).
- The government failed to document at least one meeting with Myers also during that same time period. *Compare* TT at 3653-3664 with Exs. V-A, V-B (Myers 302s). *See also* Doc. 803 at 1.

- Myers faced a severe sentence that could only be mitigated by cooperation with the government. *See United States v. Shamarr Myers*, No. 3:02-cr-24-AWT (D. Conn) Doc. 588 (Myers's plea agreement).
- Myers was developing evidence for the government, which had rejected at least some of his prior, proffered cooperation. Doc. 803 at 1.
- The government had reason to question Myers's reliability, since he had once been described as among Connecticut's "most wanted" for failure to appear in court and interfering with and resisting law enforcement. *See* Ex. V-C, 2001 News, CT Most Wanted.
- Myers had a motive to testify falsely against Mr. Aquart due to his relationships with other government witnesses, including his friend and co-defendant, Anthony Armistead,[58] whom Mr. Aquart had been accused of assaulting.[59]
- Myers had an incentive to deny or minimize to other detainees his cooperation with the government.

"[M]ost lawyers would spot the Massiah issue in this case." *See Fischer v. Smith*, 780 F.3d 556, 561 (2d Cir. 2015).[60] These facts revealed a relationship between the government and Myers designed to elicit incriminating information from Mr. Aquart. *Compare United States v. Cruz*, 785 F.2d 399, 408 (2d Cir. 1986) ("There is no indication that the agents and Assistant United States Attorneys who elicited Tuli's cooperation and information were playing any part in the

---

[58] See *United States v. White*, No. 3:09–cr–00024–SRU (D. Conn.) (charging Myers); *United States v. Sanchez*, No. 3:09–cr–00023–JCH (D. Conn.) (charging Armstead).

[59] The assault, which was offered in support of one of the non-statutory aggravating factors, was known to trial counsel.

[60] In *Smith*, the Second Circuit affirmed the determination of a *Massiah* claim based on the "double measure of deference" afforded to state courts under the Antiterrorism and Effective Death Penalty Act of 1996, noting "[e]ven if we thought counsel's choice was not reasonable, we cannot say that it was unreasonable for the State Court to take the contrary view." *Id*. at 561-62.

investigation of Cruz."). Trial counsel's failure to investigate and raise the *Massiah* issue was unreasonable and constituted deficient performance.

Trial counsel's deficient performance prejudiced Mr. Aquart. Myers's testimony was highly incriminating and provided a bridge between forensic evidence that trial counsel argued merely placed Mr. Aquart in the victims' apartment at some time in the past—or in contact with some items in their apartment—and cooperating co-defendant testimony that trial counsel argued should be suspect because it sought to shift blame from responsible parties to Mr. Aquart. The government argued Myers's testimony demonstrated not just Mr. Aquart's consciousness of guilt, but his controlling, calculating, and deceptive nature. *See* Claim XXIX. There is a reasonable probability that, if Myers's testimony had been suppressed or stricken, the jury would have evaluated the evidence differently. *See Strickland*, 466 U.S. at 694.

Should the Court determine the record is inadequate to determine whether a *Massiah* motion would have been granted, it may—and should—order an evidentiary hearing on that issue. *See Kimmelman*, 477 U.S. at 390-91 (affirming remand for determination of prejudice on Fourth Amendment claim); *United States v. Matos*, 905 F.2d 30, 34 (2d Cir. 1990) (remanding for evidentiary hearing on failure to investigate suppression motion).

## VI. Trial counsel were ineffective in failing to exclude Lashika Johnson's testimony about Efrain Johnson's alleged admissions in violation of the Sixth Amendment.

At Mr. Aquart's trial, some of the most incriminating statements against him were made by Efrain Johnson, the brother of Lashika Johnson. According to Efrain,

he was a participant to the crime, where "he helped tie the [victims] up and rough them up a little bit, but … when he left those people were still alive." TT at 2908. He said he left Aquart alone in the apartment, and that "everything that they had or used was disposed of before they came to me," meaning "bats and gloves and maybe masks." *Id.* at 2909.

Here, then, was an eyewitness and accomplice testifying directly to Mr. Aquart's involvement in the crime with specific details. Except—those statements weren't actually made at trial by Efrain himself. Instead, that devastating testimony was made by Lashika during her direct examination, where she relayed Efrain's hearsay statements to the jury.

While defense counsel attempted to keep the statements out under the theory that Efrain's statements were not self-incriminating and therefore did not satisfy the provisions of Federal Rule of Evidence 804(b)(3)(A), this was never going to succeed, as the statements clearly "tended to subject the declarant to civil or criminal liability." *Id.* (2010 version). Instead, counsel should have moved to exclude the hearsay on the grounds that there were no "corroborating circumstances clearly indicat[ing] the trustworthiness of the statement." This they unreasonably failed to do, rendering their performance constitutionally deficient. Without these statements, there is a reasonable probability that at least one juror would have voted to acquit.

### A. Deficient performance – trial counsel sought to exclude Efrain Johnson's alleged statements to his sister but unreasonably failed to move to bar those statements under all applicable grounds.

#### 1. Trial counsel only moved to exclude Efrain Johnson's statements as non-self-incriminating.

Prior to trial, the government realized it had a problem. As it had indicted Efrain Johnson as a coconspirator to Mr. Aquart, it could hardly expect him to waive his Fifth Amendment privilege against self-incrimination to testify about his involvement in the murders. This was especially true given that Efrain, unlike the vast majority of the others preparing to testify, had not been given a cooperation agreement and was facing a trial of his own, scheduled to start after Mr. Aquart's.

Fortunately, the government had a convenient loophole. If it couldn't have Efrain testify, it would settle for the next best thing: his sister, Lashika. During Lashika's proffer sessions—she had, unlike her brother, had been given a cooperation agreement—she related to government attorneys Efrain's statements to her in which he described taking part in the murders at 215 Charles Street along with Mr. Aquart. *See* Ex. VI-A (Lashika Johnson, FBI 302, Oct. 22, 2008); Ex. IV-J (Lashika Johnson, FBI 302, January 20, 2010).

But Lashika testifying to what Efrain told her would clearly be hearsay. To get around that bar, the government moved to have the statements admitted pursuant to Federal Rule of Evidence 804. Doc. 669 at 32-41. That rule provides for exceptions to the bar on hearsay when the declarant is unavailable. Once unavailability is established, Fed. R. Evid. 804(b)(3) allows hearsay in the form of a "statement which . . . so far tended to subject the declarant to civil or criminal

liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." *Id.* But importantly the rule also builds in an additional safety requirement for criminal cases: "A statement tending to expose the declarant to criminal liability … is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.*[61]

As the government noted in its motion, the Second Circuit established a three-part test for determining the admissibility of statements pursuant to Rule 804(b)(3):

> (1) the declarant is unavailable as a witness; (2) the statement is sufficiently contrary to the defendant's pecuniary or penal interests that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) corroborating circumstances indicate that the statement is trustworthy.

Doc. 669 at 37 (quoting *Wexler*, 522 F.3d at 202). The government argued that all three prongs were met. *Id.* at 37-41. The first was the least complicated: a declarant is unavailable as a witness when he invokes his Fifth Amendment right against self-incrimination. *See, e.g., Sasso*, 59 F.3d at 349. But Efrain himself didn't invoke his Fifth Amendment privilege, thereby rendering himself unavailable. Instead, it was his lawyer who did so:

---

[61] While the text of the rule at the time specified that this clause only applied to statements "offered to exculpate the accused," courts in this Circuit had long held that "satisfaction of the third element has been required in cases where the statement was offered to inculpate the accused." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008); *see also United States v. Sasso*, 59 F.3d 341, 350 (2d Cir.1995). The rule was amended in 2011 to change this discrepancy. *See* Federal Rule of Evidence 804 Advisory Committee Notes (2011).

> THE COURT: All right, and that is true, Mr. Bussert, that Efrain Johnson, your client, would, on your advice, respond to any questions about the activities on August 24th with his invocation of his Fifth Amendment rights?
>
> MR. BUSSERT: Your Honor, I think that would be my advice and Attorney Hoose as well.

TT at 2906. Certainly, a witness's attorney may invoke on their behalf. *United States v. Williams*, 927 F.2d 95, 99 (2d Cir. 1991) ("Such a ruling can be made, as in the instant case, with or without the witness being haled into court.") And it is not necessary for the judge to inquire as to whether the witness will invoke his right for each individual question; a blanket invocation is sufficient. *Davis v. Velez*, 797 F.3d 192, 202-203 (2d Cir. 2015). However, Attorney Bussert's response doesn't make it explicit that he did, in fact, consult with Efrain and get his sign-off to invoke. Compare that with *United States v. Miller*, 954 F.3d 551 (2d Cir. 2020), where the court held that a witness's lawyer had properly invoked when his counsel stated to the district court that he had advised the witness to take the Fifth and that he had "indicated to [counsel] that he would heed that advice." *Id.* at 561; *see also United States v. Pelton*, 578 F.2d 701, 710 (8th Cir. 1978) ("Rich's proof that Waggoner was unavailable under Rule 804(a)(1) was that Waggoner's attorney had said that he was going to advise Waggoner not to testify. There was no indication that Waggoner had in fact been so advised or that, if she had been, she had decided to exercise her privilege."). To the extent that Mr. Aquart's lawyers didn't challenge the propriety of the invocation, this was ineffective assistance of counsel.

Trial counsel chose prong two—and only prong two—as its hill to die on. Doc. 744. They argued in a (two page) response motion that Efrain's statements were not

actually against his penal interest and therefore could not be admitted under Rule 804(b)(3). *Id.* Trial counsel's position was that each statement must be evaluated on its own in a vacuum, and that four of them didn't pass muster: (1) Efrain relating that he saw one of the victims being hit with a bat is not self-inculpatory because he is relaying what someone else did; (2) saying that he and Azikiwe left before Mr. Aquart is not self-inculpatory because "the fact that someone left later than [Efrain] did does not expose him to any criminal liability"; (3) Efrain stating that Mr. Aquart drilled the door shut and climbed out the window is not self-inculpatory "at all" and not based on personal observation; and (4) telling his sister that Mr. Aquart disposed of the bats after the homicide did not inculpate Efrain personally since he did not help with this cover up. *Id.* at 2.[62]

But this argument strained credulity and was almost immediately dismissed. As the government pointed out at the motions hearing, the statements have to be considered in context under existing case law,[63] so the only way Efrain observed someone hitting the victim with a bat is because he was also *inside the apartment taking part in the crime*. "It is clearly self-inculpatory. It places the declarant at the scene of the crime, and, in addition to that, he's conveying knowledge as to how the

---

[62] Note that even here there is a contradiction, in that in her 12/13/10 proffer statement she says [redacted] inconsistent with her earlier statement that [redacted]. *See* Ex. VI-B, Lashika Johnson, FBI 302, Dec. 13, 2010) (emphasis added); Ex. IV-J, Lashika Johnson, FBI 302, Jan. 20, 2010.

[63] The government cited to, *inter alia*, *Williamson v. United States*, 512 U.S. 594, 603 (1994) ("Moreover, whether a statement is self-inculpatory or not can only be determined by viewing it in context. Even statements that are on their face neutral may actually be against the declarant's interest.").

murders were committed that any other person would not necessarily have." Tr. 4/14/11 at 81. The judge was similarly unimpressed, and although she reserved ruling until that point in the trial when it became necessary and that the statements would be put in their proper context, she signaled her disinterest in the defense argument as "a little bit of a stretch, that might be an understatement, to say that Mr. Johnson's statements would not be for a reasonable person against penal interest, to be hooked in with these guys who brutally murder people in the apartment that they have broken into and taken baseball bats to." Tr. 4/14/11 at 95.

When the time for decision finally came during trial, nothing changed—the defense renewed their argument[64] and the judge ruled against them, finding Efrain's statements were self-inculpatory and therefore fell under Rule 804(b)(3) and could be admitted. TT at 2904-05. Lashika testified to what Efrain told her, and that was that.

**2. Trial counsel did not move to exclude Efrain Johnson's hearsay statements on the basis that they lacked reliability even though the government itself had determined that Efrain Johnson was untrustworthy.**

Clearly, defense counsel knew Efrain's statements would be—and ultimately were—devastating to any guilt-phase defense: Here was an alleged direct participant to the murders relating incriminating details whose credibility was unencumbered by the taint of a cooperation agreement with the government like

[64] At this point defense counsel belatedly raised the Confrontation Clause as another possible bar to admission, TT at 2829. But as Efrain's statements were clearly non-testimonial under *Crawford v. Washington*, 541 U.S. 36 (2004), the court quickly denied that objection. TT at 2904-05.

virtually all of the other witnesses. Simply put, there was no conceivable reason for trial counsel not to do everything they could to keep Efrain's statements out of court.

Yet the one thing defense counsel didn't try was also the one thing that would have worked—arguing that Efrain's statements did not satisfy prong three of the Second Circuit's 804(b)(3) test. Recall that in their written and oral motions, the defense maintained that Efrain's statements did not satisfy 804(b)(3) because they were not actually self-inculpatory—prong 2. But counsel inexplicably failed to make the argument that the statements did not satisfy prong three—that there were insufficient "corroborating circumstances indicat[ing] that the statement is trustworthy." *Wexler*, 522 F.3d at 202.

There were more than enough problems with Efrain's statements to make such a challenge. They were internally contradictory, contradictory of other witnesses like John Taylor, and contradictory of the forensic evidence. *See* Claim XVI.

Had the defense made such a motion to keep Efrain's statements out for lack of trustworthiness, it would have been granted. How can we know with such certainty? Simply put, because the government agreed. As prosecutors vigorously argued, "[Efrain's] statements were *completely unreliable*." TT at 5202 (emphasis added). Indeed, this is how the government evaluated Efrain's reliability as a witness: "[Efrain] was never offered a cooperation agreement because it was never determined that he was able to tell the truth. We could not corroborate the majority

of what he said. And, in fact, even at the end he couldn't tell the truth." TT at 5202. And further: "Johnson can't tell the truth… He wasn't going to be called as a witness, and that was decided over a year ago. It has nothing to do with trial strategy, it has to do that the government doesn't suborn perjury… The government wasn't going to put him on to say that because he couldn't tell the truth about himself and his own role." TT at 5452.

These extraordinary quotes come from oral argument at the penalty phase after the defense moved to introduce statements made by Efrain to the FBI that in their view were relevant to the mitigating factor regarding Mr. Aquart's relative culpability and to rebut the aggravating factor of heinous, cruel, or depraved conduct. *See* Doc. 906. In a complete 180 from its position about Efrain's reliability at guilt-phase—when it successfully sought introduction of his statements to his sister because they were self-incriminating and reliable—the government this time argued *against* the admissibility of Efrain's proffers under Fed. R. Evid. 804(b)(3). *See* Doc. 915. Incredibly, the government took the complete opposite position as it had at guilt phase, arguing that "there is *no theory* under which [Efrain's] statements can be characterized as trustworthy." *Id.* at 8 (emphasis added). The government attempted to square this circle in two ways, neither successful. Each is taken in turn.

*First*, it argued that the statements the government introduced via Lashika and the statements the defense wished to introduce were different in one critical

way: the former were made to his sister shortly after the crime,[65] while the latter were made to the police after he had been arrested. *Id.* at 8; TT at 5204. This, the argument went, meant the former were trustworthy and the latter were not. While on the surface this seems plausible, it fails to take into consideration the context in which each statement was given.

The timing is important here. Both Johnson siblings were giving multiple proffers in the same time period.[66] Both gave *multiple* inconsistent statements.[67] And despite Efrain being incarcerated, both were speaking to each other about the events in question, hardly a pristine undertaking.[68] Indeed, the supposed incriminating statements Efrain made to his sister didn't appear until her *fifth* proffer session—and even then, the more incriminating information came two years after *that* in yet another proffer—three years after the alleged private conversation, and after she was threatened by the government with arrest and the loss of her

---

[65] Although, in earlier statements says she only spoke with Efrain after his incarceration and changed the timeline to before his incarceration only after the prosecutor threatened her.

[66] Lashika on 3/7/07; 6/4/07; 9/18/08; 9/24/08; 10/14/08; 10/22/08; 1/20/10; 12/13/10. Efrain on 3/6/07; 3/7/07; 8/11/08; 10/2/08; 11/20/08; 2/10/08.

[67] Lashika admitted in her testimony that she lied during her proffers. TT at 2916, 2922-24.

[68] *See* Ex. IV-F,Lashika Johnson FBI 302, Sept. 24, 2008 at 2 [redacted]; Ex. VI-C,Efrain Johnson, FBI 302, Oct. 2, 2008, at 1 [redacted].

children if she didn't change her tune. Ex. IV-B, Lashika Johnson FBI 302, Oct. 14, 2008); Ex. IV-C, Tr. 2/21/12 at 2081-2083, *United States v. Efrain Johnson*, 6-CR-160, Doc. 1084; Ex. IV-D, Tr. 12/16/13 at 121-122, *Connecticut v. Efrain Johson*, No. FBT-CR11-0259461-T (state trial) (Lashika testified that at this same session, one of these prosecutors had "stood up" and "yell[ed]" at her, threatening to have Johnson placed "in shackles" and taken "to jail" immediately, and further threatening that her children would be "take[n] away" from her. She believed that the only way to avoid this was to "start saying different things."). This was not a statement that Lashika reported to the police immediately after it happened, nor immediately after Efrain was arrested, nor immediately after she was first questioned.

The fact that a statement is given to a trusted friend or family member is not in itself sufficient, like the government contended, *see* Doc. 915 at 9, to satisfy the third prong; external indicia of reliability still must exist. *United States v. Katsougrakis,* 715 F.2d 769, 775 (2d Cir. 1983); *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994); *United States v. Lieberman*, 637 F.2d 95, 104 (2d Cir. 1980). And here there is additional reason to doubt the reliability of the statement given to this trusted family member. The statement used by the government was relayed to the police *after* Lashika told her brother that he should "[redacted]

[redacted].'" Ex. IV-F, Lashika Johnson FBI 302, Sept. 24, 2008.[69]

The government's argument that Efrain's statements to his sister are trustworthy is premised on an entirely unsupported supposition and belied by the characterization of him by the same government prosecutors. The government argued they were reliable because "those were statements made in private to his sister versus to law enforcement under situations where *you'd expect* him to tell the truth." TT at 5204 (emphasis added). But look at prosecutors' statements about him in court again—they aren't saying that Efrain lied; they are saying that Efrain *is a liar* and nothing he says can be trusted: "Johnson can't tell the truth…The government wasn't going to put him on to say that because he couldn't tell the truth about himself and his own role." TT at 5452. And note, too, that according to Lashika, Efrain also never said anything about the murders to the mothers of his children—exactly the scenario which the government would "expect" him to tell the truth. Ex. IV-F, Lashika Johnson FBI 302, Sept. 24, 2008.

*Second*, the government argued that Efrain's statements to police were not reliable compared to his statements to his sister because in the former he minimizes his behavior in an attempt to lessen his criminal exposure. Doc. 915 at 8; TT at 5208; TT at 5451. This argument fails to survive even the most basic scrutiny for the simple reason that Efrain Johnson minimizes his behavior in *all* of his

[69] And there are serious questions about whether Efrain's statements were actually made after this conversation. *See* Claim IV.

statements: *in sum and substance the statements to his sister and the statements to the government are the same*. They amount to him being present for the beginning of the assaults but leaving before any murders take place. Let's compare:

| | **Statements to Lashika** | | **Statements to the government** |
|---|---|---|---|
| 9/18/08 | [redacted] Ex. IV-E, Lashika Johnson, FBI 302, Sept. 18, 2008. | 3/6/07 | [redacted] Ex. IV-H, Efrain Johnson, FBI 302, Mar. 6, 2007. |
| 9/24/08 | [redacted] Ex. IV-F, Lashika Johnson, FBI 302, Sept. 24, 2008. | 3/7/07 | [redacted] |

| | | | |
|---|---|---|---|
| | | | [redacted] Ex. IV-G, Efrain Johnson, FBI 302, Mar. 7, 2007. |
| 10/14/08 | [redacted] Ex. IV-B, Lashika Johnson FBI 302, Oct. 14, 2008. | 8/11/08 | [redacted] |

| | | | |
|---|---|---|---|
| | | | [redacted] Ex.VI-D, Efrain Johnson, FBI 302, Aug. 11, 2008. |
| 10/22/08 | [redacted] Ex. VI-A, Lashika Johnson, FBI 302, Oct. 22, 2008. | 10/2/08 | [redacted] |

| | | | |
|---|---|---|---|
| | | | [redacted]. Ex. VI-C, Efrain Johnson, FBI 302, Oct. 2, 2008. |
| 1/20/10 | [redacted] Ex. IV-J, Lashika Johnson, FBI 302, Jan. 20, 2010. | 11/20/08 | [redacted] Ex. VI-E, Efrain Johnson, FBI 302, Nov. 20, 2008. |
| 12/13/10 | [redacted] | 2/8/10 | [redacted] |

| | | | |
|---|---|---|---|
| | [redacted] Ex. VI-B, Lashika Johnson, FBI 302, Dec. 13, 2010. | | [redacted] Ex. IV-I, Efrain Johnson, FBI 302, Feb. 8, 2010. |

The statements tell the same story. Perhaps the only example of Efrain “minimizing” his involvement is that to Lashika he mentions he hit one of the victims while he was tying her up. But that hardly rates as significant enough to discredit his entirely detailed other statements in which he allegedly *admits to taking part in breaking and entering, tying up a victim, and watching the victims be beaten with pipes.*

The government’s argument here was misleading. At oral argument the prosecutor based their rationale only on the last of Efrain’s statements and ignores his prior ones: “But so, the government thinks that these should not come in, period, because Johnson minimizes his behavior…he says he didn't ever see bats, he didn't ever see gloves, when clearly the jury accepted John Taylor's testimony.” TT at 5451; *and see* TT at 5206 (“Nothing about Johnson's statements could be corroborated except the fact the four of them were there. But even then Johnson claimed not to be able to recognize Taylor. Johnson claimed that he hadn't been there on the earlier run when they tried to get into the apartment. Johnson claimed to law enforcement not to have seen bats or masks though he told his sister years before he ever spoke to law enforcement that they had in fact had bats and

masks.").[70] But Efrain *did* claim to have seen the gloves in three of his first four statements; and while he didn't say anything about a bat, he did claim that "Big Man" had a large metal pipe. Again, hardly minimizing.

Without those two justifications, Efrain's statements fail to satisfy the third prong—reliability. That reliability concern is especially heightened

> when the government seeks to introduce a hearsay statement which is against the declarant's penal interest and which also inculpates the accused. Ordinarily, a statement against penal interest has clear guarantees of trustworthiness because, human nature being what it is, a person is unlikely to implicate himself criminally unless he was in fact involved in the criminal undertaking. *The veracity of the hearsay statement may be questioned, however, when the declarant also inculpates a third party.*

*Katsougrakis*, 715 F.2d at 774 (emphasis added). Not only did Efrain implicate Mr. Aquart, but he also identified him as the last one in the apartment. The veracity of both of his statements must be questioned.

In the end, the government's attempts at distinguishing between Efrain's alleged statements to his sister at guilt phase and his statements to the FBI at penalty phase were simply about the government wanting it both ways, to have the statements of an unavailable witness—whose unavailability the government itself caused—helpful to its case admitted, and the ones harmful, barred. There was no principled distinction. This is highlighted by the government's complaints about process, which ring particularly hollow because Mr. Aquart faced the same

[70] But again, this doesn't appear until the Jan. 20, 2010, proffer session.

constraints at guilt phase when the government used Efrain's statements against him without having him testify:

> We can't call Efrain Johnson to the stand and cross-examine him. We can't call his attorneys, who acknowledge that they knew he was lying. There is, like, really nothing we can do. It's unreliable testimony. It's almost impossible to sit there and prove that it's a lie, and for us to have to spend the hour, or whatever you give us, arguing to the jury, you know, that this is unreliable and you shouldn't believe it, it's misleading and confusing and it shouldn't be allowed to be presented to the jury, period.

TT at 5215.

Had Mr. Aquart's trial counsel moved to exclude Efrain's statements to his sister on the basis that they were unreliable, they would have succeeded. The government agreed that Efrain was a liar, and his words contained inadequate indicia of reliability to be admitted under Fed. R. Evid. 804(b)(3). Trial counsel sought to preclude the admission of these prejudicial statements and failing to challenge them for lacking sufficient indicia of reliability constituted deficient performance.

### B. Prejudice

Without Efrain Johnson's statements as relayed by Lashika, there is a reasonable probability that Mr. Aquart would not have been convicted. Without the statement of one of the participants, the jury is left with the incredibly flawed testimony of John Taylor.

## VII. Trial counsel were ineffective in failing to investigate and present evidence of third-party guilt.

Trial counsel were ineffective in failing to investigate and present evidence of third-party guilt. "[T]he Constitution guarantees criminal defendants a meaningful

opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Trial counsel emphasized that the government immediately zeroed in on Mr. Aquart as a suspect, to the exclusion of others. *See, e.g.*, TT at 52-53, 840, 1203, 1530, 1714-15, 2651-52, 4268-69. And they offered reasons to doubt his guilt, including that it made no sense for Mr. Aquart to have committed such a dramatic crime—which would surely draw police attention—when prosecutors alleged his motive was to protect an ongoing drug operation in the same building where the victims were killed. TT at 4269.

But trial counsel failed to give jurors any other theory of the offense, even though they had in their possession evidence "tending to prove that another person may have committed the crime with which [Mr. Aquart] was charged." *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006) (cleaned up). This evidence was neither "speculative [n]or remote" and clearly tended to prove a material fact at trial: whether Mr. Aquart was responsible for the victims' deaths. *See id.* (cleaned up).

The evidence included, but was not limited to, information suggesting that:

### A. Mr. Aquart's alleged drug operation had been the target of other robberies.

On information and belief, other locations where Mr. Aquart allegedly conducted drug activity were robbed in the period immediately before and/or after the incident at 215 Charles Street, Apartment 101, suggesting that the incident was part of a larger attack on Mr. Aquart's alleged operation and that he was not involved in the homicides.

### B. Rodney Womble, Sherrell Randolph, and others[71]—separately from Mr. Aquart's alleged drug operation—participated in other similar criminal activity, including robberies of other drug dealers, and such activity may have resulted in the murders.

As discussed above in Claim IV.D, Womble admitted that he was (1) using cocaine, (2) making mistakes with Mr. Aquart's money that required him to purchase drugs from other dealers, and (3) dealing heroin with members of the Terrace Crew—all separately from Mr. Aquart's drug operation. Each of these gave him, his girlfriend Sherrell Randolph, and others, reason to participate in activity, including assaults and robberies of other drug dealers, that may have resulted in the murders. Indeed, a jailhouse acquaintance said Womble talked to him about the murders and suggested that the shooter, i.e., the person who led the attack on the victims, was still on the street at a time when Mr. Aquart was incarcerated. *See* Ex. IV-S, Spaulding 302.

### C. Jose "Letho" Osorio, an associate of Womble, had committed similar home-invasion robberies of drug dealers.

Jose "Letho" Osorio, an associate of Womble, was killed while committing a home invasion robbery and assault with a baseball bat, Ex. VII-A ("Charges dismissed in fatal Bridgeport stabbing"), *while Mr. Aquart was in pretrial detention*. On information and belief, the victim of the home invasion robbery was a former

[71] The "others" included Kendall Willis, Richard Brooks, Peanut or P-nut, Tremont or T, Frank Hodges, Efrain Johnson, Hassan Rogers, and others, acting with or separately from Womble.

customer of the 215 Charles Street operation. The home invasion robbery took place only about a mile from 215 Charles Street. Ex. VII-B (map).

Womble and Osorio's association was known to trial counsel and the government from Womble's recorded jail calls, which referenced Osorio's nickname, "Letho," at least seven times. *See* Ex. IV-K, Womble Calls.[72] Osorio had also been a witness for the government in *United States v. Powell*, No. 3:99-cr-00264-AHN (D. Conn. 2005). On information and belief, Osorio was a family member of Hassan Rogers, a Terrace Crew member with whom Womble delivered heroin to 215 Charles Street.

### D. Other drug-related home invasions also took place in the area while Mr. Aquart was incarcerated.

Another home invasion robbery and assault, committed with a baseball bat, took place in nearby Milford, Connecticut, *while Mr. Aquart was in pretrial detention*. The victims were drug dealers who sourced their supply in Bridgeport, and drugs—up to a pound of marijuana—were among the items stolen in the robbery. *See* Ex. VII-C, Dec. 6, 2005 news article. The assailants restrained one of the victims with duct tape. *See* Ex. VII-D, Dec. 2, 2005 news article.

[72] The references are Sept. 19, 2005, 9:11;48 at 9:01; Sept. 20, 2005, 19:51:40 at 2:24; Oct. 1, 2025, 13:05:55 at 2:16; Oct. 3, 2005, 19:03:21 at 1:50; Oct. 10, 2005, 22:35:10 at 0:55; Oct. 11, 2005, 13:46:21 at 1:23; Oct. 18, 2005, 13:04:40 at 2:26.

### E. A turf war was underway between rival drug organizations over the Charles Street apartments, leading these or other persons to attack the victims.

During 2005, the City of Bridgeport was struggling with gang- and drug-related violence. On information and belief, 215 Charles Street was contested territory, which led to disputes over control of the building.

For example, on information and belief, Womble, Willis, and Rogers were members of the Terrace Crew, while Mr. Aquart grew up selling drugs for the Q&A Mob. Osorio and Rogers were witnesses against the Q&A Mob in federal trials prosecuted by the same Assistant United States Attorneys who prosecuted Mr. Aquart's case.

The failure to investigate and present any evidence of third party guilt—including, but not limited to Womble's confession to Marlon Spaulding suggesting Kendall Willis, not Mr. Aquart, was "the shooter," *see* Claim IV.D., and the relationship of the two other home invasion robberies to this case—prejudiced Mr. Aquart. Facing a gruesome crime scene and three dead people, jurors would have been reluctant to acquit Mr. Aquart, without knowing someone would be held accountable for what happened. But given the limited physical evidence connecting him to the crime scene, the credibility problems with the government's cooperating witnesses, and the unidentified DNA and latent impressions from the crime scene, evidence that a third party was responsible for the killings would have resonated with jurors. Especially since any physical evidence linking Mr. Aquart to the scene could have been explained by his relationship with Tina Johnson and/or an effort by the real perpetrators to pin the crime on him.

## VIII. Trial counsel provided ineffective assistance of counsel in failing to seek a continuance when the government provided voluminous and critical discovery, including witnesses' statements and phone records, on the eve of, and continuing through, trial.

The government belatedly disclosed critical evidence, including but not limited to witness statements and phone records, on the eve of trial, during jury selection, and during trial itself. The delay in disclosures, coupled with the approximately five-and-one-half-year delay in bringing the case to trial, and exacerbated by the late appointment of learned counsel almost two years after the murders, undermined Mr. Aquart's ability to investigate and prepare his defense. These belated disclosures continued throughout the trial, outpacing trial counsel's ability to investigate the new information and incorporate it into existing trial strategy and witness examinations. Trial counsel were ineffective in failing to request an appropriate scheduling order or continuance to permit them to review, investigate, and utilize the new information.

Their failure to seek a continuance when provided substantial late discovery prejudiced Mr. Aquart, because the discovery contained material evidence regarding witness credibility and multiple aspects of the defense, including (but not limited to):

Late disclosure of witness statements, and trial counsel's failure to request a continuance, affected trial counsel's ability to impeach government witnesses with their prior inconsistent statements and/or the statements of others. *See* Claim IV.

Late disclosure of the phone records prevented trial counsel from reviewing, analyzing, and using the records to investigate and impeach Sherrell Randolph's false testimony that she did not know Tina Johnson. *See* Claim XII.

Late disclosure of the phone records prevented trial counsel from reviewing, analyzing, and using the records to investigate and retain an expert to challenge the government's contention that, during the murders Azikiwe Aquart stole Tina Johnson's phone and later used it to call Mr. Aquart. *See* Claim X.

Late disclosure of witness statements, including from James Rucker, who died during the long pendency of the trial, prevented trial counsel from reviewing, analyzing, and using the statements to investigate and offer evidence that someone other than Azikiwe took the phone and made the call. *See* Claim X.

Late disclosure of phone records and witness statements, including from Nathaniel Grant and Juanita Hopkins, prevented trial counsel from reviewing, analyzing, and using the statements to investigate and challenge the government's motive narrative of a dispute between Mr. Aquart and Johnson. *See* Claim XII.

Late disclosure of witness statements, including recordings of jail calls between Sherrell Randolph and Rodney Womble, in which they discussed Jose Osorio, prevented trial counsel from reviewing, analyzing, and using the statements to investigate and offer evidence that persons other than Azibo Aquart were responsible for the homicides. *See* Claims IV.D, VII.

Had trial counsel sought a continuance, a different outcome would have resulted at trial or on direct appeal.

## IX. Trial counsel were ineffective in failing io investigate and present phone-record evidence.

Trial counsel provided ineffective assistance of counsel in failing to investigate and present phone-record evidence. Trial counsel failed to obtain phone records of relevant witnesses, including but not limited to Azibo and Azikiwe Aquart, Efrain Johnson, John Taylor, Tina Johnson, Jackie Bryant, Frank Hodges, Juanita Hopkins, Lashika Johnson, Sherrell Randolph, Juanita Hopkins, Shante Pettway, Randi Washington, and Rodney Womble. Trial counsel failed to obtain cell-tower records concerning the phones associated with these persons. Trial counsel failed to undertake an investigation to locate and document both cell and home phone numbers associated with those persons. Trial counsel failed to retain an expert to help evaluate and analyze the phone records.

Failure to investigate the phone records prejudiced Mr. Aquart because a competent investigation would have disclosed evidence that could have been used to impeach and undermine the government's case, including but not limited to Sherrell Randolph's testimony that she did not know Tina Johnson, the government's theory of competition and disputes between Johnson and Mr. Aquart as a motive for the crimes, and the government's claim that Azikiwe used Johnson's phone to call Azibo the morning after the murders.

## X. Trial counsel were ineffective in failing to investigate and present evidence to challenge the government's claim that Mr. Aquart's brother Azikiwe stole Tina Johnson's phone during the homicides and later used the phone to call him.

Trial counsel failed to conduct a reasonable pretrial investigation into, and to present evidence to challenge, the government's attempt to inculpate Mr. Aquart

through a phone record that showed that Tina Johnson's phone was used hours after the murders to call a phone the government tried to link to Mr. Aquart. There was no objective reason not to investigate and challenge this evidence. Trial counsel's performance fell below an objective standard of reasonableness and their failures prejudiced Mr. Aquart. *Strickland*, 466 U.S. 687.

Tina Johnson's phone was not recovered from her apartment. John Taylor testified that he observed Mr. Aquart's brother, Azikiwe, pick up Ms. Johnson's phone as he left the apartment following the homicides.[73] TT at 2326-27. Phone records for her phone, (203)543-4209, showed that at 7:25 a.m. on August 24, 2005, hours after the homicides, a call was placed---using *67, the Block Caller ID function—from that phone to (203)243-7132. TT at 3870-71; Ex. XII-B, Tina Johnson Phone Records.

The government had no direct evidence that the 243 number belonged to Mr. Aquart. Instead, they attempted to link the phone to Mr. Aquart through two witnesses: (1) Lashika Johnson testified that the morning after the homicides, she overheard Mr. Aquart answer his phone and say words to the effect "why would you be calling me from this cell phone, or something like that," TT at 2892-83; (2) Shante Pettway purported to identify the outgoing voicemail message retrieved from the 243 phone as Mr. Aquart's voice. TT at 2166-67, 2189-90, 3824-27.

An effective investigation and presentation of evidence would have revealed, among other things:

---

[73] Claims challenging Taylor's testimony are detailed above, *see* Claim IV, *ante*.

(1) The process by which Pettway identified Mr. Aquart's voice on the 543 outgoing message did not "follow common protocol as practiced by those in the forensic speech science community." Ex. X-A at 5, Declaration of Dr. Erica Gold. Detective Donaldson testified that he played the recording for Pettway, more than once, and that she was able to identify the speaker. TT at 3824-25. No other samples were played for her. As set out in the attached declaration of Erica Gold, Ph.D., under accepted earwitness identification science, now and at the time of Mr. Aquart's trial, a proper earwitness identification would have included a voice parade procedure, including playing 9 voice samples (the suspect's and 8 other carefully selected voices), to ensure a reliable identification. Ex. X-A at 3. Under the accepted best practices, use of a voice parade would have been especially important in this case, where related family members and friends within the same social network may have been involved. *Id.* at 5. Trial counsel performed deficiently in failing to retain a voice-identification expert, like Dr. Gold, to support a pretrial challenge to the admission of Pettway's identification and to impeach that identification were it admitted. Trial counsel recognized the importance of retaining an expert and took steps to do so, but too close in time to the trial. As a result, trial counsel were unable to complete and present the expert evaluation.

(2) The calls made to and from the 243 phone show contacts and call patterns consistent with ownership, possession, and use by Mr. Aquart's brother, Azikiwe, and inconsistent with ownership, possession, and use by Mr. Aquart. Azikiwe would not have used Ms. Johnson's phone to call himself, undercutting the

government's narrative about the phone call. Trial counsel performed deficiently in not investigating, analyzing, and presenting the calls and contact patterns to challenge the government's attempt to link the phone to Mr. Aquart.

(3) The use of the code *67 before dialing the 243 phone would have blocked the caller-identification function, so that the caller's name and number would not have been displayed on the 243 phone receiving the call. A blocked caller-id impeaches Johnson's testimony that she overheard Mr. Aquart say words to the effect "why are you calling me on this phone." In addition, analysis of the phone records disclosed by the government reveals that Frank Hodges frequently employed the *67 function, suggesting, with other evidence, that he may have placed the call at issue from the 543 number. Trial counsel performed deficiently in failing to investigate and present this evidence.

(4) Mr. Aquart did not own, possess, or use the 243 number. A competent investigation would have uncovered records (insurance, bills, car registration, employment, rental or other records) that could have been used to establish Mr. Aquart's actual phone number and undermine the government's efforts to link Mr. Aquart to the 243 number.

(5) Witness statements disclosed to trial counsel indicated that persons other the Aquarts, John Taylor, or Efrain Johnson entered the apartment between the time of the homicides and when law enforcement arrived on the scene, including but not limited to Frank Hodges, Eugene Stradford ("Boozine"), and the person or persons who were with Leroy Whittingham when he called 9-1-1. Trial counsel

performed deficiently in failing to investigate and present evidence that someone other than Azikiwe Aquart entered the apartment and stole and used Ms. Johnson's phone.

Mr. Aquart was prejudiced by trial counsel's failure to conduct an appropriate investigation, to retain an appropriate expert, and to present its results at trial. Information produced from an effective investigation would have undercut the government's inculpatory narrative that Azikiwe Aquart stole Mr. Johnson's phone and used it to call Mr. Aquart hours after the homicides.

## XI. Trial counsel were ineffective in failing to investigate and present evidence concerning the gloves and glove fragments found at the crime scene.

Trial counsel were ineffective in failing to investigate and present evidence about the gloves found at the crime scene and testimony about them. The gloves were central to the testimony of the government's star cooperating witness, Mr. Taylor, and to the crime scene evidence, and Mr. Aquart incorporates those claims, *see* Claims III, IV, by reference here.

An effective investigation would have revealed, among other things, that:

1. No evidence connected Mr. Aquart to any purchase of gloves from a Walgreens in Bridgeport or any community nearby, contrary to the testimony of Taylor. Trial counsel were ineffective in failing to seek surveillance video and sales receipts from area Walgreens stores and in failing to interview Walgreens' employees to demonstrate this.

2. Walgreens stores in the area did not carry gloves similar to those described by Taylor or found at the crime scene. Trial counsel were ineffective in failing to interview Walgreens' employees and in failing to obtain inventory records from Walgreens stores that could be compared to Taylor's description of the gloves and to gloves and

fragments of gloves recovered from the bedrooms in which the bodies were found.[74]

3. Expert photo comparison of the glove cuff that the government alleged Mr. Aquart's DNA could not be eliminated from—recovered from under a couch cushion in the living room—shows a distinct difference from the age and materials of gloves and remnants recovered on and around the victims' bodies and in the bedrooms.

4. The glove cuff that the government alleged contained Mr. Aquart's DNA could not be eliminated from—recovered from under a couch cushion in the living room—was significantly older than the gloves and remnants of drugs recovered on and around the victims' bodies and in the bedrooms.

Mr. Aquart was prejudiced by trial counsel's failure to conduct an appropriate investigation, to retain an appropriate expert, and to present its results at trial. Information produced from an effective investigation would have supported Mr. Aquart's defense that he was not present for the murders and that any evidence of his presence in the victims' apartment was incidental to the drug trafficking between their apartment and apartment 211.

## XII. Trial counsel's failure to challenge evidence of Mr. Aquart's purported motive was ineffective assistance of counsel.

The government's theory of the motive behind the murder of Tina Johnson and her two companions was simple: Mr. Aquart and Ms. Johnson had beef because she was selling drugs. In fact, Mr. Aquart and Ms. Johnson were friendly—so friendly that she was selling drugs for Mr. Aquart, so that the alleged motive for the murders was untrue. The key plank of the government's theory was a reputed

---

[74] Similarly, Walgreens stores did not carry the kind of duct tape recovered from the bedrooms in which the bodies were found. Trial counsel were ineffective in failing to interview employees, obtain surveillance video, sales receipts, and inventory records to impeach Taylor's testimony.

threat from Mr. Aquart to Ms. Johnson in the weeks before her murder: stop selling drugs, or else. But close examination of the statements underlying this story—something trial counsel failed to do—shows something else entirely.

Trial counsel were ineffective in failing to investigate and present evidence (either directly or through cross-examination) of this friendship and collaboration.

Mr. Aquart's reasonable doubt defense was harmed by this failure, prejudicing him.

### A. Witness testimony about a threat to Tina Johnson was easily impeached.

About four months before the murders, Ms. Randolph began dating Mr. Womble, who the government said was Mr. Aquart's lieutenant. TT at 1776. Ms. Randolph testified that Mr. Womble would deliver crack to the Charles Street apartments, where it would be sold to customers. Sometimes, when Mr. Womble was away, Ms. Randolph would help distribute the drugs in his stead. TT at 1785-97. This increased in frequency until she was sometimes delivering drugs twice a day, every day. TT at 1797.

One time, Ms. Randolph described being on the phone with Mr. Womble when she heard him banging on a door and yelling at "Tina" to open up, asking her "Do you think we playing with you?" TT at 1826-27. Mr. Womble then told Ms. Randolph that he had to call her back because he needed to call Mr. Aquart. *Id.* Ms. Randolph remembered this yelling, and the underlying threat, as taking place in the same month as the murders. TT at 1827. The government then highlighted it at closing. TT at 4247 ("And while the defendant's away, Womble tells him that he

confronted Tina, but she won't stop selling. The defendant tells Womble, 'I will take care of it.' The defendant tells Taylor, 'I have a problem to take care of when we return. I have to move some people out.'").

But there was a significant problem with Ms. Randolph's version of this story, which trial counsel never identified. During her testimony, Ms. Randolph denied ever meeting Ms. Johnson, or even knowing who Ms. Johnson was prior to the August 2005 phone incident. *Id.* at 1825. This was false—phone records collected by the government actually showed that Ms. Johnson and Ms. Randolph were in frequent contact. Indeed, there was not a *single day* in the month of August 2005 when Ms. Johnson and Ms. Randolph did not talk, and there were multiple days with as many as 20 different calls between the two. Ex. XII-A, Randolph phone records; Ex. XII-B, Tina Johnson phone records. Often, after contacting Ms. Johnson, Ms. Randolph would make a call to a number connected to Mr. Aquart. In other words, the phone records suggested, along with Womble and Randolph, Ms. Johnson was also working with Mr. Aquart.

Trial counsel similarly failed to cross-examine witness Ms. Hopkins about Mr. Aquart's relationship with Ms. Johnson. At trial, Ms. Hopkins testified that once Ms. Johnson started selling on her own, Mr. Aquart's drug sales slowed. TT at 2579. Ms. Hopkins said this caused Mr. Aquart to send Womble to hang around Tina Johnson's apartment more, scoping out the rival seller. TT at 2580. This went unaddressed during cross examination. But in a 2005 statement to Bridgeport Police, Ms. Hopkins told them that, in fact, Mr. Aquart got along "fine" with Ms.

Johnson and her roommates, and that to her knowledge they never argued. Ex. XII-C, Juanita Hopkins 8/15/05 Statement. Trial counsel never asked Ms. Hopkins why she changed her story, nor revealed for the jury her prior inconsistent statement.

This was collaboration, not competition. Trial counsel's failure to cross-examine Ms. Randolph with the concrete evidence presented by the phone records and highlight Ms. Hopkins's inconsistent statements left the government's motive evidence virtually unaddressed. Had jurors understood that Mr. Aquart had no reason to harm Ms. Johnson—and might even be working with her—jurors would have looked at the rest of the evidence in the case differently. For example, counsel's argument about why Mr. Aquart's DNA and fingerprints could have been in Apartment 101 would have seemed more credible.

### B. Trial counsel should have interviewed potential defense witnesses regarding the relationship between Tina Johnson and Mr. Aquart.

Trial counsel appear to have made little to no effort to interview the other people who lived in or worked out of 215 Charles Street. Had they done so, they would have found that Ms. Johnson was selling for Mr. Aquart.

Nathaniel Grant served as a lookout for Mr. Aquart's drug operation. Upon information and belief, during that time, he met Ms. Johnson who was selling drugs both *for* Mr. Aquart and on her own. According to Mr. Grant, there was no tension, nor any hint of competition, with Mr. Aquart about that.

Similarly, upon information and belief, other witnesses, including James Rucker, another one of Mr. Aquart's employees, and his son John, would have testified to that effect had trial counsel ever interviewed them. Mr. Rucker died

during the long pendency of the trial,[75] but his son John would have testified as to what his father told him and to his own observations of 215 Charles Street.

### C. Trial counsel failed to complete impeachment and show the Jury the import of Jacqueline Bryant's evolving testimony about threats to Tina Johnson.

At trial, Jacqueline Bryant testified that Mr. Aquart directly threatened her and Ms. Johnson about their drug selling, telling them, "they'd better stop, stop selling, he wasn't going to tell us anymore." TT at 1159-60. In a prior statement to police, however, she had not mentioned this. Ex. XII-E, Bryant Police Statement, Aug. 27, 2005. And when she testified before the grand jury, she swore under oath that it was Mr. Womble, not Mr. Aquart, who made the threats. Ex. XII-D, Grand Jury Testimony of Jacqueline Bryant, Nov. 2, 2005, at 27-27. Trial counsel attempted to impeach Ms. Bryant with these statements, which would have helped blunt the government's motive theory, but counsel could not complete the impeachment, TT at 1217, and never explained to the jury the import of Ms. Bryant's evolving story.

---

[75] The five and one-half year delay violated Mr. Aquart's Speedy Trial rights and the loss of this testimony is among the prejudice the unconstitutional delay caused Mr. Aquart. *See* Claim XXX (speedy trial remand points).

In the grand jury, the government pushed Ms. Bryant to say that Mr. Aquart had threatened Ms. Johnson, but she resisted that:

> Q. Did you ever hear Womble say that D will take care of it?
>
> A. That's what I'm talking about. He kept saying, She going to get hers, she going to get hers. Womble kept saying that. So, I stopped.
>
> Q. Did Womble ever talk about D to Tina?
>
> A. As far as I know, them was the only words.

Ex. XII-D at 29. Ms. Bryant continued that she thought something had happened between Mr. Aquart and Ms. Johnson, but she didn't know exactly what—"her and him had words or something"—only that Ms. Johnson subsequently put a peephole in her door. *Id.* at 29.[76]

The prior police statement and, to an even greater extent, the grand jury testimony directly undercut Ms. Bryant's allegations at trial that Mr. Aquart had directly threatened Ms. Johnson. Trial counsel, however, permitted Ms. Bryant to evade the impeachment. Rather than confronting her with her testimony, trial counsel asked, "in the Grand Jury you never said this," TT at 1216, and "you agree you didn't say that to the grand jury," TT at 1217, allowing her to say she didn't know and didn't remember, *id.* The rules of evidence permitted counsel to use the testimony in his questions. *See* Fed. R. Evid. 613. The line, "[a]s far as I know, them were the only words," would have been especially effective at conveying counsel's

[76] Ms. Bryant also told the grand jury about other hearsay and speculation. *Id.* at 30.

point that Ms. Bryant had only testified about direct threats by Mr. Womble, not Mr. Aquart.[77]

Counsel also failed to explain the import of this—and the other defense-favorable motive evidence—in closing argument. It was unrealistic and ineffective to expect the jury to put together the pieces of such a complex puzzle on its own.

These witnesses would have further undercut the government's motive narrative. Without it, Mr. Aquart would not have been convicted.

## XIII. The cumulative effect of counsel's ineffectiveness in Mr. Aquart's case warrants post-conviction relief.

Deficient performance under the Sixth Amendment is proved by showing "that counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688. A movant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id. Strickland* thus requires a court to assess the totality of counsel's acts and omissions when deciding whether the representation was deficient.

Similarly, *Strickland* requires that this Court consider the cumulative effect of counsel's deficient performance when determining prejudice. *Id*. at 695. *Strickland* repeatedly describes a single ineffective assistance of counsel claim as

[77] Bryant's claim that Mr. Aquart was part of the threats because he was on the phone with Womble is easily dismissed. Womble told investigators in two separate interviews that he was on the phone with Randolph.

consisting of multiple errors or omissions that result in prejudice. *See, e.g.*, S*trickland*, 466 U.S. at 693 ("Even if a defendant shows that particular errors of counsel were unreasonable…the defendant must show that they actually had an adverse effect on the defense.") (emphasis added); *id*. at 694 (holding that a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different") (emphasis added).

The Second Circuit has agreed that *Strickland* claims must be examined cumulatively, *see Lindstadt v. Kean*e, 239 F.3d 191, 204 (2nd Cir. 2001) ("We assess the impact of these [ineffectiveness] errors in the aggregate."), as have courts reviewing § 2255 cases. *See Johnson v. United States*, 860 F.Supp.2d 663, 756 (N.D. Iowa 2012) ("Strickland stands for the proposition that a multifaceted claim of ineffective assistance of counsel must be treated as a single claim.").

Each of the individual assertions of ineffective assistance of counsel in Mr. Aquart's § 2255 motion establishes *Strickland* prejudice. Cumulatively, they confirm that Mr. Aquart is entitled to postconviction relief.

**CLAIMS RELATED TO *BRADY v. MARYLAND***

According to the Supreme Court, "[t]here are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999). In the context of a *Brady* violation, prejudice means that the suppressed evidence was "material." *Id.* The

record in this case establishes that the government withheld material evidence and, thus, violated *Brady*.

Examples of the government's *Brady* violations include but are not limited to:

### XIV. The government failed to disclose that it provided substantial benefits, made threats, and provided other inducements to its witnesses for their testimony.

The government's case relied extensively on the testimony of cooperating witnesses, including John Taylor, Jackie Bryant, Frank Hodges, Juanita Hopkins, Venro Fleming, Lashika Johnson, Shamarr Myers, Nathaniel Grant, Sherrell Randolph, Judith Rivera, Shante Pettway, Randi Washington, Rodney Womble. All of these witnesses participated in the drug operations at 215 Charles and/or other crimes and many testified pursuant to cooperation agreements.

The government provided substantial benefits, made threats, or provided other inducements to testify that were not disclosed to the defense, including but not limited to: favorable treatment and recommendations, or threats of adverse consequences (including charges that carried the possibility of death or life sentences in this case) in charging and sentencing decisions and other criminal and related process; monetary payments; support with housing and other services; favorable custodial treatment, including placement and liberties not enjoyed by other prisoners (social contacts, access to tobacco, unmonitored cell phones, and other items or material otherwise deemed contraband). It also failed to disclose that it provided negative inducements, including threats, such as the threat of immediate arrest and loss of custody of children and loss of housing and other benefits.

Examples of the government's failures to disclose with respect to certain individual witnesses include, but are not limited to, the following. Each failure was prejudicial and material.

**A. John Taylor**

Mr. Taylor was the government's main witness. He was the only witness it called who claimed to offer an eyewitness account of the events inside the apartment. The government failed to disclose that it provided to Mr. Taylor favorable treatment and recommendations, and threatened adverse consequences for failure to cooperate, in charging and sentencing decisions (including threatening charges that carried the possibility of death or life sentences in this case) and other criminal and related process; monetary payments; support with housing and other services; favorable custodial treatment, including placement and liberties not enjoyed by other prisoners (social contacts, access to tobacco, unmonitored cell phones, and other items or material otherwise deemed contraband). Mr. Taylor acknowledged at trial that he testified pursuant to a cooperation agreement, but he claimed that, even so, "I don't think I'm never going home." He was ultimately sentenced to only nine years for his admitted participation in a triple homicide. The government failed to disclose information that trial counsel could have used to impeach his testimony that he believed he would serve a life sentence or to litigate relief for perjured testimony. The government also failed to disclose that it provided Mr. Taylor with direct monetary payments. *See also* Claim IV.

### B. Jackie Bryant

The government provided Ms. Bryant, who provided evidence in support of the government's motive theory, favorable treatment and recommendations, and threatened adverse consequences for failure to cooperate, in charging and sentencing decisions and other criminal and related process, including in this case and criminal cases pending before, during, and after Mr. Aquart's trial; monetary payments; support with housing and other services; favorable custodial treatment, including placement and liberties not enjoyed by other prisoners (social contacts, access to tobacco, unmonitored cell phones, and other items or material otherwise deemed contraband). The government failed to disclose information about the threats, benefits and assistance it provided to Bryant that trial counsel could have used to impeach her. *See also* Claim XXIV.

### C. Frank Hodges

Mr. Hodges testified about drug sales at 215 Charles Street and an alleged dry-run of the break-in in the days before the homicides. The government provided favorable treatment and recommendations, and threatened adverse consequences for failure to cooperate, in charging and sentencing decisions and other criminal and related process; monetary payments; support with housing and other services; favorable custodial treatment, including placement and liberties not enjoyed by other prisoners (social contacts, access to tobacco, unmonitored cell phones, and other items or material otherwise deemed contraband). Law enforcement asked Mr. Hodges to submit to a polygraph test, which he failed. At Mr. Hodges's sentencing, however, in aid of helping him obtain leniency, the government credited his

assistance and misrepresented the results of the polygraph. The government failed to disclose information about the threats, benefits, and assistance it provided to Hodges, including the extent to which the government agreed to assist him in obtaining leniency, that trial counsel could have used to impeach him. *See also* Claim XXIV.

### D. Juanita Hopkins

The government provided Ms. Hopkins with favorable treatment and recommendations, and threatened adverse consequences for failure to cooperate, in charging and sentencing decisions and other criminal and related process (including in this case); monetary payments; support with housing and other services; favorable custodial treatment, including assistance with programing, placement, and liberties not enjoyed by other prisoners (social contacts, access to tobacco, unmonitored cell phones, and other items or material otherwise deemed contraband). For Ms. Hopkins, on information and belief, this included government intervention to protect against her expulsion from various drug treatment and housing programs. The government failed to disclose information about the threats, benefits, and assistance it provided to Ms. Hopkins that trial counsel could have used to impeach her.

### E. Lashika Johnson

The government provided Lashika Johnson with favorable treatment and recommendations, and threatened adverse consequences for failure to cooperate, in charging and sentencing decisions and other criminal and related process; monetary payments; support with housing and other services; favorable custodial treatment,

including placement and liberties not enjoyed by other prisoners (social contacts, access to tobacco, unmonitored cell phones, and other items or material otherwise deemed contraband). The government provided Johnson with support in securing housing and with direct monetary support and threatened loss of benefits and support if she failed to cooperate. In addition, the government threatened Johnson with immediate arrest and loss of custody of her children and engaged in tactics intended to intimidate and frighten her. The government failed to disclose information about the benefits and assistance it provided to Johnson and about the threats and intimidation tactics made against her that trial counsel could have used to impeach her. *See also* Claims IV, VI

**F. Shamarr Myers**

The government provided Mr. Myers with favorable treatment and recommendations in charging and sentencing decisions and other criminal and related process, including early release; monetary payments; support with housing and other services; favorable custodial treatment, including placement and liberties not enjoyed by other prisoners (social contacts, access to tobacco, unmonitored cell phones, and other items or material otherwise deemed contraband). The government failed to disclose information about the benefits and assistance it provided to Mr. Myers that trial counsel could have used to impeach him. The government also failed to disclose information about the timing and nature of his role as an agent working on the government's behalf, which could have been used to litigate a *Massiah* claim or to impeach his credibility. *See also* Claims V, XXIX.

**G. Sherrell Randolph**

The government provided Ms. Randolph with favorable treatment and recommendations, and threatened adverse consequences for failure to cooperate, in charging and sentencing decisions and other criminal and related process; monetary payments; support with housing and other services; favorable custodial treatment, including placement and liberties not enjoyed by other prisoners (social contacts, access to tobacco, unmonitored cell phones, and other items or material otherwise deemed contraband). On information and belief, this included repeated intervention to protect against her remand into custody. The government permitted Ms. Randolph to testify falsely about her relationship with Tina Johnson and suffer no legal consequences from her false testimony. *See* Claims XII, XXIV. The government failed to disclose information about the threats, benefits, and assistance it provided to Ms. Randolph that trial counsel could have used to impeach her.

**H. Judith Rivera**

The government provided Ms. Rivera with favorable treatment and recommendations, and threatened adverse consequences for failure to cooperate, in charging and sentencing decisions and other criminal and related process; monetary payments; support with housing and other services; favorable custodial treatment, including placement and liberties not enjoyed by other prisoners (social contacts, access to tobacco, unmonitored cell phones, and other items or material otherwise deemed contraband). The government failed to disclose information about the threats, benefits, and assistance it provided to Ms. Rivera that trial counsel could have used to impeach her.

**I. Randi Washington**

The government provided Mr. Washington favorable treatment and recommendations, and threatened adverse consequences for failure to cooperate, in charging and sentencing decisions and other criminal and related process, including robbery, assault, and Mr. Washington's participation in arranging false immigration marriages; monetary payments; support with housing and other services; favorable custodial treatment, including placement and liberties not enjoyed by other prisoners (social contacts, access to tobacco, unmonitored cell phones, and other items or material otherwise deemed contraband). The government failed to disclose information about the threats, benefits, and assistance it provided to Mr. Washington that trial counsel could have used to impeach him.

**J. Shante Pettway**

The government provided Ms. Pettway favorable treatment and recommendations, and threatened adverse consequences for failure to cooperate, in charging and sentencing decisions and other criminal and related process; monetary payments; support with housing and other services; favorable custodial treatment, including placement and liberties not enjoyed by other prisoners (social contacts, access to tobacco, unmonitored cell phones, and other items or material otherwise deemed contraband). The government provided Ms. Pettway with support in securing housing and with direct monetary support and threatened loss of benefits and support if she failed to cooperate. In addition, the government threatened Ms. Pettway with immediate arrest and loss of custody of her children and engaged in

tactics, including close and conspicuous surveillance, intended to frighten and intimidate her. The government failed to disclose information about the benefits, and assistance it provided to Ms. Pettway and about the threats and intimidation tactics made against her that trial counsel could have used to impeach her.

### K. Rodney Womble

The government provided Mr. Womble with favorable treatment and recommendations, and threatened adverse consequences for failure to cooperate, in charging and sentencing decisions and other criminal and related process; monetary payments; support with housing and other services; favorable custodial treatment, including placement and liberties not enjoyed by other prisoners (social contacts, access to tobacco, unmonitored cell phones, and other items or material otherwise deemed contraband). The government failed to disclose information about the threats, benefits, and assistance it provided to Mr. Womble that trial counsel could have used to impeach him. *See* Claim IV.D.

## XV. The government failed to disclose that law enforcement had concluded Efrain Johnson was not a believable witness.

Mr. Aquart incorporates herein the facts and allegations set forth in Claim VI. At the penalty phase of Mr. Aquart's capital trial, FBI Agent Christopher Munger testified as to statements made by Efrain Johnson, the alleged fourth participant in the homicides. The defense elicited Efrain's statements because they contradicted the narrative offered by the government's main cooperating witness John Taylor. On cross examination of Agent Munger, the government elicited that

Efrain had not been offered a cooperation agreement because "it was determined that he was lying."

At the guilt phase of the trial, the government called Efrain's sister Lashika Johnson. Through Lashika, the government introduced inculpatory statements Efrain allegedly made to his sister. The government, however, failed to disclose law enforcement's assessment that Efrain lacked credibility. Information that the government itself believed Efrain was lying could have been used by trial counsel in support of a motion to preclude, as unreliable, introduction of Efrain's hearsay statements in the first instance or to undermine the weight and credibility of the statements if admitted. The failure to disclose prejudiced the defense.

## XVI. The government failed to disclose critical evidence that could have impeached John Taylor's testimony.

Mr. Aquart incorporates herein the facts and allegations set forth in Claim IV.A. Mr. Taylor, the government's star witness and the only witness to provide to the jurors an account of what occurred in the apartment, testified that he, Mr. Aquart, and Mr. Aquart's brother went to a Walgreens, where Mr. Aquart purchased duct tape; drove to a diner next to the Charles Street Building; and then met with Efrain Johnson, who Mr. Taylor identified as a fourth participant in the homicides, in the parking area between the diner and the Charles Street Apartment building. TT at 2284, 2285. The government failed to disclose critical, material evidence that could have been used to impeach Mr. Taylor's testimony, including but not limited to:

- Each of these locations, the Walgreens, the diner next to the Charles Street apartment building, the parking area in between the diner and the

apartment building, and the apartment building itself employed numerous surveillance cameras. Surveillance tapes would have disproved Mr. Taylor's account. The government failed to disclose surveillance evidence from these locations.

- Walgreens did not sell the duct tape or latex gloves that Mr. Taylor described and/or were recovered from the bodies at the crime scene. Sales receipts and inventory records from Walgreens would have disproved Mr. Taylor's account. The government failed to disclose these records from Walgreens.
- Cell-phone data and records, including cell site location information, could have been used to establish the location of the cell phones of each of the four persons Mr. Taylor identified as participants and to disprove his account of the events.

The failures to disclose were material and prejudicial.

## XVII. The government failed to disclose evidence and information that suggested persons other than Azibo Aquart were responsible for the homicides.

Mr. Aquart incorporates herein the facts and allegations set forth in Claim VII. The government failed to disclose information suggesting that persons other than Mr. Aquart were responsible for the homicides. This includes, but is not limited to, each of the individual theories and individuals discussed above: Rodney Womble, Sherrell Randolph, Kendall Willis, Richard Brooks, Peanut or P-nut, Tremont or T, Frank Hodges, Hassan Rodgers, Jose Osorio, Marcelino Molina, Luis Velez, the Terrace Crew, and others. The failures to disclose were material and prejudicial.

## XVIII. The government failed to disclose evidence and information that could have been used to challenge the testimony of Shamarr Myers.

Mr. Aquart incorporates herein the facts and allegations Claims V and XXIX. The government failed to disclose information suggesting that Mr. Myers had

fabricated alleged statements by Mr. Aquart that the victims "had to go" or "had to die." It also failed to disclose additional information, developed during and after trial, suggesting that Mr. Myers was an unreliable witness. And it failed to disclose information that could have been used to support precluding his testimony under *Massiah,* 377 U.S. 201 (1964). The failures to disclose were material and prejudicial.

## XIX. The government failed to disclose evidence and information that could have been used to challenge its DNA evidence.

Mr. Aquart incorporates herein the facts and allegations set forth in Claim I, *supra.* As discussed in Claim I, the government failed to disclose evidence and information that would have challenged the DNA evidence it presented through its expert, Christine Roy.

The government clearly recognized the importance of the lab's quality control to the reliability of the DNA evidence it was offering against Mr. Aquart. It affirmatively mentioned the contamination issue, although it claimed it affected only one of 70 pieces of evidence, in its opening statement to the jury. TT I at 49. But the government and its agent, the State laboratory, failed to disclose to the defense or to the jury that there had been no formal investigation into the cause of the contamination event, failed to disclose it had missed a mandatory external audit, failed to disclose that in the weeks before trial the lab was scrambling to prepare revised Standard Operating Procedures, did not disclose those new procedures, which were issued in April 2011 as jury selection began (and would have caused trial counsel to examine the protocols in effect when the evidence was tested and see that they were not sufficient to meet the FBI's 2009 Quality

Assurance Standards), and did not disclose that, even as Ms. Roy was testifying, the lab was preparing for two FBI audits in July 2011. The State lab's willful failure to provide copies of its internal validations to counsel despite repeated oral and written requests prior to trial should give rise to a presumption that the lab was purposely obfuscating, given that, in particular, the lab knew it lacked a proper validation of the injection times for the Identifiler amplification kit and that unvalidated injection times had been used to produce the results in this case. These issues, particularly considered together, could have been used to show the lack of reliability of the DNA analyses here, either in a *Daubert* hearing or during trial.

The failures to disclose were material and prejudicial.

## XX. The government failed to disclose evidence and information that could have been used to challenge its fingerprint evidence.

Mr. Aquart incorporates herein the facts and allegations set forth in Claim II. As discussed in Claim II, the government failed to disclose evidence and information that would have challenged the fingerprint evidence it presented through its expert John Pleckaitis.

The failures to disclose were material and prejudicial.

## XXI. The government's late discovery of critical evidence violated *Brady*.

Mr. Aquart incorporates herein the facts and allegations set forth in Claims VIII, X, XII. The government belatedly disclosed critical evidence, including but not limited to witness statements and phone records, on the eve of trial, during jury selection, and during trial itself. The delay in disclosures, coupled with the approximately five-and-one-half-year delay in bringing the case to trial,

undermined Mr. Aquart's ability to investigate and prepare his defense and amounted to a *Brady* violation. The late disclosures included, for example:

- Late disclosure of the phone records impaired trial counsel's ability to review and analyze the records and to challenge Ms. Randolph's false testimony that she did not know Tina Johnson. *See* Claim XII;
- Late disclosure of the phone records impaired trial counsel's ability to review and analyze the records and retain an expert to challenge the government's contention that, during the murders Azikiwe Aquart stole Tina Johnson's phone and later used it to call Mr. Aquart. Late disclosure of witness statements, including from Mr. Rucker, who died during the long pendency of the trial, impaired his ability to investigate and offer evidence that someone other than Azikiwe Aquart took the phone and made the call. *See* Claim X;
- Late disclosure of phone records and witness statements, including from Mr. Grant and Ms. Hopkins, impaired trial counsel's ability to challenge the government's motive narrative of a dispute between Mr. Aquart and Ms. Johnson. *See* Claim XII;
- Late disclosure of witness statements, including recordings of jail calls between Ms. Randolph and Mr. Womble, in which they discussed Mr. Osorio, impaired trial counsel's ability to investigate and offer evidence that persons other than those charged in this case were responsible for the homicides. *See* Claim VII.

These failures to disclose were material and prejudicial.

## XXII. The government failed to disclose phone and other records.

The government failed to disclose phone and other records that trial counsel could have used to challenge (1) Randolph's testimony that she did not know Tina Johnson; (2) the government's motive narrative of a dispute and competition between Tina Johnson and Mr. Aquart over the drug sales at 215 Charles Street; (3) Shante Pettway's identification of the voice associated with the 203-243-7132 cellphone as Mr. Aquart's; and (4) the government's evidence and argument that Tina Johnson's phone was used to call Mr. Aquart's phone after the homicides.

These failures to disclose were material and prejudicial.

## XXIII. The cumulative effect of the ineffective assistance of counsel and *Brady* violations undermines confidence in the result of Mr. Aquart's trial.

Even where individual error is insufficient to raise a probability that the outcome of a trial would have been different, the cumulative impact of *Brady* and *Strickland* error can suffice to warrant habeas relief. *See Kubat v. Thieret,* 867 F.2d 351, 370 (7th Cir. 1989) (relying on "errors" language from *Strickland* to find that "*Strickland* clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced"); *Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir. 2005) (adopting the reasoning from *Kubat*); *Lindstadt,* 239 F.3d at 199 (finding that "totality of the circumstances" language from *Strickland* mandates an aggregate error analysis); *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) ("We will address each aspect of Davis's performance the district court found deficient before considering whether Richards was cumuflatively prejudiced thereby."); *Phillips v. Woodford*, 267 F.3d 966 (9th Cir. 2001) (remanding for cumulative prejudice analysis of *Brady* and *Strickland* error); and *Gonzales v. McKune*, 247 F.3d 1066, 1078 n. 4 (10th Cir. 2001), *vacated in part on other grounds*, 279 F.3d 922, 925–26 (10th Cir. 2002) (en banc) (noting that language from *Strickland* "makes it clear that all acts of inadequate performance may be cumulated in order to conduct the prejudice prong").

Each of the *Brady* and *Strickland* errors in Mr. Aquart's case was sufficiently prejudicial to warrant habeas relief. Taken together they require this Court grant his § 2255 motion.

## CLAIMS RELATED TO *NAPUE v. ILLINOIS* & *GIGLIO v. UNITED STATES*

Prosecutors violate due process by presenting material testimony that is false or creates a false impression, or by allowing such testimony to stand uncorrected. *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). Due process is equally offended by direct statements which are untrue and the eliciting of testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *Smith v Dept. of Corrections*, 572 F.3d 1327, 1333-34 (11th Cir. 2009) ("The Giglio rule applies to explicit factual representations by the prosecutor at a side bar and implicit factual representations to the jury while questioning a witness."). This is so even where the particular prosecutor does not know that the testimony being presented is false or misleading. *See Giglio*, 405 U.S. at 154. Indeed, the truthfulness of the process is of the utmost importance even when a specific prosecutor acts in good faith. Id. at 153.

At Mr. Aquart's trial, upon information and belief, the government repeatedly presented, and failed to correct, false evidence, in violation of *Giglio* and *Napue*. Examples include, but are not limited to:

### XXIV. The government's witnesses minimized, or failed to disclose inducements, including benefits and threats, obtained from the government in exchange for testimony.

As set out above in Claim XIV, the facts of which are incorporated herein, the government failed to disclose material evidence of inducements (benefits or threats) made to its witnesses, including John Taylor, Jackie Bryant, Frank Hodges, Juanita

Hopkins, Venro Fleming, Lashika Johnson, Shamarr Myers, Sherrell Randolph, Judith Rivera, Randi Washington, Shante Pettway, and Rodney Womble. The witnesses, therefore, created a false or misleading impression of lack of interest in their testimony, which the government failed to correct.

The government knew or should have known that the false impression created by these witnesses was misleading, and the testimony was material. In addition, Mr. Aquart makes the following additional specific allegations with respect to certain witnesses:

### A. The government presented, and failed to correct, false testimony through John Taylor.

Mr. Aquart incorporates herein the facts and allegations set forth in Claims III and IV). As described above, Mr. Taylor's testimony was flatly contradicted by his own many prior inconsistent statements, by statements made by Efrain Johnson, Mr. Hodges, and other cooperating witnesses, and by the physical layout of the apartment and the evidence collected at the crime scene. His testimony incriminating Mr. Aquart was false and misleading, which the government knew or should have known, and material. The government's use of Taylor as its star witness thus violated Mr. Aquart's due process rights.

Some specific examples of Mr. Taylor's false testimony uncorrected by the government include:

- Mr. Taylor's belated alleged identification of Ms. Rivera as the person who participated in the dry-run of the break-in in the days before the homicides.
- Mr. Taylor's claim that Mr. Aquart kicked the front door of the apartment off its hinges.

- Mr. Taylor's claim that he moved the long living room couch to prop up the now broken front door.
- Mr. Taylor's claim that he was able to view what was happening in the bedrooms from his vantage point as lookout in the living room, despite the distance, the configuration of the apartment, with an obstructed view of only one of the bedrooms from the living room, and a floral couch blocking observation.
- Mr. Taylor's claim that he observed Mr. Aquart beating Tina Johnson like he was at a "meat market" and that Mr. Aquart said to Mr. Taylor "come get you some," again despite his inability, from the living room, to observe the bedrooms.
- Discrepancies between Mr. Taylor's testimony at Mr. Aquart's trial and his testimony at Efrain Johnson's later trials, including the number of blows he observed and his characterization of the scene as a "meat market."

Mr. Taylor employed a contrived demeanor while testifying to elicit sympathy and misleadingly enhance the appearance of credibility.

In each instance, the government knew or should have known that Mr. Taylor's testimony was false and misleading, and the testimony was material.

**B. The government presented, and failed to correct, false testimony through Lashika Johnson.**

As set out above, Lashika Johnson testified falsely and the government failed to correct that testimony. Mr. Aquart incorporates herein the facts and allegations set forth in Claims IV and VI. In each instance, the government knew or should have known that Lashika Johnson's testimony was false and misleading, and the testimony was material.

**C. The government presented, and failed to correct, false testimony through Sherrell Randolph.**

Mr. Aquart incorporates herein the facts and allegations set forth in Claim XII. Ms. Randolph falsely claimed not to have known Tina Johnson. Phone records,

however, established that Ms. Randolph was in frequent phone contact with Ms. Johnson. Indeed, in the days leading up to the murders, Ms. Randolph and Ms. Johnson together sold drugs on Mr. Aquart's behalf and with his knowledge and participation.

The government knew or should have known that Ms. Randolph's testimony was false and misleading, and the testimony was material.

### D. The government presented, and failed to correct, false testimony through Frank Hodges.

The government presented testimony of Mr. Hodges, knowing that he had failed a polygraph test, taken at the request of law enforcement. The government knew that his testimony was false, and it was material.

### E. The government presented, and failed to correct, false testimony through Jacqueline Bryant.

Ms. Bryant falsely testified that Mr. Aquart had threatened Tina Johnson, when, in fact, the threats were made by Mr. Womble. The government knew this, because Ms. Bryant so testified, under oath, in the grand jury. *See* Ex. XX-I at 28.

The government knew or should have known that Bryant's testimony was false and misleading, and the testimony was material.

### F. The government suggested in closing argument that Rodney Womble had been cleared by DNA Analysis and failed to correct that falsehood.

As set out in Point VI in of Mr. Aquart's opening brief in his first direct appeal, *United States v. Aquart ("Aquart(I)")*, No. 12-5086, Dkt. No. 119 (2d Cir. 2012), which he incorporates herein, the government falsely assured jurors during guilt-phase summation that another suspect in the murders, Mr. Womble, had been

cleared by DNA analysis. Mr. Womble, the alleged lieutenant in the drug operation, had a history of run-ins with Tina Johnson. But law enforcement never obtained a DNA reference sample from him, and so his profile was never compared to the evidence in this case, a point raised by the defense in summation. The government responded that because Mr. Womble's profile, as a convicted felon, was in the FBI's CODIS database and because the lab had submitted evidence samples to CODIS for comparison, he had, in effect, been ruled out as a possible source of the evidence samples. The government in closing urged:

> The defense has also brought up the fact that Womble's DNA was not submitted for testing. Well, first of all, you know Womble is a convicted felon, and you know from Christine Roy that Womble – excuse me, that the CODIS database is made up of the DNA of convicted felons. And, in fact, you know that's how they originally got the hit on Efrain Johnson and proved that he, too, was part of these murders.

TT at 4326. Driving the point home, the government finished, "There is absolutely no evidence in this record whatsoever to suggest that Womble's DNA was at that crime scene." TT at 4328.

But the evidence did not support the government's argument. Its own DNA expert denied that every profile sample obtained in Mr. Aquart's case had been submitted to CODIS. Ms. Roy explained that labs are, in fact, not permitted to submit samples that would generate excessive hits and, thus, degrade the database. TT at 3113. It is misconduct for a prosecutor to argue facts not in evidence or to urge the jurors to draw inferences that cannot be supported. The government's false suggestion that the CODIS database cleared Mr. Womble constituted such misconduct.

### G. The government presented, and failed to correct, false testimony through Shamarr Myers.

Mr. Aquart incorporates herein the facts and allegations set forth in Claims V, XXIX.

As set out in the *Massiah*-related claims, *see* Claims V, XXIX, the government permitted Myers to testify falsely regarding, among other things: whether the government solicited his cooperation in eliciting incriminating statements from Mr. Aquart, how and why the written statements (in the form of a letter) were prepared, the timeline of his contacts with the government, and the benefits he expected to receive. It also permitted him to testify falsely about alleged statements by Mr. Aquart that it knew Mr. Myers was fabricating ("had to go" and "had to die"). When the government later accused Mr. Myers of prevarication in an unrelated proceeding, it failed to notify trial counsel or the court in Mr. Aquart's case. In each instance, the government knew or should have known that Mr. Myers' testimony was false and misleading, and the testimony was material.

### H. The government presented, and failed to correct, false testimony through Christine Roy.

Mr. Aquart incorporates herein the facts and allegations set forth in Claim I (DNA).

As detailed in Claim I, the government's DNA expert's testimony misled the jury in multiple ways. She testified that the DNA lab section had been audited every year and passed the audits when, in fact, it had entirely missed its mandated bi-annual audit in 2010 – while analysis of the DNA samples in this case was still ongoing. She testified that she had used controls, negative controls, and positive

controls during the analysis of the swabs to ensure that the amplification process was working correctly, and that the negative control shows no DNA and the positive control shows only the DNA it is supposed to. TT at 3234. She assured the jury that all required protocols had been followed and all the controls checked. *Id.* In truth, the State lab had no protocols for detecting contamination and an FBI audit team, just two months after trial, "found numerous case files where negative controls and/or reagent blanks showed allelic activity both above and/or below the threshold." Ex. I-AG, July 2011 FBI Quality Assurance Casework Audit, at Standard 9.7. Ms. Roy also told the jury their instruments were validated for standard injection times. This was false. The FBI auditors found that the lab did not have all of its internal validations, including for certain injection times used in the amplification process. None of these false and misleading claims heard by the jury were ever corrected by the government.

The government knew that the DNA analysis was the product of unreliable, invalidated methods. At the time of trial, the state lab was severely underfunded and understaffed, its protocols did not meet the mandated FBI Quality Assurance Protocols, its control samples were contaminated, its supervisors were gone for weeks at a time working on private cases, it was using unvalidated methodologies, its DNA examiner failed to document her decision making, contamination episodes occurred without investigation, and it had missed its mandated external audit. For the government to present the testimony of the DNA expert without disclosing these reliability limitations was misleading and affected the jury's judgment.

In each instance, the government knew or should have known that Ms. Roy's testimony was false and misleading, and the testimony was material.

### I. The government presented, and failed to correct, false testimony of John Pleckaitis.

Mr. Aquart incorporates herein the facts and allegations set forth in Claim II.

The government presented expert fingerprint testimony from Mr. Pleckaitis involving examination and evidence presentation criticized by an Office of Inspector General Report and a National Academy of Sciences Report. It also suggested to the jury in closing argument that it was impossible that the fingerprint evidence in this case could be wrong. "Could the fingerprint identifications be mistaken?" the prosecutor argued. "Could this be the first case ever where two people have the same fingerprints?" TT at 4227. The expert testimony and the prosecutor's argument violated Mr. Aquart's constitutional rights, because the government knew about the OIG and NAS Reports' critique of the ACE-V method, that the NAS Report had called for more research on the uniqueness of fingerprints, and that there had been multiple examples of errors in fingerprint identification, including the high-profile Brandon Mayfield error made by its sister agency, the FBI.

In each instance, the government knew or should have known that the expert's testimony was false and misleading, and the testimony was material. *See generally* Claim II.

**J. The government presented, and failed to correct, evidence unconnected to the homicides that created a false and misleading impression of Mr. Aquart's involvement.**

The government introduced evidence of latex gloves and fragments of gloves, Walgreens plastic bags, and duct tape found in the apartment but unconnected to the homicides. For example, DNA collected from a latex glove cuff found under a couch cushion in the living room, away from where the victims were killed, was unconnected to the homicides. The government introduced DNA evidence collected from that cuff, from which its expert testified that Mr. Aquart could not be excluded as a contributor (with a frequency of 1 in 79 million) to create a misleading impression that that evidence linked Mr. Aquart to the homicides. *See generally* Claim I.

In each instance, the government knew or should have known that the expert's testimony was false and misleading, and the testimony was material.

**K. The government presented, and failed to correct, crime-scene evidence that created a false and misleading impression of Mr. Aquart's involvement.**

Mr. Aquart incorporates herein the facts and allegations set forth in Claim III.

As set out above, the government presented false and misleading crime-scene evidence to implicate Mr. Aquart in the homicides. In each instance, the government knew or should have known that the testimony was false and misleading, and the testimony was material. For example:

*The plastic bags said to be connected by duct tape* (GX 123). The government allowed its witnesses to testify that this evidence was not intentionally manipulated

at the crime scene when all indications from the (limited) documentation demonstrates it was.

*Disturbance of the victims' bodies*. The government presented false and misleading testimony about the disturbance of the victims' bodies before law enforcement arrived at the crime scene. The government knew or should have known that civilians and emergency responders likely moved the bodies, potentially interfering with the evidence, but maintained that the evidence was unaffected.

*The floral couch*. The government allowed its witnesses—including Mr. Whittingham, Mr. Taylor, and Ms. Bryant—to testify that a floral couch, depicted in crime scene photos in the hallway of Apartment 101, had not been present when they were in the apartment. Based on carpet-wear patterns visible in other photos, this was obviously untrue.

*Line of sight to the bedroom*. The government permitted its witnesses—including Detective Paul Ortiz[78] and Mr. Taylor—to testify that there was a clear line of sight from the entryway of the apartment to the victims' bodies, when the testimony of more neutral witnesses (like EMT Karen O'Donnell) and the crime scene video and photographs proved there was not.

*The drill*. The government presented false and misleading testimony and argument that Mr. Aquart was responsible for drilling closed the door to Apartment

[78]Government counsel should have corrected Detective Ortiz's testimony about potential contamination of the crime scene, given video and photographic evidence showing failure to wear protective gear and evidence of eating and drinking at the crime scene. *See* DX J (video of news clip); DX SSSSS.

101 and "entomb[ing] the victims … ensuring that nobody could save them." TT at 4341. The government knew or should have known that Mr. Aquart was not responsible. Its own witness admitted the door had not been drilled shut when he arrived at the crime scene. There was also evidence the residents of Apartment 101 had done work on the door recently. *See* Ex. XII-D, Grand Jury Testimony of Jacqueline Bryant (Nov. 2, 2005) at 29. And crime scene detectives did not search all the areas in Apartment 101 where a drill might have been found. Still, the government maintained its grisly narrative.

*"Meat Market."* The government allowed Mr. Taylor to testify that Mr. Aquart and his brother stood side-by-side and bludgeoned victims Tina Johnson and James Reid in a frenzied, "meat market" fashion, when the medical and blood spatter evidence and the layout of the crime scene all indicated this could not be true. By delaying presentation of the blood spatter evidence until the penalty phase, the government compounded this error by separating Mr. Taylor's testimony from the scientific evidence contradicting it.

**OTHER CLAIMS**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**B. Mr. Aquart's Fifth and Sixth Amendment rights were violated when trial counsel failed to request and the Court failed to appoint him Learned Counsel until almost two years after Mr. Aquart was first charged.**

Mr. Aquart was arrested within a week of the murders and held in state custody. Although Mr. Aquart was held on other charges, police were already questioning future cooperating witnesses about his suspected involvement in the murders. By mid-September 2005, a federal complaint had been filed against Rodney Womble, and he made his initial appearance and was detained. But Mr. Aquart was not indicted in federal court until December. Even then, although the murder investigation was well underway, Mr. Aquart was charged only with drug offenses. Justin Smith, Esq., was appointed to represent him. Mr. Smith was not learned counsel, qualified for death penalty representation, as per 18 U.S.C. § 3005. *See also* ABA, *Guidelines for Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 952 (2003).

A new drug indictment, this time alleging a conspiracy, issued on June 6, 2006. Although the murder investigation continued, with Mr. Aquart as its target and capital-eligible charges planned, learned counsel for Mr. Aquart still was not appointed, even though federal judiciary policy states that "[q]ualified counsel must be appointed in capital cases at the earliest possible opportunity." *See* https://www.uscourts.gov/file/vol07a-ch02-appx2apdf. According to the Federal Capital Trial Project, learned counsel are frequently appointed pre-indictment or

even pre-complaint to represent people facing federal homicide investigations. Learned counsel Michael Sheehan was not appointed in Mr. Aquart's case until June 29, 2007—*almost two years after his arrest*—shortly after a second superseding indictment was filed.

It was deficient performance for Attorney Smith to fail to request learned counsel for Mr. Aquart, and it violated Mr. Aquart's due process rights and right to counsel for the government to fail to seek appointment of learned counsel and for the Court to fail to appoint learned counsel *sua sponte*. These failures were prejudicial. During the nearly two years that he went without learned counsel, Mr. Aquart lost important opportunities for investigation, litigation, and other preparation of his defense, discussed in the ABA Guidelines and elsewhere in this motion. *Cf. United States v. Pedro Vidal*, 991 F.3d 1, 5 (1st Cir. 2021) (discussing importance of early appointment of learned counsel). At a hearing, and after appropriate discovery, Mr. Aquart will demonstrate this further.

**XXIX. The government violated Mr. Aquart's Sixth Amendment right by using jailhouse informant Shamarr Myers to deliberately elicit incriminating statements.**

After indictment and while represented by counsel, Mr. Aquart was transferred to a unit housing jailhouse informant Shamarr Myers. Myers testified that the FBI reached out to him—via a pop-up message in the jail law library—before he obtained incriminating statements from Mr. Aquart. Myers met with the government, received undisclosed benefits, and ultimately testified to statements the government highlighted as proof of guilt. These circumstances show deliberate elicitation by a government agent, in violation of *Massiah*, 377 U.S. 201. Myers's

testimony should have been excluded. Its admission requires vacatur of Mr. Aquart's convictions.

### A. The government elicited incriminating evidence from Mr. Aquart through jailhouse informant Myers.

During their pretrial detention, Mr. Aquart, his brother and codefendant Azikiwe Aquart, and Myers were all housed at the Wyatt Detention Center. Initially, Azikiwe Aquart and Myers were housed on the same unit—K-Pod—and Mr. Aquart was housed in a different part of the facility. *See* TT at 3632, 3633. On February 22, 2010, Mr. Aquart was moved to K-Pod, where Myers was housed.[79] At that time, federal prosecutions against Mr. Aquart had been pending for five years, and he had been represented by counsel continuously during that period.[80] Wyatt Detention Center records contain no explanation why Mr. Aquart was designated to K-Pod at that time.

Myers claimed that once Mr. Aquart moved to K-Pod, the two became "friendly" and spoke "every day," with Mr. Aquart telling Myers about the drug operation at Charles Street. *See* TT at 3633-43. On or about April 2010 (Myers recollected this was around the time of his April 1, 2010, guilty plea), Myers said Mr. Aquart told him that other people selling drugs in the Charles Street building

---

[79] Azikiwe was moved off K-Pod at some point before Mr. Aquart came to that unit.

[80] Initially, Mr. Aquart was charged in case no. 3:05-cr-00309-JBA-1. Later, that case was consolidated with case no. 3:06-cr-00160-SRU. Mr. Smith represented Mr. Aquart on both cases. Mr. Sheehan was appointed as learned counsel in the second case on July 10, 2007.

"had to go" and "had to die." *See* TT at 3643-44. This was not recorded in any report or notes by government agents.

Myers asserted he first approached the government about cooperating in Mr. Aquart's case sometime after his birthday, which was in late April. *See* TT at 3653. Before that, though, he explained—under oath—to the jury that he had received a "pop-up" on a computer in the law library at the detention facility reading, "Mr. Myers, this is the FBI, would you like to help us help you?" Myers pressed "yes," and the pop-up went away. He claimed to have told Mr. Aquart about this. TT at 3645-46. He also told his lawyer, TT at 3646, who—on information and belief—reached out to the government.

According to Myers, when he was transported to the courthouse to meet with prosecutors, he changed his mind about cooperating, in part because he saw a co-defendant, Scott Timmons, in the cellblock. *See* TT at 3654, 3656. He did meet with the government, however. *See* TT at 3364 ("I told them I didn't want to talk."); 3655 ("I told him I seen the government.").

When he returned to the jail, Myers claimed, he informed Mr. Aquart that he had "seen the government" and that "they wanted him bad." TT at 3655. "After that," Myers said—sometime in the summer of 2010, *see* TT at 3358—Mr. Aquart gave him a written list, instructing him how he could help with Mr. Aquart's case, *see* TT at 3657. Myers was to say, in short, that a girlfriend had told him that Jose "Letho" Osario committed the murders. GX 506 at 2.

Myers testified that his interactions with Mr. Aquart all occurred before he began cooperating with the government. TT at 3671. He claimed he had made no agreement with the government to cooperate, although he hoped he would receive sentencing consideration for his testimony. TT at 3672. He said his lawyer planned to ask for a mandatory-minimum five-year sentence. TT at 3674.

Two Federal Bureau of Investigation ("FBI") form FD-302 ("302) reports document government interviews with Myers on October 4, 2010, and March 16, 2011. Neither, however, documented the prior meeting Myers described as occurring in the spring of 2010. Nor did either record the alleged statements by Mr. Aquart that the victims "had to go" or "had to die," even though—according to Myers—Mr. Aquart made those statements in April 2010, before the Fall 2010 interviews occurred.

A motion filed by trial counsel on May 16, 2011—the day Myers testified—indicates that the FBI reports were only provided to the defense on the eve of Myers's testimony. *See* Doc. 803, "Defendant's Discovery Request Regarding New Witness." Counsel apparently already knew about the written instructions Myers alleged Mr. Aquart provided him. *See id.* at 1 (describing this information as "relatively old news"). But trial counsel were learning of the purported "had to go" and "had to die" statements for the first time. *See id.* at 1. Prosecutors also related information not included in the 302s about the evolution of Myers's cooperation, which differed from Myers's testimony, in which he claimed the government had approached him first:

> [I]t was related that Myers first approached federal authorities, through his attorney, with a general offer to cooperate. There was no indication that this cooperation had anything to do with the defendant. When the witness was brought in to meet with the government, it is reported that he balked and refused to proceed further. At a later unspecified date, the witness again, through counsel, sought to reinitiate cooperation. This offer to cooperate was now specific to the defendant. When the government indicated a lack of interest, the witness later produced the letter. Subsequently, the witness not only produced the letter but the account of the alleged confession.

Doc. 803 at 1.[81] Prosecutors provided no documentation of this information.

Trial counsel requested the Court order production of "all materials in the government's possession which specify the dates of when the witness first approached the government and the substance of what the witness was purporting to cooperate about." *Id.* at 2. Trial counsel also requested production of "all information in the government's possession about each subsequent contact, or request for contact by the witness, or his attorney[,] relevant to his interest in providing further information to the government." *Id.* The next day, before Myers was set to testify, however, when the Court offered to take up the motion, trial counsel responded, "[w]e have worked that out, your Honor." TT at 3571. No notes from that day regarding any discussion with prosecutors, nor any additional discovery provided, appear in trial counsel's files.

The docket for Scott Timmons, whom Myers admits was in the courthouse holding cell with him on the day he first met with the government, reflects court

---

[81] Prompted by the government, Myers also claimed he did not believe the pop-up came from the FBI. TT at 3667. But the government never offered any proof one way or the other.

proceedings on February 1, 2010, shortly ***before*** Mr. Aquart was transferred to Mr. Myers's unit at the Wyatt Detention Center. *See United States v. Timmons*, U.S. Dist. Ct. No. 3:10-cr-00036-AVC-1, Doc. 25 (D. Conn. 2010). Mr. Timmons was in court again on March 4, 2010, still a month ***before*** Myers's guilty plea on April 1, 2010, *see id.* at Doc. 39, when he claimed Mr. Aquart began making incriminating statements to him.

On April 1, 2010, Myers entered his guilty plea for conspiracy to distribute heroin. *See* U.S. Dist. Ct. No. 3:09-cr-00024-AWT, Doc. 588 (D. Conn. 2010). According to the plea agreement, Myers faced a possible enhancement under 21 U.S.C. § 851 as a repeat offender, which the government agreed not to seek. The government also agreed to advocate for a low-end, Guidelines sentence of 92 months' imprisonment. Though no other explanation was evident, Myers testified that neither concession resulted from his cooperation and that he had received no promises from the government in exchange for his cooperation in Mr. Aquart's case. *See* TT at 3669, 3672. Myers's sentencing was continued pending his testimony in Mr. Aquart's trial. *See* U.S. Dist. Ct. No. 3:09-cr-00024-AWT, Docs. 660, 772, 806 (D. Conn. 2010).

In closing argument, the government singled out Myers's testimony, arguing that, "the defendant told Shamarr Myers [the victims] had to go, the defendant had to take care of it." TT at 4252. The government continued, referring both to that statement and to the written instructions, "[t]hese are the acts of a guilty man. They demonstrate consciousness of guilt."

> A desperate, controlling guilty mind urging phantom witnesses to lie, to accuse law enforcement of things they did not do. A desperate attempt to establish a fictitious story with a detailed script and instructions on how to tell it, how to sell it. The problem being that Shamarr Myers tells you what the evidence tells you, it is entirely baseless, it is all made up. And the handwriting expert, John Sardone, tells you the author of this concocted story is the defendant.

TT at 4262. The government returned to Myers' testimony a third time in its rebuttal closing argument, reiterating the theme of consciousness of guilt:

> The script that the defendant gave to Shamarr Myers is unbelievable consciousness of guilt. Despite the fact that the defendant told Shamarr Myers that the victims had to die, he then instructed Myers to take the stand in a case that Myers knew nothing about and to lie. He told Myers to come in here and say Lethos did it. Lethos, somebody who happens to be dead.

TT at 4333. Although the defense had questioned the credibility of Myers's testimony based on his plea agreement, *see* TT at 3679-97, 3704-08, the government told the jury, "[t]here are no secret hidden agreements or deals." TT at 4232.[82]

The jury returned its guilty verdict against Mr. Aquart on May 23, 2011, and its death-penalty verdict on June 15, 2011. Myers was sentenced shortly thereafter, on June 30, 2011. He received a time-served sentence, about half of the five-year mandatory minimum he testified he was hoping for. *See* U.S. Dist. Ct. No. 3:09-cr-00024-AWT, Doc. 834 (D. Conn. 2010).

Within a year of his release, Myers was distributing heroin again. *See* U.S. Dist. Ct. No. 3:13-cr-00098-SRU, Doc. 47 at 20 (D. Conn 2014) ("2013 Govt. Sent.

[82] Trial counsel did not question Myers about another motive to lie about Mr. Aquart: Myers's relationship with Anthony Armstead, whom Aquart was accused of assaulting. *See* Claim V.

Mem."). He was arrested and charged both in a new case, *see* U.S. Dist. Ct. No. 3:13-cr-00098-SRU (D. Conn. 2013), and with a violation of his supervised release, *see* U.S. Dist. Ct. No. 3:09-cr-00024-AWT, Doc. 925 (D. Conn. 2013). At his sentencing on these matters, the government changed its tune, calling Myers's 2011 pledge to change his life "completely disingenuous," stating there was "absolutely no evidence to support" his contentions about Mr. Aquart's gang affiliation and danger to Myers, and calling his claims about his own offense conduct "demonstrably false." *See* 2013 Govt. Sent. Mem. at 19, 19 n.7, 20.[83] In additions to these statements about his lack of credibility, the government concluded about Myers, "he has no respect for the law." *Id.* at 20.

### B. The government's conduct violated *Massiah*, and the testimony elicited by Myers at the government's direction prejudiced Mr. Aquart.

The foregoing facts reveal a relationship between the government and Myers designed to elicit incriminating information from Mr. Aquart. C*ompare Cruz*, 785 F.2d at 408 ("There is no indication that the agents and Assistant United States Attorneys who elicited Tuli's cooperation and information were playing any part in the investigation of Cruz."). Mr. Aquart was transferred by the Wyatt Detention Center to K-Pod to facilitate Myers's effort on behalf of the government. Myers then conducted a campaign on behalf of the government to befriend Mr. Aquart and elicit incriminating information from him, including offering to assist in exculpating him

[83] The government also noted it had spoken "at length" at Myers's sentencing hearing, "advis[ing] Judge Thompson of the importance of Myers's testimony and its belief that he deserved a significant departure." *Id.* at 19. That proceeding is sealed.

at trial and soliciting written instructions on how to do so. This violated *Massiah*, and Myers's testimony should have been excluded or stricken from Mr. Aquart's trial. *Massiah*, 377 U.S. at 206.

"By intentionally creating a situation likely to induce [Mr. Aquart] to make incriminating statements without the assistance of counsel, the Government violated [his] Sixth Amendment right to counsel." *United States v. Henry*, 447 U.S. 264, 274 (1980). "[T]he defendant's own incriminating statements," whether oral or written statements like those shared by Myers, "obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against [Mr. Aquart] at his trial." *Massiah*, 377 U.S. at 207.

The government cannot prove beyond a reasonable doubt that the *Massiah* violation did not contribute to Mr. Aquart's verdict. *Chapman v. California*, 386 U.S. 18, 24 (1967). Myers's testimony was highly incriminating and provided a bridge between forensic evidence that trial counsel argued merely placed Mr. Aquart in the victims' apartment at some time in the past—or in contact with some items in their apartment—and cooperating co-defendant testimony that trial counsel argued should be suspect because it sought to shift blame from responsible parties to Mr. Aquart. The government argued Myers's testimony demonstrated not just Mr. Aquart's consciousness of guilt, but his controlling, calculating, and deceptive nature. *See* Claim V. A new trial is therefore required.

## XXX. Trial counsel provided ineffective assistance of counsel, in violation of Mr. Aquart's Sixth Amendment rights, in failing to raise meritorious challenges to the charges and evidence against him.

### A. Trial counsel provided ineffective assistance of counsel when they failed to challenge the VICAR counts of indictment.

Mr. Aquart was charged with and subsequently convicted of three counts of murder-in-aid-of racketeering and one count of conspiracy to commit murder-in-aid-of-racketeering, all in violation of the Violent Crimes in Aid of Racketeering (VICAR) statute, 18 U.S.C. § 1959(a). Docs. 361, 1366. Following remand from the Second Circuit, Mr. Aquart was re-sentenced to mandatory life sentences on the VICAR-murder counts. Doc. 1366.

Mr. Aquart incorporates and alleges, as if fully set forth herein, the facts and arguments set out in his opening and reply briefs and his pro se supplemental reply brief in his appeal from the resentencing judgment after remand, in *United States v. Aquart ("Aquart* (II)*")*, No. 21-2763, Dkt. Nos. 47, 93, 103 (2d Cir. 2021), attached as Ex. XXX-A.

In sum, the VICAR-murder counts (and the conspiracy to commit VICAR murder) should have been dismissed. The VICAR counts incorporated, as the predicate crime of violence for the offenses, murder as defined by Connecticut state law, specifically, Connecticut General Statutes 53a-54a (intentional murder) and 53a-54c (felony murder). The VICAR statute employs a generic definition of murder. Evaluated using the categorical approach required by the Supreme Court and the Second Circuit, Connecticut murder sweeps more broadly than the generic definition of murder used in the VICAR statute. Specifically, Connecticut's

intentional-murder statute includes causing the suicide of another, including by means of deceit, and Connecticut's felony-murder statute includes cause the death of another while in flight with not immediacy requirement. Because Connecticut state murder sweeps more broadly than VICAR's generic definition of murder, it cannot be used as predicate for VICAR charges. Accordingly, the VICAR counts should have been dismissed.

Trial counsel failed to raise this challenge to the counts against Mr. Aquart during his original trial proceedings. After the Second Circuit vacated his death sentences and remanded for re-sentencing following his initial appeal, Mr. Aquart's new lawyers raised this challenge to the VICAR counts in a motion to dismiss in the district court. Doc. 1310. After the district court denied the motion to dismiss, Mr. Aquart then raised the challenges again on direct appeal from the judgment imposed following re-sentencing in *Aquart* (II), No. 21-2763, Dkt. Nos. 47, 93, 103 (opening, reply, and supplemental pro se reply briefs).

The district court and the Second Circuit declined to reach the merits of the challenge, concluding the issue was foreclosed by the mandate rule. *Aquart* (II), 92 F.4th at 87. Because neither court reached the merits, the merits of challenge may be considered here, in support of Mr. Aquart's ineffective assistance of trial counsel claim.

Had trial counsel raised this challenge during the original trial proceedings, the result would have been different at trial or on the first direct appeal, resulting in dismissal of the VICAR counts and the resulting mandatory life sentences.

In *Barrett v. United States*, 607 U.S. 128, 131-32, 149 (2026), the United States Supreme Court held that Congress did not intend dual punishments for convictions under 18 U.S.C. § 924(c) and (j). In light of *Barrett*, the Court should consider whether dual punishments are authorized for the VICAR and other counts of conviction in this case, including but not limited to the 21 U.S.C. § 848 counts. The Court should also consider whether any other counts of conviction are similarly multiplicitous.

The Court should also evaluate the application of *United States v. Wooden*, 595 U.S. 360, 363, 375-76 (2022), which held that different instances of criminal activity may still be part of the same criminal episode and should be charged and sentenced accordingly.

Review of the relevant decisions will demonstrate that the indictment here charged Mr. Aquart for the same activity under multiple statutes, in violation of the holdings of both *Barrett* and *Wooden*, requiring vacatur of convictions and resentencing.

### B. Trial counsel provided ineffective assistance of counsel when they failed to challenge the drug-related murder counts of the indictment.

Mr. Aquart incorporates and alleges, as if fully set forth herein, the facts and arguments set out in his opening and reply briefs and his pro se supplemental reply brief in *Aquart* (II), No. 21-2763, Dkt. Nos. 47, 93, 103 (2d Cir. 2021), attached as Ex. XXX-A.

In sum, Mr. Aquart was charged with and subsequently convicted of three counts of drug-related murder in violation of 21 U.S.C. § 848(e)(1)(A) (Counts 4-7)

and one count of conspiracy to possess with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 841(b)(1)(A) (Count 8). Docs. 361, 1366. Following remand from the Second Circuit, Mr. Aquart was re-sentenced to 40 years on each of the drug counts, with the sentences to run concurrently. Doc. 1366.

Section 848 proscribes murder by a person engaged in a drug offense punishable under 21 U.S.C. § 841(b)(1)(A). At the time of the offenses, § 841(b)(1)(A)(iii) (the predicate drug offense provision under which Mr. Aquart was charged in Count 8) required proof of intent to sell 50 grams or more of cocaine base. The grand jury returned a Fourth Superseding Indictment against Mr. Aquart on that amount. Doc. 361. Subsequent to the offenses and that indictment, however, but prior to trial, the Fair Sentencing Act ("FSA") became effective, raising the threshold drug amount for a violation of 841(b)(1)(A)(iii) from 50 grams to 280 grams of crack cocaine. Fair Sentencing Act of 2010, Pub. L. No. 111–220, 124 Stat. 2372.

Following enactment of the FSA, the government did not return to the grand jury for indictment charging the new higher statutory amounts. Instead, it sought, and the Court included, as a workaround to a new indictment, a special interrogatory on the verdict form, asking the jurors to check a "yes" or "no" box, indicating whether they unanimously found that the quantity of crack in Count 8 was 280 grams or more. 05/20/2011 Tr. 4345-46; Doc. 833 at 2. The jurors checked the "yes" box. Doc. 833 at 2.

The variance between the drug-related murder charges returned by the grand jury and the final instructions and verdict sheet given to, and the verdicts returned by, the petit jury violated Mr. Aquart's rights under the Indictment Clause of the Fifth Amendment, particularly because the case was a capital case. *Smith v. United States*, 360 U.S. 1, 9 (1959) (where harm to kidnapping victim was critical to determine whether offense was capital, notice of harm could not await conclusion of evidence).

In addition, neither the Court's oral instructions nor the written verdict sheet directed that the jurors must find the drug amount beyond a reasonable doubt. Failure to instruct the jury that this finding be made beyond a reasonable doubt violated Mr. Aquart's due-process rights under the Fifth Amendment and his Sixth Amendment right to a jury. *See Sullivan v. Louisiana*, 508 U.S. 275 (1993).

Trial counsel did not move to dismiss the drug-related murder and drug conspiracy counts on Indictment Clause or Ex Post Facto grounds. They also did not move to dismiss on grounds that the statute of limitations had run. Their failure to so move was deficient performance. Trial counsel also did not request a beyond-a-reasonable-doubt instruction or object to its omission. The failure to request or object to the lack of a reasonable-doubt instruction was deficient performance.

After the Second Circuit vacated his death sentences and remanded for re-sentencing following his initial appeal, Mr. Aquart's new lawyers raised this challenge to the drug-related murder counts in a motion to dismiss in the district court. Doc. 1312. After the district court denied the motion to dismiss, Mr. Aquart

then raised the challenges again on direct appeal from the judgment imposed following re-sentencing in *Aquart* (II), No. 21-2763, Dkt. Nos. 47, 93, 103 (2d Cir. 2021) (opening, reply, and supplemental pro se reply briefs).

The district court and the Second Circuit declined to reach the merits of the challenges, concluding they were foreclosed by the mandate rule. *Aquart* (II), 92 F.4th at 87. Because neither court reached the merits, the challenges may be considered here, in support of Mr. Aquart's ineffective assistance of trial counsel claim.

Had trial counsel raised these challenges during the original trial proceedings, the result would have been different at trial or on the first direct appeal, resulting in dismissal of the drug-related murder and drug-conspiracy counts or a different verdict by the jury on those counts.

As discussed above with respect to the VICAR counts, some of the drug counts are multiplicitous and require vacatur and resentencing in light of the Supreme Court's decisions in *Barrett* and *Wooden*.

### C. Trial counsel provided ineffective assistance of counsel when they failed to raise a Sixth Amendment Speedy Trial Challenge to the over five-year pretrial delay.

Mr. Aquart incorporates and alleges, as if fully set forth herein, the facts and arguments set out in Mr. Aquart's constitutional speedy trial motion filed in the district court on remand, Doc. 1314, attached as Ex. XXX-B, and his opening and reply briefs and his pro se supplemental reply brief filed in *Aquart(II)*, No. 21-2763, Dkt. Nos. 47, 93, 103 (2d Cir. 2021), attached as Ex. XXX-A.

The government took approximately five-and-one-half years to bring Mr. Aquart to trial. That extraordinary delay was presumptively oppressive and prejudicial. Over the course of that extreme delay, against Mr. Aquart's expressed wishes and for which the government bears significant responsibility, important witnesses with information helpful to the defense died (*e.g.*, James Rucker, an important member of and witness to the drug operations and relationships at 215 Charles Street) or became unavailable (*e.g.*, Nathaniel Grant, originally charged in the offenses, who could have undercut the government's motive narrative for the homicides), and the delay exacerbated the impact of the government's tardy disclosure of, for example, phone records and witnesses statements, fatally impairing the defense team's ability to investigate and prepare for trial. The delay violated Mr. Aquart's Sixth Amendment right to a speedy trial, under well-settled law of this circuit. *See United States v. Black*, 918 F.3d 243 (2d Cir. 2019); *United States v. Tigano*, 880 F.3d 602 (2d Cir. 2018); *United States v. Pennick*, 713 F. App'x 33 (2d Cir. 2017).

Mr. Aquart's trial counsel did not move to dismiss the indictment against him on constitutional speedy-trial grounds. Indeed, trial counsel noted, contrary to Mr. Aquart's express wishes, that he wanted the case to proceed slowly and was puzzled by speedy-trial litigation. Doc. 1205 (July 6, 2010, Status Conference), at 46-47. Their failure to so move amounted to deficient performance.

After the Second Circuit vacated his death sentences and remanded for re-sentencing following his initial appeal, Mr. Aquart's new lawyers raised this

Speedy-Trial challenge in a motion to dismiss in the district court. Doc. 1314. After the district court denied the motion to dismiss, Mr. Aquart then raised the challenges again on direct appeal from the judgment imposed following re-sentencing in *Aquart* (II), No. 21-2763, Docs. 47, 93, 103 (2d Cir. 2021) (opening, reply, and supplemental pro se reply briefs).

The district court and the Second Circuit declined to reach the merits of the challenge, concluding they were foreclosed by the mandate rule. *Aquart II*, 92 F.4th at 87. The Second Circuit reviewed the issue only under an exception to the mandate rule, requiring the far higher showing of clear error or manifest injustice. *Id.* at 95. Because neither court reached the merits, and because trial counsel failed to litigate the issue in the first instance, at which time they could have shown that Mr. Aquart in fact desired to exercise his speedy-trial right and that the delay impaired their ability to investigate and prepare the defense, as alleged herein, the challenges may be considered here, in support of Mr. Aquart's ineffective assistance of trial counsel claim.

Had trial counsel raised this challenge during the original trial proceedings, the result would have been different at trial or on the first direct appeal, resulting in dismissal of the indictment against him or a different verdict by the jury.

### D. Trial counsel provided ineffective assistance of counsel when they failed to raise a Sixth Amendment Confrontation Clause Challenge to the testimony of Lashika Johnson.

Mr. Aquart incorporates and alleges, as if fully set forth herein, the facts arguments set out in his pro se supplemental reply brief filed in *Aquart* (II), No. 21-2763, Doc. 103 (2d Cir. 2021), attached as Ex. XXX-A.

Lashika Johnson testified that her brother Efrain Johnson made statements incriminating Mr. Aquart to her--statements inconsistent with statements he was alleged to have made to law enforcement in pursuit of a cooperation agreement and testified to subsequently at his own trials. *See generally* TT. 2803-2972; *see also* Claims IV and VI. Admission of these unreliable statements, from a witness who was not unavailable, offered by a witness seeking her own benefit from the government violated the guarantees of the Sixth Amendment's confrontation clause. *See, e.g.*, *Hemphill v. New York*, 595 U.S. 140 (2022); *Crawford*, 541 U.S. 36.

Trial counsel failed to move to preclude the testimony on Confrontation Ground grounds.

These alleged statements made by a purported participant corroborated the government's theory of guilt. Had trial counsel raised this challenge during the original trial proceedings and sought suppression of the evidence, the result would have been different at trial or on the first direct appeal.

**E. The government violated Mr. Aquart's due process rights when it relied on false information.**

Mr. Aquart incorporates and alleges, as if fully set forth herein, the facts and arguments set out in his objections filed in the district court ahead of resentencing, Doc. 1356, attached as Ex. XXX-C, and his pro se supplemental reply brief in *Aquart* (II), No. 21-2763, Dkt. No. 103 (2d Cir. 2021), attached as Ex. XXX-A.

In sum, throughout the proceedings, the government relied on false information, including, but not limited to:

1. DNA and fingerprint evidence collected at the scene showed that persons other than Mr. Aquart were guilty of the homicides. *See*

*also e.g.* Claims I, II, XXXI.

2. The government's theory of motive rested on a dispute between Mr. Aquart and Tina Johnson, which led him to threaten her. Contrary to the government's theory, phone records demonstrated an ongoing cooperative working relationship between Tina Johnson, government witness Sherrell Randolph, who lied when she denied knowing Tina Johnson, and Mr. Aquart. *See also e.g.* Claim XII.
3. John Taylor's account that Mr. Aquart entered the apartment and participated in the homicides is contradicted by DNA evidence linking unknown suspects to the homicides. *See also e.g.* Claims I, II, III, IV.
4. John Taylor's account of a prior attempt and other prejudicial details of the homicides were further contradicted by the accounts of other witnesses, the physical evidence recovered from the scene, and Taylor's own evolving and inconsistent statements to law enforcement and at the later trials of Efrain Johnson. *See also e.g.* Claims III, IV.
5. Latavia Whittingham, one of Tina Johnson's daughters, both at Mr. Aquart's original sentencing and at his re-sentencing following remand from the Second Circuit was allowed to falsely claim that Mr. Aquart said to her that the killing of her mother "wasn't personal, it was just business." DE1196 (December 17, 2012, sentencing transcript) at 6; see also DE1369 (October 21, 2021, re-sentencing transcript) at 68, 71, 73. Mr. Aquart never made that statement and, indeed, had no opportunity to speak privately to witness or victim family members. The government failed to correct these false statements.

Reliance on such false information violated Mr. Aquart's right to due process under the Fifth Amendment. *See Glossip v. Oklahoma*, 604 U.S. 226 (2025); *Townsend v. Burke*, 334 U.S. 740, 741 (1948); *United States v. Malcolm*, 432 F.2d 809 (2d Cir. 1970).

Had the government not introduced this false information, the result would have been different at trial or on appeal.

### F. Trial counsel provided ineffective assistance of counsel in failing to investigate and present evidence that would have shown Mr. Aquart's criminal history was wrongly calculated.

In calculating Mr. Aquart's criminal history, the government and the Court included 3 criminal history points for:

> An October 15, 1996 arrest with a January 15, 1997 conviction for Sale of a Hallucinogen/Narcotics, for which the defendant was sentenced to two years imprisonment.

Doc. 1098 at 5.

Trial counsel, however, had records establishing that Mr. Aquart was, in fact, in custody on another offense on October 15, 1996 (*see*, *e.g.*, Ex. XXX-D, Hartford Detention Grade Report (dated Oct. 30, 1996) and, thus, he could not have committed the offense set out in the government's sentencing memorandum.

Trial counsel performed deficiently in failing to present evidence to correct this error in calculating Mr. Aquart's criminal history and to establish that he had not and could not have committed the offense in question. Trial counsel also performed deficiently in not taking steps in the state court to have the prior conviction overturned or otherwise invalidated or expunged. Had trial counsel provided effective representation, Mr. Aquart's criminal history would have been calculated differently, which would have affected the determination of his discretionary, non-capital sentences.

Trial counsel also performed deficiently in failing to investigate and challenge Mr. Aquart's other criminal history. At a hearing, and after appropriate discovery, Mr. Aquart will demonstrate the resulting prejudice.

## XXXI. The fundamental fairness of the entire trial was undermined by the introduction of scientific evidence that would not be admissible today, the introduction of testimony at odds with the DNA, and the government's failure to investigate other suspects.

### A. The DNA analyses admitted against Mr. Aquart would not be considered reliable science today.

The admission of DNA evidence that has since been shown to be severely flawed undermined the fundamental fairness of Mr. Aquart's trial, in violation of his right to due process. The State lab analyzed the DNA evidence in Mr. Aquart's case between 2005 and 2010. Each of the evidentiary samples at issue here contained a complex mixture—a fact DNA analyst Christine Roy readily conceded at trial. Even before Mr. Aquart's trial, there were significant concerns in the scientific community about interpretation of such mixtures, particularly using the methods employed by Ms. Roy. See Claim I, *supra*. In the years since Mr. Aquart's conviction, those concerns have led to the rejection of such methods. That shift in scientific understanding and methodology places the DNA analyses presented in Mr. Aquart's case in serious doubt. These analyses would not be generally accepted in the scientific community today and, thus, would not meet the standard of Rule 702 for admission. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 26 ("The challenged profiles required decisions about mixtures, weak alleles, dropout, contamination, injection sensitivity, and statistical reporting. The audit findings indicate that several of those decision points were not fully governed by documented procedures, validated studies, complete reporting, or complete corrective-action processes. The documented Quality System and SOP failures substantially undermines confidence in the reliability of any of these analyses.").

Over the past fifteen years, forensic science has continued to refine the interpretation of complex DNA mixtures. Laboratories have recognized the pervasive risk of contamination and adopted stringent quality-control practices, exposing serious and systemic flaws in earlier DNA work. The forensic DNA community has largely repudiated the Combined Probability of Inclusion method used in Mr. Aquart's case, after widespread misuse revealed that the method is scientifically unsound for mixture interpretation. At the same time, the field has increasingly professionalized, abandoning deference to individual analyst judgment in favor of method reliability, with rigorous validation studies required to establish scientific validity. These developments reflect a change in science that constitutes newly discovered scientific evidence and calls into serious question the validity, reliability, and admissibility of the DNA evidence presented in Mr. Aquart's case.

At least two Courts of Appeals have recognized due process claims where a habeas petitioner's conviction rests on forensic evidence that was thereafter discredited. *See Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159, 162, 166-69 (3d Cir. 2015); *Gimenez v. Ochoa*, 821 F.3d 1136, 1144-45 (9th Cir. 2016) (observing that due process claim predicated on discredited evidence "is essential in an age where forensics that were once considered unassailable are subject to serious doubt" and joining "the Third Circuit in recognizing that habeas petitioners can allege a constitutional violation from the introduction of flawed expert testimony at trial"); *see also Feather v. United States*, 18 F.4th 982, 986 (8th

Cir. 2021) (assuming without deciding that government's use of discredited scientific evidence could violate defendant's right to due process).

For such a claim to succeed, a petitioner "must show that the admission of . . . expert testimony undermined the fundamental fairness of the entire trial because the probative value of [that] evidence, though relevant, [was] greatly outweighed by the prejudice to the accused from its admission." *Lee*, 798 F.3d at 166; *Gimenez*, 821 F.3d at 1145 (same). In *Lee*, the panel affirmed the district court's grant of habeas because (1) scientific developments after trial had rendered certain forensic evidence invalid, and (2) the state failed to point to "ample" evidence apart from the discredited forensic evidence sufficient to prove guilt beyond a reasonable doubt. 798 F.3d at 167-69.

### 1. Changing understanding of the pervasive impact of contamination on the reliability of forensic testing

For much of the early period of forensic DNA testing, contamination was treated as a discrete laboratory mishap rather than a pervasive scientific risk requiring systematic study. Although laboratories employed basic contamination precautions, there was no formal requirement that contamination risk be empirically evaluated as part of internal validation, particularly in the context of complex DNA mixtures. That understanding began to change in the late 2000s prior to Mr. Aquart's trial. In 2009, the FBI's Quality Assurance Standards for Forensic DNA Testing Laboratories emphasized contamination monitoring and, for the first time, required internal validation studies designed to assess how laboratory processes—including mixture interpretation—could be affected by contamination.

*See* Ex. I-D, 2009 QAS. Contamination was no longer viewed as an occasional error to be ruled out by analyst judgment, but as an inherent and ongoing risk that must be systematically detected, measured, and controlled through validated procedures.

Subsequent developments in forensic standards and accreditation further confirm the inadequacy of pre-2009 contamination practices. In the years following the FBI's 2009 Quality Assurance Standards, laboratories were required not only to acknowledge contamination risk, but to demonstrate—through validation, monitoring, and documented corrective action—that contamination could be reliably detected, bounded, and addressed, particularly in mixture interpretation. Laboratories that failed to meet those expectations increasingly lost accreditation or were forced to suspend operations, not because contamination was newly discovered, but because earlier protocols proved incapable of managing it. These accreditation failures underscore that pre-2009 practices rested on assumptions—chief among them that contamination could be ruled out through precaution and analyst judgment—that are no longer scientifically defensible today. They reveal that contamination risks present in earlier DNA testing, especially in complex mixtures, were systematically underestimated rather than meaningfully controlled.

Those evolving expectations were not academic—they reshaped what labs are required to do when contamination is suspected, and how institutions are judged when they fail. One prominent example came in 2015 and 2016, when the Texas Forensic Science Commission conducted a full-scale audit of the Austin Police Department's DNA section. The Commission's audit uncovered serious deficiencies,

triggering suspension of lab operations and underscoring that contamination control and mixture interpretation failures were *system-level* reliability issues, not matters of individual analyst care. *See* Texas Forensic Science Commission, *Final Audit Report for Austin Police Department Forensic Services Division DNA Section* (July 8, 2016) ("Final Austin Audit Report"), available at https://static.texastribune.org.

In the years that followed, a shift in how contamination is treated cemented across the forensic DNA community. Under modern forensic DNA quality systems, contamination events are no longer treated as isolated technical anomalies—they signal a potential failure of the laboratory's entire quality system. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D.

This modern approach to contamination can be seen in two recent major laboratory incidents: in 2024, New York City's Office of Chief Medical Examiner documented multiple contamination events tied to evidence examination, and temporarily paused key functions (including evidence examination and report issuance) while it conducted a wider review and implemented corrective actions. The lab also formally notified key stakeholders, publicly issuing a root cause analysis report. NYC OCME, *Root Cause Analysis Report*, RCA #2024-01 (Nov. 4, 2024), available at https://a860-gpp.nyc.gov. And in the same year in Minneapolis, Minnesota (Hennepin County), the crime lab paused DNA testing after discovering "sporadic" contamination, shut down for several weeks, and undertook a large-scale review of samples and retesting decisions before resuming casework. *See, e.g.,* Nick

Lentz, *DNA analysis at Hennepin County forensic lab stopped after finding contamination*, CBS News (Oct. 15, 2024).

Current accreditation frameworks require laboratories to assume that any detected contamination may reflect a systemic breakdown unless and until proven otherwise. *See* National Accreditation Board General Requirement for the Competence of Testing Laboratories ISO 17025, available at https://anab.ansi.org; 2025 FBI Quality Assurance Standards, available at https://le.fbi.gov; and post-2009 SWGDAM guidance, available at https://www.swgdam.org. As a result, a contamination event automatically triggers formal corrective action procedures: documentation of the event, suspension or limitation of affected casework, root-cause analysis, assessment of scope and impact (including retrospective review of prior cases), implementation of corrective and preventive measures, and verification that those measures are effective before normal operations resume. Analyst assurances or subjective judgments are no longer sufficient to resolve a contamination issue; the laboratory must generate objective, auditable evidence that contamination has been identified, bounded, and controlled. This institutional response reflects the modern scientific understanding that contamination is an inherent risk in DNA testing—especially in mixture interpretation—and that failure to treat contamination as a Corrective Action Report compromises the reliability of all downstream analytical conclusions.

The State lab's response to clear contamination in this case stands in stark contrast to these modern requirements. In 2010, prior to trial, the lab documented

contamination in a key evidentiary sample (#16-Z-1), yet treated the event as an isolated anomaly rather than a potential system failure. *See* Claim I, *supra; see also* Ex. I-A, Expert Report of Keith Inman, Ph.D. The trace examiner, whose profile was found in the evidentiary sample, testified that no supervisor had spoken to her about the contamination and she was aware of no investigation into it. TT at 3090-93. Had the lab examined its own testing data, it would have observed that multiple samples exhibited alleles in negative controls and reagent blanks and that several positive controls contained unexplained drop-in alleles—classic indicators of broader systemic contamination. Instead, the analysts addressed the issue informally: they held no documented review, initiated no corrective action report, conducted no root-cause analysis, assessed no scope or impact, and generated no written record. The other evidentiary samples in this matter—which were being offered to convict Mr. Aquart of a death-eligible crime—were not retested or reevaluated, and the reports regarding them were not rescinded. Instead, the report on a single evidentiary sample was changed to "inconclusive" and the sole operational change in the laboratory was that analysts began wearing masks during evidence processing.

At trial, both the analyst and the government minimized the contamination, assuring the jury that it was confined to a single sample among more than seventy and had no effect on any other testing.

> For instance, you are going to hear from the DNA examiner that one evidentiary swab amongst 70 taken in this case was contaminated at the lab by another technician.

TT at 49; *see also* TT at 3201, 3583 (testimony of Christine Roy regarding contamination event). Those assurances to the jury rested entirely on assumption, not substantive investigation. Fundamentally, such assurance was both unscientific and false. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 8-9 ("[T]he extent of the contamination issue in the Connecticut DPS laboratory during the relevant testing period is unknown, again undermining confidence in assessing whether the resulting evidentiary profiles were accurate representations of the initial DNA deposited on the tested evidence items."). Soon after trial, the FBI issued scathing audit findings regarding the lab's lack of protocols for contamination—confirming that the lab's handling of contamination in this case fell well below standards now recognized as essential to reliable DNA analysis. *See* Ex. I-AG, July 2011 FBI Quality Assurance Standards Casework Audit.

**2. Changing understanding of the inappropriateness of using the Combined Probability of Inclusion to interpret complex mixtures**

The interpretation of complex, low-level DNA mixtures like those the government used against Mr. Aquart long has been the most contested area of forensic DNA analysis. As the Texas Forensic Science Commission recognized, there was "significant confusion in the forensic DNA community regarding mixture interpretation from the inception of PCR-based methods in the mid-late 1990s to [2016]," Final Austin Audit Report at 9, and laboratories "have not always interpreted complex mixtures properly." *Id.* at 10. That confusion was not limited to isolated practitioners or outlier laboratories; methods varied widely from lab to lab—and even within the same laboratory—reflecting the absence of a coherent,

validated scientific framework for mixture interpretation. In that environment, statistical approaches were often adopted out of necessity rather than demonstrated suitability and validation and were applied to increasingly complex evidence without adequate empirical support.

One such approach was the statistical method used by the DNA analyst here: the Combined Probability of Inclusion, which emerged as a default statistical method for mixture interpretation despite being developed for far simpler scenarios. CPI assumes that contributors cannot be differentiated and that alleles are treated as equally weighted. As it came to be applied in practice, critical phenomena such as stochastic effects and dropout were unscientifically addressed through analyst judgment rather than empirical modeling. As DNA testing became more sensitive and mixtures more complex, those assumptions were routinely strained or violated. Over time, widespread misapplication became apparent: CPI was used on increasingly complex mixtures with unknown numbers of contributors, interpreted in ways driven by known reference profiles, and adjusted post-comparison through ad hoc dropout assumptions. These practices produced analyses supported by statistics that appeared objective and probative, but in fact rested on circular reasoning and unvalidated methodological choices. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D.

The study conducted by Dr. James Curran and Dr. John Buckleton into CPI illustrated these issues clearly. James M. Curran & John Buckleton, *Inclusion Probabilities and Dropout*, J. Forensic Sci. 55 (2010). The FBI's 2010 SWGDAM

guidelines similarly reflected growing recognition that CPI was being applied to data that exceeded its scientific limitations. Even after SWGDAM's intervention and by the mid-2010s, the forensic science community continued to be confronted with persistent reliability challenges in complex mixture interpretation. Large-scale interlaboratory studies conducted by the National Institute of Standards and Technology ("NIST")—most notably the MIX13 study—demonstrated profound variability in CPI-based mixture interpretation and exposed the lack of reproducibility and reliability across laboratories. NIST Interlaboratory Mixture Interpretation Study 2013, available at https://www.nist.gov. As to one of the mixtures in the study, 69% of study participants falsely included a known non-contributor and the range of statistics provided varied by multiple orders of magnitude. Michael Coble, *Interpretation Errors Detected in a NIST Interlaboratory Study on DNA Mixture Interpretation in the U.S.*, at 34, International Forensics Symposium on Error Management (July 22, 2015), available at https://www.nist.gov.

MIX13's results revealed striking inconsistency: laboratories examining the same data reached materially different conclusions about inclusion and exclusion, assigned vastly different statistical weights, and made divergent assumptions about the number of contributors and the presence of dropout. Critically, these differences were not explained by random error, but by subjective analyst choices embedded within CPI-based interpretation—choices that were neither standardized nor empirically validated. MIX13 demonstrated that CPI did not constrain

interpretation in a reproducible or scientifically meaningful way; instead, it allowed analyst discretion to drive outcomes, producing statistics that appeared precise but were highly sensitive to untested assumptions. The study showed that, for complex mixtures, CPI-based methods lack the reliability and reproducibility required of a valid scientific technique. *Id.* at 16, 22, 23, 37.

That same year, the Texas Forensic Science Commission set up a statewide review of DNA mixture interpretation cases. The Commission was concerned that laboratory interpretation policies and procedures across the state, which relied on CPI in mixture interpretation, may have been inappropriate for complex DNA mixture analysis, resulting in potential false inclusions or overstated statistics. *See* Texas Forensic Science Commission, *Fifth Annual Report* (2016), available at https://www.txcourts.gov. The statewide audit resulted in the reevaluation of numerous cases, the reissuance of reports, exoneration of defendants, and ultimately, the shutdown of one reviewed lab--the Austin Police Department's DNA laboratory. The Austin laboratory's accreditation was revoked and operations were suspended for two principal reasons that closely echo the work of the Connecticut State lab here: (1) the lab's improper use of CPI in mixture interpretation, including its failure to implement a valid stochastic threshold and its practice of inferring drop-out after reviewing known reference profiles rather than evaluating the evidentiary samples independently; and (2) the lab's inadequate response to contamination events. *See* Final Austin Audit Report.

In 2016, the President's Council of Advisors on Science and Technology issued a new report assessing the scientific validity of a number of forensic feature comparison methods, including complex DNA mixture interpretation and application of the combined probability of inclusion. *See* PCAST Report. The PCAST Report concluded that, "the interpretation of complex DNA mixtures with the CPI statistic has been an inadequately specified—and thus inappropriately subjective—method. As such, the method is clearly not foundationally valid" and "has the potential to lead to erroneous results." *Id.* at 78, 82.

By the late 2010s, CPI was no longer regarded as a generally reliable method for interpreting complex DNA mixtures. Laboratories and oversight bodies increasingly recognized that CPI's apparent simplicity masked an absence of validation, a dependence on analyst discretion, a susceptibility to confirmation bias, and an unacceptable risk of false inclusions. This recognition gradually translated into concrete institutional change: laboratories abandoned CPI for complex mixtures, audits and accreditation bodies flagged CPI misuse as a serious deficiency, and probabilistic genotyping systems—capable of modeling dropout, drop-in, and contributor number empirically—emerged as the scientifically accepted alternative. Together, these developments marked the effective end of CPI as a reliable method for complex mixture interpretation.

Were the case against Mr. Aquart tried today, the DNA analyses conducted by Ms. Roy would be plainly inadmissible under contemporary scientific standards. *See generally* Ex. I-A, Expert Report of Keith Inman, Ph.D. Ms. Roy relied on a

suspect-centric application of CPI that lacked properly validated analytical and stochastic thresholds, made no effort to assess allele dropout prospectively from the evidentiary samples, and instead inferred dropout only after comparison to known reference profiles. As a result, Ms. Roy generated different statistical conclusions depending on which person's profile was being compared—an outcome that reflects methodological circularity rather than probative scientific analysis. She further failed to determine the number of contributors or constrain her possible profile combinations before interpreting the mixtures and made no attempt to reduce the complexity of her analyses by conditioning any of the mixtures on expected contributors. Each of these departures is independently disqualifying under current practice; taken together, they demonstrate that the DNA testimony offered at trial rested on unvalidated and unreliable judgment rather than a reliable scientific method. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D.

#### 3. Changing understanding of the foundational importance of documented validation studies and consistent interpretation procedures

In the years following Mr. Aquart's trial, the forensic DNA community continued to reassess what it means for a DNA interpretation method to be scientifically reliable. Where earlier practice often treated analyst training and experience as sufficient guarantors of reliability, modern forensic science has rejected that approach in favor of empirically demonstrated method validity. This shift took hold in earnest with the 2016 PCAST Report, which defined in simple terms the kind of validation testing required to establish scientific reliability. Today, it is universally accepted that the reliability of DNA evidence depends not on

the subjective judgment of an individual analyst, but on whether the laboratory can point to documented validation studies establishing that its methods perform reliably under defined conditions and are applied through consistent, standardized procedures. "All scientific methods have limits. To use a method appropriately, one must understand those limits." Butler, et al., *DNA Mixture Interpretation: A NIST Scientific Foundation Review* (2024), https://nvlpubs.nist.gov/nistpubs/ir/2024/NIST.IR.8351.pdf.

This shift reflects a growing recognition that complex DNA mixture interpretation is inherently vulnerable to cognitive bias, irreproducibility, and silent error when analyst discretion is unconstrained. Without formal validation, laboratories cannot know whether their interpretive rules accurately account for stochastic effects, contributor number, peak height variation, or contamination risk—or whether those rules produce consistent results across analysts and cases. As oversight bodies and scientific organizations have emphasized, a method that cannot be shown, through validation, to perform reliably in the laboratory's own hands cannot be considered scientifically sound, regardless of how confidently it is applied.

As a result, contemporary standards now require laboratories to conduct and document validation studies tailored to the specific methods they employ, and to implement written interpretation procedures that limit discretion and ensure reproducibility. These requirements mark a decisive departure from earlier practices, in which laboratories often relied on informal conventions, analyst

judgment, or inherited methods without empirical testing. This evolution in scientific understanding bears directly on the DNA evidence presented in Mr. Aquart's case, where critical interpretive decisions were made in the absence of validated procedures or documented validation data.

The current scientific understanding of the foundational role of validation would have materially altered the DNA analyses in Mr. Aquart's case in at least two critical respects. First, in interpreting the mixtures at issue, Ms. Roy did not determine the number of contributors indicated by the data. Indeed, the laboratory lacked any documented procedure for estimating the number of contributors, as the FBI found in its 2011 audits. Ex. I-AG July 2011 FBI Quality Assurance Casework Audit. While at the time of trial, SWGDAM and other scientific bodies already strongly recommended determination of number of contributors, this recommendation is now accepted practice. Contemporary scientific consensus recognizes that "[i]nferring the NOC is one of the first steps in DNA mixture interpretation. Whether interpretation is performed manually or with the aid of a [probabilistic genotyping system], the NOC estimate is an important input to interpretation that constrains the number of possible genotype combinations that are considered." John M. Butler, *Supplemental Document to DNA Mixture Interpretation: A NIST Scientific Foundation Review,* at 29, available at https://www.nist.gov. Accordingly, modern DNA laboratories establish empirically validated limits on the maximum number of contributors they will interpret and decline to analyze mixtures that exceed those bounds.

Many laboratories have imposed a number of contributor cut off of four contributors, but no laboratory has validated mixture interpretation for more than five contributors. *See United States v. Ortiz*, 736 F.Supp.3d 895 (S.D. Cal. 2024) (excluding expert DNA testimony where there were "numerous" indications that analyst had underestimated number of contributors, giving rise to "a significant likelihood that [the number of contributors] was six or greater[,]" and holding that "there has not been general acceptance or peer review approval of STRmix for six-person mixtures"). Had the laboratory in this matter had a validated procedure for determining number of contributors and a validated limit on the maximum number of contributors they would interpret, the majority of the samples evaluated by and reported out by Ms. Roy as inculpating Mr. Aquart would have been found too complex to be interpretable. *See* Ex. I-A, Expert Report of Keith Inman, Ph.D., at 1 ("given their complexity, ... five of [the six evidentiary] samples under current standards using modern methods would be deemed uninterpretable.").

Second, the heightened emphasis on documented validation and the community's understanding of its importance to establishing reliability would have made Ms. Roy's unvalidated interpretations of all the samples in this matter inadmissible. PCAST Report at 80-81 (noting that scientific validity has only been established within the specific range for which experimental evidence of validity is available); *People v. Hillary*, Ind. No. 2015-15, slip op. at 8 (St. Lawrence Cty. Ct., N.Y., Aug. 26, 2016) (holding that "the lack of internal validation by the New York State Police crime lab . . . precludes the use of the STRmix results"). "[A]

laboratory's satisfaction with its validation results does not" necessarily demonstrate that "the principles underlying the procedures are valid." *People v. Collins*, 49 Misc. 3d 595, 613, 15 N.Y.S.3d 564, 576 (N.Y. Sup. Ct. 2015). Instead, the court must independently determine that the internal validation is adequate to cover the procedure used in any particular case. As the July 2011 FBI Quality Assurance Standards Casework Audit of the Connecticut State lab noted, the State lab lacked appropriate internal validation studies examining contamination and failed to define its interpretation guidelines and quality assurance parameters through appropriate internal validation. Ex. I-AG.

Here, Mr. Aquart easily meets the standard for a due process violation under *Lee*, because the flawed DNA evidence undermined the fundamental fairness of his entire trial. *Cf. Gimenez*, 821 F.3d at 1145 (denying due process claim where petitioner "presented literature revealing not so much a repudiation of [evidence], but a vigorous debate about its validity within the scientific community").

Apart from the DNA evidence, there is not ample other evidence on which to rest a conviction. *See Lee*, 798 F.3d at 167-68 (rejecting argument that remaining evidence—testimony regarding an autopsy report, testimony regarding petitioner's demeaner, and inconsistencies in petitioner's account of the night of the incident—was sufficient to prove guilt beyond a reasonable doubt). Accordingly, any probative value of the DNA evidence was greatly outweighed by the prejudice to Mr. Aquart from its admission, and thus the admission of the DNA evidence undermined the fundamental fairness of Mr. Aquart's trial.

**B. The presentation by the government of cooperating witness testimony that it knew squarely conflicted with the DNA evidence violated Due Process**

Foundational aspects of the latent impression testimony used by the government to tie Mr. Aquart to the crime scene have since been discredited. *See* Claim II. For example, it is no longer accepted practice for latent print examiners to portray fingerprints as "unique," to describe latent print comparisons as "matches," or to suggest an accused person "made" a latent print discovered at the scene of a crime. *See* Ex. II-J, Eldridge Decl. at 9-10. In addition, the examiner's conclusion about the "match" to Mr. Aquart was erroneous. *Id.* at 6, 10. The government cannot point to significant other evidence tying Mr. Aquart to the crime scene; its case relied entirely on cooperating witnesses and now-discredited forensic evidence. The jury's reliance on latent impression evidence in reaching its verdict therefore violated Mr. Aquart's right to due process.

**C. Mr. Aquart's conviction violates due process because it is based on unreliable science regarding latent impression evidence.**

The government's primary cooperating witness, John Taylor, who provided the only (purported) view from inside the apartment that night, gave very specific details in his testimony, claiming that only the Aquart brothers went into the bedroom where James Reid and Tina Johnson were found and only the Aquart brothers bound their wrists with duct tape. But skin cells from chunks of flesh under the fingernails of both Tina Johnsons's hands, which appeared to come from a struggle with her attacker—a struggle so intense it broke her wrist—were submitted for DNA analysis (evidentiary items 32-1-Z1 and 32-2-Z1). DNA Analyst

Roy determined the profiles in 32-1-Z1 and Z2 belonged to a male, and testified the DNA profile could not be from the Aquarts, Taylor, Efrain Johnson, or either of the male victims. TT at 3446-51. The government nonetheless promoted Taylor's testimony as truthful.

Taylor also specifically and consistently testified that Efrain Johnson never went into the bedroom where Tina Johnson and James Reid's wrists were bound by duct tape. The prosecutors proffered this testimony and claimed it to be the truth. And yet, trapped within the tape binding Tina Johnson's hands were sections of a ripped latex glove containing a single source DNA profile that Ms. Roy testified proved to be a match (with odds of one in 7 billion) to Efrain Johnson (9-Z-2). TT at 3164, 3169, 3171-3172; Ex. XXXI-A, Offender Hit Notification Form (Feb. 23, 2007). Moreover, another DNA profile was found on a torn edge of duct tape binding Tina Johnson's hands (8-Z-3); that profile also could not be from the Aquarts, Johnson, Taylor, or the male victims. This is also true in regards to the duct tape binding James Reid's ankles (12-Z-1) and the horrific "death mask" (10-Z-1) that encased James Reid's head, which Taylor attributed to the Aquarts. TT at 3435, 3438, 3439, 4278

John Taylor's testimony and the lab reports cannot both be true.

To pursue relief from a conviction based on claimed perjury, Mr. Aquart must make a threshold showing that the witness in fact willfully testified falsely and that the falsehoods were not known to him at the time of trial. *See Stewart*, 433 F.3d at 297; *see also United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) ("witness

commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory”). If the prosecution knew, or should have known, of the false testimony prior to the conclusion of trial, the conviction must be set aside if there is “any reasonable likelihood” that the testimony could have affected the jury’s judgment. *United States v. Cromitie*, 727 F.3d 194, 221–22 (2d Cir. 2013) (internal quotation marks omitted) (collecting cases).

**XXXII. Mr. Aquart’s due process rights were violated by the government’s failure to investigate other suspects.**

Significant quantities of a male’s skin under victim Tina Johnson’s fingernails contained DNA not attributable to any of the people charged with her murder, and there were unattributed fingerprints all over the crime scene. *See* Claims I, II, *supra*. But the government stopped investigating after charging Mr. Aquart, Azikiwe Aquart, Taylor, and Efrain Johnson, even though it had access to continually updated databases containing the DNA and latent impressions of other possible contributors and despite other evidence pointing to viable suspects, including Jose Osario, Rodney Womble, Sherrell Randolph, Frank Hodges and additional known and unknown persons. This violated Mr. Aquart’s right to due process.

**XXXIII. Mr. Aquart is factually and legally innocent of the charges.**

“A prisoner asserting actual innocence,” as Mr. Aquart is here, “challenges the validity of his convictions, whether factually or legally, and that lies close to the

core of habeas corpus." *Fernandez v. United States*, 608 U.S. __, 146 S. Ct. `192, 1306 (2026) (cleaned up). Indeed, habeas corpus "is a bulwark against convictions that violate fundamental fairness." *Engle v. Isaac*, 456 U.S. 107, 126 (1982) (cleaned up). Mr. Aquart has established that his convictions violated fundamental fairness in multiple ways—factual *and* legal—including (but not limited to) the introduction of faulty forensic evidence (Claims I-III, XXXI), the suborning of false or unreliable witness testimony (Claims IV, IX-X, XV, XVI, XXVIII), transgression of his Sixth Amendment right to counsel (Claims I-XIII, XXVIII, XXIX, XXX), and due process and other Fifth Amendment violations (Claims XXV-XXVIII, XXXI- XXXIII).

The Supreme Court recently confirmed that it has never ruled out the possibility of a freestanding actual innocence claim under § 2255. *Fernandez*, 146 S.Ct. at 1306. Given the showing that the government cannot prove Mr. Aquart's guilt beyond a reasonable doubt, his convictions should be vacated because he is innocent.

## CONCLUSION

The government's case against Mr. Aquart depended on two pillars: forensic evidence—the DNA and fingerprint evidence—and the eyewitness and cooperating witness testimony. Credible evidence now (and available at the time of trial) demonstrates that each of those grounds was at best unreliable and at worst outright erroneous. Credible evidence also demonstrates that ineffective assistance of counsel, government misconduct and juror errors interfered with Mr. Aquart's ability to obtain a fair trial where the problems with the evidence against him could

be fully explored. Examination of the issues raised here reveals that Mr. Aquart's convictions are unsupported, inconsistent with justice, and cannot be sustained.

## REQUEST FOR RELIEF

For all these reasons, individually and cumulatively, Mr. Aquart respectfully moves the Court to vacate his convictions, or in the alternative, to grant discovery and a hearing to further explore the issues raised by this motion.

Dated: July 13, 2026

THE DEFENDANT,
AZIBO AQUART

By his counsel:

s/
Monica Foster
Indiana Federal Community Defender
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
317-383-3520
IN Bar No.: 8368-49
E-mail: monica_foster@fd.org