UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| AZIBO AQUART | Crim. No. 3:26CV65 (SRU) |
| v. | |
| UNITED STATES OF AMERICA | October 11, 2026 |

**GOVERNMENT'S OPPOSITION TO PETITIONER'S MOTION TO VACATE CONVICTIONS AND SENTENCE**

On August 24, 2025, Azibo Aquart and three accomplices bound and brutally bludgeoned three people to death. On May 23, 2011, after a four-week trial, a jury convicted Aquart of murder in aid of racketeering, conspiracy to commit murder in aid of racketeering, drug-related murder, and narcotics conspiracy. Those convictions were affirmed twice by the Second Circuit across two appeals, and Aquart was sentenced to mandatory life imprisonment.

Now, Aquart has filed a petition under 28 U.S.C. § 2255 asking this Court to vacate his convictions and sentence. His over 300-page petition asserts a medley of 33 baseless challenges. Many of his claims are procedurally barred, either because they were resolved during the years-long appellate review of his case, or because they are defaulted.

In any event, all of his claims are meritless. Absent any viable claim, the instant petition perhaps seeks to make up in quantity what it lacks in quality. It runs the same baseless claims through multiple procedural mechanisms—first purported ineffective assistance of counsel, then purported discovery violations, then purported perjury violations, and so on. But Aquart cannot carry his burden as to any of the asserted claims.

Aquart was capably represented by multiple experienced, diligent, and conscientious attorneys. He received a fair jury trial, and his convictions were repeatedly affirmed on appeal.

Overwhelming evidence established Aquart's guilt—not only forensic evidence, but also testimony from multiple eyewitnesses, including one who watched Aquart commit the murders and others who testified to his threats beforehand, his disposal of incriminating evidence afterwards, and his jailhouse admissions later. After Aquart's trial, the three accomplices that Aquart recruited all either pleaded guilty and admitted to committing the murders with Aquart or were convicted at trial by other juries. There is simply no basis to overturn the jury's verdict or the sentence. The instant petition should be denied.

## I. Background

### A. Procedural History

On December 7, 2005, about four months after Aquart murdered victims Tina Johnson, Basil Williams, and James Reid, a federal grand jury indicted Aquart and others on narcotics charges. *See United States v. Aquart*, No. 3:05cr309. Aquart was first charged with the murders by the second superseding indictment, returned on June 28, 2007. *United States v. Aquart*, No. 3:06cr160, Doc. 105.[1] The day after he was first charged with the death penalty-eligible offenses, Aquart was assigned another attorney as learned counsel in the capital case. Doc. 108.

On March 3, 2010, the operative fourth superseding indictment charged Aquart in nine counts: conspiracy to murder in aid of racketeering ("VICAR conspiracy"), in violation of 18 U.S.C. § 1959(a)(5) (Count One); three counts of murder in aid of racketeering ("VICAR murder"), in violation of 18 U.S.C. § 1959(a)(1) and § 2 (Counts Two – Four); three counts of drug-related murder, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2 (Counts Five – Seven); conspiracy to distribute and to possess with intent to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846 (Count Eight); and possession of a firearm by a convicted

[1] All citations to "Doc." refer to district court docket no. 3:06cr160.

felon, in violation of 18 U.S.C. § 922(g)(1) (Count Ten). Doc. 361. On August 27, 2010, the Government filed an amended notice of intent to seek the death penalty against Aquart. Doc. 479.

On May 23, 2011, after a four-week trial on the narcotics and murder charges,[2] a jury found Aquart guilty on Counts One through Eight. Doc. 833. On June 15, 2011, the same jury unanimously found that Aquart should be sentenced to death for the murders of Tina Johnson and Basil Williams (Counts 2, 4, 5 and 7). Doc. 936. Accordingly, in the first sentencing proceeding on December 17, 2012,[3] the district court (Janet B. Arterton, J.) sentenced Aquart to death on Counts 2, 4, 5 and 7, to life imprisonment on Counts 3, 6, and 8, and to 10 years' imprisonment on Count 1. Docs. 1185, 1195.

Aquart then filed his first appeal, raising multiple challenges to his convictions, to the penalty phase of his trial, and to the constitutionality of the death penalty. In that appeal—as in the litigation that followed—Aquart "d[id] not here dispute the sufficiency of the evidence to prove that, together with others, he conspired to, and did in fact, murder Tina Johnson, James Reid, and Basil Williams." *United States v. Aquart*, 912 F.3d 1, 17 (2d Cir. 2018), *cert. denied*, 140 S. Ct. 511 (2019). Rather, he brought a series of technical challenges to his conviction and capital sentence.

In that initial appeal, the Second Circuit considered and resolved the following issues, as relevant here:

- **Denial of sufficiency challenge:** Sufficient trial evidence established VICAR's jurisdictional requirement of an interstate commerce nexus. *Id.* at 19. In particular, the evidence established that Aquart's "enterprise trafficked in crack cocaine . . . [which] is part of an economic class of activities that have a substantial effect on interstate commerce." *Id.* at 17-18 (cleaned up). "[A]mple" evidence established that "Aquart murdered Tina Johnson and two others in order to eliminate that competition" from a

[2] The district court severed Count Ten for trial and, on the government's motion, it was dismissed post-trial. Docs. 445, 1185.
[3] The district court had denied Aquart's post-trial motions. Docs. 1074, 1091.

perceived "drug rival who threatened the enterprise's monopoly." *Id.* at 19. Aquart committed the murders for the purpose of maintaining or increasing his position in the racketeering enterprise. *Id.* at 19-20.

- **Denial of perjury challenge as to John Taylor:** Aquart claimed there—as he does again here—that cooperator Taylor falsely understated his expectations for sentencing consideration ("I don't think I'm never going home"). *Id.* at 21. But the Second Circuit found that "Aquart failed to show that Taylor's challenged statement was false." *Id.* at 22. Moreover, Aquart presented no evidence that the Government was aware of any alleged falsehood at the time of trial. *Id.* at 23.

- **Denial of perjury challenge as to Lashika Johnson:** Aquart claimed there—as he does again here—that his then-girlfriend Lashika Johnson (who was also the sister of co-conspirator Efrain Johnson) falsely denied being threatened by the Government during a (counseled) proffer session. But the Second Circuit found that, on cross-examination at both Aquart's trial and her brother Efrain's trial, Lashika Johnson consistently "made clear that her testimony was a product of government pressure" to tell the truth or face consequences. *Id.* at 26.

- **Denial of prosecutorial misconduct challenge regarding Womble's DNA:** Aquart claimed there—as he does again here—that the prosecution interjected facts not in evidence by arguing, in response to defense argument and on rebuttal summation, that there was no record evidence that Rodney Womble's DNA was at the crime scene. *Id.* at 27-28. But the Second Circuit found that "the government was entitled to point out that no trial evidence, testimonial or forensic, had been adduced that put Womble (and, therefore, his DNA) at the scene of the charged murders." *Id.* at 29.

Having found no merit in any of Aquart's challenges to the guilt phase of his trial, the Second Circuit affirmed Aquart's convictions on all eight counts. *Id.* at 10, 29.

The Second Circuit then considered the penalty phase, denying multiple challenges to the sufficiency of the evidence as to Aquart's premeditation, substantial planning, and multiple killings—all of which constituted aggravating factors. *Id.* at 44-48. It also denied legal challenges to the constitutionality of the death penalty (under the Eighth Amendment and the Necessary and Proper Clause) and the purported arbitrariness of the Federal Death Penalty Act, among others. *Id.* at 49-69. However, the Circuit found error in two narrow aspects of the penalty phase, considered collectively—*first*, the prosecution's eliciting from a law enforcement witness that Efrain Johnson

had not received a cooperation agreement because "it was determined he was lying" (a type of "negative vouching" error), *id.* at 32-33; and *second*, the Government's argument, in summation, denigrating the defense mitigation strategy at the penalty phase, because it argued in the penalty phase that John Taylor played an aggravated role in the murders, but inconsistently argued in the guilty phase that Taylor wasn't even present for the murders (a violation of the defendant's Sixth Amendment right to present wholly inconsistent defenses and a potential vouching error), *id.* at 41-42.

Accordingly, on December 20, 2018, the Second Circuit affirmed Aquart's convictions on all eight counts, but vacated and remanded for a new penalty proceeding. *Id.* at 10.

Subsequently, the Government withdrew its notice of intent to seek the death penalty. Doc. 1299 at 4. Prior to the resentencing, Aquart filed a series of motions seeking to dismiss all counts of conviction and requesting resentencing, which the district court denied. Docs. 1310–14, 1354.[4] On October 21, 2021, in the second sentencing proceeding, the district court resentenced Aquart, in principal part, to concurrent terms of mandatory life imprisonment on each of Counts 2–4 (the VICAR murders); 40 years' imprisonment on each of Counts 5–7 (the drug-related murders); 40 years' imprisonment on Count 8 (the narcotics conspiracy); and 10 years' imprisonment on Count 1 (VICAR conspiracy). Doc. 1366.

Aquart then took a second appeal, in which he again raised a spate of new challenges to the convictions that had already been affirmed, including (1) whether Connecticut murder qualified as a VICAR predicate under the categorical approach; (2) whether his constitutional speedy trial

[4] Absent government objection, the district court granted Aquart's motion for resentencing on the narcotics conspiracy charge (Count 8) alone, to reflect interim changes in statutory drug quantities under 21 U.S.C. § 841. Doc. 1354. Because Aquart faced mandatory life imprisonment for the murder counts, the resentencing on Count 8 was immaterial.

rights were violated; (3) whether his convictions were vitiated by the change in the quantity of crack cocaine necessary to trigger penalties under 21 U.S.C. § 841(b)(1)(A); and (4) whether his simultaneous convictions for drug conspiracy and drug-related murder violated the Double Jeopardy clause. On January 29, 2024, the Second Circuit again affirmed Aquart's convictions on all eight counts.[5] *United States v. Aquart*, 92 F.4th 77, 85 (2d Cir. 2024), *cert. denied sub nom. Aquart v. United States.*, 145 S. Ct. 1071 (2025). The Circuit rejected the new challenges to Aquart's convictions as barred by the mandate rule and law-of-the-case doctrine. *Id.* at 88. It also held that his challenges to his murder convictions did not implicate jurisdiction or present either clear error or manifest injustice (and, in some cases, were also wrong on the merits). *Id.* at 88-100. It also rejected his Double Jeopardy challenge on the merits and *de novo* review, finding that there was no double jeopardy violation in convicting and sentencing Aquart for both narcotics conspiracy under 21 U.S.C. § 846 and drug-related murders under 21 U.S.C. § 848(e)(1)(A). *Id.* at 100-106. Notably, as relevant here, the Circuit also characterized Aquart's defense counsel as "able and determined" and noted that, in the initial direct appeal, Aquart's counsel "filed six briefs presenting some 360 pages of arguments," and ultimately prevailed in achieving vacatur of the death sentence. *Id.* at 84.

Finally, the three accomplices that Aquart recruited were also charged, convicted, and ultimately sentenced. His brother Azikiwe Aquart pleaded guilty to committing the three murders in aid of racketeering, together with Azibo Aquart and two others. Doc. 960 at 10 (plea agreement admitting to committing the charged murders with Azibo Aquart), Doc. 1247 at 18-30 (plea transcript reflecting the same). Azikiwe received a sentence of life imprisonment. Docs. 1007, 1248. Efrain Johnson was later prosecuted in state court, convicted of felony murder, and given a

[5] While the second appeal was ongoing, Aquart also filed a motion for compassionate release. Doc. 1372.

sentence of 50 years' imprisonment, which he continues to serve. Doc. 1341, Aquart 2021 Pre-Sentence Report, ¶ 3. John Taylor pleaded guilty and received a relatively lenient sentence of 108 months (nine years), reflecting his cooperation. *United States v. John Taylor*, 10cr61 (JBA), Doc. 65.

**B. Trial evidence**

From the fall of 2004 through the summer of 2005, Azibo Aquart led a large-scale drug distribution enterprise in Bridgeport. *United States v. Aquart*, 912 F.3d 1, 10 (2d Cir. 2018). Working out of Apartment 211 at 215 Charles Street, Aquart and his lieutenants sold crack cocaine to dealers and received drug sale proceeds in return. *Id.* Aquart kept tight control over the enterprise, violently disciplining dealers who sold drugs from other sources or who could not properly account for all proceeds. *Id.* Many witnesses, including Frank Hodges, Juanita Hopkins, Venro Fleming, Jacqueline Bryant, Rodney Womble, and Sherrell Randolph, who were themselves members of Aquart's organization, testified at trial regarding the existence and inner workings of the narcotics trafficking conspiracy. *See* Gov't 2015 Appellate Brief, 2015 WL 4386669, at *6-*11. Prior to the murders, Aquart had assaulted, beaten unconscious, caused the hospitalization, broken the bones of, or permanently scarred many of his underlings, including Bryant, Fleming, Hodges, Hopkins, and John Sullivan, for such infractions as shorting Aquart's drug proceeds or selling drugs acquired from other dealers. *See id.*; *Aquart*, 912 F.3d at 10.

In the summer of 2005, Tina Johnson and her boyfriend, James Reid, moved in with their friend, Basil Williams, who lived in Apartment 101 of the 215 Charles Street building. *Aquart*, 912 F.3d at 10. Although Tina Johnson initially bought crack cocaine from Aquart's dealers in the building, when the quality of Aquart's crack declined, she started to buy drugs from other sources and sold that crack to some of Aquart's customers. *Id.* Aquart confronted Tina Johnson, telling her

to stop competing with his drug sales. *Id.*; *see also* Trial Transcript ("TT") at 1156-1161. Tina Johnson not only ignored Aquart's warning, she defied it, threatening in front of others to call the police and shut down Aquart's operation if she could not sell drugs from her preferred sources at the Charles Street building. *Aquart*, 912 F.3d at 10; *see* TT1485-TT1492. When Aquart's lieutenant Rodney Womble relayed Tina's open defiance, Aquart said he would "take care of it." *Id.*; TT485-TT1492.

Accordingly, in August 2005, Aquart began planning the murder. 912 F.3d at 10. He recruited his brother Azikiwe Aquart, his girlfriend's brother Efrain Johnson, and his drug-selling associate John Taylor to assist. *Id.* Aquart and his accomplices purchased duct tape and supplied themselves with face masks, latex gloves, and baseball bats. *Id.* at 11. Aquart explained that people in his building were cutting "into his money business" and he wanted to "take them out or move them out." *Id.* They made an initial attempt to enter Apartment 101, but abandoned their effort after seeing a woman knock on the door of that apartment with no answer. *Id.*

In the early morning hours of August 24, 2005, Aquart and his three accomplices returned to brutally murder Tina Johnson, James Reid, and Basil Williams. Armed with a gun and baseball bats, the four men kicked in the door to Tina Johnson's apartment and used duct tape to bind and restrain the three victims. *Id.* at 11. After binding the victims' heads, arms, and legs, the perpetrators then bludgeoned the victims to death with baseball bats. *Id.* The evidence established that Azibo Aquart physically beat Tina Johnson and Basil Williams to death and that Azikiwe Aquart physically beat and murdered James Reid. Aquart himself "bashed" Tina Johnson's body "like he was . . . at a meat market." *Id.* Before leaving the apartment, Aquart drilled the door shut from the inside, effectively entombing his victims. *Id.* at 12, 47.

Tina Johnson's son found the victims later that day when he arrived at the apartment to

help his mother move out. When nobody answered the door, he entered the apartment through a window, finding his mother and the other two victims dead. He testified that the bedrooms in which their bodies lay were covered in blood and that the living area looked like a war zone. *Id.* at 11–12.

Aquart, his brother Azikiwe, and Efrain Johnson then went to Lashika Johnson's apartment, removed their clothes and instructed Lashika to dispose of the clothes and a black drill. *Id.* at 12. Lashika later heard Aquart receive a phone call (confirmed in toll records) from a co-conspirator using Tina Johnson's cell phone, which Azikiwe had taken from the murder scene. *Id.* at 13. Later, as Lashika testified, her brother Efrain Johnson confessed to entering Apartment 101 that morning with Aquart, his brother, and a fourth person (*i.e.*, Taylor) and tying and roughing up the victims inside. *Id.* Efrain claimed that the victims were "still alive" when he left Aquart alone in the apartment that morning. *Id.* Efrain also reported that the perpetrators had disposed of the gloves, masks, and bats before arriving at Lashika's apartment that morning. *Id.*

Aquart himself then made multiple inculpatory admissions and various efforts to obstruct justice from prison. In September 2005, Aquart told fellow inmate and co-conspirator John Taylor that he directed his "baby momma" (*i.e.*, Shante Pettway) to "get rid of the weapons." *Id.* (cleaned up). In October 2009, Aquart wrote to Venro Fleming, a member of his drug operation, instructing Fleming and other members of the organization to tell federal authorities that there was no "gang" working for Aquart and that "EVERYONE DID THEIR OWN THING"—in a stated attempt to frustrate a "conspiracy" charge. *Id.* In 2010, Aquart told fellow inmate Shamarr Myers that, while selling crack in Bridgeport, he had encountered problems with others selling crack in the same building and ultimately decided that "they had to die." *Id.* Aquart prepared a letter instructing Myers to "have a courtroom outburst" when testifying at Aquart's trial, "declare that everybody

knew that 'Letho' had killed Tina Johnson, Reid, and Williams," and accuse the prosecutors and agents before the jury of knowingly forcing him to falsely testify against Aquart. *Id.* at 14-15.

Forensic evidence showed that all three murder victims had been bound (heads, hands, feet) with duct tape and had died of blunt force trauma and multiple skull fractures. *Id.* at 12. Although the killers had worn gloves, fingerprint analysis linked Azikiwe Aquart to two plastic bags recovered from Williams' bedroom, and linked Aquart himself to a piece of duct tape holding the two bags together. *Id.* DNA analysis linked Efrain Johnson to a latex glove fragment stuck in duct tape at Tina Johnson's hands and wrists. *Id.* Azibo and Azikiwe Aquart's DNA was also linked to a vinyl glove from Tina Johnson's bedroom, and that Azibo could not be eliminated as a contributor to a latex fragment found in the apartment. *Id.* at 12 and n.2.

## II. Legal Standards

### A. 28 U.S.C. § 2255

The Supreme Court has cautioned, "it must be remembered that direct appeal is the primary avenue for review of a conviction or sentence, and death penalty cases are no exception." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). Thus, when the process of direct review, including the right to seek certiorari, comes to an end, "a presumption of finality and legality attaches to the conviction and sentence." *Id.* Accordingly, while "[t]he role of federal habeas proceedings … [is] important in assuring that constitutional rights are observed," that role "is secondary and limited." *Id.*

To obtain relief under 28 U.S.C. § 2255, a movant must show that "the sentence was imposed in violation of the Constitution or laws of the United States, the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack." 28 U.S.C. § 2255. Section 2255 does not provide a remedy for "all claimed errors in conviction and sentencing." *United States v. Addonizio*,

442 U.S. 178, 185 (1979). Rather, it provides an avenue of redress only for "fundamental defect[s] which inherently result[] in a complete miscarriage of justice" and "omission[s] inconsistent with the rudimentary demands of fair procedure." *Reed v. Farley*, 512 U.S. 339, 348 (1994) (cleaned up).

**B. Procedural default**

As a general rule, claims not raised on direct appeal are procedurally defaulted and may not be raised on collateral review unless the petitioner shows either (1) "cause" and "actual prejudice"; or (2) "actual innocence." *Massaro v. United States*, 538 U.S. 500, 504 (2003); *Bousley v. United States*, 523 U.S. 614, 621-22 (1998); *United States v. Frady*, 456 U.S. 152, 167-68 (1982). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623.

Cause exists only if a factor external to the defense prevented counsel from raising the defaulted claim at an appropriate juncture. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To establish actual prejudice, a defendant must show not only that the claimed errors amount to more than the mere possibility of prejudice, but also that they "worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." *Frady*, 456 U.S. at 170. A defendant who files a Section 2255 motion thus bears a greater burden than he would under the plain error standard applicable to forfeited claims on direct review. *See Frady*, 456 U.S. at 166.

An ineffective assistance of counsel claim, however, is not subject to the procedural default rule and therefore may be raised in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal. *Massaro*, 538 U.S. at 504.

**C. Relitigation bar**

"It is well established that a § 2255 petition cannot be used to relitigate questions which

were raised and considered on direct appeal." *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001) (cleaned up). "Reconsideration is permitted only where there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal." *Id.* (cleaned up).

Unlike the rule of procedural default, this form of the mandate rule or relitigation bar also applies to claims alleging ineffective assistance of counsel. Specifically, in the context of Section 2255 proceedings involving claims of ineffective assistance of counsel, this Court has applied this rule to "prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also [to] preclude[] re-litigation of issues impliedly resolved by the appellate court's mandate." *Yick Man Mui v. United States*, 614 F.3d 50, 53-54 (2d Cir. 2010); *see also United States v. Pitcher*, 559 F.3d 120, 124 (2d Cir. 2009) (rejecting petitioner's Section 2255 ineffective assistance claims because they were "premised on the same facts and rest on the same legal ground" as the argument made on direct appeal).

**D. Ineffective assistance of counsel**

An individual challenging his conviction on the basis of constitutional ineffectiveness bears a heavy burden. The Supreme Court laid out a two-part test for determining whether a defendant's Sixth Amendment right to effective counsel has been violated in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail, the defendant must show both (1) that the representation "fell below an objective standard of reasonableness under prevailing professional norms," and (2) that the ineffective representation caused prejudice to the defendant. *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 687-88).

In assessing the first part of the test—the objective standard of reasonableness—the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance." *Strickland*, 466 U.S. at 689. A defendant's *post hoc* accusations alone are insufficient to overcome this strong presumption, in part because a contrary holding would lead to constant litigation by dissatisfied criminal defendants. *See id.* at 690. In view of this presumption, the threshold for an ineffectiveness claim is extremely high and courts have "declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox, or downright ill-advised." *Tippins v. Walker*, 77 F.3d 682, 686 (2d Cir. 1996). The ultimate goal of the inquiry is not to second-guess decisions made by defense counsel; it is to ensure that the judicial proceeding is still worthy of confidence despite any potential imperfections. *See Roe v. Flores-Ortega*, 528 U.S. 470, 482 (2000). Accordingly, the first prong of the inquiry—performance—should be considered without "the distorting effects of hindsight." *Strickland*, 266 U.S. at 689. Courts should maintain the strong presumption that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 266 U.S. at 690.

To satisfy the second prong of the inquiry—prejudice—movants must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. "That requires a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) cleaned up). "Thus, the failure to make a meritless argument does not rise to the level of ineffective assistance . . . and 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995); *see also United States v. Conde*, No. 23-6359, 2026 WL 1045500, at *1 (2d Cir. April 17, 2026) (summary order); *Oehne v. United States*, No. 14cv44 (JCH), 2016 WL 10721817, at *10 (D. Conn. Oct. 20, 2016). The standard of *Strickland* is rigorous, and the great majority of

habeas petitions that allege constitutionally ineffective counsel founder on it." *United States v. Nolan*, 956 F.3d 71, 79 (2d. Cir. 2020) (quoting *Bell v. Miller*, 500 F.3d 149, 155 (2d. Cir 2007)).

Courts applying *Strickland* are deferential to defense lawyers' decisions about strategy at trial, including which witnesses to put before the jury, and should not find that assistance was ineffective if there was a legitimate justification for the decision. *See Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005). In other words, a reviewing court "may not use hindsight to second-guess [the lawyers'] strategy choices," *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994); must presume that "under the circumstances, the challenged action might be considered sound trial strategy;" *Bell v. Cone*, 535 U.S. at 698, 122 S.Ct. 1843, and must afford counsel a "strong presumption" of competence, *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002). For example, the very decision about whether to introduce a particular piece of evidence "is a question of trial strategy which courts will practically never second-guess," *Ozuru v. United States*, 95 CV 2241, 1997 WL 124212, at *4 (E.D.N.Y. Mar. 11, 1997) (citing *Trapnell v. United States*, 725 F.2d 149, 155 (2d Cir.1983) ("We have repeatedly noted our reluctance to second-guess matters of trial strategy simply because the chosen strategy was not successful") (citations omitted), *aff'd*, 152 F.3d 920 (2d Cir. 1998); *see also Skinner v. Duncan*, Nos. 02–CV–3430, 03–MISC–0066, 2003 WL 21386032, at *40 (S.D.N.Y. Jun. 17, 2003) (citing *Ryan v. Rivera*, No. 00–2153, 21 F. .App'x 33, 34 (2d Cir.2001) ("[W]hen a party challenges matters of trial strategy, such as the decision not to call a witness, even greater deference is generally warranted")).

**E. Professional standards for forensic evidence**

With regard to forensic evidence, professional standards do not require defense counsel to present expert testimony to rebut a Government expert. *See, e.g., Adams v. Keyser*, No. 16-CV-129 (GBD) (AJP), 2018 WL 2089337, at *6 (S.D.N.Y. May 3, 2018). Vigorous cross-

examination is sufficient. *See Nicolescu v. United States*, No. 15-CV-756 (VLB), 2021 WL 917157, at *13 (D. Conn. Mar. 10, 2021). This is particularly true when there is the possibility that a defense expert could corroborate the Government expert's testimony. *See .e.g., In Megnath v. Royce*, No. 20-CV-1305(EK), 2024 WL 759293, at *6 (E.D.N.Y. Feb. 23, 2024) (holding that in light of the trial court's finding that trial counsel hired a DNA expert, there is no indication that trial counsel's decision not to call the expert or to make an issue out of the purported anomalies was anything other than a strategic decision counsel made to focus his resources on what he determined to be more important issues); *see also Wilson v. United States*, No. 04-CR-1016 (NGG), 2023 WL 6385799, at *6 (E.D.N.Y. Sept. 29, 2023) *(*defendant "unable to show prejudice from his counsel's decision to not call a DNA expert. He argues that a DNA expert could fully educate the jury and discuss the "statistical likelihood that such DNA could have come from someone else." . . .[but] [e]ven if, arguendo, Wilson's counsel had decided to hire a rebuttal expert who said that there was a probability that the DNA was not Wilson's, there was enough evidence elsewhere in the record from eyewitnesses and cooperating co-conspirators that a jury could have reached the same conclusion."); *Herndon v. United States*, No. 10–CV–1997, 2013 WL 2405511, at *5 (D. Conn. May 31, 2013) (finding no ineffective assistance where "the absence of testimony by a[n] . . . expert for the defense resulted not from the failure to subpoena such an expert but rather from a strategic decision not to call the defense expert who was present and available to testify"); *Velazquez v. Poole*, 614 F.Supp.2d 284, 342 (E.D.N.Y. 2007) (finding no ineffective assistance where trial counsel analyzed DNA evidence but ultimately "made a strategic choice not to consult an expert witness to challenge the prosecution's expert testimony because doing so would not have been the most productive use of his resources").

Trial counsel can also legitimately decide that raising challenges to an expert's testimony

could backfire if it caused the jury to focus more on the expert's credibility and the strong scientific support underlying the test results. *See, e.g., Harrington v. Richter,* 131 S.Ct. 770, 790 (2011)("[M]aking a central issue out of blood evidence would have increased the likelihood of the prosecution's producing its own evidence on the [physical evidence's] origins and composition; and once matters proceeded on this course, there was a serious risk that expert evidence could destroy [the defendant's] case.").

**III. Discussion**

In the pending habeas petition, Aquart brings a multitude of claims—33 in all—purporting to show a violation of the Constitution or laws of the United States sufficient to vacate his convictions. This multiplicity of claims—presumably raised to obscure the weakness of each individually and all collectively—actually serves to emphasize that very weakness. And the one claim that Aquart barely attempts to make—accounting for a mere two paragraphs at the very end of a 310-page petition—is actual innocence. *See* Amended Petition for Writ of Habeas Corpus ("Aquart Br."), 3:26CV65 (SRU), Dkt. No. 21, at 308-309.

Because all meritorious claims have either been decided (and thus barred by the mandate rule) or procedurally defaulted during the past two decades of litigation, Aquart routes most of his claims here through the vehicle of claimed ineffective assistance of counsel. But he cannot establish either a deficit in reasonable performance or prejudice, both of which are required under the applicable *Strickland* standard. As to the first prong, Aquart enjoyed the zealous advocacy of industrious counsel at both the trial and appellate stages. *See Aquart*, 92 F.4th at 84 (Second Circuit calling his counsel "able and determined"). And as to the second prong, the overwhelming evidence of his guilt forecloses any argument of prejudice.

In particular, and especially as to his leading challenges to the forensic evidence (DNA,

fingerprint, and crime scene), Aquart attempts to subvert *Strickland*'s focus on methodologies used *at the time*. Contra *Strickland*, he also improperly faults his counsel—who accomplished extensive research and preparation, pursued myriad legal arguments, engaged in lengthy cross-examination, and put on a substantial defense case—for focusing on key defense theories, rather than taking a grab-bag, kitchen-sink approach and pursuing factually unsound or legally flawed theories.

But in any event, the DNA and fingerprint evidence only represented a limited portion of the overwhelming evidence of his guilt. That evidence included extensive eyewitness testimony, including from a co-conspirator who watched Aquart commit the murders and assisted him as he did so, another witness who watched Aquart dispose of the incriminating evidence just after the murders, many witnesses who observed Aquart threaten the victims beforehand or develop the motive for the murders, and multiple witnesses to whom Aquart confessed or made inculpatory admissions after the fact.

Aquart thus fails to carry his considerable burden. His convictions were lawful, and there is no basis to disturb them on collateral review.

**A. Claims One: No Ineffective Assistance as to DNA Evidence**

Aquart first claims that his trial counsel was ineffective in their handling of DNA evidence. Because Aquart fails to show either constitutionally deficient performance or prejudice, this claim is wholly without merit.

First, defense counsel put significant effort into DNA evidence. The defense obtained their own DNA expert, carefully reviewed the DNA file, and extensively cross-examined the Government's expert for several days. Aquart's claim thus founders the performance prong under *Strickland*.

Second, and perhaps more apparently, Aquart is simply wrong to claim that the

Government "relied heavily on the DNA evidence throughout the trial" and the evidence "was the linchpin used to 'corroborate' Taylor's version of events." Aquart Br. at 12-13. The DNA evidence was just one limited piece of the evidence used to convict the defendant. Even without the DNA evidence, the other evidence establishing Aquart's guilt was overwhelming. Even if he had met the performance prong (he has not), Aquart has failed to prove prejudice.

### *1. Background on DNA evidence at trial*

Deoxyribonucleic acid ("DNA") is located in almost every cell of the human body and contains all of the information that determines an individual's genetic makeup. Every cell of a certain individual contains the same DNA configuration, and while about 99% of human DNA material is identical, no two people have the same DNA sequence, except for identical twins. *See, e.g., United States v. Jakobetz*, 955 F.2d 786, 791-92 (2d Cir. 1992). At the most basic level, DNA analysis in criminal investigations involves developing a DNA profile from a suspect's DNA sample and a DNA profile from crime scene sample and then comparing the two.

To make that comparison, forensic examiners look at the DNA sequence at certain locations, or loci, throughout the genome. Because each person receives half of his DNA from one biological parent and half of his DNA from the other biological parent, each person has two DNA alleles at each locus. The alleles, at comparable loci, vary from person to person and are the basis of individual DNA profiles.[6] Scientists copy the alleles at various loci along the genome and measure the length of the repeat sequences. The length, rather than the exact sequence, of the repeat sequences (short tandem repeats or STRs) serves as a marker for DNA profiles. If the forensic examiner finds that a suspect's DNA profile matches one developed from the evidence at

---

[6] *See also* Butler, John M. "Short tandem repeat typing technologies used in human identity testing," BioTechniques 43:Sii-Sv (October 2007) *available at* https://www.future-science.com/doi/pdf/10.2144/000112582 (last visited July 26, 2021).

the crime scene, a statistical or probability assessment is performed to describe the strength or weight of the match. *See, e.g., United States v. Yee*, 134 F.R.D. 161, 181 (N.D. Ohio 1991), *aff'd sub nom. United States v. Bonds*, 12 F.3d 540 (6th Cir. 1993) ("Without the probability assessment, the jury does not know what to make of the fact that the patterns match: the jury does not know whether the patterns are as common as pictures with two eyes, or as unique as the Mona Lisa."). The process of analyzing the alleles for the purpose of identification is known as DNA profiling.

DNA material left at a crime scene can be "single source" (one person contributed to the DNA) or can contain a mixture of contributors. It is relatively easy to determine the DNA profile of the contributor to a single source sample because the alleles at each locus belong to only one person. Statistical analysis of DNA mixtures—*i.e.*, samples containing DNA from more than one contributor—is more difficult. As a general matter, if the alleles of a defendant match at all the loci generated by an evidentiary sample in question, that person is included as a possible contributor.

The DNA expert in this case, Christine Roy, who was employed at the time at Connecticut's Department of Emergency Services and Public Protection (referred to herein as "Connecticut State Laboratory"), examined the DNA evidence found at the crime scene from 2005 to 2010, issuing numerous reports. Aquart Br. at 23. For each evidentiary item swabbed, Roy extracted the DNA, quantified it, amplified it, and then graphed it on an electropherogram, before comparing the profiles to known DNA samples from the three victims and four identified suspects. Six swabs of five of the approximately seventy items from the crime scene either included Aquart's profile or his profile could not be eliminated and each of those were interpreted to include his biological brother Azikiwe. Aquart Br. at 24.

Christine Roy found that Aquart's DNA profile was included as a contributor to two DNA

swabs from a double glove found in the bedroom of Tina Johnson. For one of them, she calculated that the genetic markers that led her to include Aquart would be shared by 1 out of every 400 African Americans, and for the other swab, she found the statistical likelihood of Aquart would be shared by 1 in every 390 African Americans. Aquart Br. at 26. As for the swabs of four other prices of evidence, she concluded that Aquart could not be eliminated a contributor to fragments of a vinyl glove found stuck to duct tape a nylon stocking found in the bedroom with Johnson and Reid; a glove found in Johnson's bedroom; and the cuff of a latex glove found under a couch cushion in the living room. Aquart Br. at 26. For three of those items, she calculated a statistical probability that between 1 in 140 and 1 in 220 African Americans could not be excluded as contributors and for the last piece of evidence (the glove in the living room), she calculated that only 1 in 79 million African Americans could not be excluded as contributors. Aquart Br. at 27. Finally, in April 2009, Roy informed the Government that she had revised her conclusion as to the swabs of one of the evidentiary items, the gloves found on the bedside table, to "inconclusive" because a State Laboratory member's DNA profile had been found in the evidence profile. Aquart Br. at 27.

In reviewing the evidence admitted at trial, the district court described it as follows:

> At trial, the Government's DNA evidence included: (1) swabbings containing DNA mixtures from duct tape recovered from the hands of victim Tina Johnson, which exclude neither Azibo nor Azikiwe as potential contributors (within the African–American population, one in 140 is estimated to fit within this potential pool); (2) two separate swabbings containing DNA mixtures from latex gloves that were found in the southwest bedroom in close proximity to two of the victims' bodies, which included Azibo and Azikiwe as potential contributors (within the African–American population, one in 400 is estimated to fit within this potential pool); (3) a swabbing containing DNA mixtures from a nylon stocking found in one of the bedrooms, which included Azikiwe as a potential contributor (within the African–American population, one in 1,000 is estimated to fit within this potential pool) and Azibo was not excluded as a potential contributor (within the African–American population, one in 220 is estimated to fit within this potential pool); (4) a swabbing containing a

> DNA mixture from a latex glove found in another bedroom where one victim's body was recovered, where Azibo and Azikiwe cannot be eliminated as minor contributors (within the African–American population, one in 180 is estimated to fit with Azibo and one in 80 is estimated to fit with Azikiwe); and (5) a DNA mixture from a swabbing of a fragment of a latex glove found in the living room of the apartment, which include Azibo as a potential contributor (within the African–American population, one in 79 million is estimated to fit within this potential pool).

*United States v. Aquart*, No. 3:06CR160 JBA, 2010 WL 3211074, at *4 (D. Conn. Aug. 13, 2010).

In upholding the sufficiency of the evidence at trial, the Second Circuit explained that DNA analysis "linked various retrieved evidentiary fragments—somewhat more qualifiedly—to Azibo and Azikiwe Aquart as well as to the three victims. On some retrieved fragments, examiners found more than one person's genetic markers. On other fragments, examiners could not eliminate Aquart, Taylor, or the victims as DNA contributors." *United States v. Aquart*, 912 F.3d 1, 12 (2d Cir. 2018). The Second Circuit used the word "qualifiedly" because, as detailed in the Court's decision, Christine Roy testified that a "a cannot-be-eliminated conclusion meant that she had identified a significant number, but not all, of a person's genetic markers on a retrieved sample." *Id.,* n 2. As she explained, a glove retrieved from Tina Johnson's and Reid's bedroom revealed a mixture of DNA to which Roy concluded Aquart, Azikiwe Aquart, Reid, and Williams had each contributed because she detected all of each person's genetic markers on the glove. *Id.* She determined that because she detected a significant number, but not all, of the genetic markers of Tina Johnson and Taylor on the glove, those people could not be eliminated as DNA contributors. *Id.* She also concluded that Reid contributed to the DNA mixture detected on a latex fragment retrieved from under the cushion of a couch because all of his genetic markers were present, and that Aquart could not be eliminated as a contributor because 28 of his 30 markers were detected. *Id.*

### 2. *Aquart's ineffectiveness claim regarding DNA evidence is unfounded and ignores defense challenges to DNA evidence and trial strategy considerations*

Aquart's attacks on the DNA evidence can be broadly consolidated into the following three categories,[7] in which he purports to argue that trial counsel was ineffective for not doing more to challenge and undermine the reliability of the DNA evidence.

- **Testing/analysis method:** First, Aquart argues that the DNA testing method used by Christine Roy to analyze the DNA evidence in this case had been largely discredited by 2016 because the analyst did not assess mixture characteristics but employed the combined probability of inclusion ("CPI") method in a suspect-driven manner inferring dropout only after comparing Aquart's known profile.[8] As explained above, part of the DNA process was to amplify or copy the DNA from the evidentiary sample and during that process, some of the targeted DNA at some locations might not amplify with the loss of genetic information or allelic dropout. After amplification, the copied alleles were distinguished into peaks on an electropherogram and, in the period before the defendant's trial, most of the interpretation was undertaken manually by an analyst who would make judgment calls about which peaks represented true DNA alleles. The analyst would then look at the peaks and compare DNA profiles of any reference samples to the DNA evidence profile to determine whether the reference sample matched or could not be excluded from the evidence profile and then would calculate a rarity statistic to contextualize the significance of the match or inclusion. This, of course, became more difficult with a sample that contained a mixture of contributors and the potential for allele sharing. More recently, laboratories began using probabilistic genotyping software which is now considered to be a sounder method of analysis. Aquart asserts that because Roy did not estimate how many people's DNA were present before beginning the comparison, it was difficult to determine which alleles matched and to whom they belonged especially since some of them had low quantities of DNA. Aquart Br. at 18. According to Aquart, if Roy had not found dropout at several loci, Aquart would have been excluded as contributor and eliminated for the nylon stocking and glove. Aquart Br. at 30. Not using probabilistic genotyping software and relying on the analyst's judgment, according to Aquart, was not sufficiently reliable.

---

[7] These grounds are detailed in the two expert affidavits submitted in support of this claim of ineffectiveness—the Expert Report of Keith Inman, PhD., Defense Exhibit I-A and the Declaration of Edward J. Ungvarsky, Defense Exhibit I-B.

[8] To perform CPI with evidentiary samples containing DNA mixtures—like the ones at issue here—the examiner considers whether the known DNA profile could be a contributor to the mixture of profiles. A known profile can be included or excluded. The CPI method does not make any assumption about the number of contributors to the mixture. Instead, once it is determined that the suspect could have been a contributor, it aims to measure how many people in the general population could have also been a contributor. *See, e.g., United States v. Hill*, 13-cr-46(RNC), *United States v. Hayes*, No. 13-CR-00085-JD-1, 2014 WL 5470496, at *1 (N.D. Cal. Oct. 21, 2014).

- **Laboratory's internal controls:** Next, Aquart argues that the laboratory lacked proper internal validation methods and quality controls, which resulted in the laboratory losing its accreditation after the trial. In late 2005, at the same time as the DNA analysis in this case began, there was legislation calling for a review of forensic science and with regards to DNA evidence, an end to the lack of reproducible methods for complex mixture interpretation. Aquart Br. at 21. In order to limit subjectivity, the Federal Bureau of Investigation issued quality assurance standards ("QAS") in 2010 requiring laboratories to establish and document empirically derived analytical thresholds (minimum signal level below which peaks are presumed to be unreliable and not interpreted as alleles) and stochastic thresholds (signal below which allelic dropout cannot be ruled out) through internal validation studies. Aquart Br. at 22. According to Aquart, the Connecticut State Lab lacked validations and its operating procedures at the time did not meet the FBI's QAS and, among other issues, there was no procedure on how to identify or investigate a contamination incident, review the lab's regent blanks, negative controls or positive controls, and there was no review or guidance on interpreting mixtures or policy about the destruction of samples. Aquart Br. at 44. As a result, according to Aquart, the analysis performed at the lab was not sufficiently reliable.

- **Contamination:** Finally, Aquart focuses on contamination and contends that there was contamination with one of the samples, which should have been properly raised as an issue. Trial counsel knew that a state lab staff member's DNA had been included in a profile leading the lab to revise its conclusion for that swab to "inconclusive." Counsel initially sought discovery on how this had occurred, then narrowed their focus to try to determine the identity of the staff member so that they could determine whether the profile was found anywhere else—ultimately determining the member (Maria Warner) had coughed on a single piece of evidence as opposed to investigating further. Aquart Br. at 36. According to Aquart, contamination was likely more pervasive than just this one sample and there were multiple additional red flags that were not fully investigated, especially since trial counsel was warned of widespread contamination in DNA samples in November of 2008 including also in Efrain Johnson's DNA sample. Aquart Br. at 40. Because of the potential for contamination, Aquart contends that the DNA evidence was not reliable.

Aquart asserts that, in light of the alleged subjectivity of the analysis, lack of QAS at the State Laboratory, and documented contamination, trial counsel should have (1) moved for a *Daubert* hearing or to exclude the evidence under Federal Rules of Evidence 702 or 403; (2) invited the defense's own expert to be present during the testimony of the Government's DNA analyst to advise or actually testify during the defense case; (3) asked better cross-examination questions; (4)

given a better closing argument; and (5) moved for a new trial when the lab temporarily lost its validation. Not doing so—according to Aquart—was ineffective, thus meeting the performance prong of the *Strickland* analysis.

Aquart is wrong. As explained below, defense counsel sought out multiple DNA experts and consultants, thoroughly researched the DNA evidence and prepared for trial and ultimately pursued a reasoned strategy. Far from ineffectiveness, the defense file suggests that trial counsel was highly diligent in attempting to understand and best attack the DNA evidence. New counsel's *post-hoc* conclusory assertions regarding what could have been done better are, in many cases, totally unfounded and, at best, certainly do not rise to the level of constitutional ineffectiveness.

***(1) Daubert hearing or preclusion of DNA evidence***: Aquart first complains that trial counsel did not seek to preclude DNA evidence and the only limiting motion filed was to prevent a second DNA examiner from the State Laboratory from testifying that this person had reviewed Roy's analysis. Aquart relies on the Ungvarsky Declaration, Defense Exhibit I-B, to claim that his trial attorneys were constitutionally ineffective because before trial they knew that there were issues with the DNA testing procedures used by Roy and did not seek to preclude or limit the DNA evidence. Aquart Br. at 64. Aquart also argues that counsel knew that an evidentiary sample had been contaminated by a lab staff member and did not look to see the full extent of the contamination or to challenge DNA evidence based on potential contamination or even to seek full discovery related to contamination, which Aquart argues was contrary to prevailing practice. Aquart Br. at 67.

According to Aquart, had trial counsel sought (and received) a *Daubert* hearing, there is a reasonable likelihood that the trial court would have completely excluded the DNA evidence due to issues with the testing method, insufficient quality control procedures, and contamination. He

further argues that because his trial counsel did not move for a hearing, there was no way to prevent the admissibility of such evidence. He also contends that cross-examination could not remedy the failure because, among other things, the analyst's approach changed from case to case and not within the case (although, as discussed below, counsel did successfully cross-examine Roy for three days). Aquart Br. at 71. This argument fails. As explained below, a *Daubert* motion would have most likely been unsuccessful, and Aquart's attorneys were not constitutionally ineffective for failing to file such a challenge.

Under Federal Rule of Evidence 702, the Court may admit "[a] witness who is qualified as an expert . . . if: (a) the expert's scientific . . . knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The *Daubert* standard governs the admissibility of expert testimony under Federal Rule of Evidence 702. *See generally Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993). Under *Daubert*, the district court acts as a "gatekeeper" to ensure that expert testimony is both reliable and relevant. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). The goal is to ensure that "the courtroom door remains closed to junk science." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

When dealing with challenges to the reliability of scientific evidence, the court must focus on the methodology that the experts used to draw a conclusion and not on the conclusion itself. *See Daubert*, 509 U.S. at 590, 595, 113 S.Ct. 2786. However, as the Supreme Court has explained, "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.,* 526 U.S. at 151,

153, 119 S.Ct. 1167 (emphasis in original); *Amorgianos* 303 F.3d at 265 ("[I]n analyzing the admissibility of expert evidence, the district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case."); *see also Travelers Property & Cas. Corp. v. General Elec. Co*., 150 F. Supp. 2d 360, 363 (D. Conn. 2001) (noting that a "review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." (quoting Advisory Committee's Notes on 2000 Amendments to Fed. R. Evid. 702)).

With regards to *Daubert* motions and DNA analysis in particular, DNA analysis is a commonly used forensic technique and frequently survives *Daubert* motions. *See United States v. Morgan*, 53 F. Supp. 3d 732, 740-47 (S.D.N.Y. 2014). Moreover, as particularly relevant here, the CPI statistical method had been widely accepted in the scientific community and the results from such testing have been regularly introduced and relied upon at criminal trials, in this District, in Connecticut state cases, and around the country. For example, in the last federal court case challenging DNA results produced using the CPI statistical method as applied to a complex mixture in this District, in 2015, the court held that the method was reliable after a *Daubert* hearing and it denied the defendant's request to preclude the evidence. *See, e.g., United States v. Hill,* 13-cr-46(RNC), Dkt. Entry No. 159; *see also* Dkt. Entry Nos. 174, 175 (transcript from Daubert hearing in which the CPI method was explained, advantages and disadvantages and other issues discussed at length). Other cases have reached similar conclusions. *See, e.g., State v. Rodriguez,* No. 20372, 2020 WL 5740990, at *9 (Conn. Sept. 24, 2020) (upholding use of CPI as expert's statistical method with a mixture of three or more contributors); *State v. Haughey,* 124 Conn. App. 58, 72–73 (2010) (describing how, after a *Porter* hearing (the equivalent of a *Daubert* hearing in Connecticut state courts), the court properly found that "the [CPI Method was] generally accepted

as of the present time in the relevant scientific community based upon [all of] the evidence" presented—namely, the testimony of the experts" and further noting "the court properly could have determined that the jury would appropriately consider the benefits and weaknesses of the CPI method, as such an understanding does not necessarily depend on a scientific appreciation of the evidence but only on a comprehension of its limits when low quantity, mixed DNA samples are tested."); *see also United States v. Hayes*, No. 13-CR-00085-JD-1, 2014 WL 5470496, at *1 (N.D. Cal. Oct. 21, 2014) (in challenge to admissibility of DNA evidence produced through the CPI method as unreliable and invalid for mixed samples, upholding the introduction of such evidence and concluding "the defense challenges go to the weight and persuasiveness of the evidence rather than its admissibility. Hayes may have productive grounds for cross-examination of Baker at trial, but the challenged evidence has sufficient reliability and validity to be admitted.").

Aquart's citation to *United States v. Jones* is inapposite. In that case, the CPI method was not the subject of the challenge; rather, the FST method was. The Court's rejection of one of the defendant's experts who had made a CPI calculation using data from validation studies was just that, a rejection of the expert. The advantages and disadvantages of the CPI statistical method were not put before the court. *See United States v. Jones*, 965 F.3d 149, 158 (2d Cir. 2020).

Aquart's other precedent does not help him. For instance, he cites out-of-Circuit cases like *United States v. Bonds,* 12 F. 3d 540, 565 (6th Cir. 1993), to argue that counsel should have sought a *Daubert* hearing and that not doing so led to the perceived infallibility of the expert opinion. But in that case and others cited by the defendant (*see* Aquart Br. at 67), the court *permitted* the introduction of the DNA evidence—thus begging the question of how counsel could have been ineffective in opting not to file a likely unsuccessful motion. *See, e.g., Wilson v. United States*, No. 04-CR-1016 (NGG), 2023 WL 6385799, at *7 (E.D.N.Y. Sept. 29, 2023) ("Trial counsel's

decision to not pursue a [*Daubert*] motion that is frequently denied falls squarely within the standard of reasonableness, and therefore cannot be the basis for an ineffective assistance of counsel claim."). In the relevant time period, Connecticut courts routinely accepted DNA evidence processed by the Connecticut State Forensic Laboratory as a scientifically reliable technique under state law and even with some evidence of contamination or lack of quality controls. It was not ineffective to seek to preclude such evidence.

***(2) Defense consulting or testifying expert on DNA:*** Aquart next asserts that a defense DNA expert should have been present at trial or called to testify in order to explain to the jury the three broad issues cited above (problems with reliability of DNA analysis method, lack of internal QAS and contamination). He seeks to ignore, however, that his trial counsel had consulted with leading DNA experts. *See* Aquart Br. at 12. In fact, Aquart acknowledges that, beginning nearly three years before trial, trial counsel consulted with at least three leading DNA experts; reviewed numerous articles on DNA analysis; met and spoke with lawyers experienced in challenging this evidence, attended trainings on DNA evidence; and analyzed the DNA reports. *See* Aquart Br. at 29-30. Trial counsel's file contained articles regarding issues with the CPI method used by the State lab and indicates that they consulted with various experts before trial regarding problems with the probability calculations and, specifically, the use of the CPI. *See* Aquart Br. at 34-35. This suggests that—far from being ineffective—they did exactly what trial counsel would be expected to do in such a situation. The knowledge that they gained before the trial helped form their cross-examination questions and trial strategy.

However, Aquart argues that because his trial attorneys were aware of significant issues with the DNA testing, they should have insisted on having a DNA expert present at trial or called to testify. This type of second guessing of trial strategy and prioritization is not permitted. *See*

*United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998) ("[t]he decision not to call a particular witness is typically a question of trial strategy"); *see also Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005) ("The decision not to call a particular witness is typically a question of trial strategy that reviewing courts are ill-suited to second-guess.") (cleaned up). "*Strickland* does not enact Newton's third law for presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). Often "cross-examination will be sufficient to expose defects in an expert's presentation." *Id.*

This case is therefore different from those like *Usher v. Ercole,* 710 F. Supp. 2d 287, 303 (EDNY 2010), in which defense counsel failed to consult with experts or spend time understanding the case file. *See Velazquez v. Poole*, 614 F.Supp.2d 284, 342 (E.D.N.Y.2007) (finding no ineffective assistance where trial counsel analyzed DNA evidence but ultimately "made a strategic choice not to consult an expert witness to challenge the prosecution's expert testimony because doing so would not have been the most productive use of his resources"); *C.f. Eze v. Senkowski*, 321 F.3d 110, 136 (2d Cir. 2003) (*abrogated on other grounds*) (in which the Court noted "[i]f for instance, Eze's counsel had thoroughly investigated Dr. Lazoritz's medical conclusions and interviewed potential expert witnesses, the decision not to call an expert would not necessarily constitute constitutionally deficient performance").

Here, the defense file provides an indication that, after extensive consultation and research, the defense decided not to call a DNA expert because if an expert were only called on DNA evidence it would make the defense position on other issues look weaker, as Aquart acknowledges. Aquart Br. at 53-54; Ex. 1-AE (defense counsel email indicating "Had it been solely or even principally a DNA case, our posture quite likely would have been different. As it is, however, to call in a defense expert on this one item of evidence would in our opinion weaken our credibility

over all"). Although Aquart now second guesses this strategy, this was a reasonable one. From their research and consultation, Aquart's attorneys were equipped to bring out the issues with the DNA analysis through cross-examination. And the presence of an expert in the courtroom to consult on DNA evidence would have had little impact on the defense case. It could only have resulted in slightly better cross examination questions, which as explained below, is also a meritless line of attack. In sum, the decision not to have a defense DNA present or called to testify was also not ineffective.

***(3) Better cross examination:*** Aquart also critiques trial counsel for not doing a better job at cross-examination. First, Aquart now argues that, when Maria Warner (the source of the DNA contamination) testified, trial counsel did not bring out the larger issues with contamination at the lab. However, during her examination, defense counsel first objected, then asked to *voir dire* her, *see e.g*. TT3002, TT3006-07, TT3094, TT3097, and *then* vigorously cross-examined her, TT3072-TT3093. During cross-examination, counsel elicited from her that there had been contamination with one of the pieces of evidence; that Warner followed the same procedures with respect to all of the evidence in the case and that, after being informed there was an issue, she did not do anything further with respect to evidence in this case. TT3090-92. Defense counsel also elicited during cross examination that, after the contamination in this case, a memorandum was drafted because of the possibility of contamination and the laboratory staff had to start wearing masks. TT3093. Trial counsel was also even permitted to do re-cross examination, which focused solely on contamination. TT3097-99. Far from insufficient, the cross-examination of Maria Warner was quite successful.

Second, Aquart now objects to his trial counsel's cross-examination of Christine Roy (the main Government DNA witness who testified for four days). Among other complaints, Aquart

asserts that defense counsel did not object to or properly undermine through cross examination statements about the likelihood of Aquart's DNA being present without any statistical probability qualification; failed to ask key questions regarding contamination or validation; and generally spent too much time on what he now views as less probative issues. *See, e.g.,* Aquart Br. at 42.

These claims are all unavailing. Motions brought under section 2255 are not a vehicle to critique the success of cross-examination or to argue that counsel should have asked better questions. Even if Aquart, with the benefit of hindsight and advances in DNA testing and the luxury of studying the full trial transcript for months or years, is right that counsel could have pushed further in certain areas, he cannot deny that his counsel, a skilled and experienced trial lawyer, cross-examined Roy for four trial days. In those four days, there is no doubt that the jury understood some of the weaknesses of the DNA evidence and the need to carefully consider all of the evidence in the case. At best, Aquart's argument boils down to an assertion that trial counsel did not explore potentially fruitful lines of questioning. But this is not enough to show that he was so deficient as to deny Aquart his Sixth Amendment right to counsel. *See Nowicki v. Cunningham*, No. 09-CV-8476 KMK GAY, 2014 WL 5462475, at *12 (S.D.N.Y. Oct. 27, 2014), *aff'd*,669 F. App'x 52 (2d Cir. 2016). After all, "a litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984).

Moreover, the record indicates just how effective defense counsel was. Defense cross-examination appears to have been quite compelling. Over three days and hundreds of pages of testimony, trial counsel brought out, among other things, issues with CPI statistics, TT3318, TT3334, TT3343; used notes of the DNA examiner to identify the "extraordinarily low quantities of DNA and that they're below their thresholds," TT3242 -3243; explained that other labs were

handling testing differently and that Roy was not following SWGDAM guidelines, TT3491-3508; focused on the use of loci with dropout in the combined probability of inclusion statistics, TT3451 ("Q. One of the particular challenges associated with interpretation of mixtures is the issue of drop out, is it not?"); and brought out the issues with contamination at the state lab, TT3538-3541. The questions suggest someone very familiar with DNA evidence and the terms and processes used. *See* TT3235- 3582. Indeed, defense counsel's cross-examination was so thorough and persistent that Government counsel lodged an objection at the end of the third day:

> Defense has been cross-examining this witness for almost ten hours at this point, and I'm requesting that the Court at this point - . . . at a certain point it just becomes cumulative, harassing. You could see she's been exhausted, but it's a full six hours today, it's full four hours yesterday, two hours the day before, and the right to cross-examination is not limitless.

TT3552. Even after that objection, the Court permitted the cross examination to continue (focusing on the contamination) and onto the following day. TT3563.

Aquart even acknowledges (as he must) that defense counsel brought out issues with the numbers of contributors during cross-examination, eliciting that the total number was unknown, that it ranged between 3 and 36 people, and that Roy had not followed the 2010 SWGDAM guidelines. Aquart Br. at 29. His reliance, then, on *Rivas v. Fischer*, 780 F.3d 529, 532 (2d Cir. 2015) is simply inapposite. In *Rivas,* the defense counsel failed to cross-examine the testifying expert about his "reliance on the non-existent 'brain slides,' or to cross-examine him regarding the investigations into his alleged misconduct that were pending at the very time of the prosecution of Rivas." Here, by contrast, defense counsel covered all areas. A close review of the transcript indicates that the cross examination of Roy was highly effective. This claim should also be denied.

***(4) Better closing argument:*** Aquart additionally critiques the closing arguments by his defense counsel. He takes issue with the Government's argument that Aquart's DNA was "found

at the murder scene," and that the DNA expert had been cross examined for days with only one typo in the report emerging during that cross-examination—complaining that these claims were not properly rebutted during the defense argument. But he also concedes that "[t]rial counsel tried to pull the strands together at closing." Aquart Br. at 54. Indeed, in closing, defense counsel pointed out the limitations of the forensic evidence (TT4270); the contamination of the crime scene and movement of objects (TT4270): the multiple issues with the DNA evidence (TT4272-4278); all of the issues with contamination at the state laboratory, including "observer bias" (TT4278-4282) and the limitations of the statistical analysis (TT4282). Defense counsel did indeed pull these various strands together, concluding their DNA thus:

> when you consider the entire picture regarding DNA, the statistical uncertainty, the missing genetic markers, the unknown sequence of those genetic markers, the contamination, and the problem of observer bias, it doesn't add up to much, and it's nowhere close to being sufficient proof upon which you can base a conviction.

TT4283.

Defense counsel's summation thus "addressed all the important points the jury should consider." *Rickenbacker v. Warden*, 550 F.2d 62, 66 (2d Cir. 1976). As to DNA—as well as other topics—counsel raised arguments that effectively served to "sharpen and clarify the issues," as well as "point out the weaknesses of [their] adversar[y's] positions." *Herring v. New York*, 422 U.S. 853, 862 (1975). Consequently, trial counsel's performance cannot possibly be said to have fallen "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

***(5) Argument that counsel should have moved for a new trial:*** Aquart's last argument focuses on purported ineffectiveness post-conviction. He asserts that, after a 2010 audit, the Connecticut State Lab lost its accreditation in 2011, before he was sentenced. *See* Aquart Br. at 55-63 (describing issues with the laboratory as uncovered through the audit). According to Aquart,

the audit revealed that, while the DNA analysis in this case was still ongoing, there were inadequate protocols for detecting contamination at the lab, and that the lab did not have all of the internal validations. Aquart Br. at 58-63. Aquart argues that "[trial counsel] does not appear to have recognized – or even gone back and read the trial transcripts to check – that Ms. Roy had testified contrary to the audit findings at several points, in a way that was misleading to the jury." Aquart Br. at 61. He claims that because counsel did not request a new trial when this was revealed, they were constitutionally deficient. This argument is also unavailing.

As an initial matter, Aquart chose to pursue a direct appeal and did not raise this claim, which was available at the time. More to the point, his counsel likely concluded that there was no reason to pursue a new trial for multiple reasons—*first,* because the issues raised with the DNA testing were largely unsuccessful, and *second*, as explained below, even if there were problems with the DNA evidence, the trial presented overwhelming non-DNA evidence sufficient to convict Aquart. Finally, Aquart does not cite any convictions that were overturned or thrown out due to faulty DNA evidence as a result of the Connecticut State Forensic laboratory losing its national accreditation in August 2011. Nor is the Government aware of any such cases. Thus, far from being ineffective, any motion for a new trial on these grounds would have been properly judged as unlikely to succeed.

***3. In any event, there was no prejudice, as the DNA evidence was just one small piece of the overwhelming evidence of Aquart's guilt***

After attacking his attorney's performance with regards to the DNA evidence, Aquart moves on to the prejudice prong. Here, he is left only to speculate. He speculates that if DNA evidence had been excluded entirely or limited to testimony about the analysis of the outer glove of the doubled glove (14-1-Z1), or if its significance had been undermined through better cross examination and closing arguments, the outcome of the trial on the murder-related counts would

have been different, because the remaining forensic evidence was weak and the cooperators were shaky. He claims that the DNA was central to the Government's case because it formed independent proof that the Aquarts, Taylor and Johnson were in the apartment on the night of the murders, and because it corroborated Taylor's testimony. Aquart Br. at 81. He goes so far as to say that, without the DNA evidence, the defense could have persuasively argued that Aquart was not in the apartment and that therefore the "DNA evidence undoubtedly had serious weight in Mr. Aquart's conviction." Aquart Br. at 82.

This argument is utterly without merit. Even putting aside the DNA evidence, there was overwhelming evidence proving the defendant's guilt. Indeed, that conclusion represents not merely the Government's contention. The Second Circuit has found twice that there was more than enough evidence to sustain Aquart's conviction.

Nonetheless, even without the DNA evidence, there was overwhelming other evidence—especially eye-witness testimony—tying Aquart to the murders. The jury heard firsthand from many witnesses who had observed Aquart threatening Tina Johnson before the murders, an eye-witness accomplice who watched Aquart beat the victims to death, a close eye-witness (Aquart's then-girlfriend to boot) who watched (and assisted) Aquart in disposing of the incriminating evidence afterwards, and a witness who heard Aquart's jailhouse confession and received an inculpatory letter in which Aquart tried to falsify evidence to cover his own tracks. Moreover, because Aquart and Tina Johnson had known one another well before the murders, DNA evidence was unlikely to be case-determinative; after all, Aquart could have deposited his DNA in Tina's apartment on another occasion.

The DNA evidence was therefore simply not particularly critical, contra Aquart's claims. Although Aquart now resists this conclusion, it was shared by essentially everyone else. His own

defense counsel logically determined that this was *not* "solely or even principally a DNA case." Aquart Br. at 54; Ex. I-AE. The Government, in summation, focused heavily on the various cooperating witnesses, the non-DNA corroboration of their testimony (including, for example, through the use of Tina Johnson's phone use after the murders), and the other physical evidence, among many other things. TT4229. And the Second Circuit agreed, when it noted that, "DNA analysis also linked various retrieved evidentiary fragments—somewhat more qualifiedly—to Azibo and Azikiwe Aquart as well as to the three victims. On some retrieved fragments, examiners found more than one person's genetic markers. On other fragments, examiners could not eliminate Aquart, Taylor, or the victims as DNA contributors." *United States v. Aquart,* 912 F.3d 1, 12 (2d Cir. 2018). In upholding the sufficiency of the evidence, the Second Circuit focused on the testimony of John Taylor and Efrain Johnson, as well as Leroy Whittingham, the fingerprint evidence, Lashika's Johnson' testimony regarding Aquart's efforts to destroy the evidence and Efrain Johnson's admission, Aquart's admission to destroying evidence and Aquart's efforts to obstruct justice. *Aquart*, 912 F.3d at 1-20 (finding that his "sufficiency challenge to his VICAR convictions fails on the merits.").

Aquart's resort to case law gives him no assistance. This case is not like *Massillon v. Conway,* 574 F. Supp. 2d 381, 399 (S.D.N.Y. 2008), where the court found that without evidence (the money and drugs) that should have been suppressed, the prosecutor's case had little probative value at all. Here, by contrast, the DNA evidence played a minor role compared to the significant non-forensic evidence establishing Aquart's guilt.

Even with the benefits of advances in DNA technology and this later review, Aquart's counsel's assessment remains correct. This case was not solely or even principally a DNA case. It then logically follows that the type of DNA challenges that Aquart seeks to raise here cannot

demonstrate the requisite prejudice.

For all of these reasons, Aquart cannot demonstrate that his trial counsel were ineffective on either the *Strickland* performance or prejudice prong with regard to their handling of DNA.

**B. Claim Two: No Ineffective Assistance as to Fingerprint Evidence**

Aquart next asserts that his trial counsel was ineffective for purportedly failing to investigate and challenge the fingerprint evidence. Aquart Br. at 84. According to Aquart, trial counsel failed to make *Daubert* or other legal challenges to its admission; failed to effectively investigate and challenge this evidence relying on an unqualified expert and not calling their own defense expert; and conducted an insufficient cross-examination. Aquart contends that, if the fingerprint evidence had been excluded, the results of the proceeding would have been different.

This claim is likewise meritless.

***1. Background on fingerprint evidence***

In 2009, the Government disclosed to defense counsel that they were using John Pleckaitis as a latent print examiner who had over thirty years of experience examining latent prints, was certified by professional organizations, and previously had been qualified as an expert. *See* Aquart Br. at 84. Pleckaitis developed latent print evidence from two plastic bags connected by duct tape, a piece of broken sheet rock wallboard, and impressions on a Sirchie brand hinge lifter. From those prints, he determined that the impressions from the two bags connected by duct tape matched the fingerprint impression of Aquart's left middle finger. *See* Exhibit II-A Lab Report at 3. He also identified a fingerprint as having been made by an individual by the name of James Platt who was not charged with any crime but was known to frequent the apartment. Nine impressions were not identified although they were compared to the victims, the defendants and others known to visit the apartment. In April 2009, Azikiwe Aquart retained Ivan Futrell, a retired FBI latent fingerprint

supervisor who agreed with Pleckaitis's findings. Defense counsel did not call any fingerprint examiner at trial.

Pleckaitis was called by the Government to testify at trial and was subject to lengthy and fulsome cross-examination. TT2718-2807. At trial, Pleckaitis explained that he used the ACE-V method and detailed his conclusions. TT2732 (ACE-V stands for "analysis, comparison, evaluation and verification"). As summarized by the Second Circuit, "[f]ingerprint analysis was able to link Azikiwe Aquart to two plastic bags (one from Walgreens) recovered from Williams's bedroom, and to link Aquart to a piece of duct tape holding the two bags together." *Aquart*, 912 F.3d at 12.

***2. Applicable Law***

"It is without question that fingerprint analysis has enjoyed a long history of acceptance as a scientifically sound technique for identification and has routinely been admitted as such for the purposes of criminal trials." *United States v. Salim*, 189 F. Supp. 2d 93, 100 (S.D.N.Y. 2002); *see also United States v. Havvard,* 260 F.3d 597 (7th Cir.2001) (rejecting Defendant's contention that fingerprint analysis was not scientific and thus not reliable); *United States v. Salameh*, 152 F.3d 88, 128-9 (2d Cir.1998) (stating in dicta that identification of fingerprints rested on well-settled scientific foundation); *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir.1996) (asserting that the reliability of fingerprint comparisons cannot be questioned).

The ACE-V procedure, used by Pleckaitis here, is a procedure that has been deemed "scientifically valid and reliable," *United States v. Lundi*, No. 17-cr-388 (DLI), 2018 WL 3369665, at *3 (E.D.N.Y. July 10, 2018) (cleaned up). Courts have followed the Addendum to the 2016 Report by the President's Council of Advisors on Science and Technology ("PCAST") and "concluded that 'there was clear empirical evidence' that 'latent fingerprint analysis . . . .

method[ology] met the threshold requirements of "scientific validity" and "reliability" under the Federal Rules of Evidence.'" *United States v. Pitts*, No. 16-cr-550 (DLI), 2018 WL 1116550, at *4 (E.D.N.Y. Feb. 26, 2018) (cleaned up) (quoting Addendum to the PCAST Report on Forensic Science in Criminal Courts); *see also United States v. Cantoni,* No. 18-CR-562 (ENV), 2019 WL 1259630, at *2 (E.D.N.Y. Mar. 19, 2019).

***3. Discussion***

***(1)*** ***Daubert motion:*** Just as with his DNA claim, Aquart's claim that counsel was ineffective for failing to file a *Daubert* motion for the fingerprint expert fails. 5here is no obligation for trial counsel to move to preclude the admission of results derived from a recognized forensic science. Aquart tries to argue that the failure to request a *Daubert* hearing prevented the court from exercising its gatekeeping function and lifted the burden of proving the admissibility of the latent print evidence when the field was under scrutiny after the issuance of a report by the National Academy of Sciences National Research Counsel (the "NAS Report"). *See* Aquart Br. at 87. !

But as with the DNA, defense counsel's decision not to proceed with a *Daubert* motion, was apparently made after careful consideration and likely for strategic reasons. Such a hearing is not required "in ordinary cases where the reliability of an expert's methods is properly taken for granted." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999). The case law confirms as much. In *United States v. Pitts,* a 2018 case, the defendant—like Aquart here—argued that the fingerprint analysis was unreliable because of concerns raised by the PCAST and NAS Reports. But the Court cited the PCAST Addendum which concluded that "there was clear empirical evidence" that "latent fingerprint analysis . . . method[ology] met the threshold requirements of 'scientific validity' and 'reliability' under the Federal Rules of Evidence" and found that "[t]he views of the courts in this and other circuits are consistent with the views expressed in the PCAST

Addendum [and] [f]ingerprint analysis has long been admitted at trial without a *Daubert* hearing." *United States v. Pitts*, No. 16-CR-550 (DLI), 2018 WL 1116550, at *4–5 (E.D.N.Y. Feb. 26, 2018) (citing *United States v. Stevens*, 219 F. App'x 108, 109 (2d Cir. 2007) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)) (affirming denial of request of *Daubert* hearing and holding that "[s]uch a hearing is not required 'in ordinary cases where the reliability of an expert's methods is properly taken for granted.' "); *see also United States v. Salameh,* 152 F.3d 88, 128-129 (2d Cir. 1998) (affirming admission of fingerprint evidence); *United States v. Avitia-Guillen*, 680 F.3d 1253, 1260 (10th Cir. 2012) ("Fingerprint comparison is a well-established method of identifying persons, and one we have upheld against a *Daubert c*hallenge.").

Any failure to ensure that unidentified prints were run through databases is also not the type of failure that would come anywhere near to constituting ineffective assistance. The issue was the presence of Aquart's fingerprint, not the presence of other unidentified fingerprints in an apartment that was the site of a known drug trafficking operation with regular traffic. Even had another fingerprint been linked to another person (as in fact others were), it is unclear what defense counsel would have done with that evidence. In not moving for a *Daubert* hearing with regards to the fingerprint evidence, Aquart's counsel likely concluded, as so many courts have, that "[t]he appropriate attack of an expert's 'match' opinion is in rigorous cross-examination and the presentation of other experts to challenge the findings, not the whole-sale preclusion of a reliable methodology." *United States v. Salim,* 189 F. Supp. 2d 93, 101 (S.D.N.Y. 2002). This cannot possibly constitute ineffective assistance of counsel.

***(2) Defense expert:*** Aquart recognizes that the trial team actually retained an expert—Futrell—to consult on fingerprint evidence and that Futrell agreed with the Government's expert. He objects to that expert, however, because Futrell had been censured by a professional review

board and was suspended by the International Association for Identification in January of 2009, shortly before he was retained in this case. Aquart Br. at 90. Aquart insists that a qualified expert would not have identified Aquart as matching any of the fingerprints and would have raised other issues. His current defense counsel has retained another expert, Dr. Heidi Eldridge, who has concluded that Pleckaitis's work was not in conformance with contemporaneous standards and that the correct analysis would have been "inconclusive" because some points of comparison he relied on were degraded and because he did not provide supporting documentation of the verification process, among other issues. *See* Aquart Br. at 97-98; Exhibit II-J. Aquart speculates that a qualified expert could have provided a detailed explanation and undermined Pleckaitis's comparisons, especially the match of Aquart's known print to the latent impressions on the duct tape. Aquart also argues that a qualified expert would have brought out that it would be unusual to leave latent prints suitable for comparison when wearing latex gloves. Aquart Br. at 106.

This claim has no merit. Defense counsel did retain an expert, who applied the forensic science at the time and came to the same conclusions as Pleckaitis. Asserting that defense counsel was obligated to retain another expert because his first expert agreed with the Government expert borders on the absurd. *See also McBride v. Coveny,* No. 19-CV-0200, 2020 WL 4194895, at *8 (S.D.N.Y. July 21, 2020) ("Whether counsel should have taken certain investigatory steps and presented particular evidence are strategic decisions for which substantial deference is given."). Moreover, as discussed below, the issues that another expert would have raised were raised by defense counsel during cross-examination and the presence of other fingerprints would not have assisted in diminishing Aquart's culpability. There is simply no basis to believe that a defense expert, if called, would have necessarily undermined Pleckaitis' testimony or that any further investigation was required to be effective. *See, e.g., Alston v. United States*, No. 15-CR-0435,

2021 WL 2380064, at *7 (S.D.N.Y. June 10, 2021) (finding an "effective defense does not necessarily require the services of a private investigator" because the investigator may "[come] up with nothing useful").

***(3) Objections, cross-examination and closing argument:*** Finally, Aquart also argues that trial counsel did not object to Pleckaitis, his use of the terms "unique" and "match," his analysis using the ACE-V method and its possibility of error, and his explanation of how he would use focal points of the latent impression as guidance.

As an initial matter, "decisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987). This does not establish constitutional ineffectiveness in this case.

Here, though, cross-examination here was quite effective. Defense counsel pointed out, for instance, that there was no way to tell when someone left a print or where the item was when the print was left. TT2801-2802. This was particularly compelling, because the jury heard evidence that Aquart and Tina Johnson had known one another long before the night of the murders, and thus could have considered the possibility that Aquart left his fingerprint at the scene at another time. For this reason, even if trial counsel did note the fingerprint match, *see* Aquart Br. at 104, it could not have been prejudicial. Moreover, defense counsel also brought out multiple problems with the reliability of the forensic evidence. *See generally* TT4312- 4313.

Defense counsel likely decided that it was not helpful to attack the fingerprint evidence because there were so few matches to Aquart. Instead, counsel reasonably focused on pointing out impressions that did not match either of the Aquarts. TT2804-2805. This was far from constitutional ineffectiveness.

Ultimately, Aquart has failed to establish deficient performance, and failed even more

notably to establish prejudice. As Aquart's current expert recognizes, the only individualization conclusion was for a single latent print impression, a mark on a piece of duct taped removed from plastic bags. Exhibit II-J at 5. Multiple other fingerprints at the crime scene did not match Aquart. Defense counsel established that even if Aquart had left the fingerprint, it was impossible to tell when and what he was doing when he did.

This treatment of a single, non-conclusive evidence in no way establishes constitutional ineffectiveness. This challenge also fails.

### C. Claim Three: No Ineffective Assistance as to Crime Scene Evidence

Aquart's final attack on the forensic evidence is the most strained of all. He asserts that his trial counsel was ineffective for failing to adequately consult with and present a crime scene expert. Aquart contends that, during the trial, the defense strategy had been to concede his involvement in the drug activity but not the murders and that trial counsel sought to portray the evidence related to the murders as circumstantial. According to Aquart, because his counsel failed to consult with a crime scene expert (other than a consultant who did two days' worth of work), they could not adequately undermine the crime scene evidence at trial. Aquart centers his attack around two broad issues with the crime scene evidence—contamination of the scene and inconsistencies in the witnesses' testimony— that he alleges an expert could have underscored at trial and argues that his defense counsel were ineffective for not hiring one and the results of the proceeding would have been different if they had. Aquart's argument is without merit.

#### *1. Background on crime scene evidence*

As discussed above, in the morning of August 24, 2005, Leroy Whittingham discovered the bound, bloodied bodies of his mother, Tina Johnson, and her boyfriend, James Reid, lying in an apartment with blood on the ceiling and walls. After he called 911, multiple officers and

emergency responders entered the crime scene, some of whom testified at trial and were subject to lengthy cross-examination. The collection of evidence at the scene took several days and there were issues with documentation. Defense counsel pointed out some of the issues with the evidence found at the crime scene during closing argument.

Peter De Forst had been retained as a defense expert to provide opinions on how the crime scene was processed and how the crime might have taken place and he billed the court for 16.4 hours, but there is no record of his opinions. *See* Aquart Br. at 114. He did not testify at trial.

***2. Applicable Law***

Courts have regularly held that defense counsel is not required to call crime scene experts. *See, e.g., Jones v. Quiros*, 686 F. Supp. 3d 85, 165 (D. Conn. 2023) ("Because evidence rebutting Mr. Spears's account was brought out on cross examination and Mr. Jones cannot demonstrate what exculpatory evidence a crime scene and ballistics expert would have uncovered, this court is unable to call the SSH Court's conclusion contrary to, or an unreasonable application of, clearly established federal law."); *see also Harrington v. Richter*, 562 U.S. 86, 106–07 (2011) ("Here it would be well within the bounds of a reasonable judicial determination for the state court to conclude that defense counsel could follow a strategy that did not require the use of experts regarding the pool in the doorway to Johnson's bedroom."); *Grecco v. United States*, No. 14-CR-760 (KMK), 2023 WL 6294334, at *10 (S.D.N.Y. Sept. 27, 2023) (rejecting claim that defense counsel should have called a crime scene expert).

In many cases, there are any number of hypothetical experts that a defense attorney could engage. But an attorney can choose not to engage some or all of them and avoid activities that appear "distractive from more important duties." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009) (per curiam). Defense counsel is entitled to formulate a strategy that is reasonable at the time and to

balance resources in accord with effective trial tactics and strategies. *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005). "'Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach [and] [i]t can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts, but even that formulation is sufficiently general that state courts would have wide latitude in applying it." *Richter*, 562 U.S. at 106.

***3. Discussion***

Aquart's claim relies largely on a new expert, Kenneth Wong, that his current counsel has retained, who claims that the Government's handling of the crime scene departed from best practices. Aquart Br. at 116., Ex. III-G. Through Wong, Aquart faults the Government for a series of purportedly problematic issues in the Government's handling of the crime scene. He contends, *inter alia*, that investigators did not adequately secure and control the crime scene; that disturbances should have been better documented; that it is not clear from the record whether every closet or cabinet was searched and delays meant that the scene could be subject to contamination; that the photographs and video were of poor quality and contemporaneous observations were not made; that evidence was not preserved; that it is not clear where the bags were or how they were moved; that the appearance of the victims' bodies may have moved; that there are questions about whether the door was drilled shut; no hair or fiber evidence was found at the scene. Aquart Br. at 132.

Aquart also complains about purported inconsistencies in the testimony of witnesses at trial. In particular, he challenges testimony about whether the door was forced open, about Taylor's line of sight during the murders, about blood spatter on the walls, and other matters. *See* Aquart Br. at 134-136.

First, these challenges are factually wrong. As discussed further in the response to Aquart's Claim 24, *infra*, there was nothing inconsistent or problematic about the testimony of the witnesses, the condition of the door, the blood spatter, and so on. Taylor was able to see the attacks because he was moving about the apartment. The physical evidence established that the door had clearly been kicked in, consistent with Taylor's testimony. Evidence proffered at trial established that the apartment did indeed look like a meat market after Aquart beat his victims to death. *See infra* Section P (Claim 24) for further discussion.

And more to the point here, there is no basis to find that the performance of counsel was, in any way, ineffective. Defense counsel did initially retain an expert who performed at least two days of work. Defense counsel vigorously cross-examined the officers. Indeed, Aquart concedes that trial counsel was, in fact, effective in attempting to cross-examine witnesses on matters related to the crime scene investigation including contamination of the scene, movement of evidence, failure to collect evidence and ability to observe. Aquart Br. at 114-15. His *post-hoc* critique as to the particular questions posed on cross-examination cannot possibly be understood to make his counsel ineffective. Having effectively cross-examined the Government's crime scene witness, having successfully elicited the limitations of the crime scene evidence, and having revealed a host of steps that were not taken by the crime scene team, it was a reasonable strategic choice not to call a defense expert on the subject. *See Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008) ("Counsel's cross-examination of the prosecution's expert nurse witnesses evidence a sufficient understanding of the nature of the evidence against Boyle and its potential weaknesses."); *Bell v. Miller*, 500 F.3d 149, 156 (2d Cir. 2007) ("'[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" (quoting *Strickland*, 466 U.S. at 689)). It certainly cannot be deemed ineffective assistance of constitutional

proportions. It is also not clear that any expert would have suggested all of these belatedly-raised issues—especially given their obvious weakness, as discussed below.

Moreover, there has been no showing of actual prejudice to Aquart. The minutia that Aquart points to would not have made a significant difference. For example, pointing out that the kitchen cabinets were not properly photographed when the crime did not occur in the kitchen would have been an irrelevant line of attack Similarly, the fact that the bodies might have shifted slightly or evidence may have been moved when the victim's son was embracing his dead mother or when the EMT's were trying to help the victims was elicited on direct examination, *see infra*, and would not, in any event, have changed any outcome in this trial.

As noted above, this was not a case that turned on crime scene evidence. Instead, it was about the credibility of the Government's cooperators. Even if Aquart's trial counsel had used a crime scene expert, there is no reasonable probability that the case would have turned out differently. *See Boyle*, 544 F.3d at 1139 ("Given the nature of the evidence arrayed against him and his chosen defense, there is no reason consulting medical experts or putting them on the witness stand would have changed the outcome of Boyle's trial."). Ultimately, there is no indication that an independent review of the crime scene would have uncovered anything contrary to the existing record, let alone anything exculpatory. This claim too should be denied.

**D. Claim Four: No Ineffective Assistance as to Witness Testimony**

Aquart next claims that his counsel was constitutionally ineffective for "failing to investigate and present evidence to challenge the Government's witnesses," including John Taylor, Lashika Johnson, Efrain Johnson, and Rodney Womble. Aquart Br. at 139. This challenge also fails. As an initial matter, certain of these arguments were raised, in different forms, in Aquart's prior appeals, and thus relitigation should be barred here. But Aquart is also wrong as a substantive

matter. Defense counsel *did* extensively cross-examine all of the trial witnesses and elicit testimony (and later make arguments to the jury) that the witnesses were not credible. As a general matter, defense counsel was ready to use extraneous evidence to impeach the witnesses, but in many cases were able to elicit favorable testimony on cross-examination without the use of impeachment evidence. Then, defense counsel used that testimony to argue against conviction—arguments that the jury rejected. The fact that defense counsel did not succeed in making far-fetched legal or factual arguments does not establish either constitutionally deficient performance or the requisite prejudice.

***1. John Taylor***

First, Aquart claims that his counsel failed to investigate and impeach cooperating eyewitness John Taylor, whom Aquart recruited to assist in committing the murders, and who watched Aquart bind and then beat the victims to death. Aquart Br. at 139-152.

This argument is thoroughly contradicted by the trial record. Trial counsel undertook an extensive cross-examination of John Taylor, spanning over 100 pages of the trial transcript. TT2374-2493. That cross-examination also evinced a very thorough pre-trial investigation of Taylor. It also, contrary to Aquart's contentions here, centrally involved extensive impeachment on inconsistencies—both inconsistencies with other evidence presented and inconsistencies with Taylor's own prior statements.

Indeed, defense counsel explicitly explained, on the record, that its strategy regarding Taylor was one of impeachment. At sidebar, it explained that "it is important for the jury to understand that . . . not only did he lie, as he's admitted, but that he was consistently making up details, that he is fabricating stories, and ultimately our argument will be that the story that they're hearing is similarly fabricated, that this witness is not just – that this witness is a person who makes

up stories as he's going along." TT2458-59.

Accordingly, during cross-examination, defense counsel elicited an enormous number of admissions from Taylor that his trial testimony contradicted his own prior statements to law enforcement. *See, e.g.*, TT2392 (getting drugs from Fan was a lie), TT2393 (meeting Fan while pursuing Ebony was a lie), TT2394 (Ebony working at a Norwalk club was a lie), TT2394 (going to the club was a lie), TT2395 (believing that Fan set him up with police was a lie), TT2395-96 (Taylor continued lying despite repeated warnings about false statement liability), TT2398 (denying knowing Aquart was a lie), TT2398 (statements about Shante Pettway were a lie), TT2399 (statements about drug-dealer Bluey were a lie), TT2402-03 (initially denying knowing Azibo, Azikiwe, and others was a lie), TT2403 (denying going south with anyone from Connecticut was a lie), TT2404 (account of seizure of guns was a lie), TT2404 (initially denying knowing Denita was a lie), TT2406 (not having a gun in the car was a lie), TT2413-14 ("Ba" driving him home from train station was a lie), TT2413-14 (denying knowing Azikiwe was a lie), TT2415-16 (waiting outside in the car outside Charles Street while Dreddy and "Ba" went into the building was a lie), TT2439 (staying in the car to smoke cigarettes while Dreddy and his brother went into building was a lie), TT2439 (seeing Azibo and Azikiwe come out of the building and put bats and clothing in the trunk of the car was a lie), TT2439 (hearing the bats banging against each other was a lie), TT2444 (calling Dreddy "Fan" was a lie), TT2449 (learning about murders via TV news was a lie), TT2450 (Ziggy offering resupply of crack was a lie), TT2455 (Dreddy and Ziggy taking rope and duct tape from the apartment and going downstairs was a lie), TT2456 (Taylor told many lies "to distance myself from [Azibo and Azikiwe], from telling the truth"), TT2456 (learning about the murders with Denita was a lie), TT2456 (seeing two bloody bats outside a borrowed car was a lie), TT2461 (Dreddy claiming to be a cop was a lie), TT2462

(Dreddy telling Taylor to go wait in the car was a lie), TT2463 (not having gloves on was a lie), TT2463 (Dreddy telling Taylor not to touch anything was a lie), TT2463 (meeting up near the pool hall to drink Hennessy was a lie), TT2464 (kids sleeping in the apartment where they later met up was a lie); TT2484-86 (told many stories about returning to Connecticut, which were lies), TT2486-87 (denying getting drugs from Dreddy was a lie).

Defense counsel impeached Taylor with inconsistencies so effectively that the Government actually objected on grounds of cumulativeness. TT2458 ("[Taylor has] admitted that he lied umpteen times and I don't know what more he expects him to say other than he lied"); TT2500 ("[B]y going through ad nauseam every single prior version of the events, [defense counsel] has attacked the credibility of what [Taylor] said on everything"). Even the Court agreed that the jury had gotten that message. *See* TT2459.

And then counsel effectively argued those inconsistencies to the jury in closing. In addition to all of the admitted lies, counsel argued that Taylor's entire account on direct examination was a falsehood. Counsel presented the theory that Taylor had become stuck in his web of lies and then was "willing to improvise" to escape punishment. TT4308.

Defense counsel argued that Taylor's account of the murders was inconsistent in many ways with other testimonial and physical evidence. Counsel asserted that Taylor was lying about the fact that the perpetrators wore blue gloves. TT4309 (Taylor "tells everybody time and time again they were all wearing blue gloves . . . But that doesn't fit the evidence. There is no blue gloves in that room. . . . The fact is he never knew what color those gloves were."). Counsel further argued that Taylor's testimony about the couch propped up against the door was inconsistent with the crime scene. TT4310 ("The fact is [Taylor never knew whether there was even a couch in that apartment at all."). And counsel pointed out that Taylor's testimony about the Hispanic woman

who assisted in the "dry run" was unreliable, because Taylor inconsistently identified (or failed to identify) the woman in question, Judith Rivera. TT4310-11.

Defense counsel also extensively elicited testimony suggesting that Taylor was seeking only to protect himself. This was not difficult, since Taylor readily admitted that he had repeatedly lied in a (failed) effort to avoid law enforcement consequences for his crimes. *See generally* TT2406 (Taylor "changed strategies"), 2441-42 (Taylor "cooked up" various false stories"). Moreover, defense counsel elicited testimony that Taylor hated jail and didn't want to go back there. TT2401. Taylor was aware that he was facing the death penalty. TT2476-77. The final question defense counsel posed to Taylor—answered in the affirmative—was "Mr. Taylor, when it helps you, you lie, right?" TT2493.

In sum, counsel put to the jury Aquart's current theory that these inconsistencies and admitted lies indicated that Taylor himself was not present at the crime scene and should, in any event, be disbelieved. The jury rejected it.

In the face of this constitutionally reasonable defense performance, Aquart's arguments about ineffectiveness have no merit. First, Aquart offers no basis for his claimed deficits in the investigation phase. *See* Aquart Br. at 145-146. For example, he provides no citation for the notion that there was any extant cell phone data or extant surveillance video of the Walgreens, a nearby diner, or the Charles Street apartment building where the murders occurred, beyond that which the Government had already obtained and produced. Nor does he offer any basis to believe that "[s]urveillance video would have disproved Mr. Taylor's account." Aquart Br. at 145. Nor does he offer any basis—beyond the wholly improbable "information and belief"—for the claim that Walgreens did not sell the duct tape or latex gloves found at the crime scene. (And indeed, as discussed below, Taylor did not even testify that Aquart bought the gloves at the Walgreens. *See*

*infra*, Section K)

Aquart's argument that his counsel did not adequately "impeach Taylor with inconsistencies" is thoroughly belied by the trial record itself. Aquart Br. at 146. As discussed, defense counsel thoroughly, painstakingly impeached Taylor with inconsistencies. Aquart's complaint that counsel did not specifically highlight certain picayune details—for instance, that Lashika saw Azikiwe and Azibo in their underwear in her apartment after committing the murders, that Aquart had asked Frank Hodges to knock on Tina Johnson's door several days before the murders, and that Taylor didn't mention that Jackie Bryant was also present outside the building on the night of the dry run—does nothing to change this calculus. *See* Aquart Br. at 147-50. It's not even clear that Taylor's testimony is inconsistent with this other evidence. For example, Taylor might not have noticed Bryant outside the building that night or might not have thought to mention it; Bryant only testified in general terms that the men (specific individuals unspecified) noticed her. Aquart Br. at 148.

Moreover, there was good reason for defense counsel to avoid further impeachment of Taylor. As the trial record made plain, Taylor was a very simple and intellectually limited man. He testified that he couldn't read, and he demonstrated in testimony that he couldn't understand written documents. TT2382. He repeatedly struggled to understand questions. *See, e.g.*, TT2383-84, TT2391-92, TT2411, TT2438, TT2446, TT2471, TT2488. He testified that, every time he tried to tell a lie, law enforcement immediately identified the lie. *See, e.g.*, TT2466 ("[T]he more I lied, the more I put myself into it."), TT2483 ("I just got tired of lying. I just wanted to tell the truth. I ain't want – it don't do me no good."), TT2487 ("I was putting myself in more worse predicament by lying"). In defense summation, counsel admitted that Taylor "looked like the fool" and was "not too sophisticated." TT4306. Defense counsel thus might have reasonably avoided additional

impeachment with inconsistencies both for fear of confusing the witness, and because further questioning along those lines would have likely made it even more difficult to convince the jury that Taylor was continuing to mastermind a highly elaborate false narrative, unbeknownst to law enforcement, and based only on publicly available information.

Finally, Aquart's argument that his counsel failed to cross-examine Taylor on his release expectations ignores the extensive defense questioning and general argument on this very subject. *See* Aquart Br. at 151-52. Moreover, the Second Circuit already reviewed these facts in Aquart's first appeal and found that "[a]ny reasonable jury would have understood from the totality of Taylor's testimony that, however likely he then thought a life sentence, he retained the hope of receiving a lesser sentence by testifying against Aquart." 912 F.3d at 24; *see also id.* ("Taylor's professed release expectation did not deny the defense its argument that Taylor's motive in testifying against Aquart was to secure a reduced sentence."). Moreover, as the Circuit noted, "the district court instructed Aquart's jury that the testimony of witnesses, such as Taylor, who had entered into cooperation agreements with the Government, had to be considered 'with particular caution' precisely because such agreements gave hope for reduced sentences." *Id.* Aquart's argument here that the jury was left only with "misleading testimony that [Taylor] never expected to get out of prison and was instead testifying out of remorse and a sense of obligation to come forward" has been directly refuted by the Circuit. Aquart Br. at 152. Relitigation of this argument thus may well be directly barred by the mandate rule. But even if not, it must fail on the merits.

Defense counsel's performance regarding John Taylor was not constitutionally ineffective.

***2. Lashika and Efrain Johnson***

Similarly, Aquart wholly fails to establish constitutionally ineffective assistance of counsel regarding the investigation or impeachment of Lashika Johnson or Efrain Johnson. Aquart Br. 153-

65. After initially lying to the Government in two proffer sessions, Lashika later admitted that her boyfriend Azibo Aquart, his brother Azikiwe, and her brother Efrain Johnson appeared at her apartment in the hours after the murders, that Azibo and Azikiwe were in their underwear, that Azibo directed her to dispose of a drill and a bag of clothes in a dumpster, and that Azibo asked her to drive to his house and bring him a replacement set of clothes, which she did. Aquart Br. at 153-54. Aquart now argues that his trial counsel was constitutionally deficient in failing to further explore the Government's "threats" that made Lashika change her story. Aquart Br. at 155-58.

Aquart's argument that defense counsel failed to impeach Lashika Johnson with evidence that she changed her story only after the Government "threatened" her is directly contradicted by the record. As Aquart acknowledges, his trial counsel *did* try to "establish that Lashika Johnson provided information about what Efrain admitted to her only after being 'threatened.'" Aquart Br. at 155; *see* TT2945-46. While Lashika didn't agree with the characterization of the Government's conduct as "threats," she testified that she understood that she would be in trouble and would be prosecuted if she didn't tell the truth, causing Lashika to cry. Aquart Br. at 156; TT2946. As a substantive matter, this was fully consistent with her testimony at Efrain Johnson's trial, in which she similarly testified (in slightly more detail) that the prosecutor yelled at and threatened to prosecute her, which could end in her going to jail and losing her kids. Aquart Br. at 156-57; *See also Aquart*, 912 F.3d at 25 n.11 (full excerpts from both trials set forth).

Indeed, this argument was also raised—as part of a failed perjury claim—in Aquart's first appeal. There, the Second Circuit explicitly compared Lashika's testimony about this episode during both Aquart's trial and the later-occurring state trial of her brother Efrain Johnson and found them consistent. *Aquart,* 912 F.3d at 25-26. Relying on presiding Judge Arterton's detailed written decision explaining why Lashika Johnson's "testimony at both trials was consistent as to its

inculpatory substance," the Circuit found that, across both trials, Lashika Johnson's testimony "consistently connected her disclosure of additional inculpatory information to Government action reducing her to tears." *Id.* at 26. Relitigation of this matter thus should be barred by the mandate rule. But even if not, for the reasons discussed in the Second Circuit and even acknowledged in Aquart's own brief, this challenge fails.

It's also worth noting (as Aquart himself does), that defense counsel likely "couldn't interview Lashika Johnson while she was represented" by counsel herself. Aquart Br. at 158 n.46. Aquart then seems to imply that, to avoid a successful claim of constitutionally ineffective assistance, defense counsel would have had to interview Lashika's current boyfriend and cousin—neither of whom may have even known about the details of Lashika's proffer session. *Id.* This is simply not the law.

Aquart's arguments about defense counsel's purported failure to impeach Lashika are also meritless. Aquart Br. at 159-61. For example, Aquart now complains that defense counsel wasted time cross-examining Lashika on "a few new details that Lashika added at later proffer sessions" that might undermine her credibility, while failing to question her about the important inconsistency of whether the TV was on (as she initially indicated before being "threatened") or off (as she testified at trial). Aquart Br. at 160. In fact, Aquart has it exactly backwards: the TV testimony is insignificant (and also explained by the fact that Lashika was at that point lying to the Government), while the "few new details" about, say, taking the drill to the dumpster on Aquart's behalf was actually extremely significant. *See* Aquart Br. at 159 n.47; TT2947-48. Defense counsel's choice to focus the jury's attention on important concerns, rather than trivial ones, was not ineffectiveness—it was quite the opposite.

Finally, Aquart's arguments about defense counsel's purported failure to impeach hearsay

declarant Efrain Johnson's inculpatory statement to Lashika via Efrain's own prior (slightly) inconsistent statements to the Government is without merit. Aquart Br. at 161-65. Efrain's prior inconsistent statements to the Government—that the assailants used metal pipes (not bats) to beat the victims to death, and that Efrain left a rampaging Azibo in the apartment with two other assailants (not one or by himself)—are not favorable to Aquart's position. Indeed, Aquart acknowledges that Efrain's statements directly contradicted "the defense theory at trial that neither Mr. Aquart nor John Taylor were involved in the homicides." Aquart Br. at 164. If defense counsel had chosen to draw further attention to Efrain's prior slightly inconsistent statements, they would likely have made even clearer the crucial, highly consistent aspect of all of his statements—*i.e.*, the fact that Azibo beat the victims to death. Moreover, any possible inconsistencies in Efrain's prior inconsistent statements to the Government would have been easily understood by the jury as flowing from his self-serving desire to minimize his own involvement and criminal exposure (as compared to the truthful statements he made to his sister in private). Counsel's choice to forego that line of questioning was certainly not constitutionally deficient.

***3. Rodney Womble***

Aquart's ineffective assistance arguments regarding Aquart's drug lieutenant Rodney Womble fare no better. Aquart Br. at 165-74. First, Aquart claims that trial counsel "[i]nexplicably" failed to impeach Womble with recorded prison calls or letters to his girlfriend showing that he was unwilling to serve many years in prison, even after indicating the willingness to do so. Aquart Br. at 166. But that choice was not at all inexplicable. Indeed, no such impeachment was necessary, because Womble himself readily admitted on cross-examination to doing what he could to get out of jail as soon as possible and being unwilling to spend many years in prison. TT1533 ("Q: And of course you want to get out of prison as quickly as possible. A:

Yeah. Q: Because you knew you couldn't spend your life in prison. A: No. Q: Even 20 years is too much. A: Yeah. Q: Even ten. A: Yeah. Q: At the time you even felt that five was the most you could do. A: No, I wouldn't say that."). There was no need to "impeach" him when Womble's testimony was already consistent with the calls and letters. In fact, defense counsel specifically adverted to the fact that such "impeachment" by prior inconsistent evidence might not be necessary if Womble simply admitted it on cross-examination: "[I]f, in fact, Mr. Womble admits the specific statements that we are asking him about, then it may well be that we don't need to do anything" with extrinsic evidence. TT1518. That is precisely what happened.

Second, Aquart claims that defense counsel failed to cross-examine Womble about his purported false development of an alibi for the night of the murders. Aquart Br. at 167-68. But even after two decades of litigation, Aquart fails to show that Womble's alibi was false. In fact, the evidence he cites (Womble's calls to his girlfriend discussing their mutual whereabouts the night of the murders, and another deceased witness' FBI interview indicating that Womble took cocaine base from his apartment) is fully consistent with a true alibi—and defense counsel might well have been wary of making that clear to the jury. Moreover, insofar as there were any inconsistencies in Womble's testimony about how his relationship with Aquart soured in the weeks *before* the murder (since Womble tossed away Aquart's gun in a foot chase with police, and messed up the money in Aquart's drug operation), those were fully developed on cross-examination. TT1575-78.

Third, Aquart claims that defense counsel failed to present evidence of Womble's own motive to kill Tina Johnson himself. Aquart Br. at 168-69. His tortured explanation is that other drug dealers in the building (the Terrace Crew) may have been concerned that Womble's angry threat, in front of multiple witnesses, to Tina Johnson for undercutting Aquart's operation with her

own drug sales might have attracted unwarranted police attention for the Terrace Crew as well. *Id.* Aquart attempts, somehow, to transmute their desire to *avoid* police attention into a motive for the Terrace Crew (or Womble, on the Terrace Crew's behalf) to brutally murder Johnson and two others—a crime that was sure to (and, of course, did) attract immense and sustained police attention. Even if counsel had not pursued this theory (itself far from certain, *see infra* Section G), it was not constitutionally ineffective assistance for Aquart's defense counsel to choose not to pursue this self-evidently nonsensical theory of Womble's own "motive" to kill. Neither was defense counsel's choice not to pursue convoluted and unintelligible theories that other individuals (Kendall Willis, Marlon Spaulding) were somehow involved (or themselves at fault?), based only on the fact that various inmates were then telling one another not to talk to police. Aquart Br. at 171-73.

Aquart also complains that defense counsel failed to impeach Womble or his girlfriend Sherrell Randolph for statements purportedly "doubting" Aquart's participation in the murders. Aquart Br. at 173-74. In fact, the excerpted prison calls suggest that Womble knew perfectly well that Aquart himself committed the murders—making it quite reasonable for defense counsel to avoid eliciting testimony from Womble confirming that fact. And it is hard to understand what might have been gained by trial counsel emphasizing, as Aquart acknowledges, that Aquart "enforced the rules of his drug operation by assaultive conduct," (some of which sent his victims to the hospital or left them with permanent scars), but that Aquart had not, to date, murdered many others. Aquart Br. at 173; *see also id.* at 173-75. Counsel might reasonably have concluded that the jury would not regard such a hair-splitting argument to be particularly exonerating.

Finally, Aquart's claims about purported ineffective assistance in impeaching Womble founder on the inconvenient shoals of his counsel's extensive efforts to do just that. Aquart Br. at

174-76. Much of defense counsel's summation argued that Womble was a liar, or worse. *See* TT4294-4300. Counsel emphasized in both cross-examination and summation that Womble had been publicly seen threatening victim Tina Johnson with a table leg before her murder, suggesting that he had been the one who might have killed her. TT4297, TT4281, TT4286. Counsel did make the argument; the jury simply rejected it.

### E. Claim Five and Claim Twenty-Nine: No Ineffective Assistance as to Shamarr Myers and *Massiah*

Aquart next claims that his counsel was constitutionally ineffective for "failing to investigate and litigate the Government's *Massiah* violations with respect to Shamarr Myers," the jailhouse informant to whom Aquart had confessed, saying that the victims "had to die" for interfering in his drug operation. Aquart Br. at 176-79; Aquart Br. at 269-77. This challenge also fails, because there was no *Massiah* violation.

Under *Massiah v. United States*, 377 U.S. 201, 204 (1964) and its progeny, there may be a violation of a defendant's Sixth Amendment right to counsel, where law enforcement uses a jailhouse plant to "deliberately elicit[]" a confession from a represented defendant in the absence of counsel. But *Massiah* is wholly inapplicable here.

First, there is no infringement on the right to counsel when a law enforcement official or jailhouse informant merely reports volunteered or overheard statements. As the Supreme Court has instructed, "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). Accordingly, "a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). This is true even if the jailhouse informant was actively recruited by the

Government, placed in a particular prison cell, and agreed to listen and report back to law enforcement. *See id.* at 439 (No *Massiah* Sixth Amendment violation even where, "[b]efore [defendant] arrived in the jail, [jailhouse informant] had entered into an arrangement with [police], according to which [the informant] agreed to listen to [defendant's] conversations and report his remarks to [police]"). Even where the informant was acting specifically at the behest of law enforcement to collect information about a particular counseled defendant, there is no Sixth Amendment violation where he "merely listens and reports." *United States v. Birbal*, 113 F.3d 342, 345 (2d Cir. 1997). "[T]here is no constitutional violation in the absence of solicitation." *Id.* at 346.

Moreover, even if the jailhouse informant *does* "deliberately elicit[]" information from a represented defendant, there is no Sixth Amendment violation unless the informant is acting as a Government agent. "The Massiah rule covers only those statements obtained as a result of an intentional effort on the part of the Government, so information gotten before the inmates became agents/informants is not protected by the rule." *United States v. Stevens*, 83 F.3d 60, 64 (2d Cir. 1996). As the Second Circuit has instructed, an inmate does not become a Government agent merely by "receiving information from another inmate and subsequently transmitting it to the Government . . . in the hope of exchanging it for a benefit" such as a sentence reduction. *Stevens* 83 F.3d at 64. And "[m]ore than a cooperation agreement is required to make an informant a Government agent with regard to a particular defendant." *United States v. Whitten*, 610 F.3d 168, 193 (2d Cir. 2010). Rather, "an informant becomes a Government agent for purposes of [the Sixth Amendment] only when the informant has been instructed by the police to get information about the particular defendant." *Birbal*, 113 F.3d at 346.

Aquart's Sixth Amendment *Massiah* claim thus fails multiple times over. First, Myers was

not acting as a Government agent. Indeed, Myers had *rejected* the possibility of an agreement with the Government (after initially requesting the meeting with prosecutors himself). TT3654. And Myers was never asked to elicit information about Aquart himself. At most, Myers testified that he had received a “pop-up” in the prison law library, saying “this is the FBI, would you like to help us help you.” TT3644-45. But this vague “pop-up” did not mention Aquart or any specific defendant or even mention collecting information at all. It thus falls well short of the standard for “Government agent,” which occurs “only when the informant has been instructed by the police to get information about the *particular defendant*.” *Birbal*, 113 F.3d at 346 (emphasis added). Indeed, this Circuit has expressly indicated that “to treat every inmate who hopes to cut some future deal as a ‘government informant’ is to extend the idea behind *Massiah* far beyond its natural reach, and that we are not willing to do.” *Stevens*, 83 F.3d at 64.

But even if Myers *was* a Government agent (he was not), he did not “deliberately elicit” incriminating evidence from Aquart. To the contrary, Aquart approached Myers and asked Myers to “help him like get it out to the jury that it could have been somebody else that committed the crime.” TT3651. Aquart then “wrote [Myers] a list of things he wanted me to do for him.” TT3652, TT3657. In the letter, among other things, Aquart directed Myers to create a “courtroom outburst,” while on the witness stand and “look[ing] at the jury,” and claim that “Letho” (who had been killed during a home invasion) actually committed the crime. TT3661-62. In other words, Aquart took the initiative to write and deliver a lengthy letter scripting the false testimony a fellow inmate should give to frustrate justice. This defendant-driven process is about as far removed from deliberate elicitation by a Government agent as is possible.[9]

[9] It’s also worth noting that defense counsel extensively cross-examined Myers about his inclination and motivation to lie, including about Aquart specifically. *See* TT3677-96, TT3703-08.

### F. Claim Six: No Ineffective Assistance as to Lashika Johnson's testimony

Aquart next claims that his counsel was constitutionally ineffective for "failing to exclude Lashika Johnson's testimony about Efrain Johnson's" inculpatory statements that he had assisted Aquart in binding and beating the victims, but then left Aquart with them in the apartment. Aquart Br. at 179-97. This challenge plainly fails, because defense counsel *did* move (unsuccessfully) to exclude the statement.

As Aquart acknowledges, his trial counsel *did* seek to exclude—on the very basis of Fed. R. Evid. 804(b)(3) that he now urges—hearsay declarant Efrain Johnson's statement to his sister Lashika, who testified at trial. But the statement was admissible under Rule 804(b)(3) because (1) Efrain was unavailable as a witness (he had or would invoke his Fifth Amendment privilege), (2) because the statement was against Efrain's penal interests, such that a reasonable person in his position would not have made the statement unless true, and (3) because corroborating circumstances indicated that the statement was trustworthy. The court ultimately allowed the testimony.

Faced with no good options, Aquart's counsel chose to focus their preclusion motion on the second prong of the Rule 804 analysis, arguing that, when considered in isolation, Efrain's statements were not against his penal interest. Indeed, Efrain was seeking to help—not harm—his penal interests when he told Lashika that other people (including Aquart) hit the victims with a bat, that he left before the victims were murdered, and that Aquart later drilled the door shut and disposed of the murder weapons after he left the scene. And, as Aquart's counsel gamely argued, certain of the statements (*e.g.*, about Aquart's conduct after Efrain purportedly left) did not involve Efrain's own activity at all.

Of course, Aquart is undoubtedly correct that "this argument strained credulity and was

almost immediately dismissed." Aquart Br. at 184. But so too is the argument that Aquart now claims his counsel should have made instead—that there was purportedly no corroborating circumstances to indicate that the statement was trustworthy. In fact, overwhelming evidence corroborated the statement's trustworthiness—including but not limited to Taylor's eyewitness testimony, Lashika's own observations about Efrain and Aquart's post-murder activity, Myers' testimony regarding Aquart's later attempts to subvert justice, the extensive testimony from many witnesses about Aquart's displeasure with Tina Johnson's unauthorized drug activity and Aquart's tendency to enact violence on those who disobeyed him, and the forensic evidence. It was not ineffective assistance for Aquart's counsel not to pursue this easily refuted argument.

In an effort to resist this conclusion, Aquart here seeks to shift the standard from whether the statement lacked corroborating circumstances to whether the hearsay declarant (Efrain) was himself trustworthy. But that is not the law. Rule 804(b)(3) asks if the "*statement* . . . is supported by corroborating circumstances that clearly indicate its trustworthiness after considering the totality of circumstances under which it was made and any evidence that supports or undermines it." (emphasis added). The rule does not (and of course could not, given that it definitionally involves a statement against penal interest) ask that the *declarant's* honesty was irreproachable.

Aquart now argues that Efrain himself repeatedly lied to the Government, a point that Government counsel readily conceded then and now. But the fact that Efrain lied to law enforcement to avoid criminal penalties is essentially irrelevant in assessing whether he told the truth in private to his sister. Indeed, the Government determined that it could not call Efrain as a witness at a criminal trial without risking suborning perjury. It made no assessment of whether Efrain was likely to tell his sister the truth in private. The key question under Rule 804 is whether there was other corroborating evidence of reliability. There was.

Moreover, Aquart's argument here that Efrain's statements to police were essentially indistinguishable from his statements to his sister does not support his position here; it undermines it. *See* Aquart Br. at 190-97. Assume for the sake of argument that this contention is true (which is doubtful, given that Efrain admitted to Lashika that he personally beat one victim, while he denied as much to police). *Id.* But even if true, it suggests an even *greater* indicia of reliability with even *more* corroboration—which then would undermine any argument that his hearsay lacked the reliability necessary for admissible hearsay statements against penal interest.

**G. Claim Seven: No Ineffective Assistance as to Purported Third Party Guilt**

Aquart next claims that his counsel was constitutionally ineffective for "failing to investigate and present evidence of third-party guilt." Aquart Br. at 197-201. This challenge is also meritless. First, as Aquart acknowledges, trial counsel "offered reasons to doubt his guilt, including that it made no sense for Mr. Aquart to have committed such a dramatic crime" which would jeopardize his drug organization, and that "the government immediately zeroed in on Mr. Aquart as a suspect, to the exclusion of others." Aquart Br. at 198. In other words, his counsel did provide multiple theories of defense.

Now, Aquart complains that "trial counsel failed to give jurors any other theory of the offense." *Id.* As an initial matter, that blanket assertion is untrue. At minimum, defense counsel's cross-examination of Rodney Womble and their summation suggested to the jury that Womble himself may have killed Tina Johnson and then lied about it. *See* TT1532-35 ("Q: You knew at this point you threatened [the victims]. A: Yeah. Q: And you threatened them in public. A: Yeah. Q: People had seen this. A: Yeah. Q: In fact, they had seen you threaten Tina with a table leg. A: Yeah. A: And as far as you knew, the FBI already knew about these people. A: Yeah. Q: These witnesses. A: Yeah. Q: And of course you want to get out of prison as quickly as possible. . . . Q:

And the only way out of your mess was to cooperate. A: Yeah. Q: And tell the government what they wanted to know. A: To tell the truth. Q: They wanted you to talk about Dreddy [Azibo Aquart]. A: They wanted the truth. Q: But you already testified they were asking about Dreddy . . . So, you've got to take advantage of this opportunity. A: Yeah."); TT4297 ("And Womble knew he's been seen arguing with Tina Johnson, threatening her with a table leg. So he's got to start talking, and fast. And he does, he tells them stories.").

But even if "trial counsel failed to give jurors any other theory of the offense," that was because there wasn't one. Aquart Br. 198. Aquart's arguments to the contrary here are uniformly nebulous and implausible. Aquart argues, for instance, that "[o]n information and belief," other drug operations contested the Charles Street territory or had been the target of other robberies—leaving the details and relevance to the actual murders that occurred here largely unexplained. Aquart Br. 198-201. Similarly, the fact that various drug dealers may have committed other drug dealing or robberies has no non-speculative bearing on the facts here. Aquart Br. 199-201. And Aquart's contention here that "Letho" could have committed the crime is not only unfounded but actively controverted by evidence from jailhouse informant Shamarr Myers that Aquart concocted the "Letho did that" falsity as part of his sham narrative that he directed Myers to present to the jury in a "courtroom outburst." TT3661.

It was therefore not ineffective assistance of counsel to decline to present these fantastical alternative narratives to the jury. The Second Circuit recently explained, in an order reversing a prior finding of ineffective assistance, that there was no constitutional deficit in counsel's failing to investigate an "alternative suspect" where the defendant "failed to show 'a substantial, not just conceivable, likelihood of a different result' had [counsel] investigated the [other] individuals." *Caballero v. Miller*, No. 24-2602-PR, 2025 WL 1013395, at *6 (2d Cir. Apr. 2, 2025) (quoting

*Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)). In fact, where—as here—the "evidence proffered by criminal defendants to show that someone else committed the crime" is "speculative or remote," the district court could have properly excluded it. *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006).

### H. Claim Eight: No Ineffective Assistance in Failing to Seek Continuance

Aquart next claims that his counsel was constitutionally ineffective for "failing to seek a continuance" when the Government provided discovery close in time to trial. Aquart Br. at 202-03. As a threshold matter, this challenge is inadequately presented. Aquart does not explain with any specificity what records were produced and when. He says only that the Government "belatedly" disclosed voluminous evidence "on the eve of trial, during jury selection, and during trial itself." Aquart Br. 202. He does not specify how or why trial counsel was prevented from reviewing the records or using them at trial. And he does not explain how further investigation or analysis would have resulted in any contrary conclusion. As a substantive matter, it is also worth noting that certain disclosures—including of *Jencks* material—are explicitly permitted during the trial itself.

These types of general allegation do not serve to carry Aquart's heavy burden as to either deficient performance or—crucially—prejudice.

Moreover, this challenge is squarely at odds with a portion of the 30th claim Aquart makes in this very petition (and previously on appeal)—that his trial counsel failed to adequately protect his speedy trial rights. Aquart Br. 283. Aquart contends that his "express wishes" were for the trial to proceed apace. Aquart Br. 284. Insofar as his lawyers did not seek another continuance, then, it seems that they were merely acting in accordance with Aquart's own directive.

### I. Claim Nine: No Ineffective Assistance in Phone-Record Evidence

Aquart next claims that his counsel was constitutionally ineffective for "failing to investigate and present phone-record evidence." Aquart Br. at 204. As discussed above, Aquart wholly fails to present specific, non-speculative facts supporting this two-paragraph allegation. In fact, the Government produced voluminous phone records to defense counsel in discovery, amounting to hundreds or thousands of pages.

Moreover, it is unclear that certain phone-record evidence would even have been available for further investigation. Under federal law, even telephone toll records—which tend to enjoy longer retention periods—are only required to be retained for 18 months. *See* 47 C.F.R. § 42.6. And depending on corporate policies, certain phone data might be retained for only short retention windows.

But even if the data remained available and were obtained by defense counsel for further analysis, Aquart wholly fails to establish any prejudice under *Strickland*. At most, he speculates that the phone evidence might have impeached "Sherrell Randolph's testimony that she did not know Tina Johnson, the government's theory of competition and disputes between Johnson and Mr. Aquart as a motive for the crimes, and the government's claim that Azikiwe used Johnson's phone to call Azibo the morning after the murders." Aquart Br. 204. He does not specify how or why the phone evidence would have established these alternative facts. Some (*e.g.*, whether Sherrell Randolph knew Tina Johnson) seem ancillary at best. And given that some of these facts (especially that Aquart warned Tina Johnson not to undercut his drug sales in the building) were the subject of direct eyewitness testimony, it is hard to imagine how phone records could have meaningfully weakened the Government's evidence so much as to fatally undermine the basis for conviction.

**J. Claim Ten: No Ineffective Assistance Regarding Evidence that Azikiwe Stole**

**Johnson's Phone**

Aquart next claims that his counsel was constitutionally ineffective for "failing to investigate and present evidence to challenge the Government's claim that Mr. Aquart's brother Azikiwe stole Tine Johnson's phone during the homicides and later used the phone to call him." Aquart Br. at 204-08. This challenge also fails.

The trial evidence showed that Tina Johnson's phone was not recovered from her apartment. John Taylor testified that he observed Azikiwe pick up the phone as he left following the murders. TT2325-26. Then, the evidence (including phone records) showed that Azikiwe used Tina's phone to call Azibo Aquart (the "243 number") using *67, the block caller ID function. Aquart Br. at 205.

Aquart now claims that the Government "had no direct evidence that the 243 number belonged to Mr. Aquart." Aquart Br. at 205. But in fact, as Aquart acknowledges, the Government presented two pieces of direct evidence showing that the number did in fact belong to Aquart: (1) Lashika Johnson's testimony that she overheard Aquart answer his phone and, aggravated, say something to the effect of "why would you be calling me from this cell phone," TT2892; and (2) Shante Pettway's identification of the outgoing voicemail message on the 243 number to be Aquart's voice, TT2167. Semantic differences about whether this constituted "direct evidence" aside, this undoubtedly constituted powerful evidence that Azikiwe stole Tina's phone after the murders and then used it to call his brother and co-conspirator Azibo.

Aquart's other arguments on this point are equally unsupported. For instance, Aquart claims—notably without any citation to legal authority—that defense counsel performed deficiently by failing to challenge Shante Pettway's identification of Aquart's voice on the voicemail message or by requesting a voice parade or expert testimony on the subject. This

argument is both legally and factually meritless. As a legal matter, the Second Circuit has instructed that "voice identification is not generally considered to be an area where expertise is important." *United States v. Cambindo Valencia*, 609 F.2d 603, 640 (2d Cir. 1979); *accord* Fed. R. Evid. 901(b) advisory committee's note (stating that "aural voice identification is not a subject of expert testimony"). Indeed, the Second Circuit has affirmed the admission of a case agent's voice identification, based merely on that agent's review of recordings of a defendant conducting a drug transaction and a single post-arrest conversation with the defendant. *United States v. Riglioni*, 694 F. App'x 14, 16 (2d Cir. 2017). Here, by contrast, the Government offered overwhelmingly more reliable testimony than that of a case agent—it offered a voice identification by Shante Pettway, the mother of Aquart's five-year-old child (a relationship that Aquart fails to note in his habeas petition). *See* TT2100. The notion that trial counsel was somehow constitutionally deficient in failing to accuse Aquart's intimate partner of being unable to identify Aquart's voice should be swiftly dismissed by this Court. Had counsel done what the defense now proposes, they might well have risked losing credibility with the jury or even strengthening the jury's perception of the voice identification's validity.

Aquart's other arguments on this subject are similarly baseless. Indeed, he relies on no evidence at all when he suggests that the patterns of use for the phone suggested that his brother Azikiwe owned it. Aquart Br. at 206-07. His argument about the likelihood of Azikiwe's use of the *67 function is similarly groundless. Aquart Br. at 207. After all, it is perfectly reasonable that Azikiwe attempted to mask his use of Johnson's phone using that function, leading Azibo—when he learned that his brother was using the phone of the woman they had just beaten to death—to question his (highly imprudent) use of the phone at all. Finally, Aquart resorts to rank speculation (maybe Frank Hodges made the call, maybe another person other than Azikiwe stole the phone

after the Aquart brothers left the scene of the crime) and baseless conclusions refuted by the evidence ("Aquart did not own, possess or use the 243 number"). Aquart Br. at 207. None of this comes close to making out a plausible claim for ineffective assistance of counsel.

**K. Claim Eleven: No Ineffective Assistance Regarding Forensic Evidence of the Gloves**

Aquart next claims that his counsel was constitutionally ineffective for "failing to investigate and present evidence concerning the gloves and glove fragments found at the crime scene." Aquart Br. at 208-209. This challenge largely reiterates (and explicitly cross-references) his prior (baseless) claims about the forensic evidence and investigation of witnesses, which is discussed *supra*. But insofar as Aquart adds any new material, it is wholly meritless. In particular, he claims—with no cited basis whatsoever—that Walgreens did not sell the particular gloves found at the crime scene. He also faults trial counsel for "failing to interview Walgreens' employees to demonstrate this." Aquart Br. at 208. The notion that individual employees "from area Walgreens stores" in 2011 could have testified as to every single SKU that the massive retailer stocked in "Bridgeport or any community nearby" in 2005 simply beggars belief. Aquart Br. at 208.

But *even if* trial counsel had somehow elicited testimony that Walgreens did not sell the particular type of gloves found at the crime scene, that would have had no impact whatsoever on the outcome of the trial. Aquart now obliquely suggests that it would have undermined the credibility of the Government's so-called "star cooperating witness" John Taylor, who assisted in and personally observed Aquart commission of the murders. Aquart Br. at 208. But Taylor *never testified that Aquart purchased the gloves from Walgreens*. He testified only that Dreddy (*i.e.*, Azibo) went into the Walgreens alone and came out with "[d]uct tape and a Walgreen bag." TT2284; *see also* Aquart Br. at 140 (citing the same testimony). The purported (and unsupported) lack of connection between Walgreens and gloves found at the crimes scene is therefore a red

herring. Any effort by trial counsel to pursue that sort of testimony would most definitely have weakened, not strengthened, Aquart's case.

### L. Claim Twelve: No Ineffective Assistance Regarding Challenge to Aquart's Motive

Aquart next claims that his counsel was constitutionally ineffective for "failure to challenge evidence of Mr. Aquart's purported motive." Aquart Br. at 209-215. This claim—like all the others—is meritless.

First, Aquart claims that his counsel failed to cross-examine Womble's girlfriend Sherrell Randolph about her statement that she didn't know who Tina Johnson was before the August 2005 phone incident when Womble warned Johnson against undercutting Aquart's sales. *See* Aquart Br. at 211; TT1825. Aquart claims that Randolph's testimony on this point was inaccurate, because the phone records purportedly show that Randolph and Johnson exchanged calls, in connection with their drug activity for Aquart. Aquart Br. at 211. Aquart's claim is difficult to understand, because the records he cites as purportedly being "Randolph's phone records" (Ex. XII-A) are actually subscribed to "Elaine Jones." Aquart Br. at 211. But according to Randolph's trial testimony, Randolph's phone was subscribed in her own name, *not* someone else's. TT1825 ("Q: Were the phones in his name, your name or someone else's name? A: My name."). Further muddying the waters, Randolph testified that she had provided three additional phone lines—subscribed in her own name—to Aquart, in exchange for Aquart's paying all four phone bills. TT1824-25 ("A: . . . I had went to get a cell phone from Cingular and I was approved for four additional lines, so I gave them to Dreddy, three of the lines to Dreddy. Q: Why did you give—why did you give him phones? A: Because he was going to pay the bills for the phones. Q: Did he pay the bills for your own phone? A: Yes, he did. Q: How do you know that? A: Because we went together to the Cingular store to pay them. Q: Were the phone in his name, your name or someone

else's name? A: My name."). Thus, it is far from clear that any calls between Randolph's phone number and Johnson's represented actual communication between the two women, rather than communication between Johnson and someone using Randolph's phone (including, potentially, Aquart, who used phones that Randolph provided). In any event, this evidence certainly does not establish ineffective assistance of counsel.[10]

Similarly, it was not ineffective assistance for Aquart's trial counsel not to press Juanita Hopkins on having previously told police (on August 15, 2005, days after the murders) that Aquart got alone "fine" with Tina Johnson. Aquart Br. at 211-212. Counsel may have reasonably concluded that, had they put that question to her, Hopkins would have explained her initial fear to report the truth about Aquart—who had, after all, just bludgeoned three people to death in cold blood. Moreover, counsel may have reasonably concluded that it would have hurt Aquart's case, not helped it, to draw further attention to Hopkins' August 15, 2005 statement, in which she admitted that Aquart had pistol-whipped her and assaulted her brother so severely that he was hospitalized. *See* Ex. XII-C.

Aquart's other complaints regarding counsel's purported failure to explore Aquart's lack of motive fare no better. Some—for example, the allegations that Nathaniel Grant and James Rucker might have said that all was copacetic between Aquart and Johnson—are wholly unsupported and self-evidently based on nothing more than rank, dubious, and conveniently self-serving speculation. Aquart Br. at 212 ("upon information and belief").

Elsewhere, Aquart claims that "counsel failed to complete impeachment" of Jacqueline

[10] It's also worth noting that Randolph readily admitted that she did not recall various phone calls about which defense counsel asked her on cross-examination (given the fact that the calls had occurred years earlier), which could have reasonably convinced competent counsel that further inquiry along these lines would not be fruitful. *See, e.g.*, TT1869-1873.

Bryant, who testified that Aquart threatened her and Tina Johnson for undercutting his drug sales. Aquart Br. at 213-215. But as Aquart himself acknowledges, his lawyers *did* "impeach" Bryant with her prior, sworn grand jury testimony suggesting that lieutenant Womble passed along Aquart's threats—exactly what he now says (inaccurately) was missing. Aquart Br. at 213-215; TT1216-17 ("Q: But at the Grand Jury you never said this? A: Maybe it wasn't asked. I don't know. Q: But you agree you didn't say that to the Grand Jury. A: I don't remember everything I said at the Grand Jury."). Aquart's claim here that this cross-examination was insufficient because it didn't actually quote from the grand jury transcript is wholly misplaced. In fact, the transcript—which Aquart himself excerpts—reflects that Bryant testified consistently before the grand jury and then at trial. Aquart Br. at 214. On both occasions, she testified that Womble passed along Aquart's ("D") threats to her and Tina to stop selling drugs from her own private source, and that Aquart had also yelled at Tina. *Compare* Aquart Br. at 214 (excerpting grand jury transcript as follows: "Q: Did you ever hear Womble say that D will take care of it? A: That's what I'm talking about. He kept saying, She's going to get hers, she going to get hers. Womble kept saying that." And "[Tina] and [Aquart] had words.") *with* TT1215-1216 ("Q: Do you remember telling the Grand Jury he also said that Tina was going to get hers? A: Yes, I remember saying that. I remember saying that. Q: And that was coming from Womble, right? A: Yes. . . . Q: And that D had yelled up to Tina to stop selling; is that right? A: Basically I don't remember his exact words but it was basically we needed to stop doing what we was doing."). Trial counsel did what was possible to highlight any (subtle) differences between Bryant's grand jury and trial testimony; no more was required under *Strickland*.

In sum, none of these complaints establish either deficient performance or deficient prejudice. Aquart was entitled to constitutionally competent counsel, and he received it. He cannot

now overturn his convictions by nit-picking the way individual questions were framed.

**M. Claim Thirteen: No Ineffective Assistance of Counsel Overall**

After spending 215 pages of his brief reciting one baseless ineffective assistance claim after another, Aquart asks the Court to aggregate the (non) deficiencies and vacate his convictions based on their "cumulative effect." Aquart Br. at 215-216. But since Aquart has failed to set forth even a single instance of prejudicial ineffective assistance, there are no unprofessional errors to aggregate here. Indeed, the fact that ineffective assistance claims are reviewed under "the totality of the circumstances" actually undermines Aquart's claims, rather than bolster them. As the totality of the trial record, and even Aquart's lengthy brief and the individual claims therein, make plain, counsel here presented a robust, carefully considered defense on Aquart's behalf—leaving Aquart with no meritorious ineffective assistance claims at all.

At bottom, Aquart quibbles with particular lines of questioning on cross-examination, his counsel's choice to focus on the best defenses, and what he characterizes as insufficient attention to the pursuit of obviously weak or false theories. But none of this constitutes error—much less unprofessional prejudicial error—under *Strickland*. Indeed, *Strickland* counsels that, even "[i]f counsel does not conduct a substantial investigation into each of several plausible lines of defense, assistance may nonetheless be effective. . . . Limitations of time and money, however, may force early strategic choices, often based solely on conversations with the defendant and a review of the prosecution's evidence." 466 U.S. at 681. "Those strategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based," and "counsel need not investigate lines of defense that he has chosen not to employ at trial." *Id.* (cleaned up). Aquart's ineffective assistance claims fail.

**N. Claim Fourteen: No *Brady* Violations Regarding Witness Disclosures**

After raising 14 claims alleging ineffective assistance of counsel, Aquart next raises 10 claims alleging violations of the Government's obligations to produce exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963). Many of these arguments merely reiterate, in part or whole, the ineffective assistance claims using a different procedural hook. In any event, Aquart's *Brady* claims are likewise meritless. These poorly sketched allegations fail to fulfill any—much less all—of *Brady*'s requirements.

***1. Applicable Law***

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)

Although *Brady* claims would ordinarily be procedurally defaulted, the Supreme Court has indicated that the procedural default can be overcome only *if* a petitioner makes "an adequate showing of cause and prejudice." *Id.* at 282. Because "cause and prejudice parallel two of the three components of the alleged *Brady* violation itself," a defendant may raise a *Brady* claim on collateral review. *Id.*

The first prong of a *Brady* analysis asks whether there is "evidence . . . favorable to the defendant." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (internal quotation marks omitted). In this context, evidence is "favorable" if it "tends to exculpate the accused" or "is useful to impeach the credibility of a government witness." *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 91 (2d Cir. 2014) (internal quotation marks omitted). The exculpatory nature of the evidence in question cannot be based on inferences that are "too speculative." *United States v. Ulbricht*, 858 F.3d 71, 109 (2d Cir. 2017), *abrogated on other*

*grounds by Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018).

Evidence is not exculpatory merely because it might be useful to a defendant. The court of appeals has described exculpatory evidence as evidence "going to the heart of the defendant's guilt or innocence . . . ." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). "Information is exculpatory if it relates to the defendant's guilt or innocence." *United States v. Ulbricht*, 858 F.3d 71, 109 (2d Cir. 2017) (citing *Avellino*), *abrogated on other grounds by Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018) (requiring search warrant to obtain cell-site location information); *see also United States v. Halloran*, 821 F.3d 321, 341-42 (2016) (size of bribe "not relevant to [defendant's] guilt or innocence"); *Boyette v. Lefevre*, 246 F.3d 76, 90 (2d Cir. 2001) ("Evidence is favorable to the accused if it either *tends to show the accused is not guilty* or [relates to impeachment].") (emphasis added); *cf. Tankleff v. Senkowski*, 135 F.3d 235, 250 (2d Cir. 1998) ("Th[e] duty of disclosure is not limited to *evidence of the defendant's innocence*, but includes [impeachment material].") (emphasis added). *But see United States v. Spinelli*, 551 F.3d 159, 164 (2d Cir. 2008) (in dicta) (referring to prosecutor's duty to disclose "helpful information" but affirming conviction on the ground that suppressed information was not material).

The Second Circuit has repeatedly held that undisclosed evidence was not *Brady* material because it was not exculpatory, despite the apparent value of the evidence to a defendant. *See, e.g.*, *United States v. Sessa*, 711 F.3d 316, 321-22 (2d Cir. 2013) (evidence that latent prints did not match did not "tend to exculpate" defendant); *United States v. Thompson*, 528 F.3d 110, 121 (2d Cir. 2008) (interview notes of "two witnesses who both omitted [defendant's] name when discussing membership in a gang that members of the conspiracy belonged to"); *United States v. Douglas*, 525 F.3d 225, 247 (2d Cir. 2008) (prior inconsistent witness statement provided "no substantive support" since it was also inconsistent with defense theory); *United States v.*

*Brunshtein*, 344 F.3d 91, 101 (2d Cir. 2003) (information that defendant was provided initial list of properties by Government agent, as relating to entrapment defense, where defendant only paid bribes with respect to second list of properties).

Evidence is "material" for *Brady* purposes only if its suppression prejudiced the defendant. *Hunter*, 32 F.4th at 31. Therefore, evidence that is "material," *i.e.*, relevant, may fall well short of "materiality" under *Brady*. *See Coppa*, 267 F.3d at 141 ("'[M]aterial' in the *Brady* context does not mean material in the evidentiary sense."). *Brady* imposes "a disclosure obligation narrower in scope than the obligation to disclose *all* evidence favorable to the defendant." *Id.* (citing *Kyles v. Whitney*, 514 U.S. 419, 437 (1995)). The prosecutor's constitutional duty to disclose under *Brady* is "a result-affecting test." *Id.* The key question under *Brady* – and thus the defendant's burden to show – is whether there exists "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 582 U.S. 313, 324 (2017) (cleaned up). "A 'reasonable probability' of a different result is one in which the suppressed evidence 'undermines confidence in the outcome of the trial.'" *Id.* (cleaned up).

This materiality determination must be made "in light of the entire record." *Hunter*, 32 F.4th at 32 (internal quotation marks omitted). "Where the evidence against [a] defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin." *Id.* (internal quotation marks omitted).

Information that is inadmissible can still fall under *Brady* if it could lead to admissible evidence, *United States v. Mahaffy*, 693 F.3d 113, 131 (2012), but information that is inadmissible and would not lead to the discovery of admissible evidence cannot be material for *Brady* purposes, *see DeCologero v. United States*, 802 F.3d 155, 162 (1st Cir. 2015); *see e.g.*, *United States v. Polanco*, 510 Fed. App'x 10, 12 (2d Cir. 2013).

Finally, the *Brady* doctrine protects a criminal defendant's constitutional right to a fair trial. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also United States v. Ruiz*, 536 U.S. 622, 628 (2002) (recognizing that the right to receive exculpatory impeachment material is "a right that the Constitution provides as part of its basic 'fair trial' guarantee."). Accordingly, the question of suppression is closely linked to the timing of the disclosure in relation to the defendant's trial.

Specifically, the Government "suppresses" evidence "only if it fails to disclose *Brady* and *Giglio* material in time for its effective use at trial or at a plea proceeding . . . ." *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). Moreover, "[t]he time required for the effective use of a particular item of evidence will depend on the materiality of that evidence as defined by the Supreme Court in [*United States v. Agurs*, 427 U.S. 97 (1976)] and [*United States v. Bagley*, 473 U.S. 667 (1985)], as well as the particular circumstances of the case." *Id.*

***2. Discussion***

In his first *Brady* claim, Aquart alleges that the Government "failed to disclose that it provided substantial benefits, made threats, and provided other inducements to its witnesses for their testimony." Aquart Br. at 217. In the ensuing pages, he then asserts, without basis, that the Government committed these disclosure violations as to 10 separate witnesses. *See* Aquart Br. at 217-224. Notably, Aquart's allegations use non-specific and conclusory boilerplate, largely copying and pasting the same or similar text for each witness. He does not specify what material in particular was actually exculpatory, whether that material was in the Government's possession, how and when it was suppressed (or later discovered), and why that suppression was "material" or prejudicial for purposes of *Brady*. Moreover, the record directly refutes what weak, non-specific claims he does make. In other words, Aquart does not come close to carrying his burden to

establish *any* of the three prongs of a *Brady* violation, much less all.

As to John Taylor, Aquart claims—using boilerplate language that later appears in some form in his discussion of all 10 witnesses—that the Government "failed to disclose that it provided to Mr. Taylor favorable treatment and recommendations, and threatened adverse consequences for failure to cooperate, in charging and sentencing decisions (including threatening charges that carried the possibility of death or life sentences in this case) and other criminal and related process; monetary payments; support with housing and other services; favorable custodial treatment," and so on. Aquart Br. at 218. Aquart particularly takes issue with Taylor's testimony that "I don't think I'm never going home," and argues that "the government failed to disclose information that trial counsel could have used to impeach his testimony that he believed he would serve a life sentence or to litigate relief for perjured testimony." *Id.*

These claims are not merely poorly drawn; they are also refuted by the record. For instance, not only did the Government disclose that Taylor could have faced the death penalty, but defense counsel extensively cross-examined Taylor on precisely that fact. *See* TT2475 ("Q: And when were you first told that you were potentially looking at the death penalty in this case. A: I think it was my attorney told me."). Defense counsel explicitly elicited that Taylor was facing a penalty of "death," and that he "had a little while to think about that before you got back to [court in] Connecticut, right?" TT2476. Counsel further elicited that Taylor was seeking to "make a deal for yourself." TT2483. On direct examination, Taylor explicitly said that he had chosen to cooperate because he was "hoping" for a "[l]esser sentence." TT2374. On redirect, the prosecutor asked Taylor, "if you lie in court, what do you think your sentence on the murders, the three murder charges, is going to be?" TT2494. Taylor answered, "[l]ife sentence." TT2495.

In other words, the Government plainly disclosed the possible "adverse consequences" to

Taylor, including "charges that carried the possibility of death or life sentences in this case," as well as the fact that because "he testified pursuant to a cooperation agreement," Taylor stood to—and ultimately did—receive a lesser sentence. Aquart Br. at 218. Therefore, Aquart shows none of the prongs of the *Brady* analysis—not exculpatory evidence, not suppression, and not prejudice.

As to the other poorly specified allegations (*e.g.*, purported provision in prison of "tobacco" and "unmonitored cell phones," *inter alia*), Aquart does not explain the basis for these allegations, for the Government's knowledge thereof, for the Government's pre-trial suppression of this evidence or—perhaps most obviously—for resulting prejudice. Even if, for instance, Taylor was not seriously punished for smoking cigarettes in prison (an allegation with no sourcing whatsoever), that information is neither exculpatory, nor meaningful impeachment information, nor the sort of information that could have impacted the result of this triple-murder trial. Aquart bears the burden to show a *Brady* violation and he has wholly failed to carry it.

The same glaring deficits appear in Aquart's treatment of the purported non-disclosures as to Jackie Bryant, Frank Hodges, Juanita Hopkins, Lashika Johnson, Shamarr Myers, Sherrell Randolph, Judith Rivera, Randi Washington, and Rodney Womble. Again, Aquart asserts the same boilerplate claims about "threats, benefits and assistance" purportedly provided each of them, with minimal variation and with no citations or substantiation. Aquart Br. at 219-224. Insofar as Aquart makes any individualized allegations at all, they fail to carry his burden to establish a *Brady* violation. Indeed, the possibility of any *Brady* violations is directly refuted by the record where, as here, defense counsel was not only advised of the very categories of evidence they now claim was suppressed, but aired that evidence before the jury—thereby foreclosing any possible materiality or prejudice.

For instance, as to Frank Hodges, Aquart's only individualized (but unsubstantiated) claim

is that the Government "misrepresented the results of the polygraph" that Hodges took and, according to Aquart failed. Aquart Br. at 219-220. As an initial matter, that contention does not accurately represent the record. In fact, the Government merely brought to the Court's attention evidence suggesting that Hodges had in fact passed the polygraph, notwithstanding a confusing report. *See* Government's Motion in Limine to Exclude the Results of a Polygraph Examination, Dkt. No. 750, Apr. 15, 2011, at 2 n.1. And in any event, the Government made that representation in a motion *in limine* filed on April 15, 2011, *before* Aquart's trial began. That information thus definitionally was not suppressed in violation of *Brady*.

As to Juanita Hopkins, Aquart's only individualized (but unsubstantiated) claim is that the Government provided "intervention to protect her against her expulsion from various drug treatment and housing programs." Aquart Br. at 220. But the trial record reflects that Aquart's counsel was well aware of Hopkins' noncompliance with the treatment program rules, and indeed cross-examined her on that very subject before the jury. *See* TT2614-15 ("Q: Later you did violate the program rules? A: Yes."). Thus there was no suppression and no possible prejudice.

As to Lashika Johnson, Aquart reiterates the baseless argument that the Government failed to disclose that it "threatened Johnson with immediate arrest and loss of custody of her children and engaged in tactics intended to intimidate and frighten her." Aquart Br. at 221. That false contention has already been addressed *supra* (Claim IV), and is refuted by Lashika testified to the jury that the prosecutors warned that she could be "prosecuted." TT2945. Again, there was no suppression or prejudice.

As to Shamarr Myers, Aquart reiterates the baseless argument that the Government "failed to disclose information about the timing and nature of his role as an agent working on the Government's behalf, which could have been used to litigate a *Massiah* claim." Aquart Br. at 221.

That false contention has already been addressed *supra* (Claims V and XXIX) and fails to establish suppression or prejudice.

As to Sherrell Randolph, Aquart reiterates the baseless argument that the Government failed to disclose that it "permitted Ms. Randolph to testify falsely about her relationship with Tina Johnson." Aquart Br. at 222. That false contention has already been addressed *supra* (Claim XXII) and fails to establish suppression or prejudice. Further, he argues based on nothing but "information and belief" that the Government failed to disclose "repeated intervention to protect against her remand into custody." Aquart Br. at 222. But even assuming *arguendo* that were true, defense counsel actively cross-examined Randolph on the fact that her cooperation helped to enable her to "not serve time in prison." TT1854. Randolph readily acknowledged that she was hoping to "stay out" of custody and "expecting for the Judge to just have leniency" on her because of her choice "to cooperate. TT1854-55. Since this theory was aired to the jury at length, Aquart cannot establish any of the elements of a *Brady* violation.

As to Randi Washington, Aquart's only individualized (but unsubstantiated) claim is that the Government failed to disclose wholly unspecified "favorable treatment" regarding Washington's prior criminal history, including assault and other crimes. Aquart Br. at 223. Of course, the Government provided disclosure regarding Washington's criminal history to defense counsel, consistent with its obligations. And again, Washington was extensively cross-examined on his criminal history and the impact on his credibility or motivation to lie, foreclosing any finding of a *Brady* violation. *See* TT2054-2084.

Finally, as to Shante Pettway, Aquart's only individualized (but unsubstantiated) claim is that the Government failed to disclose "support in securing housing and with direct monetary support" in exchange for her cooperation. Aquart Br. at 223. Aquart's challenge on these grounds

is directly refuted by the record. On cross-examination, his counsel asked Pettway if the Government had "provided you with some financial help to allow you to move" and given her "[s]omething towards your rent and moving expenses and a security deposit;" Pettway freely admitted that it had. TT2197; *see also* TT2202 (Pettway testifying that she received "money" and "received assistance from the government" in "find[ing] a place to live"), TT2216 (same). Aquart's attempt to recast as a *Brady* violation information that was obviously disclosed to his counsel and then, by his counsel, to the jury borders on bad faith.

### O. Claims Fifteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, and Twenty-Three: No Other *Brady* Violations

The next nine *Brady* claims are merely retreads of Aquart's meritless ineffective assistance claims, but now asserted under the guise of *Brady*. Each comprises one or two paragraphs and essentially cross-references the facts and arguments set forth in prior claims. None establishes the three prongs of a *Brady* claim (exculpatory evidence, suppressed by the Government, and material). They are thus easily dispatched for the reasons discussed in the corresponding sections, above.

### P. Claim Twenty-Four: No *Napue* Violations

Aquart next revisits many of the same claims he's already raised before in yet a different guise—here, the purported violation of due process by failing to correct false testimony, under *Napue v. Illinois*, 360 U.S. 264 (1959) and *Giglio v. United States*, 405U.S. 150 (1972). Aquart Br. at 231-241. The primary difference here is not in the substantive arguments presented, but in the procedural mechanism used. Instead of arguing that his defense counsel was constitutionally ineffective (as in Claims One through Thirteen), or that exculpatory discovery was unlawfully and unconstitutionally suppressed (as in Claims Thirteen through Twenty-Three), Aquart now argues that the Government unconstitutionally elicited false testimony, which it knew or should have

known to be false, that could have impacted the jury's verdict. But there was no false testimony, no prosecutorial knowledge of falsity (or imputed knowledge), and no materiality. Thus, these recycled *Napue* claims are equally meritless.

***1. Applicable Law***

In *Napue* v. *Illinois*, the Supreme Court held that a conviction knowingly "obtained through use of false evidence" violates the Fourteenth Amendment's Due Process Clause. 360 U.S. at 269. "To establish a *Napue* violation, a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it to go uncorrected when it appeared." *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025) (cleaned up). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears," even if "the false testimony goes only to the credibility of the witness." *Napue*, 360 U.S. at 269. "If the defendant makes that showing, a new trial is warranted so long as the false testimony may have had an effect on the outcome of the trial—that is, if it in any reasonable likelihood could have affected the judgment of the jury." *Id.* (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972) and *Napue*, 360 U.S. at 271).

Accordingly, "to challenge a conviction because of a prosecutor's knowing use of false testimony, a defendant must establish that (1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Helmsley*, 985 F.2d 1202, 1205–06 (2d Cir. 1993).

"When such challenges are made on a collateral attack, as they usually are, they are subject to the requirement of due diligence on the part of the defendant." *United States v. Helmsley*, 985 F.2d 1202, 1206 (2d Cir. 1993). "A motion to vacate a sentence under 28 U.S.C. § 2255 must be

supported by cause for the defendant's failure to raise his claim earlier." *Id.* "Such cause can be established by showing that the claim is based on newly discovered evidence that could not reasonably have been discovered before trial." This court has recognized "at most a limited exception to the normal requirement of due diligence with respect to collateral attacks . . . where the prosecutor is claimed not merely to have been aware of circumstances indicating the falsity of a witness's testimony but to have been directly involved as a participant in the transaction about which the witness has allegedly lied." *Id.* at 1207.

***2. Discussion***

None of Aquart's *Napue* claims establish any—much less all—of the elements of a due process violation for introducing perjured testimony, knowingly or with imputed prosecutorial knowledge, which affected the jury's verdict. Indeed, Aquart cannot demonstrate perjury at all. At most, he points to slight differences in recollection and the like. But "[d]ifferences in recollection do not constitute perjury, . . . and when testimonial inconsistencies are revealed on cross-examination, the jury is entitled to weigh the evidence and decide the credibility issues for itself." *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009) (cleaned up); *see id*. at 494-95 ("It is the task of the jury as the appropriate arbiter of the truth to sift falsehoods from facts and determine whether an inconsistency in a witness's testimony represents intentionally false testimony or instead has innocent provenance such as confusion, mistake, or faulty memory.") (cleaned up); *see also United States v. Joyner,* 201 F.3d 61, 82 (2d Cir. 2000) ("[C]ross-examination and jury instructions regarding witness credibility will normally purge the taint of false testimony."). In many cases, Aquart makes no meaningful argument about perjury or even falsity at all.

Most of Aquart's *Napue* claims regarding witness testimony—against Lashika Johnson,

Sherrell Randolph, Frank Hodges, Jacqueline Bryant, Shamarr Myers, Christine Roy, and John Pleckaitis—involve only brief, boilerplate allegations and mostly cross-references to other sections. Aquart Br. at 233-39. In most cases, he does not even identify the purportedly false testimony. For Frank Hodges, for example, he alleges only that Hodges had "failed a polygraph test." Aquart Br. at 234. Even if true (though there is some uncertainty on that point, as discussed above), that would be irrelevant. Polygraph exams—or even past lies—say nothing about a witness' truth or falsity on the stand. Indeed, many of the witnesses freely admitted to lying previously to law enforcement—sadly, not an atypical occurrence. This does not establish that their trial testimony was perjured or false.

For other of the allegations, the purported falsity is obviously invented. For example, Aquart alleges that Jackie Bryant "falsely testified that Mr. Aquart had threatened Tina Johnson, when, in fact, the threats were made by Mr. Womble." Aquart Br. at 234. But as discussed above, Bryant testified that Womble, Aquart's lieutenant, relayed threats on Aquart's behalf, and Aquart himself also threatened Tina.

Aquart's primary *Napue* claim rests on John Taylor's testimony. But as already discussed at length above, Taylor did not provide any false testimony, and certainly none that the Government recognized (or should have recognized as false). Aquart cannot begin to establish otherwise. Indeed, he does not meaningfully try. Instead, he points only to the same points challenging Taylor's identification of Judith Rivera as the woman who participated in the dry-run and Taylor's testimony regarding the physical aspects of the crime scene (the door kicked off its hinges, the placement of a couch, his own sight lines, and the blows that Aquart rained on the victims), discussed above. But he doesn't establish that any of this was false.

As to the Rivera identification, for example, he only alludes to (but does not cite, beyond

a vague incorporation by reference to other sections of his brief) evidence that the defense pressed in closing argument that Taylor did not recognize a photo of Rivera shown to him by agents at some point before the trial. *See* Aquart Br. at 232; *see also* TT4310-11. But Taylor never purported to personally know Rivera herself. At trial, he only testified that he saw a "light-skinned female" knocking on the door at the time of the dry run. TT2297. And when asked at trial to identify Rivera in Government Exhibit 217, Taylor was able to do so. TT2435-36. But even if Taylor had at some point failed to identify Rivera, that does not establish falsity or perjury of which the Government must have been aware—at worst, it merely indicates a lapse in memory. In any event, defense counsel

As to Taylor's testimony that Aquart kicked the victims' front door open, Aquart argues that Taylor must have been committing perjury because the door was still on its hinges. Aquart Br. at 232, 130, 142. But Taylor actually testified only that Aquart "kicked the door in," TT2312, and that "when we kicked the door in the door – it hinges came off or broke or cracked the door frames or something, but the door wouldn't shut like it's supposed to," TT2317. Taylor's testimony quite plainly did not purport to any certainty about whether the door had actually come off its hinges. Moreover, Taylor's testimony was fully consistent with the other trial evidence that Aquart had kicked in the door and later, after committing the murders, drilled it shut again. A first responder testified that that the door's "framing had been broken apart." TT122. Crime scene photographs taken of the door showed that the door and jamb was damaged, and that screws had been drilled into the door from the interior side of the door, effectively drilling the door shut. TT305-06. And of course, Lashika Johnson testified that Aquart directed her to dispose of a drill hours after he committed the crime. TT2884-85. Aquart does not bother to explain how it could have constituted falsity impermissible under *Napue*.

As to Taylor's testimony that he "moved the long living room couch to prop up the now broken front door," Aquart does not say enough to understand even what particular testimony he is referencing, much less why it is purportedly false.

As to Taylor's testimony that he was able to observe Aquart beating the victims to death, Aquart says that the apartment's sight lines would have prevented that. But Taylor testified that he had been moving about, thus making the activity in the various rooms visible to him. *See* TT2315 ("Q: Did you go towards that room, too? A: Yes"), TT231516 ("A: . . . I was standing on the outside, I could, like, see both. I could see them two in this room, I could see him in this room, because I'm standing right here in the room. Q: Are the bedrooms close to each other? A: Yes, right besides each other."), TT2318 ("Q: . . . Is that when you went down the hall? A: Yes."). In particular, at the moment that Aquart finished binding his victims, Taylor testified that he was moving "back and forth." TT2321. When he first heard the victims screen "Yeow," Taylor testified that "I go back, and I look." TT2321-22. He further explained, "when I go back and look, I look, I seen them. [Aquart] was standing over like this over [Tina Johnson] and start hitting her." TT2322. Aquart's argument here, then, that Taylor suffered from an "inability" to "observe the bedrooms" where Aquart was beating the victim to death is thus directly contradicted by the record. Aquart Br. at 233.

As to Taylor's testimony that the murder scene looked like a "meat market," TT2503, as discussed above, that was both true and unambiguously established by other witnesses and evidence. For instance, Leroy Whittingham, who discovered the bodies, testified that "there was blood on the wall and blood on the ceiling." TT89. First responders also noted that there was "blood everywhere[;] [i]t was on the ceiling, on the walls[;] [j]ust everywhere on the floor . . . just everywhere you looked." TT146, *see also* TT132.

Aquart even goes so far as to allege that "Taylor employed a contrived demeanor while testifying to elicit sympathy and misleadingly enhance the appearance of credibility." Aquart Br. at 233. How Taylor's "demeanor" could possibly make out a *Napue* claim of perjured or otherwise false testimony—which the Government knowingly and unconstitutionally suborned—is left unexplained and is in fact inexplicable.

Relatedly, Aquart purports to raise under *Napue* various complaints about the crime scene evidence adduced—the lines of sight, the drilled door, the couch, the disturbance of evidence, the "meat market." Aquart Br. at 239-241. As discussed, these are uniformly meritless. Though most have already been addressed here, it is worth noting that the Government openly acknowledged that the crime scene involved disturbance of evidence and of the victims' bodies as Tina's son Leroy Whittingham and first responders arrived at the scene. *See, e.g.*, TT89 (Leroy testifying that "I was just moving pillows off her" and "holding" Tina), TT89-90 (Leroy moving through the apartment), TT90-91 (Leroy "kicked the door" in), TT151 (first responded "started to do compressions on [Tina's] breast line"), TT151 (first responders moved items on the mattress).

Aquart also seeks to use *Napue* as a vehicle to challenge—once again—the Government's reference in rebuttal summation to the fact that "[t]here is absolutely no evidence in this record whatsoever to suggest that Womble's DNA was at that crime scene." Aquart Br. at 235. Aquart contends that, because not every profile sample obtained in Aquart's case was submitted to the DNA database, this argument constituted prosecutorial misconduct. *Id.*

This argument was raised, exhaustively analyzed, and decided in the Government's favor, in Aquart's first appeal. The Second Circuit held, "we do not think the government unfairly insinuated that CODIS testing had been performed on all samples." *United States v. Aquart*, 912 F.3d 1, 28 (2d Cir. 2018). Moreover, the trial testimony "provided a good faith factual basis for

the government to challenge the defense suggestion that it had deliberately failed to consider Rodney Womble in any of its DNA testing." *Id.* Thus, the Second Circuit concluded, "[i]n short, we identify no misconduct." *Id.* at 28. Aquart's attempt to relitigate this matter here is thus squarely barred by operation of the mandate rule.

Finally, it's worth noting—contrary to Aquart's reckless and baseless arguments of prosecutorial misconduct here—that the Government took extremely seriously its obligation prohibiting the eliciting of perjured testimony. Indeed, the Government denied a cooperation agreement to Efrain Johnson and refused to call him as a witness—even though Efrain would have inculpated Aquart—because it believed that Efrain might offer false testimony. As the prosecutor explained to the Court, the decision not to call Efrain Johnson was not "trial strategy." TT5452. On the contrary, Johnson would have testified against Aquart: "Johnson clearly stated that Aquart was the leader, that he did this [crime]." TT5452. Nonetheless, the Government refused to call him, because "the government doesn't suborn perjury," and the "government wasn't going to put him on to say that because [Efrain] couldn't tell the truth about himself and his own role." TT5452. The Government actively shunned any possible elicitation of false testimony, consistent with its obligations. Aquart's arguments here should be swiftly denied.

**Q. Claim Twenty-Five: No Constitutional Violations in Juror Disclosures**

Aquart next argues that two jurors' inaccurate responses to the jury questionnaires entitles him to vacatur of his convictions. Aquart Br. at 241-249. This claim is also baseless. Both jurors honestly disclosed their own and/or their family members' criminal histories, but apparently failed to include certain decades-old convictions—some of which may have even been unknown to them. Aquart cannot establish either the failure to answer honestly, or the valid basis for a challenge for cause. These challenges must fail.

The Supreme Court has long held that "a litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984). Given this unavoidable fact, the Court has set forth a stringent standard for overturning convictions based on purportedly inaccurate responses by jurors in voir dire. To obtain a new trial, the defendant must (1) "first demonstrate that a juror failed to answer honestly a material question on *voir dire,*" and (2) "then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556. The Second Circuit strictly applies the standard set forth in *McDonough*, including where juror "nondisclosures or misstatements" were "deliberate." *United States v. Langford*, 990 F.2d 65, 68 (2d Cir. 1993).

To establish a valid basis for a challenge for cause, the defendant must show either (1) actual bias, (2) implied bias, or (3) inferable bias. *See United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997). Actual bias arises when "the juror admits partiality" or "the judge finds actual partiality based upon the juror's voir dire answers." *Id.* at 43. Implied bias "is attributed to a a prospective juror regardless of actual partiality" in circumstances in which "an average person in the position of the juror in controversy would be prejudiced." *Id.* at 45. Inferable bias, generally entrusted to the district court's discretion, arises "only after having received responses from the juror that permit an inference that the juror in question would not be able to decide the matter objectively." *Id.* at 47.

Aquart's challenges to the jurors' responses fails to establish any part of the relevant test.

Aquart first challenges the jury questionnaire responses that Juror 1 provided, in which he admitted to having sustained multiple criminal convictions in 1998 for possession of an unlicensed firearm and possession of a controlled substance—both felonies.[11] Aquart Br. at 245-248.

[11] The juror names are omitted in this filing to the public docket.

However, according to Aquart, Juror 1 failed to disclose that he had previously sustained misdemeanor convictions in 1994 and 1976 for larceny in the sixth degree, impersonation, and trespass, for which he did not serve any time, and for felony convictions for possession of narcotics in 1987 and attempted burglary in 1979. Aquart Br. at 245.

Juror 1 disclosed that his brother had been arrested for drunken disorderly conduct. Aquart Br. at 245-46. But, according to Aquart, he failed to disclose a series of convictions that his brothers had sustained in the 1970s, 1980s, and 1990s, and arrests that his sister sustained. Aquart Br. at 246-47.

These nondisclosures do not rise to the level of a constitutional violation of Aquart's trial rights. As an initial matter, it is not even clear whether they were deliberately dishonest. As for the convictions sustained by Juror 1's siblings decades before, it is not even clear that he was aware of them. His responses to the Court suggest that he was struggling to recall details. *See* April 6, 2011 Transcript of Jury Selection, at 38 ("Let's see, my brother, he was probably arrested or stopped—what was he? Drinking in public. He got a citation for it.").

And even as to his own convictions, it is far from clear that Juror 1 sought to be deliberately dishonest. First, he did acknowledge his most recent convictions. *Id.* at 39-40 ("I was pulled over in a motor vehicle and I was in possession of narcotics and a firearm. . . . I believe it was a felony I was charged with."). It is possible that the earlier convictions—particularly those dating back many decades or the misdemeanors—might not have come to mind, especially since he concededly was struggling with substance abuse during those years. *See id.* at 41.

Moreover, inasmuch as he did fail to fully disclose, Juror 1 seemed motivated at least in part by embarrassment. He told the Court that "that is just past history right now, my drug abuse and substance. I leave that baggage behind. It's not something I always bring up in my own

personal life." *Id.* at 43. In this way, Juror 1's circumstances echo those of *United States v. Langford*, in which the Second Circuit rejected a similar challenge where a juror "failed to give truthful information in response to the voir dire" regarding her criminal history, but "did so only to avoid embarrassment." 990 F.2d at 69. Accordingly, the Court held that there was no showing of bias or other cause for dismissal. *Id.* And recently, in a sex trafficking case, the Second Circuit refused to vacate a conviction where a juror failed to disclose "his history of sexual abuse," because the defendant failed to establish that the erroneous response was deliberately incorrect or that the juror would have been "struck for cause if he had provided accurate responses to the questionnaire." *United States v. Maxwell*, 118 F.4th 256, 267 (2d Cir. 2024), *cert. denied*, 146 S. Ct. 93 (2025). In so holding, the Circuit recalled the Supreme Court's admonition that "to invalidate the result of a trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give." *Id.* at 267 n.33 (quoting *McDonough*, 464 U.S. at 555) (cleaned up). The same result should obtain here.

Finally, Aquart's attribution of bias to Juror 1 is both illogical and contrary to the case law. Aquart argues that Juror 1 was biased because his prior crimes featured "meaningful similarities" with those of which Aquart stood accused. Aquart Br. at 247; *see also id.* at 243 ("The clearest case of inferable bias is a situation where a juror engages in similar conduct to the defendant at trial."). But actually, any such similarities would have inured to Aquart's benefit, not his detriment. The fact that Juror 1 was similarly situated to the defendant presumably made him more—not less—sympathetic to Aquart. The very case law that Aquart cites in support of his inferable bias argument makes that clear—and undermines Aquart's argument here. In *Torres*, the Second Circuit found that a given juror's criminal history, which mirrored the defendant's, might have

created bias in the *defendant's favor*—which is why the Government had sought to excuse that juror, and the defendant had opposed. *Torres*, 128 F.3d at 48. Aquart's argument here seeks to turn the reasoning of *Torres* on its head. If there was any bias in Juror 1, it was to Aquart's advantage. In any event, he cannot establish the requisite basis for challenge for cause.

Aquart's argument as to Juror 2 is still weaker. Aquart Br. at 248-49. Juror 2 volunteered information about the criminal history of someone close to her—her daughter. Aquart now complains that she did not disclose the fact that her son had also sustained a conviction back in 1989 for sale of narcotics and received a suspended sentence. But Aquart cannot even establish that Juror 2 knew about her son's decades-old conviction. And even if he could, he could not establish any valid basis to challenge for cause a juror who openly disclosed another child's drug-related criminal history.

### R. Claim Twenty-Six: No Constitutional Violations in Juror Voir Dire or Purported Bias

Aquart next argues that his conviction should be vacated because one of the jurors happened upon the scene of a murder of a convenience store clerk shortly after it occurred, while Aquart's trial was underway. The juror (Juror 1, discussed above) did not see the murder victims or, indeed, any evidence of the murder, beyond the fact that the convenience store was apparently unstaffed and that police met him as he exited the store. Aquart cannot establish that the commission of this other murder should essentially provide him a get-out-of-jail-free route for the murders that he committed.

First, Aquart's characterization of the emotional impact of this convenience store murder on Juror 1 far outstrips Juror 1's own description. Aquart makes much of the fact that armed police confronted Juror 1 as he exited the store, presumably concerned that Juror 1 could be the perpetrator. In support of this characterization, Aquart cites *another* witness' statement,

particularly highlighting the fact that this other witness was handcuffed and arrested. *See* Aquart Br. at 252 (citing Ex. XXVI-C). But Juror 1's own statement doesn't mention anything about being confronted at gunpoint, and merely notes that, as he exited the store "I was you know approached by the West Haven Police Department." Ex. XXVI-B at 4. He conversationally ended the statement by noting that he was "late for jury duty." Ex. XXVI-B at 7. There is no indication from Juror 1's statement that he was particularly emotionally affected at all. Aquart's argument that Juror 1 must have suffered inherent bias based on this incident alone is belied by Juror 1's own statements.

Aquart also fails to establish ineffective assistance of counsel based on inadequate voir dire of Juror 1. As he acknowledges, the Court did question Juror 1 as to whether he felt capable of continuing, repeatedly asking for his assurance:

> THE COURT: I know you've been very attentive throughout this trial and you've served as a juror for a long time now on this trial. But, given your experience of this morning, do you feel that you are okay to continue?
> JUROR: Oh, yes, your Honor.
> THE COURT: Are you sure?
> JUROR: Yep.
> THE COURT: All right. And that will be fine. I would ask you, however, not to share your experience with your fellow jurors. All right?
> JUROR: Yes.
> THE COURT: All right, why don't we then ask you to go back, go back around and come in the usual way to the jury room, and then we'll bring everyone out. And you are sure you are all right?
> JUROR: I'm fine.
> THE COURT: Very good then.

TT2640-41. It did so at the request of both counsel, not just the Government. TT2639 (Government counsel: "We had just a discussion with counsel. Maybe we should just inquire of [the juror] if he feels capable." Defense counsel: "I think that's a good idea. I would second the motion.").

Aquart does not—and cannot—establish that this reasonable voir dire was insufficient on a constitutional dimension and prejudicial to the point of requiring vacatur of his own murder convictions. It is not even clear on this record what else should have been asked of Juror 1. Aquart

now claims that the Court should have further inquired about the "circumstances of the murder" and what the juror witnessed, and "how he was managing in the immediate aftermath." Aquart Br. at 251-52. But it is not clear what relevance the circumstances of that other murder had to Aquart's own case. Moreover, Juror 1 did not actually witness that other murder, or even have the disturbing experience of seeing the victim's body. Finally, the Court *did* ask, repeatedly, "how he was managing in the immediate aftermath." Juror 1 indicated that he was managing just "fine." TT2641. There is no indication of what the Court could (or should) have done to assure itself that Juror 1 was, indeed, fine, as Juror 1 explained that he was.

### S. Claim Twenty-Seven: No Juror Misconduct

Aquart final juror-related claim involves a potential violation of law—committed *by* Aquart's counsel, *not* against Aquart. To pursue this (meritless) claim, Aquart's defense counsel tracked down members of the trial jury at their homes and questioned them about their jury service. Defense counsel did this without the requisite notice and authorization by the Court. The Government has filed a pending motion for a hearing on this violation, and hereby incorporates all arguments cited in that briefing herein. *See Aquart v. United States*, No. 26cv65, Motion for Hearing Under Local Rule 83.5 and Reply Memorandum, Dkt. Nos. 24 & 29.

In short, this defense effort plainly violated the Second Circuit rule requiring that defense counsel "[a]t a minimum," give "notice to opposing counsel and the court" before post-trial questioning of jurors "in all cases." *United States v. Moten*, 582 F.2d 654, 665-66 (2d Cir. 1978). No such notice was given here.

Defense counsel's communications also almost certainly violated Local Rule 83.5(1)(c), which prohibits any party from "question[ing] a juror concerning the deliberations of the jury, votes of the jury or the actions or comments of any other juror"—"[u]nless explicitly authorized

by the Court." The instant defense investigation was not explicitly authorized by the Court. Moreover, the frightened jurors themselves contacted the Court to report that they were asked questions about the length of the jury's deliberations and whether they perceived that any jurors knew more than they let on.

The defense communications also may have violated Local Rule 83.5(1)(d), which prohibits any party from "contact[ing], communicat[ing] with or interview[ing] any juror in any manner which subjects the juror to harassment, misrepresentation, duress or coercion." Multiple jurors (all of whom voted to convict Aquart of bludgeoning three people to death in premeditated fashion) have reported feeling fear and distress upon being contacted by defense counsel at their private homes and some have even contacted police after the unwanted approach.

Moreover, Aquart failed to demonstrate the sort of "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial.'" *United States v. Stewart*, 433 F.3d 273, 302–03 (2d Cir. 2006) (cleaned up). This is a threshold inquiry that must be satisfied before any approach to jurors, which Aquart has entirely failed to even attempt.

Accordingly, this Court should disregard—and indeed, should strike from the record—this claim arising from Aquart's unlawful contact with the trial jurors.

All that said, it is worth emphasizing that the contentions of purported juror misconduct that Aquart does make are feeble and unpersuasive. He contends that one juror (Juror 3) and her daughter "each clipped an article from the Hartford Courant—because this is not something that usually happens to a person!" Ex. XXXVII-A. The articles in question appeared at an indeterminate time— "probably in the middle or toward the end" of the trial—and "one was just short and basic," while the "other was longer." *Id.* This improperly elicited contention does not

establish any grounds for vacating the verdict.

As a general matter, courts consider three steps in assessing the "effects of trial publicity on jurors:" (1) "whether the coverage has a potential for unfair prejudice," (2) whether other jurors "have learned of the potentially prejudicial publicity," and (3) what effect, if any, it has had on that juror's ability to decide the case fairly." *United States v. McDonough*, 56 F.3d 381, 386 (2d Cir. 1995). Aquart establishes none of these factors, notwithstanding an extensive and unlawful effort to extract information from the juror without court supervision. It is not even clear that Juror 3 actually read the news article, much less that she was exposed to extra-record prejudicial information (*e.g*., false facts, inadmissible evidence, etc.). Indeed, the defense submission suggests rather that the juror may have merely retained a copy of the paper as a memento. If anything, Juror 3's statement suggests a bias *in favor* of Aquart. She described Aquart as "quiet and polite . . . [a]nd handsome! Everyone said how handsome he was!" Ex. XXXVII-A.

Aquart's final juror misconduct claims are even more far-fetched. Aquart Br. at 258. He claims that Juror 4 noted that Aquart's brother Azikiwe "pleaded guilty before the trial." Ex. XXXVII-B. Aquart claims that the juror's belief was "wrong and therefore especially problematic." Aquart Br. at 258. Actually, however, Azikiwe Aquart *did* plead guilty before his own trial. And in any event, Juror 4 does not say when he learned that Azikiwe pleaded guilty, though the timing of Azikiwe's plea suggest that the juror may well have learned that after Azibo Aquart's trial was long over. Nor—crucially—does Juror 4 say that he "considered this as relevant" in deciding Aquart's guilt. Aquart Br. at 258. On the contrary, the context and content of this statement suggests a stray comment made as part of a 15-year retrospective.

The claims of juror misconduct are therefore meritless. More to the point, they arise out of defense misconduct that should not be countenanced by this Court.

**T. Claim Twenty-Eight: No Violation of Constitutional Rights to Counsel**

In his next claim, loading the proverbial kitchen sink, Aquart asserts that his trial counsel was ineffective for not realizing that he was denied his Sixth Amendment right to conflict-free counsel and his Fifth and Sixth Amendment rights to learned counsel. These claims—many of which are based on rank speculation devoid of any evidentiary support—are utterly without merit.

The Sixth Amendment right to effective assistance of counsel "generally ensures that an accused may be represented by any attorney who will agree to take his case." *United States v. Perez*, 325 F.3d 115, 124 (2d Cir. 2003). A defendant has a "'correlative right to representation that is free from conflicts of interest.'" *Cardoza v. Rock*, 731 F.3d 169, 183 (2d Cir. 2013) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). Where an ineffective assistance of counsel claim is based on a conflict of interest, a showing of prejudice may be presumed if the petitioner's attorney "actively represented conflicting interests," and "an actual conflict of interest adversely affected his lawyer's performance." *Strickland*, 466 U.S. at 692.

However to succeed on such a claim, a defendant must establish "1) an actual conflict of interest existed, namely 'the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action,'; 2) a lapse in representation demonstrated by the existence of 'some plausible alternative defense strategy not taken up by counsel'; and 3) 'that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" *Vasquez v. Parrott*, 397 F. Supp. 2d 452, 458 (S.D.N.Y. 2005) (quoting *United States v. Moree*, 220 F.3d 65, 69 (2d Cir. 2000) (internal citations and quotations omitted). "An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor,* 535 U.S. 162, 172 n. 5 (2002). The attorney suffers from only a potential conflict when the "interests of the defendant may place the attorney under

inconsistent duties at some time in the future." *United States v. Perez*, 325 F.3d 115, 125 (2d Cir. 2003) (quotation marks omitted). A potential conflict of interest without more is not a basis for habeas relief.

Generally, "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course," *Bracy v. Gramley*, 520 U.S. 899, 904 (1997), and must meet a heavy burden to establish [his] right to discovery, s*ee Pizzuti v. United States*, 809 F. Supp. 2d 164, 176 (S.D.N.Y. 2011). Rule 6 of the Rules Governing Section 2255 Proceedings provides that a petitioner is entitled to discovery only if the judge, "for good cause," grants leave to do so. *See* 28 U.S.C. § 2255, Rule 6(a).

Good cause is shown only if the petitioner presents "specific allegations . . . show[ing] reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . .entitled to relief." *Bracy*, 520 U.S. at 908-09 (cleaned up). However, "generalized statements regarding the possibility of the existence of discoverable material" are insufficient. *Pizzuti*, 809 F. Supp. 2d at 176. "Rule 6 does not license a petitioner to engage in a 'fishing expedition' by seeking documents 'merely to determine whether the requested items contain any grounds that might support his petition, and not because the documents actually advance his claims of error.'" *Ruine v. Walsh*, No. 00-CV-3798, 2005 WL 1668855, at *6 (S.D.N.Y July 14, 2005) (quoting *Charles v. Artuz*, 21 F. Supp. 2d 168, 169 (E.D.N.Y. 1998)).

"[T]he filing of a motion pursuant to Section 2255 does not automatically entitle the movant to a hearing; that statutory provision does not imply that there must be a hearing where the allegations are 'vague, conclusory, or palpably incredible.'" *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)). A hearing is necessary only where the petition "set[s] forth specific facts supported by competent

evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the movant] to relief." *Id.* at 131. "In determining [whether a hearing is required, courts] look 'primarily to the . . . evidence proffered in support of the application in order to determine whether, if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief.'" *Frank LoCascio v. United States*, 395 F.3d 51, 57 (quoting *Dalli v. United State*s, 491 F.2d 758, 760 (2d Cir. 1974)); *see also Perevoznikov v. United States,* No. 20-CR-0415, 2025 WL 916883, at *4 (E.D.N.Y. Mar. 25, 2025) ("To warrant a hearing, 'the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the petitioner] to relief.'" (quoting *Gonzalez*, 722 F.3d at 131)).

***1. Claims Regarding Conflicted Attorneys***

Aquart raises a variety of claims regarding purported conflicts of interest by the attorneys who represented him. First, Aquart argues that Attorney Beverly Van Ness actively represented him and his co-defendant brother even when, as he claims, their defenses were in conflict. Aquart Br. at 259-264; Ex. XXVIII-A through XXVIII-C.

As an initial matter, the record is not clear that Attorney Van Ness undertook any joint representation at all during a meaningful time period. On December 3, 2010, Azikiwe Aquart moved for the appointment of Attorney Van Ness to serve in the role of "skillful capital case appellate lawyer who can provide trial support" and who would "assist counsel with jury selection memoranda, motions in limine and trial and sentencing strategy and direction for preservation of the record." Defense Exhibit XXVIII-A. According to the docket, the Court granted that motion as to Azikiwe Aquart on December 9, 2010: "Attorney Update in case as to Azikiwe Aquart. Attorney Beverly Van Ness for Azikiwe Aquart added." The docket is silent as to whether Attorney Van Ness also represented Azibo Aquart at that time. Moreover, when Attorney Van Ness

submitted her CJA voucher, she did so only under the "United States v. Azikiwe Aquart" docket. Ex. XXVIII-C.

But in any event, at the time, Attorney Van Ness was initially appointed in December 2010 and at all relevant times thereafter, both defendants already each had two lawyers, and Attorney Van Ness was appointed only to assist in the background. Defense Exhibit XXVIII-B. Moreover, critically and undisputedly, a few short months later, on March 30, 2011, Azibo's case was severed from that of his brother (upon his request). And Azibo's case proceeded first. After severance, then, any assistance that Attorney Van Ness provided on Azibo Aquart's case could not possibly have been in conflict with his brother's case. Defense Exhibit XXVIII-C.

Aquart's reliance on case law does not help him. He cites several out-of-circuit cases, *United States ex rel., Zembowski v. DeRobertis*, 771 F2d 1057, 1062 (7th Cir. 1985) and *Selsor v. Kaiser*, 81 F.3d 1492, 148-150 (10th Cir. 1996), to argue that the judge should have asked Aquart to waive any conflict and conduct an inquiry into that conflict. But these cases are distinguishable. In the first, the court held that ["j]oint representation of co-defendants by a single attorney 'is not per se violative of constitutional guarantees of effective assistance of counsel'" and in that case, unlike here, the attorney actually objected to the join representation as opposed to asking for it. *DeRobertis*, 771 F2d at 1062. Similarly, in *Kaiser*, the attorneys objected to the joint representation and the question was "whether the state court judges took adequate steps to ascertain whether the risk of conflict of interest was too remote to warrant separate counsel." *Kaiser*, 81 F.3d at 1500. Again, there was no objection here.

However, even assuming that Beverly Van Ness's assistance in representing both defendants or any of the other hypothetical issues rose to the level of an actual conflict (it did not), the Court would still have to find under *Mickens v. Taylo*r, 535 U.S. 162 (2002) and its progeny

that such a conflict adversely affected counsel's performance. An "actual conflict" for Sixth Amendment purposes exists when counsel's divided loyalties cause the counsel to take actions—or refrain from taking actions—that are detrimental to one client and beneficial to another. *Id*. at 171.

Here, Aquart cannot show that there was any adverse effect. First, it is hard to see any sort of actual conflict with regards to an attorney who was helping only on the sidelines with briefing, when Aquart had two other extremely active trial attorneys. Second, the Court cannot possibly find that there was any effect on performance. Aquart's case was severed from that of his brother's and by the time of trial he had two attorneys focusing just on him. Whatever help Attorney Van Ness provided, there is not even the allegation that it somehow undercut his case at that point.

Aquart also argues that his other trial counsel also faced conflicts and overlapping representations—which can be more fairly attributed to the small size of this District, as opposed to conflicting loyalties. Specifically, he lays out that his Learned Counsel, Michael Sheehan represented David Nunley in *United States v. Luke Jones*, et al., a case handled by the same prosecutors as those on Aquart's case and in which Jose "Letho" Osorio was a cooperating witness for the Government. Aquart claims that defense counsel Attorney Sheehan and the Government failed to investigate Osorio's role in the murders. This claim borders on frivolous. The only trial evidence about Osorio was the evidence that Aquart attempted to obstruct justice by directing fellow inmate Shamarr Myers by letter to create a "courtroom outburst," while on the witness stand and "look[ing] at the jury," and falsely claim that "Letho" (*i.e.,* Osorio, who had been recently killed and thus was unavailable to defend himself) actually committed the crime. TT3661-62. It was no dereliction of duty (nor was it borne out of any conflict of interest) for counsel not to pursue

the obviously false theory that Osorio committed the murders. Indeed, any effort to do so would likely have lost favor with the jury—not gained it.

Aquart's other conflict claims are similarly baseless. He claims, for instance that Attorney Smith represented Allen Navarro in *United States v. George Sanchez, et al.*, a case with the same prosecutors as those on Aquart's case and in which Navarro was a co-defendant and co-conspirator of Anthony Armstead, a penalty phase witness against Aquart. He also says that Attorney Sheehan's "office" (though apparently not Attorney Sheehan himself) represented in *United States v. Malcolm White et al.* Terrence Brown, a co-defendant and co-conspirator of Shamarr Myers, to whom Aquart confessed in prison (and another case charged by the same prosecutors as those who tried Aquart). Aquart does not provide any detail as to how specifically there was a conflict in any of these situations. Moreover, he appears to recognize that he cannot establish that any of this had any adverse effect on him. Instead, he states that "[a]t a hearing, and after appropriate discovery, [he] will demonstrate that the conflicts resulting from his trial counsel's prior representation adversely affected their performance and the conflict resulted in prejudice to the case. Aquart Br. at 266. This is simply insufficient.

Third—and it is worth underscoring that his claims get weaker as he progresses—Aquart argues that counsel hired as a trial investigator Daniel Markle, to work a private investigator from July 2007 through December 2009. Daniel Markle was the brother of one of the trial prosecutors, Peter Markle. However, Aquart recognizes that Daniel Markle's agency conducted no work after August 2007 when Peter Markle entered his appearance on Aquart's case. Aquart Br. at 266.

Finally, Aquart asserts that, in November of 2007, one of Aquart's lawyers, Justin Smith was engaged to be married to Darcy Beausoleil, who was herself employed by the Federal Public Defender for the District of Connecticut, counsel for Government witness Rodney Womble. They

were married in December 2007, but Aquart speculates that they were engaged for much longer—based on no evidence at all. In any event, trial counsel requested that Aquart sign a waiver to avoid any potential for conflict and Attorney Sheehan wrote a letter to Aquart memorializing a discussion in which Aquart agreed to waive the conflict. Aquart Br. at 267. Now, though (some 16 years later), Aquart claims that he did not actually sign a waiver, and notes that there is only an unsigned waiver in the file. Aquart Br. at 267. He does not however, allege that he ever raised any concern in his myriad court appearances between December 2007 and today. Perhaps recognizing that he does not have a cognizable claim, Aquart again asserts that "at a hearing, and after appropriate discovery," he can show that deficient performance flowed from the conflict. Aquart Br. at 267. Again, that is simply inadequate.

As to the asserted potential conflicts that, the fact that his attorneys or their offices had previously represented some individuals who were somehow connected to other individuals tangentially related to this case is not even a cognizable potential conflict. He cannot point to any adverse consequence of these alleged relationships. These claims must be dismissed.

#### *2. Claims Regarding Learned Counsel*

Finally, Aquart argues that his Fifth and Sixth Amendment rights were violated when the Court did not appoint him Learned Counsel until almost two years after he was charged, and that his trial attorney was ineffective for not requesting Learned Counsel. This argument completely ignores the critical fact that he was not initially charged with a death-eligible offense.

As Aquart acknowledges, Attorney Justin Smith was appointed to represent him when he was initially indicted on a federal drug offense in December of 2005. As soon as Aquart was charged with a death-eligible offense in 2007, Michael Sheehan (who was qualified as Learned Counsel), was appointed to also represent him. Aquart now argues that it was deficient

performance for Attorney Smith not to request Learned Counsel when he was charged in drug cases. Aquart Br. at 298. Aquart is wrong.

The statute governing the appointment of Learned Counsel states in relevant part that:

> **Whoever is indicted for treason or other capital crime** shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours.

18 U.S.C.A. § 3005 (emphasis added). Therefore, there is no right to Learned Counsel without being charged with a death eligible offense and an investigation into potential charges is not enough. In fact, the Second Circuit has held that district courts do not have an obligation to continue the appointment of Learned Counsel after the Government has announced that it does not intend to seek the death penalty. *See, e.g., United States v. Douglas,* 525 F.3d 225, 235–37 (2d Cir. 2008) ("[W]e agree with the majority of the federal courts of appeals that once the government has formally informed the court and the defendant of its intention not to seek the death penalty, the matter is no longer a capital case within the meaning of § 3005 and that section does not require the district court to continue the appointment of a second attorney") (citing to other Circuits that held that a defendant does not have a statutory right to a second-court appointed attorney if he is not facing a capital offense).

Aquart's argument that he was somehow improperly denied Learned Counsel is thus contrary to law. His reliance on *United States v. Pedro Vidal*, 991 F.3d 1, 5 (1st Cir. 2021), for the proposition that it is important to have early appointment of learned counsel is totally misplaced. In that case, the court explained that "[t]he district court informed Pedró-Vidal at his initial appearance that the charged offenses were eligible for the death penalty and *then* promptly appointed learned counsel." *Pedro-Vidal*, 991 F.3d at 6 (emphasis added). Accordingly, even had

Aquart suspected that he was being investigated for murder when he was charged with a drug offense and requested Learned Counsel, he would not have been entitled to one. His counsel was not ineffective for not mounting a request that would have been rejected by the district court. Nor is Aquart entitled to an evidentiary hearing on this meritless claim. All of these claims should be rejected.

**U. Claim Thirty: Mandate Rule Bars Re-litigation and There Is No Cause to Re-Litigate Meritless, Prior Appellate Challenges**

Continuing his maximalist approach, Aquart's 30th claim alleges ineffective assistance of counsel for the purported failure to raise a medley of claims that Aquart has already raised in his second appeal to the Second Circuit. Specifically, Aquart seeks to relitigate—under the guise of ineffective assistance of counsel—claims challenging the VICAR convictions as purportedly violating the categorical approach, the drug-related murder convictions on as purportedly violating the Fifth Amendment indictment rights, and all convictions as purportedly violating his Speedy Trial rights. Aquart Br. at 278-85. He also makes some new arguments—wholly devoid of fact or law—that admission of Efrain Johnson's hearsay statements via witness Lashika Johnson violated the Confrontation Clause, and that his criminal history was wrongly calculated. Aquart Br. at 285-288. These claims are uniformly meritless.

First, Aquart claims that his counsel was constitutionally ineffective for failing to raise various challenges that he brought before the district court and in his second appeal (but not his first), and which both district and circuit courts disposed of by operation of the mandate rule and law-of-the-case doctrine.

In its 2024 opinion, the Second Circuit considered these arguments—and rejected them. *See. Aquart*, 92 F.4th at 77. "It is well established that a § 2255 petition cannot be used to relitigate questions which were raised and considered on direct appeal." *United States v. Sanin*, 252 F.3d

79, 83 (2d Cir. 2001) (cleaned up). "Reconsideration is permitted only where there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal." *Id.* (cleaned up).

To be sure, the Second Circuit was considering primarily whether the district court properly applied the mandate rule to foreclose reconsideration of the convictions that the Second Circuit already affirmed. But in so doing, it noted that while the *district court* may not have been authorized to reconsider matters outside of the Second Circuit's mandate, "the law-of-the-case doctrine does not bind [the Second Circuit] with the same 'rigidity' that the mandate rule binds the district court." *Id.* at 87. Accordingly, the Second Circuit undertook an extensive analysis to assess whether these arguments substantively presented "compelling circumstances warranting an exception from the law-of-the-case doctrine." *Id.* It found none. *Id.* ("We identify neither error by the district court . . . nor compelling circumstances warranting an exception from the law-of-the-case doctrine."). This analysis encompassed an extensive assessment of the legality of Aquart's VICAR convictions (which he now challenges in Claim XXX.A), of his drug-related murder convictions (which he now challenges in Claim XXX.B), and of his Speedy Trial claims (which he now challenges in Claim XXX.C).

The Second Circuit also specifically evaluated whether there existed—as Aquart here urges—any "intervening change in controlling law warrant[ing] reconsideration of his guilt." *Id.* at 92. Again, it found none. *Id.* at 94 (there was "no clear intervening change in controlling law"). Finally, the Circuit also considered whether allowing his convictions to stand would represent "clear error or manifest injustice." *Id.* at 94. Once again, it found no such clear error or manifest injustice. The Court also noted that Aquart "does not profess innocence of the VICAR murders," and that, in any event, the trial evidence overwhelmingly supported the jury's verdict of his guilt.

*Id.* at 95.

But *even if* the relitigation bar did not foreclose Aquart's challenges as a procedural matter, they fail as a substantive one—for the reasons set forth in the Second Circuit's opinion and further discussed in the Government's prior brief. *See* Gov't Br., *United States v. Aquart*, 2022 WL 3108036.

*First*, Aquart argues here—as he did there—that his VICAR convictions should be vacated because Connecticut murder is not a categorical match for generic federal murder. But the categorical approach does not apply to evaluating predicate acts under the VICAR statute, and even if it did, the relevant state-law offense here plainly matches generic murder.

*Second*, Aquart claims that his convictions for drug-related murder are invalid because the indictment and verdict form did not require a finding that he committed a drug-trafficking offense under the newly enacted penalties of 21 U.S.C. § 841(b)(1)(A), as set out in the Fair Sentencing Act of 2010. But a conviction under § 848(e)(1)(A) does not require a simultaneous or prior conviction under § 841(b)(1)(A); all it requires is a finding that, *at the time of the murder*, the defendant was engaged in an offense punishable under § 841(b)(1)(A). The indictment and verdict form met that standard here.

*Third*, Aquart asserts that constitutional Speedy Trial violations warrant vacatur of all counts. But Aquart, not the Government, repeatedly sought or consented to continuances of the trial date. He never raised a Speedy Trial claim in this case, and he has made no meaningful claim of prejudice from any delay. Moreover, Aquart cannot make a compelling showing on three of the four prongs of a Speedy Trial claim. The Second Circuit also traced the relevant history, and substantively rejected any Speedy Trial challenge. *See United States v. Aquart*, 92 F.4th at 95-100.

In sum, Aquart already raised these challenges on appeal, and lost. He should be barred

from re-raising any challenges whose substance was already litigated. But even if the Court were to permit re-litigation as a procedural matter, it must deny these challenges on the merits—as the Second Circuit did in its own assessment. The Circuit having thus decided these matters, there is nothing further for this Court to do.

Finally, Aquart interjects several more arguments into his 30th claim—two of which largely repeat challenges already made and draw upon his prior *pro se* briefing. *See* Aquart Br. at 285-288. It must be presumed that Aquart submitted these briefs *pro se*—even while represented by counsel throughout—because his lawyers, as officers of the court, felt uncomfortable advancing obviously frivolous claims. But in any event, these should be swiftly dismissed. Lashika Johnson's testimony regarding her brother Efrain Johnson's obviously non-testimonial out-of-court statements against penal interest did not violate the guarantees of the Sixth Amendment's Confrontation Clause. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004) ("Testimonial" hearsay may violate the Confrontation Clause but "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design" to permit its admission, if otherwise lawful). And there was no false information, no Government reliance thereon, and no due process violation. *See* Aquart Br. at 286-87.

Aquart's final claim regarding purported ineffective assistance of counsel in wrongly calculating his Criminal History Category is so frivolous that its submission here borders on bad faith. First (and least importantly), as noted in Aquart's 2024 Pre-Sentence Report, Aquart pleaded guilty to that October 15, 1996 arrest, and it seems unlikely that he would have done so if he had been able to prove an alibi so easily. PSR ¶ 101. Indeed, it is very possible that there was an error in the offense date, given conflicting information in the plea agreement, as discussed at his sentencing. *See* Sentencing Tr., Doc. 1368, at 11-12 ("that record is very confused").

Second, even if (as ultimately occurred) that conviction was not scored as part of his Criminal History calculation, Aquart's Criminal History Category remained the highest possible level—a CHC VI. So Aquart's representation now to the Court that his "criminal history would have been calculated differently" is simply untrue. Aquart Br. at 288.

Third, Aquart also flatly misrepresents the record when he says that trial counsel "fail[ed] to present evidence to correct this error in calculating Mr. Aquart's criminal history." Aquart Br. at 288. In fact, as the sentencing transcript makes plain, Aquart's counsel *did* present evidence as to this precise issue, communicated with the Government, and reached a favorable stipulated outcome, whereby both parties agreed that the October 1996 arrest should *not* count toward his Criminal History Category. *See* Sentencing Tr., Doc. 1368, at 11-12 (THE COURT: "I think the points attributed under [PSR ¶] 101 [for the October 1996 arrest] will not be counted."). Indeed, the very lawyer who filed Aquart's instant brief was personally involved in that effort. Aquart's argument that none of this occurred is therefore mystifying.

Finally, and needless to say, none of these calculations mattered whatsoever. In a narrow sense, this conviction didn't matter because Aquart remained in the highest possible CHC of VI, even without scoring that conviction. *See* Sentencing Tr., Doc. 1368, at 12 (THE COURT: "That, however, still remains a, not withstanding the lower point count, a Criminal History 6."). But in a broader sense, it didn't matter because Aquart faced a mandatory life sentence for the murders he committed.

Accordingly, there is no possible prejudice that Aquart could have faced here—even if any failure had occurred (it didn't). Perhaps recognizing as much, Aquart says only, "[a]t a hearing, and after appropriate discovery, Mr. Aquart will demonstrate the resulting prejudice." Aquart Br. at 288. That is flatly insufficient. Aquart carries the burden to show cause and prejudice. He has

quite obviously shown neither.

## V. Claims Thirty-One and Thirty-Two: No Due Process Violations

Aquart next tries to reconstitute his DNA and crime scene arguments in yet another guise—now, presenting them as an all-purpose due process violation of the "fundamental fairness" of his trial. Aquart Br. at 289-308. These claims should be swiftly dismissed, for the reasons already set forth above.

First, insofar as any such claim can lawfully lie (Aquart cites only Third and Ninth Circuit cases for the proposition, *see* Aquart Br. at 290), they are intended to be used only when a conviction rests on scientific evidence that is "now invalid." *Han Tak Lee v. Houtzdale SCI*, 798 F.3d 159, 167 (3d Cir. 2015). In *Lee*, in which the defendant had been convicted of murdering his daughter by burning down the cabin in which she was sleeping, the fire-science evidence had changed so much as to make it doubtful that there was any crime at all. *Id.*

This is world's away from Aquart's case. Here, it is undisputed and indisputable that the three victims were murdered. Moreover, unlike the cases on which Aquart relies, the forensic evidence here has not been invalidated. Of course, science marches on, and now forensic experts have additional techniques that they might use at a crime scene today. But nothing Aquart has presented indicates that the forensic evidence here has suffered from the type of invalidation that might raise questions of fundamental fairness.

Finally, and most importantly, Aquart's conviction rested very little on any forensic evidence. Rather, it was primarily established by overwhelming testimonial evidence, including by people who observed him threaten one of the victims before the murder, actively watched and participated in the murders themselves, saw him dispose of the incriminating evidence after, and heard him try to falsify evidence from prison to cover his tracks. Of course, the forensic evidence

was also consistent with the mountain of testimonial evidence against Aquart. But it was not central to the finding of Aquart's guilt.

Aquart now complains that "the government stopped investigating after charging Mr. Aquart, Azikiwe Aquart, Taylor, and Efrain Johnson." Aquart Br. at 308. First, that is inaccurate. The investigation continued apace throughout Aquart's trial. Indeed, it continued through the plea hearings of his accomplices Azikiwe Aquart and John Taylor, who admitted to committing these murders alongside Aquart. It also continued throughout the trials of Efrain Johnson, who was convicted twice (once federally, and then after vacatur for lack of federal nexus, again in state court) on essentially the same evidence presented in Aquart's trial.

More to the point, the gravamen of this complaint is nonsensical. The evidence spoke with one voice. The Government had no need to try improperly to assign blame for these crimes to other "viable suspects," who actually were no such thing. Aquart Br. at 308. The Government had found the mastermind of these heinous crimes—Azibo Aquart. A jury of his peers agreed. So did every court to have reviewed the evidence against him since.

These claims should also be denied.

**W. Claim Thirty-Three: No Basis Whatsoever to Believe Aquart Innocent**

Aquart devotes a mere two paragraphs to his final claim—the most far-fetched of all. Here, Aquart contends that he is "factually and legally innocent." Aquart Br. at 308. Because Aquart devotes only a few sentences to this claim, the Government will not belabor a response at greater length. Aquart was not factually or legally innocent. He bludgeoned three people to death in cold blood. He was convicted after a lengthy trial by a jury, who heard the overwhelming evidence against him. That conviction has now been affirmed twice. Aquart presents no basis—legal, factual, or otherwise—to disturb those convictions.

## IV. Conclusion

For the reasons set forth herein, Aquart's habeas petition must be denied.

Respectfully submitted,

DAVID X. SULLIVAN
UNITED STATES ATTORNEY

*/s/*

ELENA L. CORONADO
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv09758
1000 Lafayette Blvd., 10th Floor
Bridgeport, CT 06604
(203) 696-3000

JOCELYN COURTNEY KAOUTZANIS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. 30426
157 Church Street, 25th Floor
New Haven, CT 06510
(203) 821-3700

CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2026, a copy of the foregoing Memorandum Opposing Compassionate Release was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Elena L. Coronado*

ELENA L. CORONADO
ASSISTANT U.S. ATTORNEY